Roland Tellis (SBN 186269)
rtellis@baronbudd.com
Daniel Alberstone (SBN 105275)
dalberstone@baronbudd.com
Mark Pifko (SBN 228412)
mpifko@baronbudd.com
Sterling L. Cluff (SBN 267142)
scluff@baronbudd.com
David B. Fernandes, Jr. (SBN 280944)
dfernandes@baronbudd.com
BARON & BUDD, P.C.
15910 Ventura Boulevard, Suite 1600
Encino, California 91436
Telephone: (818) 839-2333
Facsimile: (818) 986-9698

Roman M. Silberfeld (SBN 62783)
rsilberfeld@robinskaplan.com
ROBINS KAPLAN LLP
2049 Century Park East, Suite 3400
Los Angeles, California 90067
Telephone: (310) 552-0130
Facsimile: (310) 229-5580

Aaron M. Sheanin (SBN 214472)
asheanin@robinskaplan.com
ROBINS KAPLAN LLP
2440 W. El Camino Real, Suite 100
Mountain View, California 94040
Telephone: (650) 784-4040
Facsimile: (650) 784-4041

*Plaintiffs' Co-Lead Counsel*
*Additional counsel listed on signature page*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE WELLS FARGO COLLATERAL PROTECTION INSURANCE LITIGATION | Case Number: 8:17-ML-2797-AG-KES<br><br>**CONSOLIDATED CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED**<br><br><br>Hon. Andrew J. Guilford |

# **TABLE OF CONTENTS**

I.    NATURE OF ACTION ..................................................................................... 1

II.   THE PARTIES .................................................................................................. 3

    A.    Plaintiffs ................................................................................................ 3

        Plaintiff Angelina Camacho ................................................................... 3

        Plaintiff Odis Cole ................................................................................. 4

        Plaintiff Nyle Davis ............................................................................... 5

        Plaintiff Duane Fosdick ......................................................................... 6

        Plaintiff Brandon Haag .......................................................................... 7

        Plaintiff Paul Hancock ........................................................................... 8

        Plaintiff Dustin Havard .......................................................................... 9

        Plaintiff Brian Miller ........................................................................... 10

        Plaintiff Analisa Moskus ..................................................................... 11

        Plaintiff Regina Gonzalez .................................................................... 12

        Plaintiff Keith Preston .......................................................................... 13

        Plaintiff Victoria Reimche .................................................................... 14

        Plaintiff Dennis Small .......................................................................... 15

        Plaintiff Bryan Tidwell ........................................................................ 17

    B.    Defendants .......................................................................................... 17

III.  JURISDICTION AND VENUE ....................................................................... 20

IV.   INTRA-DISTRICT ASSIGNMENT ............................................................... 21

V.    FACTS COMMON TO ALL COUNTS ........................................................... 21

    A.    Collateral Protection Insurance and Force-Placed Insurance ..................... 21

    B.    Wells Fargo, Balboa, QBE, and National General Unlawfully Force-Placed CPI Policies on Hundreds of Thousands of Borrowers' Automobile Loan Accounts ....................................................................... 24

    C.    The *New York Times* Exposes Defendants' Force-Placed CPI Scheme ....... 26

VI.   STATUTE OF LIMITATIONS ........................................................................ 30

i

    A.    Discovery Rule ................................................................................ 30

    B.    Fraudulent Concealment ................................................................ 30

VII.   CLASS ACTION ALLEGATIONS ........................................................ 31

    A.    Class Definitions ........................................................................... 31

    B.    Class Certification Requirements: Federal Rule of Civil Procedure 23 ..... 33

VIII.  RICO ALLEGATIONS .......................................................................... 36

IX.   CLAIMS ASSERTED ON BEHALF OF THE NATIONWIDE CLASS ............. 38

         FIRST CLAIM FOR RELIEF ................................................................ 38

         Violations of the Racketeer Influenced and Corrupt Organizations Act ......... 38

    A.    The Wells Fargo-National General CPI Enterprise ....................... 38

    B.    Conduct of the Wells Fargo-National General CPI Enterprise ..... 40

    C.    Pattern of Racketeering Activity .................................................. 42

    D.    Damages ......................................................................................... 44

         SECOND CLAIM FOR RELIEF ......................................................... 45

         Violations of the Racketeer Influenced and Corrupt Organizations Act ......... 45

    A.    The Wells Fargo-QBE CPI Enterprise ......................................... 45

    B.    Conduct of the Wells Fargo-QBE CPI Enterprise ....................... 47

    C.    Pattern of Racketeering Activity .................................................. 49

    D.    Damages ......................................................................................... 52

         THIRD CLAIM FOR RELIEF ............................................................. 52

         Violations of the Racketeer Influenced and Corrupt Organizations Act ......... 52

    A.    The Wells Fargo-Balboa CPI Enterprise ...................................... 53

    B.    Conduct of the Wells Fargo-Balboa CPI Enterprise .................... 54

    C.    Pattern of Racketeering Activity .................................................. 56

    D.    Damages ......................................................................................... 59

         FOURTH CLAIM FOR RELIEF .......................................................... 60

         Violation of the Bank Holding Company Act ................................ 60

         FIFTH CLAIM FOR RELIEF ............................................................... 62

ii

Violation of the Consumer Legal Remedies Act ................................................ 62

SIXTH CLAIM FOR RELIEF ................................................ 64

Violation of the California Unfair Competition Law ................................................ 64

SEVENTH CLAIM FOR RELIEF ................................................ 66

Fraud by Concealment ................................................ 66

EIGHTH CLAIM FOR RELIEF ................................................ 69

Unjust Enrichment ................................................ 69

X.   CLAIMS ASSERTED ON BEHALF OF STATE CLASSES ................................................ 70

COLORADO COUNT ONE: VIOLATION OF THE COLORADO CONSUMER PROTECTION ACT ................................................ 70

ILLINOIS COUNT ONE: VIOLATION OF THE ILLINOIS CONSUMER FRAUD AND DECEPTIVE TRADE PRACTICES ACT ................................................ 72

INDIANA COUNT ONE: VIOLATION OF THE INDIANA DECEPTIVE CONSUMER SALES ACT ................................................ 75

MINNESOTA COUNT ONE: VIOLATION OF MINNESOTA PREVENTION OF CONSUMER FRAUD ACT ................................................ 77

MINNESOTA COUNT TWO: VIOLATION OF MINNESOTA UNIFORM DECEPTIVE TRADE PRACTICES ACT ................................................ 79

MISSISSIPPI COUNT ONE: VIOLATION OF THE MISSISSIPPI CONSUMER PROTECTION ACT ................................................ 81

MISSOURI COUNT ONE: VIOLATION OF MISSOURI MERCHANDISING PRACTICES ACT ................................................ 83

NEW JERSEY COUNT ONE: VIOLATION OF THE NEW JERSEY CONSUMER FRAUD ACT ................................................ 86

TENNESSEE COUNT ONE: VIOLATION OF THE TENNESSEE CONSUMER PROTECTION ACT ................................................ 89

CONSOLIDATED CLASS ACTION COMPLAINT

WISCONSIN COUNT ONE: VIOLATION OF THE WISCONSIN
    DECEPTIVE TRADE PRACTICES ACT ........................................... 91
WYOMING COUNT ONE: VIOLATION OF THE WYOMING
    CONSUMER PROTECTION ACT ..................................................... 93
XI.    PRAYER FOR RELIEF .......................................................................... 95
XII.    DEMAND FOR JURY TRIAL .............................................................. 97

CONSOLIDATED CLASS ACTION COMPLAINT

Plaintiffs Angelina Camacho, Odis Cole, Nyle Davis, Duane Fosdick, Brandon Haag, Paul Hancock, Dustin Havard, Brian Miller, Analisa Moskus, Regina Gonzalez, Keith Preston, Victoria Reimche, Dennis Small, and Bryan Tidwell bring this action on behalf of themselves and all others similarly situated (collectively "Plaintiffs") against Defendants Wells Fargo & Company, Wells Fargo Bank, N.A. (collectively, "Wells Fargo"), National General Holdings Corp. and National General Insurance Company (collectively, "National General"), on behalf of themselves and as successors to the assets and liabilities of Balboa Insurance Company ("Balboa") and the Lender-Placed Insurance business of QBE North America ("QBE") (together with Wells Fargo, the "Defendants"). Plaintiffs allege the following based upon information and belief, the investigation of counsel, and personal knowledge as to the allegations pertaining to themselves.

## I.    NATURE OF ACTION

1.    On September 27, 2016, following the announcement of its $185 million settlement with federal regulators concerning its fraudulent bank account scheme, Wells Fargo's Board of Directors promised "to ensur[e] that *all* aspects of the Company's business are conducted with integrity, transparency, and oversight."[1]    Unfortunately, however, under its new management, Wells Fargo's fraudulent practices continue.

2.    For more than a decade, Wells Fargo, together with auto insurance underwriters, Balboa, QBE, and National General, engaged in a scheme to bilk millions of dollars from more than 800,000 unsuspecting Wells Fargo customers.    Through this scheme, Wells Fargo's customers were forced to pay for a type of auto insurance -- commonly known as Collateral Protection Insurance ("CPI") -- they did not need or want. Making matters worse, when Wells Fargo's customers complained and informed

---

[1] *See* Wells Fargo Issues Statement on Agreements Related to Sales Practices, BUS. WIRE (Sept. 8, 2016), http://www.businesswire.com/news/home/20160908006266/en/Wells-Fargo-Issues-Statement-Agreements-Related-Sales (emphasis added); Wells Fargo Announces Plan to Remediate Customers for Auto Insurance Coverage, WELLS FARGO (July 27, 2017), https://newsroom.wf.com/press-release/consumer-lending/wells-fargo-announces-plan-remediate-customers-auto-insurance.

CONSOLIDATED CLASS ACTION COMPLAINT

Defendants that they maintained their own insurance on their vehicles, making CPI unnecessary, Wells Fargo refused to remove the unlawful charges. As a result, these individuals suffered financial harm including inflated charges, delinquency charges, late fees, repossession costs, increased interest rates, overdraft fees, and damage to their credit reports.

3.      Defendants' force-placed CPI scheme was first reported by the *New York Times* on July 27, 2017, after the *New York Times* obtained an internal report commissioned by Wells Fargo's executives. The internal report revealed that more than 800,000 auto loan customers, including active military personnel, paid for unnecessary CPI policies, which pushed nearly 275,000 of them into delinquency, and resulted in nearly 25,000 unlawful vehicle repossessions. When confronted by the *New York Times'* article, Wells Fargo's spokesperson Jennifer A. Temple publicly stated, "[w]e take full responsibility for these errors and are deeply sorry for any harm we caused customers." This lawsuit tests Wells Fargo's commitment to its customers.

4.      As alleged in more detail below, Defendants sought to unlawfully generate profits by force-placing unnecessary CPI policies on unsuspecting customers. Defendants then collected payments for insurance premiums, interest, and other fees, while sharing in undisclosed kickback commissions for each of the CPI policies they wrote, thereby increasing the premiums paid by every individual who received Defendants CPI policies.

5.      To carry out the scheme, Wells Fargo provided borrower information to its insurance partners, Balboa, QBE, and National General. Balboa, QBE, and National General, in turn, were supposed to check an insurance database to confirm whether Wells Fargo's customers had insurance coverage. A CPI policy was only lawfully authorized if Wells Fargo's customers did not maintain sufficient insurance to cover the amount owed on their vehicles.[2]  in reality, Wells Fargo, Balboa, QBE, and National General all failed

---

[2] Wells Fargo Dealer Servs, *Understanding Your Auto Loan*, https://www.wellsfargodealerservices.com/consumers/financialeducation/understandingyourautoloan/default.asp#fees (last visited Jan. 26, 2018).

to check their internal databases to see if Wells Fargo's customers had insurance coverage or, if they did check their databases, they simply ignored what they learned.  Instead, Defendants imposed redundant auto insurance coverage and then frequently, and without any notice, automatically deducted the cost of the CPI insurance from the customers' bank accounts, along with the regularly scheduled principal and interest payment for the auto loan.  Compounding the problem, Defendants' failure to properly disclose the CPI policies and/or the resulting automatic deductions from customers' bank accounts often put them in a financial tailspin.

6.     Not only were the CPI policies unnecessary, they were more expensive than the coverage Wells Fargo's customers obtained on their own.  Additionally, Wells Fargo received kickbacks from Balboa, QBE, and National General, in the form of shared commissions on each CPI policy, which provided Defendants with the financial incentive to churn these unneeded and unwanted CPI policies.

## II.     THE PARTIES

### A.     Plaintiffs

#### Plaintiff Angelina Camacho

7.     Plaintiff Angelina Camacho ("Camacho") is currently a resident and a citizen of the State of New Jersey.

8.     Plaintiff Camacho purchased a vehicle from a dealership in New Jersey.

9.     Plaintiff Camacho financed the purchase of her vehicle with a loan from Wells Fargo, which she acquired in January 2014.

10.     In 2016, Plaintiff Camacho started receiving late notices from Wells Fargo even though she made her monthly payments on time, which led to her vehicle being repossessed.  Following repossession of her vehicle, Plaintiff Camacho discovered that Wells Fargo had placed a CPI policy on her auto loan account. She learned that Wells Fargo had been deducting sums from her monthly payment to pay for the CPI premium, leaving portions of her auto loan unpaid.  After providing Wells Fargo with additional copies of her insurance, her vehicle was returned to her.

11.    Plaintiff Camacho subsequently proved to Wells Fargo that she, at all times, maintained proper insurance on her vehicle, and Wells Fargo removed the CPI policy.  In a letter to Plaintiff Camacho, Wells Fargo admitted its error, confirming that they had received her insurance prior to the CPI placement, and that this had contributed to the repossession of her vehicle.

12.    Defendants alone maintain a complete accounting of all CPI-related charges and fees assessed and paid, and the details of each and every amount assessed and paid cannot be alleged with complete precision without access to Defendants' records. Nevertheless, Plaintiffs are informed and believe, and on that basis allege that Plaintiff Camacho paid some or all of the CPI-related charges assessed on her account.

13.    Plaintiff Camacho's CPI charges caused her vehicle to be repossessed, lowered her credit score, affected her ability to purchase vehicles for her children, caused her lost wages, and affected her ability to get a loan for a rental property in 2015.

14.    Plaintiff Camacho reviewed documents that were made available to her in connection with her auto loan.  Had the CPI scheme been disclosed, Plaintiff Camacho would have seen and been aware of it and would not have obtained an auto loan from Wells Fargo, would not have paid the CPI charges, and/or would have disputed the CPI charges and demanded full compensation.

**Plaintiff Odis Cole**

15.    Plaintiff Odis Cole ("Cole") is currently a resident and a citizen of the State of Illinois.

16.    Plaintiff Cole purchased a vehicle from a dealership in Burbank, Illinois.

17.    Plaintiff Cole financed the purchase of his vehicle with a loan from Wells Fargo, which he acquired in or around January 2015.

18.    In July 2016, Wells Fargo placed a CPI policy on Plaintiff Cole's auto loan account and charged him $1,036.00.  As a result of the increased CPI charge on his auto loan account, Plaintiff Cole was also charged at least one late fee.

19.     Plaintiff Cole repeatedly contacted Wells Fargo to inform the bank that he maintained the required auto insurance through Stonegate Insurance.

20.     Nevertheless, Wells Fargo continued to charge Plaintiff Cole for the CPI policy and deducted sums from his monthly loan payment to pay for the CPI premium.

21.     Defendants alone maintain a complete accounting of all CPI-related charges and fees assessed and paid, and the details of each and every amount assessed and paid cannot be alleged with complete precision without access to Defendants' records. Nevertheless, Plaintiffs are informed and believe, and on that basis allege that Plaintiff Cole paid some or all of the CPI-related charges assessed on his account.

22.     Plaintiff Cole reviewed documents that were made available to him in connection with his auto loan.  Had the CPI scheme been disclosed, Plaintiff Cole would have seen and been aware of it and would not have obtained an auto loan from Wells Fargo, would not have paid the CPI charges, and/or would have disputed the CPI charges and demanded full compensation.

### Plaintiff Nyle Davis

23.     Plaintiff Nyle Davis ("Davis") is currently a resident and a citizen of the State of Missouri.

24.     Plaintiff Davis purchased a vehicle from a dealership in Neosho, Missouri.

25.     Plaintiff Davis financed the purchase of his vehicle with a loan from Wells Fargo which he acquired in or around September 18, 2014.

26.     Between February 2015 and October 2016, Wells Fargo placed three CPI policies on Plaintiff Davis' auto loan account and charged him in excess of $2,100.  Wells Fargo added the CPI policies to Plaintiff Davis' loan account despite receiving proof that he had insurance coverage through Progressive and State Farm.

27.     Nevertheless, Wells Fargo continued to charge Plaintiff Davis for the CPI policy and deducted sums from his monthly loan payment to pay for the CPI premium. As a result of such deductions, Plaintiff Davis was erroneously deemed to be delinquent under his loan agreement and was charged late fees.

28.    In late 2016, Plaintiff Davis' vehicle was repossessed. The repossession company told Plaintiff Davis that he was purportedly late on his Wells Fargo auto loan payments and the bank had ordered a repossession of his vehicle. Plaintiff Davis ultimately had to pay $1,200 to recover his vehicle from the repossession company, which included $1,035 in "redemption and reactivation" fees.

29.    Defendants alone maintain a complete accounting of all CPI-related charges and fees assessed and paid, and the details of each and every amount assessed and paid cannot be alleged with complete precision without access to Defendants' records. Nevertheless, Plaintiffs are informed and believe, and on that basis allege that Plaintiff Davis paid some or all of the CPI-related charges assessed on his account.

30.    Plaintiff Davis reviewed documents that were made available to him in connection with his auto loan.  Had the CPI scheme been disclosed, Plaintiff Davis would have seen and been aware of it and would not have obtained an auto loan from Wells Fargo, would not have paid the CPI charges, and/or would have disputed the CPI charges and demanded full compensation.

**Plaintiff Duane Fosdick**

31.    Plaintiff Duane Fosdick ("Fosdick") is currently a resident and a citizen of the State of California.

32.    Plaintiff Fosdick purchased a vehicle from a dealership located in Chico, California.

33.    Plaintiff Fosdick financed the purchase of his vehicle with a loan from Wells Fargo, which he acquired in or around June 2014.

34.    Between October 2014 and April 2015, Wells Fargo placed two CPI policies on Plaintiff Fosdick's auto loan and charged him in excess of $2,000.  As a result of the increased CPI charges on his auto loan account, Plaintiff Fosdick was also charged at least one late fee.   In October 2016, Wells Fargo placed another CPI policy on Plaintiff Fosdick's auto loan account and charged him in excess of $1,000.

CONSOLIDATED CLASS ACTION COMPLAINT

35.    Plaintiff Fosdick repeatedly contacted Wells Fargo to inform the bank that he maintained the required auto insurance through National General.

36.    Nevertheless, Wells Fargo continued to charge Plaintiff Fosdick for the CPI policies and deducted sums from his monthly loan payment to pay for the CPI premiums.

37.    Defendants alone maintain a complete accounting of all CPI-related charges and fees assessed and paid, and the details of each and every amount assessed and paid cannot be alleged with complete precision without access to Defendants' records. Nevertheless, Plaintiffs are informed and believe, and on that basis allege that Plaintiff Fosdick paid some or all of the CPI-related charges assessed on his account.

38.    Plaintiff Fosdick reviewed documents that were made available to him in connection with his auto loan.  Had the CPI scheme been disclosed, Plaintiff Fosdick would have seen and been aware of it and would not have obtained an auto loan from Wells Fargo, would not have paid the CPI charges, and/or would have disputed the CPI charges and demanded full compensation.

### Plaintiff Brandon Haag

39.    Plaintiff Brandon Haag ("Haag") is currently a resident and a citizen of the State of Wisconsin.

40.    Plaintiff Haag purchased a vehicle from a dealership in La Crosse, Wisconsin.

41.    Plaintiff Haag financed the purchase of his vehicle with a loan from Wells Fargo, which he acquired in or around November 14, 2013.

42.    In October 2014, Wells Fargo placed a CPI policy on Plaintiff Haag's auto loan account and charged him in excess of $1,400.  Wells Fargo added the CPI policy to Plaintiff Haag's loan account despite receiving proof that he had insurance coverage through GEICO.

43.    Nevertheless, Wells Fargo continued to charge Plaintiff Haag for the CPI policy and deducted sums from his monthly loan payment to pay for the CPI premium.

As a result of such deductions, Plaintiff Haag was erroneously deemed to be delinquent under his loan agreement and was charged late fees.

44.     Defendants alone maintain a complete accounting of all CPI-related charges and fees assessed and paid, and the details of each and every amount assessed and paid cannot be alleged with complete precision without access to Defendants' records. Nevertheless, Plaintiffs are informed and believe, and on that basis allege that Plaintiff Haag paid some or all of the CPI-related charges assessed on his account.

45.     Plaintiff Haag reviewed documents that were made available to him in connection with his auto loan.  Had the CPI scheme been disclosed, Plaintiff Haag would have seen and been aware of it and would not have obtained an auto loan from Wells Fargo, would not have paid the CPI charges, and/or would have disputed the CPI charges and demanded full compensation.

### **Plaintiff Paul Hancock**

46.     Plaintiff Paul Hancock ("Hancock") is currently a resident and a citizen of the State of Indiana.

47.     Plaintiff Hancock purchased a vehicle from a dealership in Shelbyville, Indiana.

48.     Plaintiff Hancock financed the purchase of his vehicle with a loan from Wells Fargo which he acquired in or around February 8, 2016.

49.     In May 2016, Wells Fargo placed a CPI policy on Plaintiff Hancock's auto loan account and charged him $598.00.

50.     Plaintiff Hancock repeatedly contacted Wells Fargo to inform the bank that he maintained the required auto insurance policy through Allstate.

51.     Despite receiving this information, Wells Fargo did not credit Plaintiff Hancock's account for the unlawful charge or otherwise refund the amount charged that it had collected. Indeed, Wells Fargo continued to charge Plaintiff Hancock for the CPI policy.

52.     As a result of the increased CPI charges on his auto loan account, Plaintiff Hancock was charged a late fee immediately after the CPI policy was in place.

53.     Defendants alone maintain a complete accounting of all CPI-related charges and fees assessed and paid, and the details of each and every amount assessed and paid cannot be alleged with complete precision without access to Defendants' records. Nevertheless, Plaintiffs are informed and believe, and on that basis allege that Plaintiff Hancock paid some or all of the CPI-related charges assessed on his account.

54.     Plaintiff Hancock reviewed documents that were made available to him in connection with his auto loan.  Had the CPI scheme been disclosed, Plaintiff Hancock would have seen and been aware of it and would not have obtained an auto loan from Wells Fargo, would not have paid the CPI charges, and/or would have disputed the CPI charges and demanded full compensation.

### **Plaintiff Dustin Havard**

55.     Plaintiff Dustin Havard ("Havard") is currently a resident and a citizen of the State of Mississippi.

56.     Plaintiff Havard purchased a vehicle from a dealership in Jackson, Mississippi.

57.     Plaintiff Havard financed the purchase of his vehicle with a loan from Wells Fargo, which he acquired in or around April 3, 2012.

58.     On July 12, 2012, Wells Fargo placed a CPI policy on Plaintiff Havard's auto loan account and charged him $1,200.00.  Wells Fargo added the policy to Plaintiff Havard's loan account despite receiving proof that he had insurance coverage.  As a result of such deductions, Plaintiff Havard was erroneously deemed to be delinquent under his loan agreement and was charged late fees.

59.     Plaintiff Havard repeatedly contacted Wells Fargo to inform the bank that he maintained the required auto insurance through Safeco and Allstate insurance companies.

60.     Nevertheless, Wells Fargo continued to charge Plaintiff Havard for the CPI policy and deducted sums from his monthly loan payment to pay for the CPI premium.

61.    In or around November 15, 2016, Wells Fargo repossessed Plaintiff Havard's vehicle.

62.    Defendants alone maintain a complete accounting of all CPI-related charges and fees assessed and paid, and the details of each and every amount assessed and paid cannot be alleged with complete precision without access to Defendants' records. Nevertheless, Plaintiffs are informed and believe, and on that basis allege that Plaintiff Havard paid some or all of the CPI-related charges assessed on his account.

63.    Plaintiff Havard reviewed documents that were made available to him in connection with his auto loan.  Had the CPI scheme been disclosed, Plaintiff Havard would have seen and been aware of it and would not have obtained an auto loan from Wells Fargo, would not have paid the CPI charges, and/or would have disputed the CPI charges and demanded full compensation.

## **Plaintiff Brian Miller**

64.    Plaintiff Brian Miller ("Miller") is currently a resident and a citizen of the State of Mississippi.

65.    Plaintiff Miller purchased a vehicle from a dealership located in Olive Branch, Mississippi.

66.    Plaintiff Miller financed the purchase of his vehicle with a loan from Wells Fargo, which he acquired in or around October 31, 2014.

67.    Between December 22, 2015 and August 4, 2016, Wells Fargo placed two CPI policies on Plaintiff Miller's auto loan account and charged him in excess of $1,400. Wells Fargo added the CPI policies to Plaintiff Miller's loan account despite receiving proof that he had insurance coverage through Progressive.

68.    Plaintiff Miller repeatedly contacted Wells Fargo to inform the bank that he maintained the required auto insurance through Progressive.

69.    Nevertheless, Wells Fargo continued to charge Plaintiff Miller for the CPI policies and deducted sums from his monthly loan payment to pay for the CPI premiums.

As a result of such deductions, Plaintiff Miller was erroneously deemed to be delinquent under his loan agreement and was charged late fees.

70.    In August 2016, Plaintiff Miller attempted to trade in his vehicle in connection with the purchase of a new vehicle when he discovered his credit score had been significantly lowered due to Wells Fargo reporting six (6) late automobile loan payments.  The late payments were caused by the placement of CPI on his loan without his knowledge and the subsequent automatic withdrawal of enlarged car payments on his bank account.  Those withdrawals were insufficient to cover both the CPI premium and his loan payment.  Therefore, Wells Fargo applied his payment to his CPI premium first, then applied the balance of his payment to his principal and interest.

71.    Defendants alone maintain a complete accounting of all CPI-related charges and fees assessed and paid, and the details of each and every amount assessed and paid cannot be alleged with complete precision without access to Defendants' records. Nevertheless, Plaintiffs are informed and believe, and on that basis allege that Plaintiff Miller paid some or all of the CPI-related charges assessed on his account.

72.    Plaintiff Miller reviewed documents that were made available to him in connection with his auto loan.  Had the CPI scheme been disclosed, Plaintiff Miller would have seen and been aware of it and would not have obtained an auto loan from Wells Fargo, would not have paid the CPI charges, and/or would have disputed the CPI charges and demanded full compensation.

### Plaintiff Analisa Moskus

73.    Plaintiff Analisa Moskus ("Moskus") is currently a resident and a citizen of the State of California.

74.    Plaintiff Moskus purchased a vehicle from a dealership in Lawndale, California.

75.    Plaintiff Moskus financed the purchase of her vehicle with a loan from Wells Fargo, which she acquired in or around May 31, 2008.

76.    In January 2013, Wells Fargo placed a CPI policy on Plaintiff Moskus' auto loan account and charged her approximately $800. Wells Fargo added the CPI policy to Plaintiff Moskus' loan account despite receiving proof that she already had insurance coverage through AAA.

77.    Nevertheless, Wells Fargo continued to charge Plaintiff Moskus for the CPI policy and deducted sums from her monthly loan payment to pay for the CPI premium. As a result of such deductions, Plaintiff Moskus was erroneously deemed to be delinquent under her loan agreement and Wells Fargo reported such purported delinquency to credit agencies.

78.    Defendants alone maintain a complete accounting of all CPI-related charges and fees assessed and paid, and the details of each and every amount assessed and paid cannot be alleged with complete precision without access to Defendants' records. Nevertheless, Plaintiffs are informed and believe, and on that basis allege that Plaintiff Moskus paid some or all of the CPI-related charges assessed on her account.

79.    Plaintiff Moskus reviewed documents that were made available to her in connection with her auto loan.  Had the CPI scheme been disclosed, Plaintiff Moskus would have seen and been aware of it and would not have obtained an auto loan from Wells Fargo, would not have paid the CPI charges, and/or would have disputed the CPI charges and demanded full compensation.

**Plaintiff Regina Gonzalez**

80.    Plaintiff Regina Gonzalez ("Gonzalez") is currently a resident and a citizen of the State of Minnesota.

81.    Plaintiff Gonzalez purchased a vehicle from a dealership in Inver Grove Heights, Minnesota.

82.    Plaintiff Gonzalez financed the purchase of her vehicle with a loan from Wells Fargo, which she acquired in or around March 2014.

83.    Between March 2015 and June 2015, Wells Fargo placed two CPI policies on Plaintiff Gonzalez's auto loan account and charged her in excess of $2,500.  As a result of

the increased CPI charges on her auto loan account, Plaintiff Gonzalez was also charged at least one late fee.

84.     Plaintiff Gonzalez repeatedly contacted Wells Fargo to inform the bank that she maintained the required auto insurance through State Farm.

85.     Nevertheless, Wells Fargo continued to charge Plaintiff Gonzalez for the CPI policies and deducted sums from her monthly payment to pay for the CPI premiums.

86.     As a result of such deductions, Plaintiff Gonzalez was erroneously deemed to be delinquent under her loan agreement and was charged late fees.

87.     In early 2016, Plaintiff Gonzalez's vehicle was repossessed.  As a result, she lost her job because she had no transportation to get to work. Plaintiff Gonzalez's credit score was also damaged as a result of the CPI charges. Unable to obtain another loan, Plaintiff Gonzalez had no other option but to rent a vehicle, requiring her to pay far more than what she had paid as her original monthly loan payment.

88.     Defendants alone maintain a complete accounting of all CPI-related charges and fees assessed and paid, and the details of each and every amount assessed and paid cannot be alleged with complete precision without access to Defendants' records. Nevertheless, Plaintiffs are informed and believe, and on that basis allege that Plaintiff Gonzalez paid some or all of the CPI-related charges assessed on her account.

89.     Plaintiff Gonzalez reviewed documents that were made available to her in connection with her auto loan.  Had the CPI scheme been disclosed, Plaintiff Gonzalez would have seen and been aware of it and would not have obtained an auto loan from Wells Fargo, would not have paid the CPI charges, and/or would have disputed the CPI charges and demanded full compensation.

**Plaintiff Keith Preston**

90.     Plaintiff Keith Preston ("Preston") is currently a resident and a citizen of the State of Nevada.

91.     Plaintiff Preston purchased a vehicle from a dealership in Sacramento, California.

92.     Plaintiff Preston financed the purchase of his vehicle with a loan from Wells Fargo, which he acquired in or around September 2007.

93.     In May 2008, Wells Fargo placed a CPI policy on Plaintiff Preston's auto loan account and charged him $1,583.  As a result of the increased CPI charges on his auto loan account, Plaintiff Preston was also charged at least one late fee.

94.     Plaintiff Preston repeatedly contacted Wells Fargo to inform the bank that he maintained the required auto insurance through Commerce West Insurance Company, Victoria Fire & Casualty, and later through GEICO.

95.     Despite receiving the information, Wells Fargo did not fully credit Plaintiff Preston's account for an unlawful charge or otherwise refund the full amount charged. Instead, Wells Fargo issued a partial refund of $1,185.00 in May 2008.

96.     Plaintiff Preston continued to call Wells Fargo regarding this issue from 2008 through November 2013.

97.     Plaintiff Preston also made a CPI payment and paid CPI interest in November 2013.

98.     Defendants alone maintain a complete accounting of all CPI-related charges and fees assessed and paid, and the details of each and every amount assessed and paid cannot be alleged with complete precision without access to Defendants' records. Nevertheless, Plaintiffs are informed and believe, and on that basis allege that Plaintiff Preston paid some or all of the CPI-related charges assessed on his account.

99.     Plaintiff Preston reviewed documents that were made available to him in connection with his auto loan.  Had the CPI scheme been disclosed, Plaintiff Preston would have seen and been aware of it and would not have obtained an auto loan from Wells Fargo, would not have paid the CPI charges, and/or would have disputed the CPI charges and demanded full compensation.

### Plaintiff Victoria Reimche

100.   Plaintiff Victoria Reimche ("Reimche") is currently a resident and a citizen of the State of Colorado.

101.   Plaintiff Reimche purchased a vehicle from a dealership in Lone Tree, Colorado.

102.   Plaintiff Reimche financed the purchase of her vehicle with a loan from Wells Fargo, which she acquired in or around January 2011.

103.   Between April 2011 and May 2012, Wells Fargo placed two CPI policies on Plaintiff Reimche's auto loan account and charged her in excess of $2,000. As a result of the increased CPI charges on her auto loan account, Plaintiff Reimche was also charged at least one late fee.

104.   Plaintiff Reimche repeatedly contacted Wells Fargo to inform the bank that she maintained the required auto insurance through Geico and Progressive.

105.   Nevertheless, Wells Fargo continued to charge Plaintiff Reimche for the CPI policies and deducted sums from her monthly loan payment to pay for the CPI premiums. Moreover, when Plaintiff Reimche paid off her loan in August 2015, Wells Fargo applied $382.49 to CPI and $7.54 to CPI interest.

106.   Defendants alone maintain a complete accounting of all CPI-related charges and fees assessed and paid, and the details of each and every amount assessed and paid cannot be alleged with complete precision without access to Defendants' records. Nevertheless, Plaintiffs are informed and believe, and on that basis allege that Plaintiff Reimche paid some or all of the CPI-related charges assessed on her account.

107.   Plaintiff Reimche reviewed documents that were made available to her in connection with her auto loan.  Had the CPI scheme been disclosed, Plaintiff Reimche would have seen and been aware of it and would not have obtained an auto loan from Wells Fargo, would not have paid the CPI charges, and/or would have disputed the CPI charges and demanded full compensation.

### Plaintiff Dennis Small

108.   Plaintiff Dennis Small ("Small") is currently a resident and a citizen of the State of Tennessee.

109.   Plaintiff Small purchased a new vehicle from a dealership located in Tennessee.

110.   Plaintiff Small financed the purchase of his vehicle with a loan from Wells Fargo, which he acquired in or around October 2014.

111.   In 2016, Wells Fargo placed a CPI policy on Plaintiff Small's auto loan despite receiving proof that he had insurance coverage.  Plaintiff Small contacted Wells Fargo after discovering that his loan balance was not reducing at its usual rate.  Wells Fargo placed the CPI policy and deducted sums from Plaintiff Small's monthly loan payment to pay for the CPI premium.  As a result of such deductions, Plaintiff Small was erroneously deemed to be delinquent under his loan agreement and was charged at least one late fee.

112.   Although Plaintiff Smalls sent proof of insurance to Wells Fargo in an attempt to secure a solution, Wells Fargo continued to bill him for CPI premiums and accrued interest.

113.   Defendants alone maintain a complete accounting of all CPI-related charges and fees assessed and paid, and the details of each and every amount assessed and paid cannot be alleged with complete precision without access to Defendants' records. Nevertheless, Plaintiffs are informed and believe, and on that basis allege that Plaintiff Small paid some or all of the CPI-related charges assessed on his account.

114.   As a result, Wells Fargo Bank never removed the CPI charges, never refunded the CPI premiums or interest, and never acknowledged the improper CPI charges on Plaintiff Small's account.

115.   Plaintiff Small reviewed documents that were made available to him in connection with his auto loan. Had the CPI scheme been disclosed, Plaintiff Small would have seen and been aware of it and would not have obtained an auto loan from Wells Fargo, would not have paid the CPI charges, and/or would have disputed the CPI charges and demanded full compensation.

**Plaintiff Bryan Tidwell**

116.   Plaintiff Bryan Tidwell ("Tidwell") is currently a resident and a citizen of the State of Wyoming.

117.   Plaintiff Tidwell purchased a new vehicle from a dealership in Cody, Wyoming.

118.   Plaintiff Tidwell financed the purchase of his vehicle with a loan from Wells Fargo, which he acquired in or around March 2017.

119.   Between June 2016 and September 2016, Wells Fargo placed two CPI policies on Plaintiff Tidwell's auto loan account and charged him in excess of $1,700.  As a result of the increased CPI charges on his auto loan account, Plaintiff Tidwell was also charged at least one late fee.

120.   Plaintiff Tidwell repeatedly contacted Wells Fargo to inform the bank that he maintained the required auto insurance through Progressive.

121.   Nevertheless, Wells Fargo continued to charge Plaintiff Tidwell for the CPI policies and deducted sums from his monthly loan payment to pay for the CPI premiums.

122.   Defendants alone maintain a complete accounting of all CPI-related charges and fees assessed and paid, and the details of each and every amount assessed and paid cannot be alleged with complete precision without access to Defendants' records. Nevertheless, Plaintiffs are informed and believe, and on that basis allege that Plaintiff Tidwell paid some or all of the CPI-related charges assessed on his account.

123.   Plaintiff Tidwell reviewed documents that were made available to him in connection with his auto loan.  Had the CPI scheme been disclosed, Plaintiff Tidwell would have seen and been aware of it and would not have obtained an auto loan from Wells Fargo, would not have paid the CPI charges, and/or would have disputed the CPI charges and demanded full compensation.

**B.   Defendants**

124.   Defendant Wells Fargo & Company is a Delaware corporation and bank holding company with its principal place of business in San Francisco, California.  Wells

Fargo & Company is one of the nation's largest corporations, providing a wide-range of financial services to customers throughout the United States.  On information and belief, Wells Fargo & Company participated in the force-placement of CPI polices alleged herein from its California offices, including the decision (and/or ratification of the decision) to enter into agreements with Balboa, QBE, and National General to force-place unnecessary and inflated CPI on hundreds of thousands of borrowers throughout the United States.

125.  Defendant Wells Fargo Bank, N.A. is a subsidiary of Wells Fargo & Company, and is a national bank organized and existing as a national association under the National Bank Act, 12 U.S.C. §§ 21 *et seq*., with its principal place of business in San Francisco, California.  Wells Fargo Bank, N.A. directly owns the automobile loans secured by class members' vehicles, which are located throughout the United States. Wells Fargo Bank, N.A. is the primary entity used by Wells Fargo & Company for the origination and servicing of automobile loans.  Wells Fargo Bank, N.A., originates and services loans to consumers through its Wells Fargo Dealer Services Division, headquartered in Irvine, California.

126.  Plaintiffs are informed and believe, and based thereon allege, that at all material times herein, each Wells Fargo defendant was the agent, servant, or employee of, and acted within the purpose, scope and course of said agency, service, or employment, and with the express or implied knowledge, permission, and consent of the other Wells Fargo defendants, and ratified and approved the acts of the other Wells Fargo defendants.

127.  Wells Fargo & Company exercises specific and financial control over the operation of Wells Fargo Bank, N.A., and it dictates the policies and practices of Wells Fargo Bank, N.A.  Wells Fargo & Company also exercises power and control over the specific activities in this lawsuit, and it is the ultimate recipient of the revenue and profits from the conduct described herein.

128.  Defendant National General Holdings Corp. is a Delaware corporation and an insurance holding company headquartered in New York, New York.  On July 15, 2015, National General Holdings Corp. announced the acquisition of the assets and liabilities of

QBE.  Plaintiffs are informed and believe that QBE operated as the outside service provider for Wells Fargo's CPI program, at a minimum, during the period 2011 to 2015, and the scope of its services included insurance tracking, borrower identification, and policy placement.  QBE underwrote CPI policies for Wells Fargo's customers throughout the United States.  QBE conducted the business of underwriting CPI policies on behalf of Wells Fargo from its offices located in Irvine, California.

129.  On June 1, 2011, QBE acquired the assets and liabilities of Balboa, from Bank of America.  Plaintiffs are informed and believe that Balboa was the outside service provider for all aspects of Wells Fargo's CPI program during the period from at least 2005 to 2011.  As an insurance service provider, Balboa was responsible for insurance tracking, borrower identification, and policy placement, among other things.  Balboa underwrote CPI policies for Wells Fargo's customers throughout the United States.  Balboa's participation in the force-placed CPI scheme was approved of and managed by executives located in Irvine, California, and all of Balboa's CPI policies were issued from Irvine, California.  From 2005 to 2011, Balboa was a wholly-owned subsidiary of Bank of America.

130.  Defendant National General Insurance Company is a national insurance agency incorporated in Missouri, with its principal place of business in Winston-Salem, North Carolina.  National General administers the CPI division of the National General Lender Services business on behalf of its parent corporation, National General Holdings Corp.  National General also provides insurance tracking and CPI policies throughout the United States.  Plaintiffs are informed and believe that National General was an outside service provider for all aspects of Wells Fargo's CPI program during the period 2011 to 2016, and the scope of its services included insurance tracking, borrower identification, and policy placement. National General underwrote CPI policies for Wells Fargo's customers throughout the United States.

131.  In this Complaint,  whenever reference is made to any act, deed or conduct that Defendants committed in connection with Defendants' force-placed CPI scheme and

the related enterprises, the allegations mean that each of the Defendants engaged in the act, deed, or conduct by or through one or more of their officers, directors, agents, employees, or representatives, each of whom was actively engaged in the management, direction, control, or transaction of Defendants' ordinary business and affairs, and the affairs of the enterprise.

### III.   <u>JURISDICTION AND VENUE</u>

132.   This Court has jurisdiction over this matter under 28 U.S.C. § 1331 based on the federal claims asserted under the Racketeer Influence and Corrupt Organizations Act, 18 U.S.C. §§ 1961 *et seq*., and 18 U.S.C. §§ 1331, 1334, 1962, and 1964, and the Bank Holding Company Act, 12 U.S.C. § 1972 *et seq*.

133.   This Court also has jurisdiction over this action pursuant to the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d), because at least one Class member is of diverse citizenship from one Defendant, there are more than 100 Class members, and the aggregate amount in controversy exceeds $5 million, exclusive of interest and costs.

134.   This Court may exercise supplemental jurisdiction over Plaintiffs' state-law claims pursuant to 28 U.S.C. § 1367 because all of Plaintiffs' state-law claims are derived from a common nucleus of operative facts and are of the kind Plaintiffs would ordinarily expect to try in one judicial proceeding.

135.   This Court has personal jurisdiction over Defendants pursuant to 18 U.S.C. § 1965 and 12 U.S.C. § 1975.

136.   Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because Wells Fargo maintains its principal places of business in California.   Moreover, Defendants are considered to reside in this District because their contacts with it are sufficient to subject them to personal jurisdiction herein.   Furthermore, the acts giving rise to Plaintiffs' claims occurred, among other places, in this District.   At oral argument before the Judicial Panel on Multidistrict Litigation, "Wells Fargo represented that the primary witnesses would be found in the Central District of California."   *In re Wells*

*Fargo Auto Ins. Marketing & Sales Practices Litig.*, MDL No. 2797, Dkt. No. 90 at 2 (J.P.M.L. Oct. 5, 2017).

## IV.  INTRA-DISTRICT ASSIGNMENT

137.  This action is properly assigned to the Santa Ana Division of this District pursuant to the Central District Local Rules because a substantial portion of the events or omissions giving rise to Plaintiffs' claims arise in the counties served by the Santa Ana Division of this Court.  Several named Plaintiffs and proposed Class Representatives, as well as thousands of Class members, obtained automobile loans, had CPI policies force-placed on their loans, and suffered injuries as a result of Defendants' CPI scheme in the counties served by this Division.  Moreover, Defendants conduct substantial business in the counties served by this Division.  Finally, this Consolidated Class Action Complaint is being filed as an original action in this District, and as the Consolidated Class Action Complaint in MDL No. 2797 proceedings, which have been consolidated before the Honorable Andrew J. Guilford, presiding in the Santa Ana Division of this District.

## V.  FACTS COMMON TO ALL COUNTS

### A.  Collateral Protection Insurance and Force-Placed Insurance

138.  Vehicles in the United States are typically covered by one of the following three categories of insurance:  liability insurance, collision insurance, and comprehensive insurance.

139.  Liability insurance provides coverage when the insured is the at-fault driver in an incident that causes property damage or injury to a person.  Consumers are required by laws in most states to maintain liability insurance.  Collision insurance covers the vehicle when it is in a collision with another driver or stationary object.  Comprehensive coverage handles all other kinds of non-collision damages, such as flooding, fires, and natural disasters, among other things.

140.  The auto insurance policies at issue in this case are commonly referred to as Collateral Protection Insurance ("CPI").  Unlike auto insurance policies commonly purchased by vehicle owners, which not only cover the insured vehicle, but also liability

for collisions with other vehicles, property loss, and bodily injury, CPI *only* covers the cost of damage to the insured vehicle.   Although vehicle owners are not required to maintain collision or comprehensive coverage by law, according to a 2013 Insurance Information Institute report, 78% of insured drivers purchase comprehensive coverage and 73% purchase collision coverage, in addition to the mandatory liability insurance.[3]

141.   When vehicle owners obtain loans to purchase their vehicles, their insurer may obligate them to carry CPI insurance.[4]   If borrowers do not obtain CPI insurance, their lender may purchase it for them.   To pay for the additional costs of CPI policies, lenders like Wells Fargo tack on an additional premium to the borrower's principal, thus raising the borrower's monthly payment.   In Wells Fargo's case, this premium included a commission, a portion of which was paid by Balboa, QBE, and National General as a kickback to Wells Fargo.   The concealed kickback commission payments ensured that all of Defendants' CPI policy premiums were more expensive than the premiums for coverage borrowers obtained on their own.   The concealed kickback commissions also generated undisclosed charges on every CPI policy Defendants wrote, because even properly placed CPI policies included charges for undisclosed kickback commissions.   In this regard, the CPI market created by the partnership between Wells, Balboa, QBE, and National General was "rigged" against the borrower because it pushed up costs for consumers, rather than down.

142.   After Balboa, QBE, and National General force-placed a CPI policy on a Wells Fargo borrower, Wells Fargo assessed a full year's worth of CPI premium charges against borrowers' accounts, and Wells Fargo then charged interest each month on the CPI policy before applying payments to the principal loan balance, ensuring that Wells

---

[3] William Hoffman, *Forced Protection: How Will the Industry Respond to Wells Fargo's Insurance Scandal*, Auto Finance News (Oct. 5, 2017), https://www.autofinancenews.net/forced-protection-how-will-the-industry-respond-to-wells-fargos-insurance-scandal/.

[4] *Car Loan FAQ's*, Wells Fargo, https://www.wellsfargo.com/help/faqs/auto-loans/ (last visited Jan. 26, 2018).

CONSOLIDATED CLASS ACTION COMPLAINT

Fargo's CPI charges got paid first, and any deficiency resulted in the borrower falling short on the underlying loan.[5]

143.   The core decisions concerning the force-placed CPI scheme were made by Defendants in their California offices and headquarters.  These decisions implemented a nationwide practice of force-placing Defendants' unnecessary CPI policies on Wells Fargo's automobile loan customers and assessing improperly inflated charges against their accounts in exchange for lucrative kickbacks from the insurance underwriters.

144.   Defendants are no strangers to force-placed insurance abuse.  For example, in May 2013, Wells Fargo Bank N.A., QBE Specialty Insurance Co., and a class of Florida homeowners reached a settlement, which required Wells Fargo to pay up to $19.25 million to class members.  The suit charged Wells Fargo, among others, with deriving improper financial benefits from force-placed insurance.[6]  Additionally, in 2014, while Wells Fargo's automobile CPI scheme was in full-swing, a Florida federal judge approved a $281 million settlement reached by Wells Fargo and Assurant Inc. in a suit over their force-placed homeowners insurance practices.[7]   The suit, which involved about 1.3 million class members, alleged Wells Fargo allowed Assurant to automatically issue force-placed insurance on mortgage loans if a borrower's voluntary insurance lapsed. After collecting high premiums on the new coverage, Wells Fargo passed the payments along to Assurant, who would later funnel a portion of the premiums back to Wells Fargo as "commissions."

---

[5] *See Understanding Your Auto Loan, supra* note 2.

[6] *Regulatory Landscape for 2016: Lender-Placed Insurance and What You Need to Know*, LendersRisk.com (Feb. 8, 2016), http://lendersrisk.com/index.php/regulatory-landscape-for-2016-lender-placed-insurance-and-what-you-need-to-know/.

[7] Kelly Knaub, *Wells Fargo's Contested $281M Force-Placed Deal Approved*, Law360 (Oct.) 30, 2014), https://www.law360.com/articles/591839/wells-fargo-s-contested-281m-force-placed-deal-approved.

145.   Additionally, in 2015, Wells Fargo and Assurant settled a putative class action in Illinois federal court in which they were accused of conspiring to inflate the cost of force-placed hazard insurance in order to provide kickbacks to Wells Fargo.[8]

**B.   Wells Fargo, Balboa, QBE, and National General Unlawfully Force-Placed CPI Policies on Hundreds of Thousands of Borrowers' Automobile Loan Accounts**

146.   In approximately 2005, Wells Fargo began contractually obligating customers to accept CPI policies if the customer either failed to obtain sufficient auto insurance, or allowed their auto insurance to lapse.  The policies were underwritten at various times by Balboa, QBE, and National General.

147.   Wells Fargo benefitted greatly from force-placed CPI policies, because it received interest on the cost of the CPI policies and fees for late payments or insufficient funds, when a borrower's payment was not able to cover the cost of the CPI premium, principal, and interest.  In addition, Wells Fargo received kickbacks from Balboa, QBE, and National General for each CPI policy purchased for borrowers.

148.   Wells Fargo also relentlessly pushed its employees to generate additional revenue.  This directive from Wells Fargo management incentivized Defendants to ensure that CPI policies were forced on customers who already had sufficient underlying auto insurance.

149.   At a minimum, 800,000 Wells Fargo customers, who maintained sufficient insurance on their vehicles, were billed by Wells Fargo for unnecessary CPI.  The force-placed CPI scheme was highly profitable because it generated significant additional premiums, interest, and related fees.

150.   In addition to directly benefitting from customers' payment of premiums, interest, and related fees on the CPI policies, Wells Fargo structured customers' loan

---

[8] Dani Kass, *Wells Fargo, Assurant Settle Force-Placed Insurance Suit*, Law360 (May 11, 2015), https://www.law360.com/articles/654372/wells-fargo-assurant-settle-force-placed-insurance-suit.

CONSOLIDATED CLASS ACTION COMPLAINT

payments to maximize the interest customers paid on CPI policies over the life of their automobile loan.   Wells Fargo describes the manner in which it applies payments as follows:

     i.    Loan interest - the daily amount due on your loan;

     ii.   Collateral Protection Insurance (CPI) Interest - the amount of interest on your insurance premium (**if applicable**);

     iii.  Principal - the principal payment amount due on your loan;

     iv.  CPI principal - the principal payment on your insurance premium (**if applicable**)

     v.   Payment variance - any amount remaining due from previous payments;

     vi.  CPI variance - any amount remaining due from previous insurance premium payments (**if applicable**); and

     vii. Other charges - fees such as nonsufficient funds.[9]

151.   This payment structure had the effect of increasing the overall interest customers pay to Wells Fargo on their loans, because less of their payment went to the actual outstanding loan principal each month, and it increased the likelihood of underpayments, late payments, fees for insufficient funds, and repossessions.   The fact that the addition of CPI policies was not properly disclosed to customers only increased the likelihood of these adverse consequences because it decreased the likelihood that customers would call to complain or notice that their payments were deficient. Defendants' actions also caused significant damage to the credit reports of thousands of customers.

152.   For those customers who did discover increased charges due to the CPI, working with Defendants to remove the CPI was typically futile.   Many customers who sent proof of their underlying insurance policies to Defendants had no success in getting the unnecessary force-placed CPI removed.   In other cases, the CPI charges would stop

---

[9] *See Understanding Your Auto Loan, supra* note 2 (emphasis added).

for a month or two and then inexplicably reappear with no explanation or notice. Defendants generally refused to fix the problem, or even grant leniency to its customers whose vehicles were wrongfully being repossessed.

## C.   The *New York Times* Exposes Defendants' Force-Placed CPI Scheme

153.   Defendants' fraudulent CPI scheme finally came to light on July 27, 2017, when *The New York Times* ran an investigative report on the scandal.[10]   The *New York Times* report, was based on a copy of an internal report commissioned by and prepared for Wells Fargo by consulting firm Oliver Wyman that detailed the scheme (the "Oliver Wyman Report").

154.   The Oliver Wyman Report, commissioned in 2016, investigated Defendants' CPI practices between January 2012 and July 2016.   It found that Defendants charged roughly 800,000 consumers for CPI they did not need, with an estimated 274,000 becoming delinquent on their account.   Approximately 25,000 vehicles were wrongfully repossessed as a result of Defendants' CPI practices.   The report estimated that Wells Fargo owed $73 million to its customers.[11]

155.   However, Wells Fargo borrowers sustained financial damages far beyond the costs of the insurance, and the scheme began well before 2012.[12]   The harm also included repossession costs, late fees, charges for insufficient funds, time spent dealing with overdrafts, unfair charges, bank account deficiencies, attempts to reverse the Defendants' wrongful charges, and damage to consumers' credit reports.

---

[10] Gretchen Morgenson, *Wells Fargo Forced Unwanted Auto Insurance on Borrowers*, N.Y. Times (July 27, 2017), https://www.nytimes.com/2017/07/27/business/wells-fargo-unwanted-auto-insurance.html.

[11] *Id.*

[12] The *New York Times* reported that the scheme began as early as 2006.  *Id.*  But, after a subsequent *Times* article questioned the time period of Wells Fargo's study, Wells Fargo subsequently admitted that the CPI scheme began as early as 2005.  *See* Wells Fargo, SEC and Other Regulatory Filings, Q3 2017 Form 10-Q 3 (2017) https://www08.wellsfargomedia.com/assets/pdf/about/investor-relations/sec-filings/2017/third-quarter-10q.pdf.

156.   In a press release posted to its Dealer Services website on the same day the *New York Times* story was first published, Wells Fargo announced a purported "remediation" program:  "In total, approximately $64 million of cash remediation will be sent to customers in the coming months, along with $16 million of account adjustments, for a total of approximately $80 million in remediation."[13]

157.   However, Wells Fargo's "remediation" program is not what it purports to be. Wells Fargo has not offered consumers remediation of the financial harm they suffered. Rather, Wells Fargo has informed borrowers that if they submit proof of insurance, they "may be eligible for a refund."  Wells Fargo offers no "remediation" for its scheme to apply unnecessary, unauthorized and inflated CPI premiums, and Wells Fargo's remediation program offers no relief for the undisclosed and lucrative kickbacks.

158.   The core decisions concerning the nationwide remediation program were made by Defendants in their California offices and headquarters.

159.   Wells Fargo's announced "remediation" program has drawn criticism from federal regulators.  On October 20, 2017, the *New York Times* ran a follow-up article after having reviewed a preliminary report on the CPI scandal prepared by the Office of the Comptroller of the Currency ("OCC").  The report stated that Wells Fargo had most likely underestimated how much it would cost to reimburse harmed customers.[14]  The OCC found that Wells Fargo's claimed $80 million fund to compensate consumers was not enough money to properly reimburse consumers, nor did the money sufficiently cover all of the consumers impacted.  The OCC also found that Wells Fargo used "an overly complicated reimbursement methodology, which lacked clear support for addressing all the customer costs incurred," according to the report.

---

[13] *See Wells Fargo Announces Plan to Remediate Customers for Auto Insurance Coverage, supra* note 1.

[14] Gretchen Morgenson, *Regulator Blasts Wells Fargo for Deceptive Auto Insurance Program*, N.Y. Times (Oct. 20, 2017), https://www.nytimes.com/2017/10/20/business/wells-fargo-auto-insurance-comptroller.html.

CONSOLIDATED CLASS ACTION COMPLAINT

160.   As noted by the *New York Times*, "[t]he report paints a damning picture of a bank that didn't monitor its contractors, that lacked the impetus to correct problems once they were uncovered and that proved unresponsive to complaints from its customers."[15]

161.   Whereas Wells Fargo initially claimed that Defendants' force-placed CPI practices affected only 570,000 between January 2012 and 2016 and would require $80 million in remediation, Wells Fargo's 2017 3rd Quarter Form 10-Q, filed on November 3, 2017, paints a different picture.  Wells Fargo now admits that "the time period in which customers may be eligible to claim or otherwise receive remediation compensation for certain CPI placements has now been extended back to October 2005."[16]   And, Wells Fargo increased its original $80 million remediation pledge to approximately $130 million.[17]

162.   Soon after the *New York Times* reported on the OCC's report, Senator Sherrod Brown, a member of the Senate Banking Committee, bluntly noted during a Congressional hearing on Wells Fargo's various scandals -- "The company pure and simple lied to this committee -- and lied to the public."[18]   Senator Brown was referring to Wells Fargo's public statement that it first became aware of the CPI debacle a year earlier, in July 2016.  Yet, former Wells Fargo CEO John Stumpf did not disclose the CPI scheme to Congress during a hearing in September 2016 concerning millions of fake bank accounts that Wells Fargo created.

163.   In written questions following the 2016 hearings, the Senate Banking Committee specifically asked Wells Fargo executives if they were "confident that this

---

[15] *See Regulator Blasts Wells Fargo for Deceptive Auto Insurance Program, supra* note 16.

[16] Wells Fargo, SEC and Other Regulatory Filings, Q3 2017 Form 10-Q 3 (2017), https://www08.wellsfargomedia.com/assets/pdf/about/investor-relations/sec-filings/2017/third-quarter-10q.pdf.

[17] *Id*.

[18] Matt Egan, *Wells Fargo Accused of Lying to Congress About Auto Insurance Scandal*, CNN (Oct. 3, 2017), http://money.cnn.com/2017/10/03/investing/wells-fargo-lie-congress-hearing-auto-insurance/index.html.

CONSOLIDATED CLASS ACTION COMPLAINT

type of fraudulent activity does not exist" elsewhere in the bank. Lawmakers also asked whether Wells Fargo "discovered other types of misconduct." Wells Fargo responded in November 2016, saying: "We believe that the activity at issue here was limited to certain" employees working in the company's community banking division. Wells Fargo did not mention the auto insurance scandal, which was rooted in its auto dealer services department.[19]

164.    Recently, the Honorable John Tigar, United States District Judge for the Northern District of California, rejected similar claims of lack of corporate knowledge or involvement in the "fake accounts" scandal also plaguing Wells Fargo. "Just as it is implausible that the director defendants were unaware of the account-creation scheme given the extent of the alleged fraud and the number of red flags," Judge Tigar wrote, "it is implausible that Wells Fargo's senior management, involved in the day-to-day operations of the bank and with greater access to the underlying cross-sell metrics and employee whistle-blower complaints than independent board members, was unaware of the alleged fraud."[20]

165.    In a now-familiar theme, Wells Fargo's 2017 3rd quarter 10-Q filing notes that "a former team member has alleged retaliation for raising concerns regarding automobile lending practices."[21]

166.    All of these statements describe companies -- driven entirely by profit and willing co-conspirators -- Wells Fargo, Balboa, QBE, and National General -- that together rigged an already abusive insurance practice for own gain.

---

[19] Id.

[20] Gretchen Morgenson, *Bringing Accountability to the Wells Fargo Boardroom*, N.Y. Times (Nov. 3, 2017), https://www.nytimes.com/2017/11/03/business/wells-fargo-board.html; *see also In re Wells Fargo & Company Shareholder Derivative Litigation*, 2017 WL 4414304, at *14 (N.D. Cal. Oct. 4, 2017).

[21] *See Wells Fargo Q3 2017 Form 10-Q, supra* note 18.

CONSOLIDATED CLASS ACTION COMPLAINT

# VI.    STATUTE OF LIMITATIONS

## A.    Discovery Rule

167.    The discovery rule tolls any statutes of limitation otherwise-applicable to any claims asserted herein.

168.    Plaintiffs and Class members did not discover, and could not have discovered through the exercise of reasonable diligence, that Defendants conspired to force-place hundreds of thousands of unnecessary CPI policies and refuse to honor proof of insurance, when provided.

169.    Defendants' CPI scheme was elaborate and well concealed.  Indeed, it was not until Wells Fargo commissioned a report on Defendants' conduct -- which was leaked to the *New York Times* -- that Plaintiffs and Class members discovered the fraud. Plaintiffs and Class members had no realistic ability to discover the true nature of Defendants' CPI practices until July 27, 2017 at the earliest.

## B.    Fraudulent Concealment

170.    Defendants' affirmative and active concealment of their conduct also tolls any otherwise-applicable statute of limitations to any claims asserted herein.

171.    Under the fraudulent concealment doctrine, the causes of action alleged herein did or will only accrue upon discovery of the true nature of the charges assessed against borrowers' accounts, as a result of Defendants' concealment of the material facts.

172.    Defendants kept Plaintiffs and members of the Class, as defined below, ignorant of critical information required for the prosecution of their claims, without any fault or lack of diligence on their part.  Plaintiffs and members of the Class did not discover, and could not have discovered through the exercise of reasonable diligence, the true nature of the Defendants' force-placed CPI scheme, including the kickbacks to Wells Fargo from Balboa, QBE, and National General, until the publication of the *New York Times* article on July 27, 2017 at the earliest.

173.    Defendants are under a continuous duty to disclose, to Plaintiffs and Class members, the true character, quality, and nature of the charges they assess on borrowers'

accounts. Defendants actively and affirmatively concealed the true character, quality, and nature of their assessment of force-placed charges for CPI polices on borrowers' accounts. Plaintiffs and members of the Class reasonably relied on Defendants' affirmative and active concealment.

## VII.    CLASS ACTION ALLEGATIONS

### A.    Class Definitions

174.   Plaintiffs bring this action on behalf of themselves and a Nationwide Class and State Classes (collectively, the "Class"), defined as:

**Nationwide Class:**

All residents of the United States of America who obtained an auto loan through Wells Fargo Bank, N.A., or its subsidiaries or divisions, and who were assessed charges for CPI auto insurance and/or related fees.

**California State Class:**

All residents of the State of California who obtained an auto loan through Wells Fargo Bank, N.A., or its subsidiaries or divisions, and who were assessed charges for CPI auto insurance and/or related fees.

**Colorado State Class:**

All residents of the State of Colorado who obtained an auto loan through Wells Fargo Bank, N.A., or its subsidiaries or divisions, and who were assessed charges for CPI auto insurance and/or related fees.

**Illinois State Class:**

All residents of the State of Illinois who obtained an auto loan through Wells Fargo Bank, N.A., or its subsidiaries or divisions, and who were assessed charges for CPI auto insurance and/or related fees.

**Indiana State Class:**

All residents of the State of Indiana who obtained an auto loan through Wells Fargo Bank, N.A., or its subsidiaries or divisions, and who were assessed charges for CPI auto insurance and/or related fees.

1

**Minnesota State Class:**

2

All residents of the State of Minnesota who obtained an auto loan through Wells

3

Fargo Bank, N.A., or its subsidiaries or divisions, and who were assessed charges

4

for CPI auto insurance and/or related fees.

5

**Mississippi State Class:**

6

All residents of the State of Mississippi who obtained an auto loan through Wells

7

Fargo Bank, N.A., or its subsidiaries or divisions, and who were assessed charges

8

for CPI auto insurance and/or related fees.

9

**Missouri State Class:**

10

All residents of the State of Missouri who obtained an auto loan through Wells

11

Fargo Bank, N.A., or its subsidiaries or divisions, and who were assessed charges

12

for CPI auto insurance and/or related fees.

13

**New Jersey State Class:**

14

All residents of the State of New Jersey who obtained an auto loan through Wells

15

Fargo Bank, N.A., or its subsidiaries or divisions, and who were assessed charges

16

for CPI auto insurance and/or related fees.

17

**Tennessee State Class:**

18

All residents of the State of Tennessee who obtained an auto loan through Wells

19

Fargo Bank, N.A., or its subsidiaries or divisions, and who were assessed charges

20

for CPI auto insurance and/or related fees.

21

**Wisconsin State Class:**

22

All residents of the State of Wisconsin who obtained an auto loan through Wells

23

Fargo Bank, N.A., or its subsidiaries or divisions, and who were assessed charges

24

for CPI auto insurance and/or related fees.

25

**Wyoming State Class:**

26

All residents of the State of Wyoming who obtained an auto loan through Wells

27

Fargo Bank, N.A., or its subsidiaries or divisions, and who were assessed charges

28

for CPI auto insurance and/or related fees.

CONSOLIDATED CLASS ACTION COMPLAINT

175.    Excluded from the proposed Nationwide Class and State Classes are Defendants, Balboa, QBE, their agents, officers, and directors, and their families, as well as their parent companies, subsidiaries, and affiliates, and any judicial officer assigned to this case.   Plaintiffs reserve the right to revise the definitions of the Nationwide Class and State Classes based upon subsequent investigation and discovery.

176.    Certification of Plaintiffs' claims for classwide treatment is appropriate because Plaintiffs can prove the elements of their claims regarding liability and entitlement to damages on a classwide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claim.

177.    Plaintiffs reserve the right to amend the Class Definition if discovery and further investigation reveal that the Class should be expanded or otherwise modified.

**B.    Class Certification Requirements: Federal Rule of Civil Procedure 23**

178.    This action is brought and properly may be maintained as a class action on behalf of the Nationwide Class and/or State Classes proposed herein under the provisions of Federal Rules of Civil Procedure 23(a)(1)-(4) and 23(b)(3), and satisfies the requirements thereof.

179.    <u>Numerosity</u>: While the exact number of members of the Class is unknown to Plaintiffs at this time, and can only be determined by appropriate discovery, membership in the Class is ascertainable based upon the records maintained by Defendants. At this time, Plaintiffs are informed and believe that the Class includes at least 800,000 members. Therefore, the Class is sufficiently numerous that joinder of all members of the Class in a single action is impracticable under Federal Rule of Civil Procedure Rule 23(a)(1), and the resolution of their claims through a class action will be of benefit to the parties and the Court.

180.    <u>Ascertainability</u>: Names and addresses of members of the Class are available from Defendants' records.  Notice can be provided to the members of the Class through direct mailing, publication, or otherwise using techniques and a form of notice similar to

those customarily used in consumer class actions arising under California state law and federal law.

181.   Typicality: Plaintiffs' claims are typical of the claims of the other members of the Class which they seek to represent under Federal Rule of Civil Procedure 23(a)(3) because Plaintiffs and each member of the Class have been subjected to the same unlawful, deceptive, and improper practices and has been damaged in the same manner thereby.

182.   Adequacy: Plaintiffs will fairly and adequately represent and protect the interests of the Class as required by Federal Rule of Civil Procedure Rule 23(a)(4). Plaintiffs are adequate representatives of the Class, because they have no interests which are adverse to the interests of the members of the Class.  Plaintiffs are committed to the vigorous prosecution of this action and, to that end, Plaintiffs have retained counsel who are competent and experienced in handling class action litigation on behalf of consumers.

183.   Superiority: A class action is superior to all other available methods of the fair and efficient adjudication of the claims asserted in this action under Federal Rule of Civil Procedure 23(b)(3) because:

a.   The expense and burden of individual litigation make it economically unfeasible for members of the Class to seek to redress their claims other than through the procedure of a class action;

b.   If separate actions were brought by individual members of the Class, the resulting duplicity of lawsuits would cause members to seek to redress their claims other than through the procedure of a class action; and

c.   Absent a class action, Defendants likely would retain the benefits of their wrongdoing, and there would be a failure of justice.

184.   Common questions of law and fact exist as to the members of the Class, as required by Federal Rule of Civil Procedure 23(a)(2), and predominate over any questions which affect individual members of the Class within the meaning of Federal Rule of Civil

Procedure 23(b)(3).  The common questions of fact include, but are not limited to, the following:

      a.     Whether Defendants engaged in the unlawful conduct alleged herein;

      b.     Whether Defendants force-placed CPI policies on Wells Fargo auto loan customers who maintained independent automobile insurance;

      c.     Whether Defendants charged Plaintiffs and other Class members premiums, interest, and other fees as a result of their force-placed CPI policies;

      d.     Whether Defendants wrongfully threatened collections, repossessed vehicles, and made adverse notations on credit reports of Plaintiffs and other Class members as a result of their force-placed CPI policies;

      e.     Whether Defendants made misrepresentations and omissions of material fact regarding their loans and their procedures for force-placing CPI policies;

      f.     Whether Wells Fargo received kickback commission payments from Balboa, QBE, and National General for force-placed CPI policies and, as a result, whether Plaintiffs and Class Members were charged unlawfully inflated CPI premiums;

      g.     Whether Defendants knew or should have known that they failed to properly confirm whether borrowers had independent automobile insurance;

      h.     Whether Defendants' conduct violates RICO, the Bank Holding Company Act, consumer protection statutes, false advertising laws, and other laws asserted as causes of action herein;

      i.     Whether Plaintiffs and other Class members are entitled to equitable relief, including but not limited to, restitution or injunctive relief;

      j.     Whether such equitable relief includes Defendants' remediation of Plaintiffs' and Class Members' credit reports;

      k.     Whether Plaintiffs and the other Class members are entitled to damages, including treble damages, punitive damages, exemplary damages, statutory

damages (where allowed by state law), and other monetary relief and, if so, in what amount;

l.   Whether Defendants continue to unlawfully force-place unnecessary CPI policies; and

m.   Whether Plaintiffs and members of the Class are entitled to an award of reasonable attorneys' fees, pre-judgment interest, and costs of this suit.

185.   Plaintiffs are not aware of any difficulty that may be encountered in the management of this litigation, which should preclude its maintenance as a class action.

## VIII.   RICO ALLEGATIONS

186.   As alleged below, Plaintiffs bring claims pursuant to 18 U.S.C. §§ 1962(c) and 1964 of the Racketeer Influenced and Corrupt Organizations Act ("RICO") against all Defendants.  The following allegations pertain to each claim for relief under RICO.

187.   Plaintiffs and the members of the Class are each "persons" as that term is defined in 18 U.S.C. § 1961(3) who were injured in their business or property as a result of Defendants' wrongful conduct.

188.   Defendants are, and at all relevant times were, "persons" within the meaning of 18 U.S.C. § 1961(3) because they are entities capable of holding legal or beneficial interest in property.

189.   Section 1964(c) provides that "[a]ny person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefore . . . and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee."  18 U.S.C. § 1964(c).

190.   Section 1962(c) makes it unlawful "for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt."  18 U.S.C. §1962(c).

191.   RICO defines an enterprise as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity."  18 U.S.C. § 1961(4).   An association-in-fact enterprise generally has three structural features, including:  (1) a purpose; (2) relationships among those associated with the enterprise; and (3) longevity sufficient to permit those associates to pursue the enterprise's purpose.  *See Boyle v. United States*, 556 U.S. 938, 946 (2009).

192.   As alleged below and throughout this Complaint, Wells Fargo and each of the underwriters orchestrated a scheme to extract millions of dollars from Plaintiffs and members of the Class by force-placing unlawful, unnecessary, and undisclosed CPI policies in connection with automobile loans issued and held by Wells Fargo.  Wells Fargo and each of the underwriters conducted their business through association-in-fact enterprises in violation of section 1962(c) by a pattern of racketeering activity, including mail and wire fraud, for the purpose of improperly profiting from unlawfully force-placed CPI policies.  The CPI scheme enabled Wells Fargo and each of the underwriters to enjoy undisclosed kickback payments derived, among other things, from the commissions generated on the force-placed CPI polices.

193.   Defendants' endeavor had the desired effect.  Wells Fargo and each of the underwriters secured unlawful profits during the pendency of the enterprises.  And, as collateral damage, unsuspecting borrowers were charged millions of dollars in premiums, interest, overdraft fees, late fees, and experienced negative credit occurrences and repossession as a result of Defendants' conduct.

1
2

IX.   **CLAIMS ASSERTED ON BEHALF OF THE NATIONWIDE CLASS**

**FIRST CLAIM FOR RELIEF**

3
4

**Violations of the Racketeer Influenced and Corrupt Organizations Act**

**18 U.S.C. § 1962(c)**

5

**(Against Defendants Wells Fargo and National General)**

6      194.   Plaintiffs incorporate by reference, in this claim for relief, each and every

7  allegation of the preceding paragraphs, with the same force and effect as though fully set

8  forth herein.

9      195.   Plaintiffs bring this claim for relief on behalf of themselves and the members

10 of the Nationwide Class pursuant to 18 U.S.C. §§ 1962(c) and 1964 of RICO against

11 Wells Fargo and National General (for purposes of this cause of action, "Defendants").

12 **A.    The Wells Fargo-National General CPI Enterprise**

13     196.   Defendants Wells Fargo and National General formed an association-in-fact

14 enterprise, referred to as the "Wells Fargo-National General CPI Enterprise."  The Wells

15 Fargo-National General CPI Enterprise included: (a) Wells Fargo, its subsidiaries,

16 employees, and agents; and (b) National General, its subsidiaries, employees, and agents.

17 The Wells Fargo-National General CPI Enterprise was formed for the purpose of

18 unlawfully extracting significant revenue and profits from Plaintiffs and the Class by

19 force-placing automobile insurance policies on their automobile loans, and sharing

20 undisclosed kick-back commission payments between the members of the enterprise.

21     197.   At all relevant times, each member of the Wells Fargo-National General CPI

22 Enterprise was aware of the enterprise's purpose and conduct, and was a knowing,

23 willing, and active participant in that conduct.  Each member of the enterprise reaped

24 substantial profits from the conduct of the enterprise.

25     198.   Each member of the Wells Fargo-National General CPI Enterprise acquired,

26 maintained control of, was associated with, and conducted or participated in the conduct

27 of the enterprise's affairs.  But, at all relevant times, the enterprise, and each member

28 thereof: (a) had an existence separate and distinct from each of its members; (b) was

CONSOLIDATED CLASS ACTION COMPLAINT

separate and distinct from the pattern of racketeering in which the Defendants engaged; and (c) was an ongoing and continuing organization consisting of legal entities, including the Defendants, along with other individuals and entities, including unknown third parties.

199.   The members of the Wells Fargo-National General CPI Enterprise are systematically linked through continually coordinated activities, financial ties, and contractual business arrangements.   Plaintiffs are informed and believe that the Wells Fargo-QBE CPI Enterprise is an ongoing and continuing enterprise.

200.   Neither Wells Fargo nor National General could have accomplished the purpose of the Wells Fargo-National General CPI Enterprise without the assistance of the other and both profited financially from the scheme.

201.   The Wells Fargo-National General CPI Enterprise described above involved regular communications between Wells Fargo and National General in which insurance and customer information, and payments were exchanged to facilitate the goals of the enterprise.   Such communication occurred, and continues to occur, through the mail and wire facilities of the United States.

202.   The members of the Wells Fargo-National General CPI Enterprise functioned as a continuing unit for the purposes of implementing the scheme, and each agreed to take actions to hide the existence of the scheme, as well as the controlling association-in-fact enterprise from others.

203.   The Wells Fargo-National General CPI Enterprise engaged in and affected interstate commerce because, *inter alia*, it advertised, issued, and affected the price and terms of auto loans and/or insurance policies that were issued to and utilized by thousands of Class members throughout the United States, its territories, the District of Columbia, and the Commonwealth of Puerto Rico, and the Wells Fargo-National General CPI Enterprise also required that Class members make monthly insurance payments on those policies in interstate commerce to Wells Fargo.

204.   The effects of the Wells Fargo-National General CPI Enterprise are still felt today, as many Wells Fargo auto loan customers continue to make payments for CPI

premiums and interest, and many auto loan customers continue to be damaged by CPI-related negative reports to credit reporting agencies.

**B.     Conduct of the Wells Fargo-National General CPI Enterprise**

205.   During the Class Period, Wells Fargo and National General exerted control over the Wells Fargo-National General CPI Enterprise and participated in the operation and management of its affairs, directly and indirectly.

206.   Wells Fargo participated in the operation and management of the enterprise in the following ways:

a.   Misrepresenting the terms of its auto loans to customers upon their initial application and throughout the application process;

b.   Transmitting loan application and other customer information to National General;

c.   Misrepresenting the role that National General played in the loan application process;

d.   Misrepresenting the circumstances under which customers would receive a force-placed CPI policy;

e.   Force-placing unnecessary and undisclosed CPI policies;

f.   Receiving kick-back commission payments from National General for CPI policies;

g.   Concealing the true nature of its relationship with National General from customers;

h.   Paying National General the alleged value of premiums that National General wrote on borrowers' automobile loans;

i.   Collecting monthly payments from Class members, including premium charges and interest;

j.   Misrepresenting to credit reporting agencies and to Class members that there were delinquencies when CPI premiums and insurance were not paid; and

k.    Misrepresenting to credit reporting agencies, Class members, and the Courts that repossession of Class members' vehicles was authorized because Class members were delinquent on their loan accounts.

207. The Wells Fargo-National General CPI Enterprise has a hierarchical decision-making structure headed by Wells Fargo. Wells Fargo generally directed the terms and cost of auto loans it used, determined who those loans would be issued to as well as when, and determined if, a customer's application and/or information would be transmitted to National General for review. Wells Fargo generally directed National General regarding its review of automobile loan policies and, ultimately, force-placed the CPI policies underwritten by National General, and collected payments for them.

208. National General also participated in and conducted the affairs of the Wells Fargo-National General CPI Enterprise, in the following ways:

a.    Underwriting CPI policies that Wells Fargo force-placed, with knowledge and intent that they be used in the enterprise's fraudulent scheme;

b.    Misrepresenting that it did or would search a database of insurance coverage to determine whether borrower's maintained insurance on their vehicles;

c.    Underwriting CPI policies for loans it knew or should have known were secured by sufficient automobile insurance;

d.    Ignoring and/or disregarding proof of insurance submitted by borrowers after they learned about force-placed CPI policies;

e.    Accepting payments from Wells Fargo for premiums due on the CPI policies;

f.    Paying kickback commissions to Wells Fargo for every CPI policy it underwrote;

g.    Transmitting information about loan applications and insurance coverage regarding Wells Fargo's customers;

h.    Misrepresenting its role in the loan application process;

i.    Authorizing the issuance of unnecessary and unauthorized CPI policies; and

j.    Concealing the true nature of its relationship with Wells Fargo.

209.   Defendants also directed and controlled the ongoing organization necessary to implement the common purpose of the enterprise and meetings and through communications which Plaintiffs cannot fully allege at present, because Defendants and other third-parties currently possess such documents.

**C.   Pattern of Racketeering Activity**

210.   Defendants carried out their force-placed CPI scheme through a pattern of racketeering activity that employed the use of United States mail and wire facilities. Defendants accomplished this scheme by committing, conspiring to commit, and/or aiding-and-abetting the commission of at least two predicate acts of racketeering activity (i.e. violations of 18 U.S.C. §§ 1341 and 1343) within the past ten years.

211.   Defendants' predicate acts of racketeering activity (18 U.S.C. § 1961(1)(B)) including, but are not limited to:

- Mail Fraud:  Defendants violated 18 U.S.C. § 1341 by sending and/or receiving, or causing to be sent and/or received, materials via U.S. mail or commercial interstate carriers, for the purpose of executing the unlawful and fraudulent scheme to profit from force-placed CPI policies.

- Wire Fraud:  Defendants violated 18 U.S.C. §1343 by transmitting and/or receiving, or by causing to be transmitted and/or received, materials by wire for the purpose of executing the unlawful and fraudulent scheme to profit from force-placed CPI policies.

212.   The Wells Fargo-National General CPI Enterprise's pattern of racketeering likely involved thousands of separate instances wherein the U.S. Mail or interstate wire facilities were knowingly and intentionally used to further the enterprise's pattern of racketeering activity, including mail and wire fraud.  Many of the precise dates of Defendants' fraudulent use of the U.S. Mail and interstate wire facilities have been deliberately hidden, and cannot be alleged without access to Defendants' books and records.

213.   Plaintiffs have, however, described the types of, and in some instances, occasions on which the predicate acts of mail and/or wire fraud occurred.  They include thousands of communications to perpetuate and maintain the Wells Fargo-National General CPI Enterprise's scheme, including the things and documents described below. Wells Fargo and National General's use of the mail and wire includes, but is not limited to:

a.   Marketing materials regarding Defendants' auto loans and CPI insurance policies;

b.   Correspondence between Wells Fargo and National General establishing their relationship regarding the enterprise, and the issuance of auto loans and/or CPI policies;

c.   Insurance policies transmitted between Wells Fargo and National General;

d.   Loan documents exchanged between (1) Wells Fargo and borrowers; and (2) Wells Fargo and National General;

e.   Loan payment notices exchanged between Wells Fargo and borrowers;

f.   Loan balance statements exchanged between Wells Fargo and borrowers;

g.   Loan payments sent by borrowers to Wells Fargo;

h.   Demands for payment sent by Wells Fargo to borrowers;

i.   Collections notices sent by Wells Fargo, or caused to be sent by Wells Fargo, to borrowers;

j.   Proofs of claim sent by Wells Fargo, or caused to be sent by Wells Fargo;

k.   Correspondence sent between Wells Fargo and National General;

l.   Correspondence sent between Wells Fargo, credit bureaus, and its debt collectors;

m.   Correspondence sent by Wells Fargo to any entities or individuals tasked with unlawfully repossessing borrowers' vehicles; and

n.   Correspondence between borrowers, Wells Fargo and/or National General.

214.   The Wells Fargo-National General CPI Enterprise also communicated by U.S. Mail, interstate facsimile, and by interstate electronic mail with various other affiliates, regional offices, divisions, and other third-party entities in furtherance of the Wells Fargo-National General CPI Enterprise's mail and wire fraud.

215.   Wells Fargo and National General knew, and intended that, Plaintiffs and the members of the Class would rely on the material misrepresentations and omissions made by them and would incur increased costs as a result. Indeed, if Plaintiffs and the Class did not make unnecessary payments for CPI policies, the Wells Fargo-National General CPI Enterprise could not succeed.

216.   Each of these fraudulent mailings and interstate wire transmissions constitutes "racketeering activity" within the meaning of 18 U.S.C. § 1961(1)(B). Collectively, these violations constitute a "pattern of racketeering activity," within the meaning of 18 U.S.C. § 1961(5), through which Wells Fargo and National General intended to and did defraud Plaintiffs, and members of the Class.

217.   Each instance of racketeering activity alleged herein was related, had similar purposes, involved the same or similar participants and methods of commission, and had similar results affecting similar victims, including Plaintiffs and the Class.

218.   The pattern of racketeering activity alleged herein and the Wells Fargo-National General CPI Enterprise are separate and distinct from each other.  Likewise, Wells Fargo and National General are distinct from the Wells Fargo-National General CPI Enterprise, they have a separate existence from the enterprise, including distinct legal statuses, different offices and roles, bank accounts, officers, directors, employees, individual personhood, reporting requirements, and financial statements.

219.   Defendants' final racketeering activity occurred within five years of the commission of a prior incident of racketeering.

**D.**   **Damages**

220.   Defendants' pattern of racketeering activity directly and proximately caused Plaintiffs and members of the Nationwide Class injury in their business and property

because Plaintiffs paid inflated charges for CPI policies that were inflated, unlawful, unnecessary, and undisclosed, as well as increased interest on their automobile loans, diminished credit scores, and costs of repossession.

221.   Plaintiffs are the most directly harmed individuals and entities and there are no other Plaintiffs better suited to seek a remedy from the Wells Fargo and National General for the economic harms at issue here.

222.   Plaintiffs also seek all legal relief as allowed by law, including *inter alia*, actual damages and treble damages.  Plaintiffs seek equitable relief, including but not limited to the elimination of adverse notations on their credit reports and remediating reduced credit scores, as deemed proper by the Court.  Plaintiffs also seek attorneys' fees, all costs and expenses of suit, and pre- and post-judgment interest pursuant to 18 U.S.C. § 1964(c).

## SECOND CLAIM FOR RELIEF

### Violations of the Racketeer Influenced and Corrupt Organizations Act
### 18 U.S.C. § 1962(c)

### (Against Defendants Wells Fargo and National General as Successor to QBE)

223.   Plaintiffs incorporate by reference, in this claim for relief, each and every allegation of the preceding paragraphs, with the same force and effect as though fully set forth herein. Plaintiffs allege this claim against National General, on behalf of itself and as successor to the assets and liabilities of QBE.

224.   Plaintiffs bring this claim for relief on behalf of themselves and the members of the Nationwide Class pursuant to 18 U.S.C. §§ 1962(c) and 1964 of RICO.

### A.   The Wells Fargo-QBE CPI Enterprise

225.   Wells Fargo and QBE formed an association-in-fact enterprise, referred to as the "Wells Fargo-QBE CPI Enterprise."  The Wells Fargo-QBE CPI Enterprise included: (a) Wells Fargo, its subsidiaries, employees, and agents; and (b) QBE, its subsidiaries, employees, and agents.  The Wells Fargo-QBE CPI Enterprise was formed for the purpose of unlawfully extracting significant revenue and profits from Plaintiffs and the Class by

force-placing automobile insurance policies on their automobile loans, and sharing undisclosed kick-back commission payments between the members of the enterprise.

226.   At all relevant times, each member of the Wells Fargo-QBE CPI Enterprise was aware of the enterprise's purpose and conduct, and was a knowing, willing, and active participant in that conduct.   Each member of the enterprise reaped substantial profits from the conduct of the enterprise.

227.   Each member of the Wells Fargo-QBE CPI Enterprise acquired, maintained control of, was associated with, and conducted or participated in the conduct of the enterprise's affairs.   But, at all relevant times, the enterprise, and each member thereof: (a) had an existence separate and distinct from each of its members; (b) was separate and distinct from the pattern of racketeering in which Wells Fargo and QBE engaged; and (c) was an ongoing and continuing organization consisting of legal entities, including Wells Fargo and QBE, along with other individuals and entities, including unknown third parties.

228.   The members of the Wells Fargo-QBE CPI Enterprise are systematically linked through continually coordinated activities, financial ties, and contractual business arrangements.   The Wells Fargo-QBE CPI Enterprise was an ongoing and continuing enterprise.

229.   Neither Wells Fargo nor QBE could have accomplished the purpose of the Wells Fargo-QBE CPI Enterprise without the assistance of the other and both profited financially from the scheme.

230.   The Wells Fargo-QBE CPI Enterprise described above involved regular communications between Wells Fargo and QBE in which insurance and customer information, and payments were exchanged to facilitate the goals of the enterprise.   Such communication occurred, and continues to occur, through the mail and wire facilities of the United States.

231.   The members of the Wells Fargo-QBE CPI Enterprise functioned as a continuing unit for the purposes of implementing the scheme, and each agreed to take

1    actions to hide the existence of the scheme, and the controlling association-in-fact

2    enterprise, from others.

3          232.   The Wells Fargo-QBE CPI Enterprise engaged in and affected interstate

4    commerce because, *inter alia*, it advertised, issued, and affected the price and terms of

5    auto loans and/or insurance policies that were issued to and utilized by thousands of Class

6    members throughout the United States, its territories, the District of Columbia and the

7    Commonwealth of Puerto Rico, and the Wells Fargo-QBE CPI Enterprise also required

8    that Class members make monthly insurance payments on those policies in interstate

9    commerce to Wells Fargo.

10          233.   The effects of the Wells Fargo-QBE CPI Enterprise are still felt today, as

11    many Wells Fargo auto loan customers continue to make payments for CPI premiums and

12    interest, and many auto loan customers continue to be damaged by CPI-related negative

13    reports to credit reporting agencies.

14    **B.**   **Conduct of the Wells Fargo-QBE CPI Enterprise**

15          234.   During the Class Period, Wells Fargo and QBE exerted control over the

16    Wells Fargo-QBE CPI Enterprise and participated in the operation and management of its

17    affairs, directly and indirectly.

18          235.   Wells Fargo participated in the operation and management of the enterprise

19    in the following ways:

20        a.   Misrepresenting the terms of its auto loans to customers upon their initial

21            application and throughout the application process;

22        b.   Transmitting loan application and other customer information to QBE;

23        c.   Misrepresenting the role that QBE played in the loan application process;

24        d.   Misrepresenting the circumstances under which customers would receive a

25            force-placed CPI policy;

26        e.   Force-placing unnecessary and undisclosed CPI policies;

27        f.   Receiving kick-back commission payments from QBE for CPI policies;

28        g.   Concealing the true nature of its relationship with QBE from customers;

h.     Paying QBE the alleged value of premiums that QBE wrote on borrowers' automobile loans;

i.     Collecting monthly payments from Class members, including premium charges and interest;

j.     Misrepresenting to credit reporting agencies and to Class members that there were delinquencies when CPI premiums and insurance were not paid; and

k.     Misrepresenting to credit reporting agencies, Class members, and the Courts that repossession of Class members' vehicles was authorized because Class members were delinquent on their loan accounts.

236.   The Wells Fargo-QBE CPI Enterprise has a hierarchical decision-making structure headed by Wells Fargo.  Wells Fargo generally directed the terms and cost of auto loans it used, determined who those loans would be issued to as well as when, and determined if, a customer's application and/or information would be transmitted to QBE for review.  Wells Fargo generally directed QBE regarding its review of automobile loan policies and, ultimately, force-placed the CPI policies underwritten by QBE, and collected payments for them.

237.   QBE also participated in and conducted the affairs of the Wells Fargo-QBE CPI Enterprise, in the following ways:

a.     Underwriting CPI policies that Wells Fargo force-placed, with knowledge and intent that they be used in the enterprise's fraudulent scheme;

b.     Misrepresenting that it did or would search a database of insurance coverage to determine whether borrower's maintained insurance on their vehicles;

c.     Underwriting CPI policies for loans it knew or should have known were secured by sufficient automobile insurance;

d.     Ignoring and/or disregarding proof of insurance submitted by borrowers after they learned about force-placed CPI policies;

e.     Accepting payments from Wells Fargo for premiums due on the CPI policies;

CONSOLIDATED CLASS ACTION COMPLAINT

      f.     Paying kickback commissions to Wells Fargo for every CPI policy it underwrote;

      g.    Transmitting information about loan applications and insurance coverage regarding Wells Fargo's customers;

      h.    Misrepresenting its role in the loan application process;

      i.    Authorizing the issuance of unnecessary and unauthorized CPI policies; and

      j.    Concealing the true nature of its relationship with Wells Fargo.

238. Wells Fargo and QBE also directed and controlled the ongoing organization necessary to implement the common purpose of the enterprise and meetings, and through communications, which Plaintiffs cannot fully allege at present, because Wells Fargo and QBE and other third-parties currently possess such documents.

## C.    Pattern of Racketeering Activity

239. Wells Fargo and QBE carried out their force-placed CPI scheme through a pattern of racketeering activity that employed the use of United States mail and wire facilities. Wells Fargo and QBE accomplished this scheme by committing, conspiring to commit, and/or aiding-and-abetting the commission of at least two predicate acts of racketeering activity (i.e. violations of 18 U.S.C. §§ 1341 and 1343) within the past ten years.

240. Wells Fargo and QBE's predicate acts of racketeering activity (18 U.S.C. § 1961(1)(B)) including, but are not limited to:

- Mail Fraud: Wells Fargo and QBE violated 18 U.S.C. § 1341 by sending and/or receiving, or causing to be sent and/or received, materials via U.S. mail or commercial interstate carriers, for the purpose of executing the unlawful and fraudulent scheme to profit from force-placed CPI policies.

- Wire Fraud: Wells Fargo and QBE violated 18 U.S.C. §1343 by transmitting and/or receiving, or by causing to be transmitted and/or received, materials by wire for the purpose of executing the unlawful and fraudulent scheme to profit from force-placed CPI policies.

CONSOLIDATED CLASS ACTION COMPLAINT

241. The Wells Fargo-QBE CPI Enterprise's pattern of racketeering likely involved thousands of separate instances wherein the U.S. Mail or interstate wire facilities were knowingly and intentionally used to further the enterprise's pattern of racketeering activity, including mail and wire fraud. Many of the precise dates of Wells Fargo and QBE's fraudulent use of the U.S. Mail and interstate wire facilities have been deliberately hidden, and cannot be alleged without access to Wells Fargo and QBE's books and records.

242. Plaintiffs have, however, described the types of, and in some instances, occasions on which the predicate acts of mail and/or wire fraud occurred. They include thousands of communications to perpetuate and maintain the Wells Fargo-QBE CPI Enterprise's scheme, including the things and documents described below. Wells Fargo and QBE use of the mail and wire includes, but is not limited to:

    a.    Marketing materials regarding Wells Fargo and QBE's auto loans and CPI insurance policies;

    b.    Correspondence between Wells Fargo and QBE establishing their relationship regarding the enterprise, and the issuance of auto loans and/or CPI policies;

    c.    Insurance policies transmitted between Wells Fargo and QBE;

    d.    Loan documents exchanged between (1) Wells Fargo and borrowers and (2) Wells Fargo and QBE;

    e.    Loan payment notices exchanged between Wells Fargo and borrowers;

    f.    Loan balance statements exchanged between Wells Fargo and borrowers;

    g.    Loan payments sent by borrowers to Wells Fargo;

    h.    Demands for payment sent by Wells Fargo to borrowers;

    i.    Collections notices sent by Wells Fargo, or caused to be sent by Wells Fargo, to borrowers;

    j.    Proofs of claim sent by Wells Fargo, or caused to be sent by Wells Fargo;

    k.    Correspondence sent between Wells Fargo and QBE;

l.     Correspondence sent between Wells Fargo, credit bureaus and its debt collectors;

m.    Correspondence sent by Wells Fargo to any entities or individuals tasked with unlawfully repossessing borrowers' vehicles; and

n.     Correspondence between borrowers, Wells Fargo and/or QBE.

243.   The Wells Fargo-QBE CPI Enterprise also communicated by U.S. Mail, interstate facsimile, and by interstate electronic mail with various other affiliates, regional offices, divisions, and other third-party entities in furtherance of the Wells Fargo-QBE CPI Enterprise's mail and wire fraud.

244.   Wells Fargo and QBE knew, and intended that, Plaintiffs and the members of the Class would rely on the material misrepresentations and omissions made by them and would incur increased costs as a result. Indeed, if Plaintiffs and the Class did not make unnecessary payments for CPI policies, the Wells Fargo-QBE CPI Enterprise could not succeed.

245.   Each of these fraudulent mailings and interstate wire transmissions constitutes "racketeering activity" within the meaning of 18 U.S.C. § 1961(1)(B). Collectively, these violations constitute a "pattern of racketeering activity," within the meaning of 18 U.S.C. § 1961(5), through which Wells Fargo and QBE intended to and did defraud Plaintiffs, and members of the Class.

246.   Each instance of racketeering activity alleged herein was related, had similar purposes, involved the same or similar participants and methods of commission, and had similar results affecting similar victims, including Plaintiffs and the Class.

247.   The pattern of racketeering activity alleged herein and the Wells Fargo-QBE CPI Enterprise are separate and distinct from each other.  Likewise, Wells Fargo and QBE are distinct from the Wells Fargo-QBE CPI Enterprise, they have a separate existence from the enterprise, including distinct legal statuses, different offices and roles, bank accounts, officers, directors, employees, individual personhood, reporting requirements, and financial statements.

248.   Wells Fargo and QBE's final racketeering activity occurred within five years of the commission of a prior incident of racketeering.

**D.     Damages**

249.   Wells Fargo and QBE's pattern of racketeering activity directly and proximately caused Plaintiffs and members of the Nationwide Class injury in their business and property because Plaintiffs paid inflated charges for CPI policies that were inflated, unlawful, unnecessary and undisclosed, as well as increased interest on their automobile loans, diminished credit scores, and costs of repossession.

250.   Plaintiffs are the most directly harmed individuals and entities and there are no other Plaintiffs better suited to seek a remedy from the Wells Fargo and QBE for the economic harms at issue here.

251.   Plaintiffs also seek all legal relief as allowed by law, including *inter alia*, actual damages and treble damages.   Plaintiffs seek equitable relief, including but not limited to the elimination of adverse notations on their credit reports and remediating reduced credit scores, as deemed proper by the Court.   Plaintiffs also seek attorneys' fees, all costs and expenses of suit, and pre- and post-judgment interest pursuant to 18 U.S.C. § 1964(c).

<u>**THIRD CLAIM FOR RELIEF**</u>

**Violations of the Racketeer Influenced and Corrupt Organizations Act**

**18 U.S.C. § 1962(c)**

**(Against Defendants Wells Fargo and National General as Successor to Balboa)**

252.   Plaintiffs incorporate by reference, in this claim for relief, each and every allegation of the preceding paragraphs, with the same force and effect as though fully set forth herein. Plaintiffs allege this claim against National General, on behalf of itself and as successor to the assets and liabilities of Balboa.

253.   Plaintiffs bring this claim for relief on behalf of themselves and the members of the Nationwide Class pursuant to 18 U.S.C. §§ 1962(c) and 1964 of RICO.

1

## A.    The Wells Fargo-Balboa CPI Enterprise

254.   Wells Fargo and Balboa formed an association-in-fact enterprise, referred to as the "Wells Fargo-Balboa CPI Enterprise."  The enterprise included: (a) Wells Fargo, its subsidiaries, employees, and agents; and (b) Balboa, its subsidiaries, employees, and agents.   The Wells Fargo-Balboa CPI Enterprise was formed for the purpose of unlawfully extracting significant revenue and profits from Plaintiffs and the Class by force-placing automobile insurance policies on their automobile loans, and sharing undisclosed kickback commission payments between the members of the enterprise.

255.   At all relevant times, each member of the Wells Fargo-Balboa CPI Enterprise was aware of the enterprise's purpose and conduct, and was a knowing, willing, and active participant in that conduct.   Each member of the enterprise reaped substantial profits from the conduct of the enterprise.

256.   Each member of the enterprise acquired, maintained control of, was associated with, and conducted or participated in the conduct of the enterprise's affairs. But, at all relevant times, the enterprise, and each member thereof: (a) had an existence separate and distinct from each of its members; (b) was separate and distinct from the pattern of racketeering in which the Wells Fargo and Balboa engaged; and (c) was an ongoing and continuing organization consisting of legal entities, including Wells Fargo and Balboa, along with other individuals and entities, including unknown third parties.

257.   The members of the enterprise are systematically linked through continually coordinated activities, financial ties, and contractual business arrangements.   The Wells Fargo-Balboa CPI Enterprise was an ongoing and continuing enterprise.

258.   Neither Wells Fargo nor Balboa could have accomplished the purpose of the Wells Fargo-Balboa CPI Enterprise without the assistance of the other and both profited financially from the scheme.

259.   The Wells Fargo-Balboa CPI Enterprise described above involved regular communications between Wells Fargo and Balboa in which insurance and customer information, and payments were exchanged to facilitate the goals of the enterprise.   Such

communication occurred, and continues to occur, through the mail and wire facilities of the United States.

260.   The members of the Wells Fargo-Balboa CPI Enterprise functioned as a continuing unit for the purposes of implementing the scheme, and each agreed to take actions to hide the existence of the scheme, as well as the controlling association-in-fact enterprise, from others.

261.   The Wells Fargo-Balboa CPI Enterprise engaged in and affected interstate commerce because, *inter alia*, it advertised, issued, and affected the price and terms of auto loans and/or insurance policies that were issued to and utilized by thousands of Class members throughout the United States, its territories, the District of Columbia, and the Commonwealth of Puerto Rico. The Wells Fargo-Balboa CPI Enterprise also required that Class members make monthly insurance payments on those policies in interstate commerce to Wells Fargo.

262.   The effects of the Wells Fargo-Balboa CPI Enterprise are still felt today, as many Wells Fargo auto loan customers continue to make payments for CPI premiums and interest, and many auto loan customers continue to be damaged by CPI-related negative reports to credit reporting agencies.

**B.     Conduct of the Wells Fargo-Balboa CPI Enterprise**

263.   During the Class Period, Wells Fargo and Balboa exerted control over the Wells Fargo-Balboa CPI Enterprise and participated in the operation and management of its affairs, directly and indirectly.

264.   Wells Fargo participated in the operation and management of the enterprise in the following ways:

a.     Misrepresenting the terms of its auto loans to customers upon their initial application and throughout the application process;

b.     Transmitting loan application and other customer information to Balboa;

c.     Misrepresenting the role that Balboa played in the loan application process;

d.      Misrepresenting the circumstances under which customers would receive a force-placed CPI policy;

e.      Force-placing unnecessary and undisclosed CPI policies;

f.      Receiving kick-back commission payments from Balboa for CPI policies;

g.      Concealing the true nature of its relationship with Balboa from customers;

h.      Paying Balboa the alleged value of CPI premiums that Balboa wrote on borrowers' automobile loans;

i.      Collecting monthly payments from Class members, including premium charges and interest;

j.      Misrepresenting to credit reporting agencies and to Class members that there were delinquencies when CPI premiums and insurance were not paid; and

k.      Misrepresenting to credit reporting agencies, Class members, and the Courts that repossession of Class members' vehicles was authorized because Class members were delinquent on their loan accounts.

265.    The Wells Fargo-Balboa Enterprise has a hierarchical decision-making structure headed by Wells Fargo.  Wells Fargo generally directed the terms and cost of auto loans it used, determined who those loans would be issued to as well as when, and determined if, a customer's application and/or information would be transmitted to Balboa for review.  Wells Fargo generally directed Balboa regarding its review of automobile loan policies and, ultimately, force-placed the CPI policies underwritten by Balboa, and collected payments for them.

266.    Balboa also participated in and conducted the affairs of the Wells Fargo-Balboa CPI Enterprise, in the following ways:

a.      Underwriting CPI policies that Wells Fargo force-placed, with knowledge and intent that they be used in the enterprise's fraudulent scheme;

b.      Misrepresenting that it did or would search a database of insurance coverage to determine whether borrower's maintained insurance on their vehicles;

c.    Underwriting CPI policies for loans it knew or should have known were secured by sufficient automobile insurance;

d.    Ignoring and/or disregarding proof of insurance submitted by borrowers after they learned about force-placed CPI policies;

e.    Accepting payments from Wells Fargo for premiums due on the CPI policies;

f.    Paying kickback commissions to Wells Fargo for every CPI policy it underwrote;

g.    Transmitting information about loan applications and insurance coverage regarding Wells Fargo's customers;

h.    Misrepresenting its role in the loan application process;

i.    Authorizing the issuance of unnecessary and unauthorized CPI policies; and

j.    Concealing the true nature of its relationship with Wells Fargo.

267.   Wells Fargo and Balboa also directed and controlled the ongoing organization necessary to implement the common purpose of the enterprise and meetings and through communications which Plaintiffs cannot fully allege at present, because Wells Fargo and Balboa and other third-parties currently possess such documents.

## C.   **Pattern of Racketeering Activity**

268.   Wells Fargo and Balboa carried out their force-placed CPI scheme, through a pattern of racketeering activity that employed the use of United States mail and wire facilities.  Wells Fargo and Balboa accomplished this scheme by committing, conspiring to commit, and/or aiding-and-abetting the commission of at least two predicate acts of racketeering activity (i.e. violations of 18 U.S.C. §§ 1341 and 1343) within the past ten years.

269.   Wells Fargo and Balboa's predicate acts of racketeering activity (18 U.S.C. § 1961(1)(B)) including, but are not limited to:

- <u>Mail Fraud</u>:  Wells Fargo and Balboa violated 18 U.S.C. § 1341 by sending and/or receiving, or causing to be sent and/or received, materials via U.S.

1
2

mail or commercial interstate carriers, for the purpose of executing the unlawful and fraudulent scheme to profit from force-placed CPI policies.

3
4
5
6

- <u>Wire Fraud</u>: Wells Fargo and Balboa violated 18 U.S.C. §1343 by transmitting and/or receiving, or by causing to be transmitted and/or received, materials by wire for the purpose of executing the unlawful and fraudulent scheme to profit from force-placed CPI policies.

7
8
9
10
11
12
13

270. The Wells Fargo-Balboa CPI Enterprise's pattern of racketeering likely involved thousands of separate instances wherein the U.S. Mail or interstate wire facilities were knowingly and intentionally used to further the enterprise's pattern of racketeering activity, including mail and wire fraud. Many of the precise dates of Wells Fargo and Balboa's fraudulent use of the U.S. Mail and interstate wire facilities have been deliberately hidden, and cannot be alleged without access to Wells Fargo and Balboa's books and records.

14
15
16
17
18

271. Plaintiffs have, however, described the types of, and in some instances, occasions on which the predicate acts of mail and/or wire fraud occurred. They include thousands of communications to perpetuate and maintain the Wells Fargo-Balboa CPI Enterprise's scheme, including the things and documents described below. Wells Fargo and Balboa's use of the mail and wire includes, but is not limited to:

19
20

a. Marketing materials regarding Wells Fargo and Balboa's auto loans and CPI insurance policies;

21
22
23

b. Correspondence between Wells Fargo and Balboa establishing their relationship regarding the enterprise, and the issuance of auto loans and/or CPI policies;

24

c. Insurance policies transmitted between Wells Fargo and Balboa;

25
26

d. Loan documents exchanged between (1) Wells Fargo and borrowers; and (2) Wells Fargo and Balboa;

27

e. Loan payment notices exchanged between Wells Fargo and borrowers;

28

f. Loan balance statements exchanged between Wells Fargo and borrowers;

g.    Loan payments sent by borrowers to Wells Fargo;

h.    Demands for payment sent by Wells Fargo to borrowers;

i.    Collections notices sent by Wells Fargo, or caused to be sent by Wells Fargo, to borrowers;

j.    Proofs of claim sent by Wells Fargo, or caused to be sent by Wells Fargo;

k.    Correspondence sent between Wells Fargo and Balboa;

l.    Correspondence sent between Wells Fargo, credit bureaus and its debt collectors;

m.    Correspondence sent by Wells Fargo to any entities or individuals tasked with unlawfully repossessing borrowers' vehicles; and

n.    Correspondence between borrowers, Wells Fargo and/or Balboa.

272.   The Wells Fargo-Balboa CPI Enterprise also communicated by U.S. Mail, interstate facsimile, and by interstate electronic mail with various other affiliates, regional offices, divisions, and other third-party entities in furtherance of the enterprise's mail and wire fraud.

273.   Wells Fargo and Balboa knew, and intended that, Plaintiffs and the members of the Class would rely on the material misrepresentations and omissions made by them and would incur increased costs as a result. Indeed, if Plaintiffs and the Class did not make unnecessary payments for CPI policies, the Wells Fargo-Balboa CPI Enterprise could not succeed.

274.   Each of these fraudulent mailings and interstate wire transmissions constitutes "racketeering activity" within the meaning of 18 U.S.C. § 1961(1)(B). Collectively, these violations constitute a "pattern of racketeering activity," within the meaning of 18 U.S.C. § 1961(5), through which Wells Fargo and Balboa intended to and did defraud Plaintiffs, and members of the Class.

275.   Each instance of racketeering activity alleged herein was related, had similar purposes, involved the same or similar participants and methods of commission, and had similar results affecting similar victims, including Plaintiffs and the Class.

276.   The pattern of racketeering activity alleged herein and the Wells Fargo-Balboa CPI Enterprise are separate and distinct from each other.  Likewise, Wells Fargo and Balboa are distinct from the Wells Fargo-Balboa CPI Enterprise, they have a separate existence from the enterprise, including distinct legal statuses, different offices and roles, bank accounts, officers, directors, employees, individual personhood, reporting requirements, and financial statements.

277.   Wells Fargo and Balboa's final racketeering activity occurred within five years of the commission of a prior incident of racketeering.

**D.     Damages**

278.   Wells Fargo and Balboa's pattern of racketeering activity, directly and proximately caused Plaintiffs and members of the Nationwide Class, injury in their business and property because Plaintiffs paid inflated charges for CPI policies that were unlawful, unnecessary and undisclosed, as well as increased interest on their automobile loans, diminished credit scores, and costs of repossession.

279.   Plaintiffs are the most directly harmed individuals and entities and there are no other Plaintiffs better suited to seek a remedy from the Wells Fargo and Balboa for the economic harms at issue here.

280.   Plaintiffs also seek all legal relief as allowed by law, including *inter alia*, actual damages, and treble damages.  Plaintiffs seek equitable relief, including but not limited to the elimination of adverse notations on their credit reports and remediating reduced credit scores, as deemed proper by the Court. Plaintiffs also seek attorneys' fees, all costs and expenses of suit, and pre- and post-judgment interest pursuant to 18 U.S.C. § 1964(c).

## FOURTH CLAIM FOR RELIEF

### Violation of the Bank Holding Company Act

### 12 U.S.C. § 1972

### (Against Wells Fargo)

281.   Plaintiffs incorporate by reference each and every allegation of the preceding paragraphs, with the same force and effect as though fully set forth herein.

282.   Plaintiffs bring this claim for relief on behalf of themselves and the members of the Nationwide Class.

283.   Wells Fargo & Company and Wells Fargo Bank, N.A. are a "bank holding companies" and "banks" within the meaning of 12 U.S.C. § 1971 and 12 U.S.C. § 1841 (a) and (c).

284.   Wells Fargo Bank, N.A. is a "subsidiary" of Wells Fargo & Company, as defined in 12 U.S.C. § 1971 and 12 U.S.C. § 1841(d).

285.   Wells Fargo Dealers Services is a "subsidiary" of Wells Fargo Bank, N.A. and Wells Fargo & Company as defined in 12 U.S.C. § 1971 and 12 U.S.C. § 1841(d).

286.   The Bank Holding Company Act ("BHCA") 12 U.S.C. § 1972 prohibits a bank extending credit from requiring the borrower to agree to obtain some additional property or service from the bank, the holding company of the bank, or a subsidiary of the holding company of a bank.

287.   Specifically, the BHCA states that "a bank shall not in any manner extend credit, lease, or sell property of any kind, or furnish any service, or fix or vary the consideration for any of the foregoing, on the condition or requirement . . . that the customer shall obtain some additional credit, property, or service from [such bank or] a bank holding company of such bank, or from any other subsidiary of such bank holding company . . . [or] that the customer provide some additional credit, property, or service to [such bank] or a bank holding company of such bank, or to any other subsidiary of such bank holding company."

288.   Despite purporting to allow Plaintiffs and members of the Nationwide Class to maintain their own automobile insurance in lieu of purchasing CPI, Wells Fargo in practice required Plaintiffs and members of the Nationwide Class to pay for CPI in exchange for financing.  Each such Plaintiff and Nationwide Class Member who obtained an auto loan from Wells Fargo was subsequently charged for CPI, regardless of whether he or she maintained independent automobile insurance coverage.

289.   Wells Fargo also conditioned its forbearance from collecting on its existing automobile loans on payment of CPI charges.  When such CPI charges were not paid, Wells Fargo threatened to—and often did—cease extending credit, repossess vehicles, and assess other additional charges on Plaintiffs and members of the Nationwide Class.

290.   Wells Fargo's practice of assessing such charges for CPI, even when auto loan customers maintained their own insurance, was unusual and not traditional in the banking industry.

291.   Wells Fargo's related practice of repeatedly re-assessing such charges, threatening collections, and repossessing vehicles despite customers' objections was similarly unusual and not traditional in the banking industry.

292.   Also unusual and not traditional in the banking industry was Wells Fargo's practice of profiting from its CPI program through the generation of kickbacks in the form of commission payments from Balboa, QBE, and National General.

293.   As set forth above, Wells Fargo's extension of credit under the conditions set out above—including its forbearance from collecting on existing credit—constituted an anticompetitive tying arrangement in violation of 12 U.S.C. § 1972(1).

294.   Wells Fargo's extension of credit on these terms benefited Wells Fargo because the force-placed CPI generated revenue for Wells Fargo in the form of kickbacks from National General, increased interest payments, and fees, among other methods.

295.   Wells Fargo's provision of CPI to Plaintiffs and members of the National Class constituted both a "service" and "credit" under 12 U.S.C. § 1972(A) and (B).

296.   Plaintiffs' and National Class Members' payments to Wells Fargo for CPI charges and related fees constituted "property" under 12 U.S.C. § 1972(C) and (D).

297.   As a direct and proximate result of Wells Fargo's violation of 12 U.S.C. § 1972(1), Plaintiffs have suffered damage and are entitled to treble damages pursuant to 12. U.S.C. § 1975.

## FIFTH CLAIM FOR RELIEF

### Violation of the Consumer Legal Remedies Act

### Cal. Civ. Code § 1750 *et seq.*

### (Against All Defendants)

298.   Plaintiffs incorporate by reference each and every allegation of the preceding paragraphs with the same force and effect as though fully set forth herein. Plaintiffs allege this claim against National General, on behalf of itself and as successor to the assets and liabilities of Balboa and QBE.

299.   Plaintiffs Duane Fosdick, Analisa Moskus and Keith Preston  (for purposes of this claim, "Plaintiffs") bring this count on behalf of themselves, the Nationwide Class, and, in the alternative, on behalf of the California State Class (for purposes of this claim, the "Class").

300.   Plaintiffs and other members of the Class were deceived by Defendants' failure to disclose their pattern of practice of force-placing unlawful, unnecessary and undisclosed CPI policies without regard to the insurance policies maintained by Plaintiffs and Class members, and that Defendants shared in kickback commissions on the undisclosed CPI policies.

301.   Defendants engaged in unfair or deceptive acts or practices when, in the course of their business they, among other acts and practices, made materially incomplete representations about the circumstances under which CPI policies would be force-placed, their pattern and practice of force-placing unnecessary CPI policies, and that Defendants were sharing kick-back commissions for force-placed CPI policies.   In so doing, Defendants engaged in unfair or deceptive acts or practices, as defined by the California

Consumers Legal Remedies Act (the "CLRA"),  Cal. Civ. Code §1770 *et seq.*, including but not limited to:

    a.    Misrepresenting the source, sponsorship, approval, or certification of Defendants' loans and CPI policies;

    b.    Representing that Defendants' loans and CPI policies have sponsorship, approval, characteristics, or benefits that they do not have;

    c.    Advertising Defendants' loans and CPI policies with intent not to sell them as advertised; and

    d.    Representing that Defendants' loans and CPI policies confers or involves rights, remedies, or obligations which they do not have or involve, or which are prohibited by law;

302.   In the various channels of information through which Defendants offered loans and CPI policies, Defendants failed to disclose material information concerning their loans and CPI policies.  Defendants had a duty to disclose because they:

    a.    Possessed exclusive knowledge that they were force-placing CPI policies throughout the United States that did not comply with federal or state law or comply with their loan contracts;

    b.    Concealed the foregoing from Plaintiffs and the Class members; and/or

    c.    Made incomplete representations about the CPI policies generally, including the manner in which, and under what circumstances, they would be force-placed and the premiums Plaintiffs and the Class members would be obligated to pay.

303.   As alleged above, Defendants knew about the pattern and practice of fraudulently force-placing and profiting from CPI policies at the time they made representations about their loans and CPI Policies.  Moreover, all of the information that Defendants disclosed and concealed was intended to induce consumers to obtain automobile loans from Defendants.

304.   Defendants intended for the Plaintiffs and the other Class members to rely on them to provide adequately and honestly funded and managed automobile loans, and to honestly and accurately reveal the problems described throughout this Complaint.

305.   Plaintiffs and the other Class members have suffered injury in fact and actual damages resulting from Defendants' material omissions because they paid inflated charges, charged interest, and contributed to the unlawful payment of kick-back commissions from the unlawfully force-placed CPI Policies.

306.   Plaintiffs and the Class seek an order enjoining Defendants' unfair or deceptive acts or practices, equitable relief, an award of attorneys' fees and costs under Cal. Civ. Code § 1780(e), and any other just and proper relief available under the CLRA.

307.   Plaintiffs and the Class are serving notice of suit and a demand pursuant to Cal. Civ. Code § 1782(a), and reserve the right to amend this Complaint to seek damages under the CLRA.

## SIXTH CLAIM FOR RELIEF

### Violation of the California Unfair Competition Law

### Cal. Bus. & Prof. Code § 17200 *et seq.*

### (Against All Defendants)

308.   Plaintiffs incorporate by reference each and every allegation of the preceding paragraphs with the same force and effect as though fully set forth herein.   Plaintiffs allege this claim against National General, on behalf of itself and as successor to the assets and liabilities of Balboa and QBE.

309.   Plaintiffs Duane Fosdick, Analisa Moskus and Keith Preston (for purposes of this claim, "Plaintiffs") bring this claim for relief on behalf of themselves.   The Nationwide Class, and, in the alternative, on behalf the California State Class (for purposes of this claim, the "Class").

310.   California's Unfair Competition Law ("UCL"), Business and Professions Code § 17200 *et seq.*, prohibits any "unlawful, unfair, or fraudulent business act or

practices." Defendants have engaged in unlawful, fraudulent, and unfair business acts and practices in violation of the UCL.

311.   Defendants' practice of force-placing CPI policies and charging customers for inflated charges due to undisclosed kickback commissions and interest on those policies, as alleged herein, constitutes unfair business acts or practices because Defendants' conduct was injurious to consumers, offended public policy, and was unethical and scrupulous.  Defendants' unfair business acts and practices caused harm to consumers in California and nationwide.  The gravity of the harm suffered by hundreds of thousands of consumers greatly outweighs the utility of force-placing unnecessary CPI policies.

312.   Defendants' practice of force-placing CPI policies and charging customers for inflated charges due to undisclosed kickback commissions and interest on those policies, as alleged herein, constitute unlawful business acts or practices because they violate multiple state, federal and common laws, including, but not limited to:  18 U.S.C. §§ 1341, 1343; 18 U.S.C. § 1962; 12 U.S.C. § 1972, *et seq.*; Cal Civ. Code §§ 1572, 1573, 1709, 1710, and 1711; and the common law.

313.   Defendants' practice of force-placing CPI policies and charging customers for inflated charges due to undisclosed kickback commissions and interest on those policies, as alleged herein, also constitutes fraudulent business acts or practices. Defendants' representations regarding the CPI policies, including the statements regarding charges, and omissions of material fact regarding its pattern and practice of force-placing unnecessary CPI policies were false, misleading, and likely to deceive the public, including Plaintiffs and members of the Class.

314.   Plaintiffs and the other Class members relied on the reasonable expectation that Defendants comply with the law.  Plaintiffs and the Class also relied on Defendants' representations that the force-placed CPI charges were lawful and necessary and required to maintain their loans in good standing, and to avoid repossession.

315.   Accordingly, Plaintiffs and the other Class members have suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' misrepresentations and their concealment of and failure to disclose material information.

316.   Plaintiffs requests that this Court enter such orders or judgments as may be necessary to enjoin Defendants from continuing its unfair, unlawful, and/or deceptive practices and to restore to Plaintiffs and members of the Class any money it acquired by unfair competition, including restitution and/or restitutionary disgorgement, as provided in Cal. Bus. & Prof. Code § 17203 and Cal. Bus. & Prof. Code § 3345; and for such other relief set forth below.

## SEVENTH CLAIM FOR RELIEF

### Fraud by Concealment

### (Against All Defendants)

317.   Plaintiffs incorporate by reference each and every allegation of the preceding paragraphs with the same force and effect as though fully set forth herein. Plaintiffs allege this claim against National General, on behalf of itself and as successor to the assets and liabilities of Balboa and QBE.

318.   Plaintiffs bring this claim for relief on behalf of themselves and the Nationwide Class, and, in the alternative, on behalf of the California State Class (for purposes of this claim, the "Class").

319.   Each Defendant committed fraud through their scheme to force-placing unlawful, unnecessary, and undisclosed CPI policies on the automobile loans of the Plaintiffs and Class members.  Defendants concealed from Plaintiffs and the Class members that they engaged in a pattern of practice of force-placing CPI policies on borrowers' automobile loans, and sharing in kickback payments in the form of commissions for the force-placed CPI policies, without regard for the insurance policies already maintained by Plaintiffs and the Class members.

320.   Wells Fargo began requiring insurance on automobile loans as early as 2005. In conjunction with the insurance requirement, Wells Fargo represented to Plaintiffs and

Class members that they needed to maintain active comprehensive and collision insurance naming Wells Fargo as a loss payee, and that proof of insurance was required. Absent from Wells Fargo's discussion of the necessary insurance was any mention of force-placed collateral insurance. However, Wells Fargo did explain, in other representations, that borrowers could be charged for CPI premiums, and interest therein, if applicable.

321. Force-placed CPI policies were not applicable unless the Plaintiffs or Class members did not maintain insurance on their vehicles. But, when Wells Fargo made these representations, it intentionally concealed, suppressed, omitted, and failed to disclose the material facts that Wells Fargo, in conjunction with Balboa, QBE, and National General, force-placed CPI polices without regard for the insurance Plaintiffs or Class members maintained on their vehicle. Wells Fargo intentionally concealed, suppressed, omitted, and failed to disclose the material fact that it received kickback commission payments from Balboa, QBE, and National General related to the CPI policies they issued.

322. On information and belief, Balboa, QBE, and National General represented to Plaintiffs and Class members that premiums for the force-placed CPI policies were necessary and proper because they were required by Wells Fargo. On information and belief Balboa, QBE, and National General also represented that they would not force-place CPI policies if the Plaintiffs and Class members maintained insurance on their vehicles. But, Balboa, QBE, and National General intentionally concealed, suppressed, omitted, and failed to disclose the material facts that they, in conjunction Wells Fargo, force-placed CPI polices without regard for the insurance Plaintiffs or Class members maintained on their vehicle. Balboa, QBE, and National General intentionally concealed, suppressed, omitted, and failed to disclose the material fact they paid kickback commissions to Wells Fargo for the CPI policies they issued.

323. A reasonable consumer who maintained the insurance coverage required by Defendants would not have expected to be charged premiums or interest for force-placed CPI policies, or to contribute to the kick-back commission payments between Wells Fargo, Balboa, QBE, and National General. Plaintiffs and the members of the Class did

not know of the facts which Defendants concealed from them.  Moreover, as consumers, Plaintiffs and the members of the Class did not, and could not, unravel the deception on their own.

324.  Defendants had a duty to disclose that they had a pattern and practice of force-placing CPI policies without regard for the insurance policies maintained by Plaintiffs or the Class members, and sharing kickback commissions on the force-placed CPI policies.  Defendants had such a duty because they had superior knowledge -- the true facts were known only to them and they knew that these facts were not known to or reasonably discoverable by Plaintiffs or members of the Class.  Defendants also had a duty to disclose the true nature of their CPI scheme because they actively concealed the truth from Plaintiffs and the members of the Class.

325.  Finally, Defendants had a duty to disclose the true nature of their fraudulent CPI scandal in light of their statements and partial representations about the circumstances under which they would force-place CPI policies, the validity of their CPI practices, and the charges for premiums and interest on CPI policies, as alleged herein.  Having volunteered to provide information to Plaintiffs and the Class members, Defendants had the duty to disclose the whole truth.

326.  As alleged above, Plaintiffs and the Class members reviewed documents that were made available to them in connection with their auto loans.  Had the truth concerning the CPI scheme been disclosed, Plaintiffs and the Class members would have seen and been aware of it, and would not have obtained an auto loan from Wells Fargo, would not have paid the CPI charges, and/or would have disputed the CPI charges and demanded full compensation.  Plaintiffs and members of the Class sustained damages because they were forced to pay inflated charges and insurance for unlawful, unnecessary, and undisclosed CPI policies.  Plaintiffs and members of the Class also sustained damages when they incurred late fees, insufficient funds fees, damage to their credit scores, and repossession of their vehicles.  Accordingly, Defendants are liable to Plaintiffs and the members of the Class for damages in an amount to be proven at trial.

327.   Defendants' acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud; in reckless disregard of the rights of Plaintiffs; and to enrich themselves.  Defendants' misconduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount shall be determined according to proof at trial.

## EIGHTH CLAIM FOR RELIEF

### Unjust Enrichment

### (Against All Defendants)

328.   Plaintiffs incorporate by reference, in this cause of action, each and every allegation of the preceding paragraphs with the same force and effect as though fully set forth herein. Plaintiffs allege this claim against National General, on behalf of itself and as successor to the assets and liabilities of Balboa and QBE.

329.   Plaintiffs Nyle Davis, Regina Gonzalez, Brandon Haag, Paul Hancock, Dustin Havard, Brian Miller, Victoria Reimche, Bryan Tidwell (for purposes of this claim, "Plaintiffs") bring this Claim for Relief on behalf of themselves, and on behalf of the Colorado State Class, the Indiana State Class, the Mississippi State Class, the Minnesota State Class, the Missouri State Class, the Tennessee State Class, the Wisconsin State Class and the Wyoming State Class (for purposes of this claim, the "Class").

330.   Defendants force-placed unnecessary and undisclosed CPI policies on Plaintiffs and the Class members' automobile loan accounts, resulting in the payment of CPI premium, interest, late fees, and other charges to Defendants.

331.   Defendants were unjustly enriched at the expense of Plaintiffs and the Class members.  Money and property belonging to the Plaintiffs and members of the Class were unjustly taken by Defendants.

332.   It would be inequitable and unconscionable for Defendants to retain the profit, benefit, and other compensation they obtained from the conduct alleged herein.

333.   Plaintiffs and Class members seek restitution from Defendants, and an order disgorging all profits, benefits, and other compensation obtained by Defendants from their unlawful practice of force-placing unlawful, unnecessary, and undisclosed CPI policies.

334.   In the alternative, Plaintiffs and Class members seek an order establishing a constructive trust over all money or property wrongfully obtained by the Defendants' conduct alleged herein.

## X.   CLAIMS ASSERTED ON BEHALF OF STATE CLASSES

## COLORADO COUNT ONE: VIOLATION OF THE COLORADO CONSUMER PROTECTION ACT

### (Against All Defendants)

335.   Plaintiffs incorporate by reference each and every allegation of the preceding paragraphs with the same force and effect as though fully set forth herein.

336.   Plaintiff Victoria Reimche (for the purposes of this count, "Plaintiff") brings this count on behalf of herself and the Colorado State Class members against all Defendants.   Plaintiff and the Colorado State Class allege this claim against National General, on behalf of itself and as successor to the assets and liabilities of Balboa and QBE.

337.   Plaintiff and the Colorado State Class members are "persons" within the meaning of § 6-1-102(6) of the Colorado Consumer Protection Act ("Colorado CPA"), COLO. REV. STAT. § 6-1-101, *et seq.* Plaintiff and the Colorado State Class members are "consumers" within the meaning of COLO. REV. STAT. § 6-1-113(1)(a).

338.   Defendants are "persons" within the meaning of the Colorado Consumer CPA.

339.   The Colorado CPA prohibits deceptive trade practices in the course of a person's business. COLO. REV. STAT. § 6-1-105.

340.   In the course of their business, Defendants, through their agents, employees, and/or subsidiaries, violated the Colorado CPA as detailed above.   Specifically, in force-placing CPI policies and sharing in kick-back commission payments, Defendants engaged

in one or more of the following unfair or deceptive acts or practices as defined in COLO. REV. STAT. § 6-1-105, including, but not limited to:

  a. Representing that Defendants' loans and CPI policies have approval, characteristics, uses, or benefits that they do not have;

  b. Advertising Defendants' loans and CPI policies with the intent not to sell them as advertised; and/or

  c. Making a false or misleading statement of fact concerning the price of Defendants' loans and CPI policies.

341. Defendants' scheme and concealment of the true characteristics of their fraudulent CPI scheme was material to the Colorado State Class, as Defendants intended. Had they known the truth, the Colorado State Class would not have obtained automobile loans from Wells Fargo.

342. Plaintiff and the Colorado State Class members had no way of discerning that Defendants' representations were false or misleading.  Plaintiff and Colorado State Class members did not and could not unravel Defendants' deception on their own.

343. Defendants intentionally and knowingly misrepresented or omitted material facts regarding their CPI policies with intent to mislead Plaintiff and the Colorado State Class members.  Defendants knew or should have known that their conduct violated the Colorado CPA.

344. Defendants owed Plaintiff and the Colorado State Class members a duty to disclose the illegality of their scheme to force-place CPI policies because Defendants:

  a. Possessed exclusive knowledge that they were force-placing CPI policies throughout the United States that did not comply with federal or state law or comply with their loan contracts;

  b. Intentionally concealed the foregoing from Plaintiff and the Colorado State Class members; and/or

  c. Made incomplete representations about the CPI policies generally, including the manner in which, and under what circumstances, they would be force-

CONSOLIDATED CLASS ACTION COMPLAINT

placed and the premiums Plaintiff and the Colorado State Class members would be obligated to pay.

345.   Plaintiff and Colorado State Class members suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' concealment, misrepresentations, and/or failure to disclose material information.

346.   Defendants' violations present a continuing risk to Plaintiff and the Colorado State Class, as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

347.   Pursuant to COLO. REV. STAT. § 6-1-113, Plaintiff and the Colorado State Class seek an order enjoining Defendants' unfair and/or deceptive acts or practices, and awarding damages, treble or punitive damages, and any other just and proper relief available under the Colorado CPA.

## ILLINOIS COUNT ONE: VIOLATION OF THE ILLINOIS CONSUMER FRAUD AND DECEPTIVE TRADE PRACTICES ACT
### 815 ILL. COMP. STAT. 505/1 *et seq.* and 510/2
### (Against All Defendants)

348.   Plaintiffs incorporate by reference each and every allegation of the preceding paragraphs with the same force and effect as though fully set forth herein.

349.   Plaintiff Odis Cole (for the purposes of this count, "Plaintiff") brings this count on behalf of himself and the Illinois State Class members against all Defendants. Plaintiff and the Illinois State Class allege this claim against National General, on behalf of itself and as successor to the assets and liabilities of Balboa and QBE.

350.   Plaintiff and the Illinois State Class are "consumers" as that term is defined in 815 ILL. COMP. STAT. 505/1(e).

351.   Defendants are "person[s]" as that term is defined in 815 ILL. COMP./1(c).

352.   The Illinois Consumer Fraud and Deceptive Business Practices Act ("Illinois CFA") prohibits "unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or

72
CONSOLIDATED CLASS ACTION COMPLAINT

the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact … in the conduct of trade or commerce … whether any person has in fact been misled, deceived or damaged thereby." 815 ILL. COMP. STAT. 505/2.  The Illinois CFA further prohibits deceptive trade practices undertaken in the course of business. 815 ILL. COMP. STAT. 510/2.

353.   In the course of their business, Defendants, through their agents, employees, and/or subsidiaries, violated the Illinois CFA as detailed above.  Specifically, in force-placing CPI policies and sharing in kick-back commission payments, Defendants engaged in one or more of the following unfair or deceptive acts or practices as defined in 815 ILL. COMP. STAT. 505/2 and 510/2, including, but not limited to:

a.   Causing likelihood of confusion or of misunderstanding as to the approval or certification of Defendants' loans and CPI policies;

b.   Representing that Defendants' loans and CPI policies have approval, characteristics, uses, or benefits that they do not have;

c.   Advertising Defendants' loans and CPI policies with the intent not to sell them as advertised;

d.   Engaging in other conduct which created a likelihood of confusion or of misunderstanding; and/or

e.   Using or employing deception, fraud, false pretense, false promise or misrepresentation, or the concealment, suppression, or omission of a material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the advertisement and sale of Defendants' loans and CPI policies, whether or not any person has in fact been misled, deceived, or damaged thereby.

354.   Defendants' scheme and concealment of the true characteristics of their fraudulent CPI scheme was material to the Plaintiff and the Illinois State Class, as Defendants intended.  Had they known the truth, Plaintiff and the Illinois State Class would not have obtained automobile loans from Wells Fargo.

355.   Plaintiff and the Illinois State Class members had no way of discerning that Defendants' representations were false or misleading.  Plaintiff and the Illinois State Class members did not and could not unravel Defendants' deception on their own.

356.   Defendants intentionally and knowingly misrepresented or omitted material facts regarding their CPI policies with intent to mislead Plaintiff and the Illinois State Class members.  Defendants knew or should have known that their conduct violated the Illinois CFA.

357.   Defendants owed Plaintiff and the Illinois State Class members a duty to disclose the illegality of their scheme to force-place CPI policies because Defendants:

a.   Possessed exclusive knowledge that they were force-placing CPI policies throughout the United States that did not comply with federal or state law or comply with their loan contracts;

b.   Intentionally concealed the foregoing from Plaintiff and the Illinois State Class members; and/or

c.   Made incomplete representations about the CPI policies generally, including the manner in which, and under what circumstances, they would be force-placed and the premiums Plaintiff and the Illinois State Class members would be obligated to pay.

358.   Plaintiff and Illinois State Class members suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' concealment, misrepresentations, and/or failure to disclose material information.

359.   Defendants' violations present a continuing risk to Plaintiff and the Illinois State Class, as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

360.   Pursuant to 815 ILL. COMP. STAT. 505/10a(a) and 510/3, Plaintiff and the Illinois State Class seek an order enjoining Defendants' unfair and/or deceptive acts or practices, and awarding damages, punitive damages, and any other just and proper relief available under the Illinois CFA.

CONSOLIDATED CLASS ACTION COMPLAINT

## INDIANA COUNT ONE: VIOLATION OF THE INDIANA DECEPTIVE CONSUMER SALES ACT

### Indiana Code § 24-5-0.5-3 *et seq.*

### (Against All Defendants)

361.   Plaintiffs incorporate by reference each and every allegation of the preceding paragraphs with the same force and effect as though fully set forth herein.

362.   Plaintiff Paul Hancock (for the purposes of this count, "Plaintiff") brings this count on behalf of himself and the Indiana State Class members against all Defendants. Plaintiff and the Indiana State Class allege this claim against National General, on behalf of itself and as successor to the assets and liabilities of Balboa and QBE.

363.   Plaintiff and the Indiana State Class members are "persons" within the meaning of IND. CODE § 24-5-0.5-2(2).

364.   Defendants are "persons" within the meaning of IND. CODE § 24-5-0.5-2(2) and "supplier[s]" within the meaning of IND. CODE § 24-5- .05-2(a)(3).  Defendants' loans and CPI policies are "consumer transactions" within the meaning of IND. CODE § 24-5- .05-2(a)(1).

365.   The Indiana Deceptive Consumer Sales Act ("Indiana DCSA") prohibits any unfair, abusive, or deceptive act, omission, or practice in connection with a consumer transaction.  IND. CODE § 24-5-0.5-3.  "Such an act, omission, or practice . . . is a violation of this chapter whether it occurs before, during, or after the transaction."  *Id.*

366.   In the course of their business, Defendants, through their agents, employees, and/or subsidiaries, violated the Indiana DCSA as detailed above.  Specifically, in force-placing CPI policies and sharing in kick-back commission payments, Defendants engaged in one or more of the following unfair or deceptive acts or practices as defined in IND. CODE § 24-5-0.5-3, including, but not limited to:

   a.   Representing that Defendants' loans and CPI policies have approval, characteristics, uses, or benefits that they do not have; and/or

b.    Advertising Defendants' loans and CPI policies with the intent not to sell them as advertised.

367.    Defendants' scheme and concealment of the true characteristics of their fraudulent CPI scheme was material to the Indiana State Class, as Defendants intended. Had they known the truth, the Indiana State Class would not have obtained automobile loans from Wells Fargo.

368.    Plaintiff and the Indiana State Class members had no way of discerning that Defendants' representations were false or misleading.   Plaintiff and the Indiana State Class members did not and could not unravel Defendants' deception on their own.

369.    Defendants intentionally and knowingly misrepresented or omitted material facts regarding their CPI policies with intent to mislead Plaintiff and the Indiana State Class members.  Defendants knew or should have known that their conduct violated the Indiana DCSA.

370.    Defendants owed Plaintiff and the Indiana State Class members a duty to disclose the illegality of their scheme to force-place CPI policies because Defendants:

a.    Possessed exclusive knowledge that they were force-placing CPI policies throughout the United States that did not comply with federal or state law or comply with their loan contracts;

b.    Intentionally concealed the foregoing from Plaintiff and the Indiana State Class members; and/or

c.    Made incomplete representations about the CPI policies generally, including the manner in which, and under what circumstances, they would be force-placed and the premiums Plaintiff and the Indiana State Class members would be obligated to pay.

371.    Plaintiff and the Indiana State Class members suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' concealment, misrepresentations, and/or failure to disclose material information.

372.    Defendants' violations present a continuing risk to Plaintiff and the Indiana State Class, as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

373.    Pursuant to IND. CODE § 24-5-0.5-4, Plaintiff and the Indiana State Class seek an order enjoining Defendants' unfair and/or deceptive acts or practices, and awarding damages, punitive damages, and any other just and proper relief available under the Indiana DCSA.

## MINNESOTA COUNT ONE: VIOLATION OF MINNESOTA PREVENTION OF CONSUMER FRAUD ACT

### Minnesota Statutes § 325F.68 *et seq.*

### (Against All Defendants)

374.    Plaintiffs incorporate by reference each and every allegation of the preceding paragraphs with the same force and effect as though fully set forth herein.

375.    Plaintiff Regina Gonzalez (for the purposes of this count, "Plaintiff") brings this count on behalf of herself and the Minnesota State Class members against all Defendants.  Plaintiff and the Minnesota State Class allege this claim against National General, on behalf of itself and as successor to the assets and liabilities of Balboa and QBE.

376.    Defendants' loans and CPI policies constitute "merchandise" within the meaning of MINN. STAT. § 325F.68(2).

377.    The Minnesota Prevention of Consumer Fraud Act ("Minnesota CFA") prohibits "[t]he act, use, or employment by any person of any fraud, false pretense, false promise, misrepresentation, misleading statement or deceptive practice, with the intent that others rely thereon in connection with the sale of any merchandise, whether or not any person has in fact been misled, deceived, or damaged thereby …."  MINN. STAT. § 325F.69(1).

378.    In the course of their business, Defendants, through their agents, employees, and/or subsidiaries, violated the Minnesota CFA as detailed above.  Specifically, in force-

placing CPI policies and sharing in kick-back commission payments, Defendants engaged in one or more of the following unfair or deceptive acts or practices as defined in MINN. STAT. § 325F.69(1), including but not limited to: using or employing deception, fraud, false pretense, false promise or misrepresentation, or the concealment, suppression or omission of a material fact with intent that others rely upon such concealment, suppression or omission, in connection with the advertisement and sale of Defendants' loans and CPI Policies, whether or not any person has in fact been misled, deceived, or damaged thereby.

379. Defendants' scheme and concealment of the true characteristics of their fraudulent CPI scheme was material to the Minnesota State Class, as Defendants intended. Had they known the truth, the Minnesota State Class would not have obtained automobile loans from Wells Fargo.

380. Plaintiff and the Minnesota State Class members had no way of discerning that Defendants' representations were false or misleading. Plaintiffs and Minnesota State Class members did not and could not unravel Defendants' deception on their own.

381. Defendants intentionally and knowingly misrepresented or omitted material facts regarding their CPI policies with intent to mislead Plaintiff and the Minnesota State Class members. Defendants knew or should have known that their conduct violated the Minnesota CFA.

382. Defendants owed Plaintiff and the Minnesota State Class members a duty to disclose the illegality of their scheme to force-place CPI policies because Defendants:

    a.    Possessed exclusive knowledge that they were force-placing CPI policies throughout the United States that did not comply with federal or state law or comply with their loan contracts;

    b.    Intentionally concealed the foregoing from Plaintiff and the Minnesota State Class members; and/or

    c.    Made incomplete representations about the CPI policies generally, including the manner in which, and under what circumstances, they would be force-

placed and the premiums Plaintiff and the Minnesota State Class members would be obligated to pay.

383.   Plaintiff and Minnesota State Class members suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' concealment, misrepresentations, and/or failure to disclose material information.

384.   Defendants' violations present a continuing risk to Plaintiff and the Minnesota State Class, as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

385.   Pursuant to MINN. STAT. §§ 8.31(3a) and 549.20(1)(a), Plaintiff and the Minnesota State Class seek an order enjoining Defendants' unfair and/or deceptive acts or practices, and awarding damages, and any other just and proper relief available under the Minnesota CFA.

## MINNESOTA COUNT TWO: VIOLATION OF MINNESOTA UNIFORM DECEPTIVE TRADE PRACTICES ACT
### Minnesota Statutes § 325d.43 *et seq.*
### (Against All Defendants)

386.   Plaintiffs incorporate by reference each and every allegation of the preceding paragraphs with the same force and effect as though fully set forth herein.

387.   Plaintiff Regina Gonzalez (for the purposes of this count, "Plaintiff") brings this count on behalf of herself and the Minnesota State Class members against all Defendants.  Plaintiff and the Minnesota State Class alleges this claim against National General, on behalf of itself and as successor to the assets and liabilities of Balboa and QBE.

388.   The Minnesota Deceptive Trade Practices Act ("Minnesota DTPA") prohibits deceptive trade practices. MINN. STAT. § 325D.44.

389.   In the course of their business, Defendants, through their agents, employees, and/or subsidiaries, violated the Minnesota DTPA as detailed above.  Specifically, in force-placing CPI policies and sharing in kick-back commission payments, Defendants

engaged in one or more of the following unfair or deceptive acts or practices as defined in MINN. STAT. § 325D.44, including, but not limited to:

    a.     Causing likelihood of confusion or of misunderstanding as to the approval or certification of Defendants' loans and CPI policies;

    b.     Representing that Defendants' loans and CPI policies have approval, characteristics, uses, or benefits that they do not have;

    c.     Advertising Defendants' loans and CPI policies with the intent not to sell them as advertised; and/or

    d.     Engaging in other conduct which created a likelihood of confusion or of misunderstanding.

390. Defendants' scheme and concealment of the true characteristics of their fraudulent CPI scheme was material to the Minnesota State Class, as Defendants intended. Had they known the truth, the Minnesota State Class would not have obtained automobile loans from Wells Fargo.

391. Plaintiff and the Minnesota State Class members had no way of discerning that Defendants' representations were false or misleading. Plaintiff and Minnesota State Class members did not and could not unravel Defendants' deception on their own.

392. Defendants intentionally and knowingly misrepresented or omitted material facts regarding their CPI policies with intent to mislead Plaintiff and the Minnesota State Class members. Defendants knew or should have known that their conduct violated the Minnesota DTPA.

393. Defendants owed Plaintiff and the Minnesota State Class members a duty to disclose the illegality of their scheme to force-place CPI policies because Defendants:

    a.     Possessed exclusive knowledge that they were force-placing CPI policies throughout the United States that did not comply with federal or state law or comply with their loan contracts;

    b.     Intentionally concealed the foregoing from Plaintiff and the Minnesota State Class members; and/or

1
2
3
4

    c.    Made incomplete representations about the CPI policies generally, including the manner in which, and under what circumstances, they would be force-placed and the premiums Plaintiff and the Minnesota State Class members would be obligated to pay.

5
6
7

394.   Plaintiff and the Minnesota State Class members suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' concealment, misrepresentations, and/or failure to disclose material information.

8
9
10

395.   Defendants' violations present a continuing risk to Plaintiff and the Minnesota State Class, as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

11
12
13
14

396.   Pursuant to MINN. STAT. §§ 8.31(3a), 325D.45, and 549.20(1)(a), Plaintiff and the Minnesota State Class seek an order enjoining Defendants' unfair and/or deceptive acts or practices, and awarding damages, and any other just and proper relief available under the Minnesota DTPA.

15
16

**MISSISSIPPI COUNT ONE: VIOLATION OF THE MISSISSIPPI CONSUMER PROTECTION ACT**

17

**Mississippi Code Annotated § 75-24-1 *et seq.***

18

**(Against All Defendants)**

19
20

397.   Plaintiffs incorporate by reference each and every allegation of the preceding paragraphs with the same force and effect as though fully set forth herein.

21
22
23
24
25

398.   Plaintiffs Brian Miller and Dustin Havard (for the purposes of this count, "Plaintiffs") bring this count on behalf of themselves and the Mississippi State Class members against all Defendants.  Plaintiffs and the Mississippi State Class allege this claim against National General, on behalf of itself and as successor to the assets and liabilities of Balboa and QBE.

26
27
28

399.   The Mississippi Consumer Protection Act ("Mississippi CPA") prohibits "unfair or deceptive trade practices in or affecting commerce."  MISS. CODE. ANN.§ 75-24-5(1).

400.   In the course of their business, Defendants, through their agents, employees, and/or subsidiaries, violated the Mississippi CPA as detailed above. Specifically, in force-placing CPI policies and sharing in kick-back commission payments, Defendants engaged in one or more of the following unfair or deceptive acts or practices as defined in MISS. CODE. ANN.§ 75-24-5(1), including, but not limited to:

a.   Misrepresentation of the source, sponsorship, approval, or certification of Defendants' loans or CPI policies;

b.   Representing that Defendants' loans and CPI policies have approval, characteristics, uses, or benefits that they do not have; and/or

c.    Advertising Defendants' loans and CPI policies with the intent not to sell them as advertised.

401.   Defendants' scheme and concealment of the true characteristics of their fraudulent CPI scheme was material to Plaintiffs and the Mississippi State Class, as Defendants intended.  Had they known the truth, Plaintiffs and the Mississippi State Class would not have obtained automobile loans from Wells Fargo.

402.   Plaintiffs and the Mississippi State Class members had no way of discerning that Defendants' representations were false or misleading.  Plaintiffs and the Mississippi State Class members did not and could not unravel Defendants' deception on their own.

403.   Defendants intentionally and knowingly misrepresented or omitted material facts regarding their CPI policies with intent to mislead Plaintiffs and the Mississippi State Class members.  Defendants knew or should have known that their conduct violated the Mississippi CPA.

404.   Defendants owed Plaintiffs and the Mississippi State Class members a duty to disclose the illegality of their scheme to force-place CPI policies because Defendants:

a.   Possessed exclusive knowledge that they were force-placing CPI policies throughout the United States that did not comply with federal or state law or comply with their loan contracts;

b.   Intentionally concealed the foregoing from Plaintiffs and the Mississippi State Class members; and/or

c.   Made incomplete representations about the CPI policies generally, including the manner in which, and under what circumstances, they would be force-placed and the premiums Plaintiffs and the Mississippi State Class members would be obligated to pay.

405.   Plaintiffs and the Mississippi State Class members suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' concealment, misrepresentations, and/or failure to disclose material information.

406.   Defendants' violations present a continuing risk to Plaintiffs and the Mississippi State Class, as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

407.   Plaintiffs and the Mississippi State Class seek an under MISS. CODE. ANN. § 75-25-9 enjoining Defendants' unfair and/or deceptive acts or practices and awarding damages, including restitution under § 75-24-11, and any other just and proper relief available under the Mississippi CPA.

408.   Plaintiffs and the Mississippi State Class are serving notice of suit and a demand, and reserve the right to amend this Complaint to seek damages under the Mississippi CPA.

## MISSOURI COUNT ONE: VIOLATION OF MISSOURI MERCHANDISING PRACTICES ACT

### Missouri Revised Statutes § 407.010 *et seq.*

### (Against All Defendants)

409.   Plaintiffs incorporate by reference each and every allegation of the preceding paragraphs with the same force and effect as though fully set forth herein.

410.   Plaintiff Nyle Davis (for the purposes of this count, "Plaintiff") brings this count on behalf of himself and the Missouri State Class members against all Defendants.

Plaintiff alleges this claim against National General, on behalf of itself and as successor to the assets and liabilities of Balboa and QBE.

411.   Plaintiff and the Missouri State Class members are "persons" within the meaning of MO. REV. STAT.  407.010(5).

412.   Defendants are "persons" within the meaning of MO. REV. STAT. § 407.010(5).  Defendants are also engaged in "trade" or "commerce" within the meaning of MO. REV. STAT. § 407.010(7).

413.   The Missouri Merchandising Practices Act ("Missouri MPA") prohibits the "act, use or employment by any person of any deception, fraud, false pretense, misrepresentation, unfair practice, or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise in trade or commerce."  MO. REV. STAT. § 407.020.  Any "act, use or employment declared unlawful by [the Missouri MPA] violates [section 407.020] whether committed before, during or after the sale, advertisement or solicitation." *Id.*

414.   In the course of their business, Defendants, through their agents, employees, and/or subsidiaries, violated the Missouri MPA as detailed above.  Specifically, in force-placing CPI policies and sharing in kick-back commission payments, Defendants engaged in one or more of the following unfair or deceptive acts or practices as defined in MO. REV. STAT. § 407.020, including, but not limited to: using or employing deception, fraud, false pretense, false promise or misrepresentation, or the concealment, suppression or omission of a material fact with intent that others rely upon such concealment, suppression or omission, in connection with the advertisement and sale of Defendants' loans and CPI policies, whether or not any person has in fact been misled, deceived or damaged thereby.

415.   By failing to disclose the unlawful force-placed CPI policies and kick-back commission payments, described herein that were known to or that were available to Defendants upon reasonable inquiry, Defendants deprived consumers of all material facts about their loans and CPI policies. By failing to release material facts Defendants' loans

and CPI policies, Defendants curtailed or reduced the ability of consumers to take notice of material facts about their loans and CPI policies, and/or it affirmatively operated to hide or keep those facts from consumers.  MO. CODE REGS. TIT. 15, § 60-9.110.

416.  Defendants' scheme and concealment of the true characteristics of their fraudulent CPI scheme was material to the Plaintiff and the Missouri State Class, as Defendants intended.  Had they known the truth, Plaintiff and the Missouri State Class would not have obtained automobile loans from Wells Fargo.

417.  Plaintiff and the Missouri State Class members had no way of discerning that Defendants' representations were false or misleading.  Plaintiff and the Missouri State Class members did not and could not unravel Defendants' deception on their own.

418.  Defendants intentionally and knowingly misrepresented or omitted material facts regarding their CPI policies with intent to mislead Plaintiff and the Missouri State Class members.  Defendants knew or should have known that their conduct violated the Missouri MPA.

419.  Defendants owed Plaintiff and the Missouri State Class members a duty to disclose the illegality of their scheme to force-place CPI policies because Defendants:

a.  Possessed exclusive knowledge that they were force-placing CPI policies throughout the United States that did not comply with federal or state law or comply with their loan contracts;

b.  Intentionally concealed the foregoing from Plaintiff and the Missouri State Class members; and/or

c.  Made incomplete representations about the CPI policies generally, including the manner in which, and under what circumstances, they would be force-placed and the premiums Plaintiff and the Missouri State Class members would be obligated to pay.

420.  Plaintiff and the Missouri State Class members suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' concealment, misrepresentations, and/or failure to disclose material information.

421.   Defendants' violations present a continuing risk to Plaintiff and the Missouri State Class, as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

422.   Pursuant to MO. REV. STAT. § 407.025, Plaintiff and the Missouri State Class seek an order enjoining Defendants' unfair and/or deceptive acts or practices, and awarding damages, punitive damages, and any other just and proper relief available under the Missouri MPA.

## NEW JERSEY COUNT ONE: VIOLATION OF THE NEW JERSEY CONSUMER FRAUD ACT

### New Jersey Statutes Annotated § 56:8-1 *et seq.*

### (Against All Defendants)

423.   Plaintiffs incorporate by reference each and every allegation of the preceding paragraphs with the same force and effect as though fully set forth herein.

424.   Plaintiff Angela Camacho (for the purposes of this count, "Plaintiff") brings this count on behalf of herself and the New Jersey State Class members against all Defendants.  Plaintiff and the New Jersey State Class allege this claim against National General, on behalf of itself and as successor to the assets and liabilities of Balboa and QBE.

425.   Plaintiff and the New Jersey State Class members are "persons" within the meaning of N.J. STAT. ANN. § 56:8-1(d).

426.   Defendants are "persons" within the meaning of N.J. STAT. ANN. § 56:8-1(d). Defendants are also engaged in "sales" of "merchandise" within the meaning of N.J. STAT. ANN. § 56:8-1(c), (e).

427.   The New Jersey Consumer Fraud Act ("New Jersey CFA") prohibits "[t]he act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing concealment, suppression, or omission of any material fact with the intent that others rely upon such concealment, suppression or omission, in connection with the sale or

advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby . . ." N.J. STAT. ANN. § 56:8-2.

428.   Under the New Jersey CFA, "[t]he advertisement of merchandise as part of a plan or scheme not to sell the item or service so advertised or not to sell the same at the advertised price is an unlawful practice and a violation of the act to which this act is a supplement." N.J. STAT. ANN. § 56:8-2.2

429.   In the course of their business, Defendants violated the New Jersey CFA as detailed above.   Specifically, in force-placing CPI policies and sharing in kick-back commission payments, Defendants engaged in one or more of the following unfair or deceptive acts or practices as defined in N.J. STAT. ANN. §§ 56:8-2, and 56:8-2.2, including, but not limited to: using or employing deception, fraud, false pretense, false promise, or misrepresentation, or the concealment, suppression, or omission of a material fact with the intent that others rely upon such concealment, suppression, or omissions, in connection with the advertisement and sale of Defendants' loans and CPI policies, whether or not any person has in fact been misled or damaged thereby, and the advertisement of Defendants' loans and CPI policies as part of a plan or scheme not to sell them as advertised.

430.   Defendants' scheme and concealment of the true characteristics of their fraudulent CPI scheme was material to the New Jersey State Class, as Defendants intended.   Had they known the truth, the New Jersey State Class would not have obtained automobile loans from Wells Fargo.

431.   Plaintiff and the New Jersey State Class members had no way of discerning that Defendants' representations were false or misleading.   Plaintiff and the New Jersey State Class members did not and could not unravel Defendants' deception on their own.

432.   Defendants intentionally and knowingly misrepresented or omitted material facts regarding their CPI policies with intent to mislead Plaintiff and the New Jersey State

Class members.  Defendants knew or should have known that their conduct violated the New Jersey CFA.

433.   Defendants owed Plaintiff and the New Jersey State Class members a duty to disclose the illegality of their scheme to force-place CPI policies because Defendants:

a.   Possessed exclusive knowledge that they were force-placing CPI policies throughout the United States that did not comply with federal or state law or comply with their loan contracts;

b.   Intentionally concealed the foregoing from Plaintiff and the New Jersey State Class members; and/or

c.   Made incomplete representations about the CPI policies generally, including the manner in which, and under what circumstances, they would be force-placed and the premiums Plaintiff and the New Jersey State Class members would be obligated to pay.

434.   Plaintiff and the New Jersey State Class members suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' concealment, misrepresentations, and/or failure to disclose material information.

435.   Defendants' violations present a continuing risk to Plaintiff and the New Jersey State Class, as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

436.   Pursuant to N.J. STAT. ANN. § 56:8-19, Plaintiff and the New Jersey State Class seek an order enjoining Defendants' unfair and/or deceptive acts or practices, and awarding damages, punitive damages, and any other just and proper relief available under the New Jersey CFA.

## TENNESSEE COUNT ONE: VIOLATION OF THE TENNESSEE CONSUMER PROTECTION ACT

### Tennessee Code Annotated § 47-18-101 *et seq.*

### (Against All Defendants)

437.   Plaintiffs incorporate by reference each and every allegation of the preceding paragraphs with the same force and effect as though fully set forth herein.

438.   Plaintiff Dennis Small (for the purposes of this count, "Plaintiff") brings this count on behalf of himself and the Tennessee State Class members against all Defendants. Plaintiff and the Tennessee State Class allege this claim against National General, on behalf of itself and as successor to the assets and liabilities of Balboa and QBE.

439.   Plaintiff and the Tennessee State Class members are "persons" and "consumers" within the meaning of TENN. CODE §§ 47-18-103(2), (13).

440.   Defendants are engaged in "trade" or "commerce" or "consumer transactions" within the meaning TENN. CODE § 47-18-103(19).

441.   The Tennessee Consumer Protection Act ("Tennessee CPA") prohibits "unfair or deceptive acts or practices affecting the conduct of any trade or commerce." TENN. CODE § 47-18-104.

442.   In the course of their business, Defendants violated the Tennessee CPA as detailed above.   Specifically, in force-placing CPI policies and sharing in kick-back commission payments, Defendants engaged in one or more of the following unfair or deceptive acts or practices as defined in TENN. CODE § 47-18-104, including, but not limited to:

     a.    Causing likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or certification of Defendants' loans and CPI policies;

     b.    Representing that Defendants' loans and CPI policies have sponsorship, approval, characteristics, uses, or benefits that they do not have;

     c.    Advertising Defendants' loans and CPI policies with the intent not to sell them as advertised; and/or

d.    Representing that Defendants' loans or CPI policies confer or involve rights, remedies, or obligations that they did not have or involve or which were prohibited by law.

443.   Defendants' scheme and concealment of the true characteristics of their fraudulent CPI scheme was material to Plaintiff and the Tennessee State Class, as Defendants intended.  Had they known the truth, Plaintiff and the Tennessee State Class would not have obtained automobile loans from Wells Fargo.

444.   Plaintiff and the Tennessee State Class members had no way of discerning that Defendants' representations were false or misleading.  Plaintiff and the Tennessee State Class members did not and could not unravel Defendants' deception on their own.

445.   Defendants intentionally and knowingly misrepresented or omitted material facts regarding their CPI policies with intent to mislead Plaintiff and the Tennessee State Class members.  Defendants knew or should have known that their conduct violated the Tennessee CPA.

446.   Defendants owed Plaintiff and the Tennessee State Class members a duty to disclose the illegality of their scheme to force-place CPI policies because Defendants:

a.    Possessed exclusive knowledge that they were force-placing CPI policies throughout the United States that did not comply with federal or state law or comply with their loan contracts;

b.    Intentionally concealed the foregoing from Plaintiff and the Tennessee State Class members; and/or

c.    Made incomplete representations about the CPI policies generally, including the manner in which, and under what circumstances, they would be force-placed and the premiums Plaintiff and the Tennessee State Class members would be obligated to pay.

447.   Plaintiff and the Tennessee State Class members suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' concealment, misrepresentations, and/or failure to disclose material information.

448.   Defendants' violations present a continuing risk to Plaintiff and the Tennessee State Class, as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

449.   Pursuant to TENN. CODE §§ 47-18-109, Plaintiff and the Tennessee State Class seek an order enjoining Defendants' unfair and/or deceptive acts or practices, and awarding damages, treble or punitive damages, and any other just and proper relief available under the Tennessee CPA.

## WISCONSIN COUNT ONE: VIOLATION OF THE WISCONSIN DECEPTIVE TRADE PRACTICES ACT

### Wisconsin Statutes § 100.18 *et seq.*

### (Against All Defendants)

450.   Plaintiffs incorporate by reference each and every allegation of the preceding paragraphs with the same force and effect as though fully set forth herein.

451.   Plaintiff Brandon Haag (for the purposes of this count, "Plaintiff") brings this count on behalf of himself and the Wisconsin State Class members against all Defendants. Plaintiff and the Wisconsin State Class allege this claim against National General, on behalf of itself and as successor to the assets and liabilities of Balboa and QBE.

452.   Plaintiff and the Wisconsin State Class members are "persons" and members of "the public" within the meaning of the Wisconsin Deceptive Trade Practices Act (the "Wisconsin DTPA").  WIS. STA. §100.18(1).

453.   Defendants are each a "person, firm, corporation, or association" within the meaning of WIS. STA. §100.18(1).

454.   The Wisconsin DTPA prohibits any "assertion, representation or statement of fact which is untrue, deceptive or misleading."  WIS. STA. § 100.18(1).

455.   In the course of their business, Defendants violated the Wisconsin DTPA as detailed above.  Specifically, in force-placing CPI policies and sharing in kick-back commission payments, Defendants engaged in unfair or deceptive acts or practices as

defined in WIS. STA. § 100.18(1) because they made assertions, representations, and statements of fact which were untrue, deceptive, and misleading.

456. Defendants' scheme and concealment of the true characteristics of their fraudulent CPI scheme was material to Plaintiff and the Wisconsin State Class, as Defendants intended. Had they known the truth, Plaintiff and the Wisconsin State Class would not have obtained automobile loans from Wells Fargo.

457. Plaintiff and the Wisconsin State Class members had no way of discerning that Defendants' representations were false or misleading. Plaintiff and the Wisconsin State Class members did not and could not unravel Defendants' deception on their own.

458. Defendants intentionally and knowingly misrepresented or omitted material facts regarding their CPI policies with intent to mislead Plaintiff and the Wisconsin State Class members. Defendants knew or should have known that their conduct violated the Wisconsin DTPA.

459. Defendants owed Plaintiff and the Wisconsin State Class members a duty to disclose the illegality of their scheme to force-place CPI policies because Defendants:

   a. Possessed exclusive knowledge that they were force-placing CPI policies throughout the United States that did not comply with federal or state law or comply with their loan contracts;

   b. Intentionally concealed the foregoing from Plaintiff and the Wisconsin State Class members; and/or

   c. Made incomplete representations about the CPI policies generally, including the manner in which, and under what circumstances, they would be force-placed and the premiums Plaintiff and the Wisconsin State Class members would be obligated to pay.

460. Plaintiff and the Wisconsin State Class members suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' concealment, misrepresentations, and/or failure to disclose material information.

461. Defendants' violations present a continuing risk to Plaintiff and the Wisconsin State Class. Defendants' unlawful acts and practices complained of herein also affect the public interest.

462. Pursuant to WIS. STA. § 100.18(11)(b)(2), Plaintiff and the Wisconsin State Class seek an order enjoining Defendants' unfair and/or deceptive acts or practices, and awarding damages, punitive damages, and any other just and proper relief available under the Wisconsin DTPA.

## WYOMING COUNT ONE: VIOLATION OF THE WYOMING CONSUMER PROTECTION ACT

### Wyoming Statutes Annotated § 40-12-101 *et seq.*

### (Against All Defendants)

463. Plaintiffs incorporate by reference each and every allegation of the preceding paragraphs with the same force and effect as though fully set forth herein.

464. Plaintiff Bryan Tidwell (for the purposes of this count, "Plaintiff") brings this count on behalf of himself and the Wyoming State Class members against all Defendants. Plaintiff and the Wyoming State Class allege this claim against National General, on behalf of itself and as successor to the assets and liabilities of Balboa and QBE.

465. Plaintiff and the Wyoming State Class members are "persons" within the meaning of WYO. STAT. § 40-12-102(a)(i).

466. Defendants are "persons" within the meaning of WYO. STAT. § 40.12-102(a)(i).

467. Defendants' automobile loans and CPI policies are "merchandise" pursuant to WYO. STAT. § 40-12-102(a)(vi).

468. Each loan and CPI policy were "consumer transactions" as defined by WYO. STAT. §40-12-102(a)(ii). These consumer transactions occurred in the course of Defendants' business under WYO. STAT. § 40-12-105(a).

469.   The Wyoming Consumer Protection Act ("Wyoming CPA") prohibits deceptive trade practices "in the course of [a person's] business and in connection with a consumer transaction."   WYO. STAT. §40-12-105(a).

470.   In the course of their business, Defendants violated the Wyoming CPA as detailed above.   Specifically, in force-placing CPI policies and sharing in kick-back commission payments, Defendants engaged in one or more of the following unfair or deceptive acts or practices as defined in WYO. STAT. §§ 40-102-105(a), including, but not limited to:

a.   Representing that Defendants' loans and CPI policies had a source, origin, sponsorship, approval, accessories, or uses they did not have;

b.   Representing that Defendants' loans and CPI policies were supplied in accordance with previous representations, when they were not;

c.   Making false and misleading statements of fact concerning the price of Defendants' and CPI policies;

d.   Advertising loans and CPI policies with the intent not to sell them as advertised; and

e.   Engaging in unfair or deceptive acts or practices.

471.   Defendants' scheme and concealment of the true characteristics of their fraudulent CPI scheme was material to Plaintiff and the Wyoming State Class, as Defendants intended.   Had they known the truth, Plaintiff and the Wyoming State Class would not have obtained automobile loans from Wells Fargo.

472.   Plaintiff and the Wyoming State Class members had no way of discerning that Defendants' representations were false or misleading.   Plaintiff and the Wyoming State Class members did not and could not unravel Defendants' deception on their own.

473.   Defendants intentionally and knowingly misrepresented or omitted material facts regarding their CPI policies with intent to mislead Plaintiff and the Wyoming State Class members.   Defendants knew or should have known that their conduct violated the Wyoming CPA.

CONSOLIDATED CLASS ACTION COMPLAINT

474.    Defendants owed Plaintiff and the Wyoming State Class members a duty to disclose the illegality of their scheme to force-place CPI policies because Defendants:

a.    Possessed exclusive knowledge that they were force-placing CPI policies throughout the United States that did not comply with federal or state law or comply with their loan contracts;

b.    Intentionally concealed the foregoing from Plaintiff and the Wisconsin State Class members; and/or

c.    Made incomplete representations about the CPI policies generally, including the manner in which, and under what circumstances, they would be force-placed and the premiums Plaintiff and the Wyoming State Class members would be obligated to pay.

475.    Plaintiff and the Wyoming State Class members suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' concealment, misrepresentations, and/or failure to disclose material information.

476.    Defendants' violations present a continuing risk to the Wyoming State Class. Defendants' unlawful acts and practices complained of herein also affect the public interest.

477.    Pursuant to WYO. STAT. §§ 40-12-108(a) and 40-12-108(b), Plaintiff and the Wyoming State Class seeks an order enjoining Defendants' unfair and/or deceptive acts or practices, and awarding damages, punitive damages, and any other just and proper relief available under the Wyoming CPA.

## XI.    **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, individually and on behalf of members of the Nationwide Class and State Classes, respectfully request that the Court grant certification of the proposed Nationwide Class and State Classes, including the designation of Plaintiffs as the named representatives of the Nationwide Class and respective State Classes, the appointment of the undersigned as Class Counsel, and the designation of any appropriate issue classes and/or subclasses, under the applicable provisions of Fed. R.

Civ. P. 23, and that the Court enter judgment in their favor and against Defendants, as follows:

A.    A declaration that any applicable statute of limitations are tolled under the discovery rule or due to the fraudulent concealment alleged in this Complaint, and that Defendants are estopped from relying on any statutes of limitation as a defense;

B.    An order enjoining Defendants, temporarily and permanently, from continuing the unlawful, deceptive, fraudulent, and unfair business practices alleged in this Complaint;

C.    Injunctive and equitable relief in the form of a comprehensive program to fully reimburse and make whole all Class members for all costs and economic losses, including credit repair and the costs of vehicle repossession;

D.    Costs, restitution, compensatory damages for economic loss and out-of-pocket costs, treble damages under RICO, multiple damages under applicable states' laws, punitive and exemplary damages under applicable law;

E.    Rescission of all force-placed CPI policies, including reimbursement of and/or compensation for the full cost of the CPI policy, including any interest, taxes, license and other fees;

F.    A determination that Defendants are financially responsible for all Class notice and administration of Class relief;

G.    Any and all applicable statutory and civil penalties;

H.    An order requiring Defendants to pay both pre- and post-judgment interest on any amounts awarded;

I.    An award of attorneys' fees and costs, including expert costs;

J.    Leave to amend this Complaint to conform to the evidence produced in discovery and at trial; and

K.    Such other or further relief as the Court may deem appropriate, just and equitable.

CONSOLIDATED CLASS ACTION COMPLAINT

## XII.   DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury of any and all issues in this action so triable by right, pursuant to Federal Rule of Civil Procedure 38(b).

Dated:  January 26, 2018

Respectfully submitted,

By:   */s/ Roland Tellis*
Roland Tellis

BARON & BUDD, P.C.
15910 Ventura Boulevard, Suite 1600
Encino, California  91436
Telephone:  (818) 839-2333
Facsimile:   (818) 986-9698

By:   */s/ Roman M. Silberfeld*
Roman M. Silberfeld

ROBINS KAPLAN LLP
2049 Century Park East, Suite 3400
Los Angeles, California  90067
Telephone: (310) 552-0130
Facsimile: (310) 229-5580

Aaron M. Sheanin (SBN 214472)
asheanin@robinskaplan.com
2440 W. El Camino Real, Suite 100
Mountain View, California  94040
Telephone:  (650) 784-4040
Facsimile:  (650) 784-4041

Kellie Lerner (*pro hac vice*)
klerner@robinskaplan.com
Benjamin D. Steinberg
bsteinberg@robinskaplan.com
399 Park Avenue, Suite 3600
New York, New York  10022
Telephone:  (212) 980-7400
Facsimile:  (212) 980-7499

*Plaintiffs' Co-Lead Counsel*

CONSOLIDATED CLASS ACTION COMPLAINT

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

GIBBS LAW GROUP LLP
Eric H. Gibbs (SBN 178658)
Michael L. Schrag (SBN 185832)
505 14th Street, Suite 1110
Oakland, California 94612
Telephone:   (510)-350-9700
Facsimile:    (510 350-9701

Levin Sedran & Berman
Charles E. Schaffer (*Pro Hac Vice*)
510 Walnut Street, Suite 500
Philadelphia, Pennsylvania 19106
Telephone:   (215) 592 1500
Facsimile:    (215) 592-4663

WEITZ & LUXENBERG, P.C.
Paul F. Novak (*Pro Hac Vice*)
719 Griswold, Suite 620
Detroit, Michigan 48226
Telephone:   (313) 800-4170
Facsimile:    (646) 293-7992

*Plaintiffs' Steering Committee*

CASEY GERRY SCHENK
FRANCAVILLA BLATT & PENFIELD, LLP
David S. Casey, Jr. (SBN 060768)
Gayle M. Blatt (SBN 122048)
110 Laurel Street
San Diego, California
Telephone:   (619) 238-1811
Facsimile:    (619) 544-9232

*Plaintiffs' Liaison Counsel*

CONSOLIDATED CLASS ACTION COMPLAINT