Roland Tellis (SBN 186269)
rtellis@baronbudd.com
Daniel Alberstone (SBN 105275)
dalberstone@baronbudd.com
Mark Pifko (SBN 228412)
mpifko@baronbudd.com
Sterling L. Cluff (SBN 267142)
scluff@baronbudd.com
David B. Fernandes, Jr. (SBN 280944)
dfernandes@baronbudd.com
BARON & BUDD, P.C.
15910 Ventura Boulevard, Suite 1600
Encino, California  91436
Telephone:  (818) 839-2333
Facsimile:   (818) 986-9698

Roman M. Silberfeld (SBN 62783)
rsilberfeld@robinskaplan.com
ROBINS KAPLAN LLP
2049 Century Park East, Suite 3400
Los Angeles, California  90067
Telephone: (310) 552-0130
Facsimile: (310) 229-5580

Aaron M. Sheanin (SBN 214472)
asheanin@robinskaplan.com
ROBINS KAPLAN LLP
2440 W. El Camino Real, Suite 100
Mountain View, California  94040
Telephone:  (650) 784-4040
Facsimile:  (650) 784-4041

*Plaintiffs' Co-Lead Counsel*
*Additional counsel listed on signature page*

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE WELLS FARGO COLLATERAL PROTECTION INSURANCE LITIGATION | Case Number:  8:17-ML-2797-AG-KES<br><br>**AMENDED CONSOLIDATED CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED**<br><br>Hon. Andrew J. Guilford |

**REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL**

75925478.7

# **Table of Contents**

I.  NATURE OF ACTION ........................................................................................ 1

II.  THE PARTIES ................................................................................................... 4

    A.  Plaintiffs ................................................................................................. 4

    B.  Defendants .............................................................................................. 6

III.  JURISDICTION AND VENUE ......................................................................... 8

IV.  INTRA-DISTRICT ASSIGNMENT .................................................................. 9

V.  FACTS COMMON TO ALL COUNTS ........................................................... 10

    A.  Collateral Protection Insurance and Force-Placed Insurance ...................... 10

    B.  Defendants Unlawfully Force-Place CPI on Millions of Borrowers'
        Automobile Loan Accounts for More Than 14 Years ................................. 14

        1.  The CPI Vendor Provided ████████████████████
            ███████████████ for the CPI Program.............................. 14

        2.  The CPI Vendor Paid an Undisclosed Kickback in the Form of
            an Unearned Commission to Wells Fargo's Subsidiary .................... 16

        3.  Defendants Operated the CPI Program as a Single, Continuous
            Enterprise Since Inception ................................................................ 18

        4.  The CPI Program Was Lucrative for Defendants ............................... 22

        5.  Charges to Wells Fargo's Auto Loan Borrowers Were Not
            Insurance Premiums .......................................................................... 26

        6.  Wells Fargo and Its CPI Vendor Unlawfully Force-Placed CPI ........ 29

            a.  Wells Fargo Obtained Borrowers' Insurance Information
                from the Automobile Dealer at the Time of Sale .................... 29

            b.  Defendants Disregarded Borrowers' Proof of Insurance ......... 31

            c.  Defendants Sent False and Misleading "Insurance
                Request" Letters to Borrowers ................................................ 32

i

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

   d. Wells Fargo Had No Practice of Monitoring the CPI
Vendor's Telephone Calls to Borrowers ................................... 36

   e. Defendants Sent False and Misleading "Coverage Issued"
Letters to Borrowers ................................................................. 37

  7. Wells Fargo Sent ███████ Deceptive Account Statements to
Borrowers ........................................................................................ 41

  8. Wells Fargo Identified Other Features of the CPI Program That
Harmed Borrowers ........................................................................... 43

  9. Defendants Knowingly Ignored and Failed to Track Consumer
Complaints About CPI ...................................................................... 46

C. Wells Fargo's Management, Risk Officers, and Board of Directors
Knew That the CPI Program Harmed Its Customers .................................... 48

D. The *New York Times* Exposes Defendants' Force-Placed CPI Scheme ....... 52

VI. PLAINTIFFS' EXPERIENCES ................................................................................ 57

Plaintiff Angelina Camacho ........................................................................................ 57

Plaintiff Odis Cole ...................................................................................................... 58

Plaintiff Nyle Davis ..................................................................................................... 60

Plaintiff Duane Fosdick ............................................................................................... 61

Plaintiff Regina Gonzalez ............................................................................................ 63

Plaintiff Brandon Haag ................................................................................................ 65

Plaintiff Paul Hancock ................................................................................................. 66

Plaintiff Dustin Havard ............................................................................................... 68

Plaintiff Brian Miller ................................................................................................... 69

Plaintiff Analisa Moskus .............................................................................................. 71

Plaintiff Keith Preston ................................................................................................. 72

Plaintiff Victoria Reimche ........................................................................................... 74

75925478.7

Plaintiff Dennis Small.................................................................................75

Plaintiff Bryan Tidwell ..............................................................................75

VII.   STATUTE OF LIMITATIONS.................................................................78

    A.   Discovery Rule ..................................................................................78

    B.   Fraudulent Concealment ...................................................................79

VIII.  CLASS ACTION ALLEGATIONS ...........................................................80

    A.   Class Definitions ...............................................................................80

    B.   Class Certification Requirements: Federal Rule of Civil Procedure 23 .......81

IX.    RICO ALLEGATIONS ..............................................................................84

X.     CAUSES OF ACTION ...............................................................................86

    FIRST CLAIM FOR RELIEF:  Violations of the Racketeer Influenced and
    Corrupt Organizations Act ................................................................86

    A.   The CPI Enterprise ...........................................................................86

    B.   Conduct of the CPI Enterprise .........................................................88

    C.   Pattern of Racketeering Activity ......................................................90

    D.   Damages ............................................................................................93

    SECOND CLAIM FOR RELIEF:  Violation of the Bank Holding Company
    Act .....................................................................................................94

    THIRD CLAIM FOR RELIEF:  Violation of the California Unfair
    Competition Law................................................................................99

    FOURTH CLAIM FOR RELIEF:  Fraud by Concealment ..................................100

    FIFTH CLAIM FOR RELIEF:  Unjust Enrichment .........................................104

XI.    PRAYER FOR RELIEF ...........................................................................105

XII.   DEMAND FOR JURY TRIAL .................................................................106

75925478.7

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

Plaintiffs Angelina Camacho, Odis Cole, Nyle Davis, Duane Fosdick, Regina Gonzalez, Brandon Haag, Paul Hancock, Dustin Harvard, Brian Miller, Analisa Moskus, Keith Preston, Victoria Reimche, Dennis Small, and Bryan Tidwell bring this action on behalf of themselves and all others similarly situated (collectively "Plaintiffs") against Defendants Wells Fargo & Company, Wells Fargo Bank, N.A. (collectively, "Wells Fargo"), National General Holdings Corp. and National General Insurance Company (collectively, "National General") (together with Wells Fargo, the "Defendants"). Plaintiffs allege the following based upon information and belief, the investigation of counsel, and personal knowledge as to the allegations pertaining to themselves.

## I.     NATURE OF ACTION

1.     On September 27, 2016, following the announcement of its $185 million settlement with federal regulators concerning its fraudulent bank account scheme, Wells Fargo's Board of Directors promised "to ensur[e] that *all* aspects of the Company's business are conducted with integrity, transparency, and oversight."[1]  Unfortunately, however, even under its new management, Wells Fargo's fraudulent practices continue.

2.     For more than fourteen years, Wells Fargo and its predecessors, together with auto insurance underwriter National General and its predecessors ("CPI Vendor"), engaged in a scheme to bilk millions of dollars from approximately 2 million unsuspecting Wells Fargo customers.  Through this scheme, Wells Fargo and the CPI Vendor forced millions of customers to pay for auto insurance—commonly known as Collateral Protection Insurance ("CPI")—they did not need or want.  Making matters

---

[1] *See* Business Wire, <u>Independent Directors of Wells Fargo Conducting Investigation of Retail Banking Sales Practices and Related Matters</u>, September 27, 2016, available at https://www.businesswire.com/news/home/20160927006772/en/Independent-Directors-Wells-Fargo-Conducting-Investigation-Retail; Business Wire, <u>Wells Fargo Issues Statement on Agreements Related to Sales Practices</u>, September 8, 2016, available at http://www.businesswire.com/news/home/20160908006266/en/Wells-Fargo-Issues-Statement-Agreements-Related-Sales (emphasis added); Wells Fargo, <u>Wells Fargo Announces Plan to Remediate Customers for Auto Insurance Coverage</u>, July 27, 2017, available at https://newsroom.wf.com/press-release/consumer-lending/wells-fargo-announces-plan-remediate-customers-auto-insurance.

75925478.7

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

worse, Defendants possessed information showing that these customers already had their own insurance but intentionally ignored this information when they forced-placed CPI. When Wells Fargo's customers complained and informed Defendants that they maintained independent insurance on their vehicles, making CPI unnecessary, Wells Fargo refused to remove the unlawful charges.

3.    Defendants' force-placed CPI scheme was first reported by the *New York Times* on July 27, 2017, after the *Times* obtained an internal report commissioned by Wells Fargo's executives. The internal report revealed that more than 800,000 auto loan customers, including active military personnel, paid for unnecessary CPI, pushing nearly 275,000 of them into delinquency, and resulting in nearly 25,000 unlawful vehicle repossessions. As a result the CPI scheme, these individuals suffered financial harm including inflated premiums, delinquency charges, late fees, repossession costs, increased interest rates, overdraft fees, and damage to their credit reports.

4.    When confronted by the *Times* article, Wells Fargo's spokesperson Jennifer A. Temple publicly stated, "[w]e take full responsibility for these errors and are deeply sorry for any harm we caused customers." This lawsuit tests Wells Fargo's commitment to its customers and seeks full compensation for all damages Defendants caused.

5.    As alleged in more detail below, Defendants sought to unlawfully generate profits by force-placing unnecessary CPI on unsuspecting customers and then collected payments for insurance premiums, interest, and other fees, while also sharing in undisclosed kickbacks in the form of unearned commissions and other compensation, thereby increasing the costs paid by every individual on whose accounts Defendants force-placed CPI. These concealed kickbacks increased the charges to all borrowers on whom Defendants had force-placed CPI, whether duplicative or not, and provided Defendants with the financial incentive to perpetuate the CPI scheme.

6.    To carry out the scheme, Wells Fargo provided borrower information to its CPI Vendor. The CPI Vendor, in turn, was supposed to check electronic and hard copy insurance information to confirm whether Wells Fargo's customers had insurance

2

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

coverage.  A CPI policy was only lawfully authorized if Wells Fargo's customers did not maintain sufficient insurance to cover the amount owed on their vehicles.[2]  But, in reality, Defendants intentionally ignored available insurance information, then frequently, and without any notice, automatically deducted CPI charges from the customers' bank accounts, along with the regularly scheduled principal and interest payment for the auto loan.  Compounding the problem, Defendants' failure to properly disclose the CPI and/or the resulting automatic deductions from customers' bank accounts often put them in a financial tailspin.

7.    In furtherance of  their scheme to wrongfully force-place CPI, Defendants falsely represented to, and concealed from, customers—through form insurance placement letters, uniform bank statements, and online balance reports—that customers owed Wells Fargo more money (because of the CPI charges) than they actually did.  ████████

████████████████████████████████████████████████████████████

████████████.[3]  Examples of these misrepresentations and omissions are detailed below.

██         ██████████████████████████████████████

████████████  ██████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████[5]

[2] Wells Fargo Dealer Services, Financial Education, Understanding Your Auto Loan, available at https://www.wellsfargodealerservices.com/consumers/financialeducation/understandingyourautoloan/default.asp#fees.

[3] WFCPI_00035207 at 214; WFCPI_00050483 at 484.

[4] WFCPI_00050483 at 484.

[5] WFCPI_00035207 at 208.

3

## II.    **THE PARTIES**

**A.    Plaintiffs**

9.    Plaintiff Angelina Camacho ("Camacho") is currently a resident and a citizen of the State of New Jersey.  Plaintiff Camacho obtained an auto loan through Wells Fargo Bank, N.A., or its predecessors, subsidiaries or divisions, was assessed charges for CPI and/or related fees, and was damaged thereby.

10.    Plaintiff Odis Cole ("Cole") is currently a resident and a citizen of the State of Illinois.  Plaintiff Cole obtained an auto loan through Wells Fargo Bank, N.A., or its predecessors, subsidiaries or divisions, was assessed charges for CPI and/or related fees, and was damaged thereby.

11.    Plaintiff Nyle Davis ("Davis") is currently a resident and a citizen of the State of Missouri.  Plaintiff Davis obtained an auto loan through Wells Fargo Bank, N.A., or its predecessors, subsidiaries or divisions, was assessed charges for CPI and/or related fees, and was damaged thereby.

12.    Plaintiff Duane Fosdick ("Fosdick") is currently a resident and a citizen of the State of California.  Plaintiff Fosdick obtained an auto loan through Wells Fargo Bank, N.A., or its predecessors, subsidiaries or divisions, was assessed charges for CPI and/or related fees, and was damaged thereby.

13.    Plaintiff Regina Gonzalez ("Gonzalez") is currently a resident and a citizen of the State of Minnesota.  Plaintiff Gonzalez obtained an auto loan through Wells Fargo Bank, N.A., or its predecessors, subsidiaries or divisions, was assessed charges for CPI and/or related fees, and was damaged thereby.

14.    Plaintiff Brandon Haag ("Haag") is currently a resident and a citizen of the State of Wisconsin.  Plaintiff Haag obtained an auto loan through Wells Fargo Bank, N.A., or its predecessors, subsidiaries or divisions, was assessed charges for CPI and/or related fees, and was damaged thereby.

15.    Plaintiff Paul Hancock ("Hancock") is currently a resident and a citizen of the State of Indiana.  Plaintiff Hancock obtained an auto loan through Wells Fargo Bank,

4

N.A., or its predecessors, subsidiaries or divisions, was assessed charges for CPI and/or related fees, and was damaged thereby.

16.    Plaintiff Dustin Havard ("Havard") is currently a resident and a citizen of the State of Mississippi.  Plaintiff Havard obtained an auto loan through Wells Fargo Bank, N.A., or its predecessors, subsidiaries or divisions, was assessed charges for CPI and/or related fees, and was damaged thereby.

17.    Plaintiff Brian Miller ("Miller") is currently a resident and a citizen of the State of Mississippi.  Plaintiff Miller obtained an auto loan through Wells Fargo Bank, N.A., or its predecessors, subsidiaries or divisions, was assessed charges for CPI and/or related fees, and was damaged thereby.

18.    Plaintiff Analisa Moskus ("Moskus") is currently a resident and a citizen of the State of California.  Plaintiff Moskus obtained an auto loan through Wells Fargo Bank, N.A., or its predecessors, subsidiaries or divisions, was assessed charges for CPI and/or related fees, and was damaged thereby.

19.    Plaintiff Keith Preston ("Preston") is currently a resident and a citizen of the State of Nevada.  Plaintiff Preston obtained an auto loan through Wells Fargo Bank, N.A., or its predecessors, subsidiaries or divisions, was assessed charges for CPI and/or related fees, and was damaged thereby.

20.    Plaintiff Victoria Reimche ("Reimche") is currently a resident and a citizen of the State of Colorado.  Plaintiff Reimche obtained an auto loan through Wells Fargo Bank, N.A., or its predecessors, subsidiaries or divisions, was assessed charges for CPI and/or related fees, and was damaged thereby.

21.    Plaintiff Dennis Small ("Small") is currently a resident and a citizen of the State of Tennessee.  Plaintiff Small obtained an auto loan through Wells Fargo Bank, N.A., or its predecessors, subsidiaries or divisions, was assessed charges for CPI and/or related fees, and was damaged thereby.

22.    Plaintiff Bryan Tidwell ("Tidwell") is currently a resident and a citizen of the State of California.  Plaintiff Tidwell obtained an auto loan through Wells Fargo Bank,

5

N.A., or its predecessors, subsidiaries or divisions, was assessed charges for CPI and/or related fees, and was damaged thereby.

**B.    Defendants**

23.    Defendant Wells Fargo & Company is a Delaware corporation and bank holding company with its principal place of business in San Francisco, California. Wells Fargo & Company is one of the nation's largest corporations, providing a wide-range of financial services to customers throughout the United States. Wells Fargo & Company participated in the force-placement of CPI alleged herein from its California offices, including the decision (and/or ratification of the decision) to enter into agreements with its CPI Vendor to wrongfully force-place CPI on hundreds of thousands of borrowers throughout the United States.

24.    Defendant Wells Fargo Bank, N.A. is a subsidiary of Wells Fargo & Company, and is a national bank organized and existing as a national association under the National Bank Act, 12 U.S.C. §§ 21 *et seq.*, with its principal place of business in San Francisco, California. Wells Fargo Bank, N.A. owns the automobile loans secured by Class members' vehicles, which are located throughout the United States. Wells Fargo Bank, N.A. is the primary entity used by Wells Fargo & Company for the origination and servicing of automobile loans. Wells Fargo Bank, N.A., originates and services loans to consumers through its Wells Fargo Dealer Services division, headquartered in Irvine, California.

25.    As detailed herein, Wells Fargo Dealer Services is the successor-in-interest to Wachovia Dealer Services, Inc. ("Wachovia") and WFS Financial Inc. ("WFS"), both of which served the same roles and functions in the CPI scheme as Wells Fargo Dealer Services. WestFin Insurance Agency, Inc. ("WestFin") is also a wholly-owned subsidiary of Wells Fargo Bank, N.A.

26.    At all material times herein, each Wells Fargo defendant and their predecessors and affiliates were the agents, servants, or employees of, and acted within the purpose, scope and course of said agency, service, or employment, and with the

6

express or implied knowledge, permission, and consent of the other Wells Fargo defendants, and ratified and approved the acts of the other Wells Fargo defendants.

27.    Wells Fargo & Company exercises specific and financial control over the operation of Wells Fargo Bank, N.A. and its affiliates, and it dictates the policies and practices of Wells Fargo Bank, N.A.  Wells Fargo & Company also exercises power and control over the specific activities in this lawsuit, and it is the ultimate recipient of the revenue and profits from the conduct described herein.

28.    Defendant National General Holdings Corp. is a Delaware corporation and an insurance holding company headquartered in New York, New York.  National General Holdings Corp. is a specialty personal lines insurance holding company that traces its roots to 1939, and provides personal and commercial automobile, homeowners, umbrella, recreational vehicle, motorcycle, supplemental health, and other niche insurance products. National General Holdings Corp. participated in the force-placement of CPI alleged herein, including the decision (and/or ratification of the decision) to enter into agreements with Wells Fargo to wrongfully force-place CPI on hundreds of thousands of borrowers throughout the United States.

29.    Defendant National General Insurance Company ("National General" or "NGIC") is a national insurance agency incorporated in Missouri, with its principal place of business in Winston-Salem, North Carolina.  National General administers the CPI division of the National General Lender Services business on behalf of its parent corporation, National General Holdings Corp.  National General also provides insurance tracking and CPI throughout the United States.  National General was the CPI Vendor for all aspects of Wells Fargo's CPI Program from 2015 until the termination of the CPI Program in September 2016.  The scope of its services included, among other things, insurance tracking, borrower identification, policy placement, and underwriting CPI that Wells Fargo force-placed on auto loan borrowers throughout the United States.

30.    As detailed herein, National General is the successor-in-interest to several other entities that operated as Wells Fargo's CPI Vendor.  Those entities included

7

Newport Management Corporation ("Newport"), Meritplan Insurance Company ("Meritplan"), and Balboa Insurance Company ("Balboa") which underwrote CPI and provided insurance tracking services during the period 2002 to 2011. These companies' participation in the force-placed CPI scheme was approved of and managed by executives located in Irvine, California. These companies issued CPI from Irvine, California.

31. On June 1, 2011, QBE First Insurance Agency, Inc. ("QBEF") acquired the assets and liabilities of Newport, Meritplan, and Balboa, then becoming the CPI Vendor. QBEF underwrote CPI and provided insurance tracking services during the period 2011 to 2015. QBEF's participation in the force-placed CPI scheme was approved of and managed by executives located in Irvine, California. QBEF issued CPI from Irvine, California. On July 15, 2015, National General Holdings Corp. announced the acquisition of the assets and liabilities of the parent company of QBEF.

32. At all material times herein, each National General defendant and their predecessors and affiliates were the agents, servants, or employees of, and acted within the purpose, scope and course of said agency, service, or employment, and with the express or implied knowledge, permission, and consent of the other National General defendants, and ratified and approved the acts of the other National General defendants.

33. Whenever, in this Complaint, reference is made to any act, deed or conduct Defendants committed in connection with Defendants' force-placed CPI scheme and the related enterprise, the allegations mean that each of the Defendants engaged in the act, deed, or conduct by or through one or more of their officers, directors, agents, employees, or representatives, each of whom was actively engaged in the management, direction, control or transaction of Defendants' ordinary business and affairs, and the affairs of the enterprise.

## III.    **JURISDICTION AND VENUE**

34. This Court has jurisdiction over this matter under 28 U.S.C. § 1331 based on the federal claims asserted under the Racketeer Influence and Corrupt Organizations Act,

75925478.7

18 U.S.C. §§ 1961 *et seq*., and 18 U.S.C. §§ 1331, 1334, 1962, and 1964, and the Bank Holding Company Act, 12 U.S.C. § 1972 *et seq*.

35.    This Court also has jurisdiction over this action pursuant to the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d), because at least one Class member is of diverse citizenship from one Defendant, there are more than 100 Class members, and the aggregate amount in controversy exceeds $5 million, exclusive of interest and costs.

36.    This Court may exercise supplemental jurisdiction over Plaintiffs' state-law claims pursuant to 28 U.S.C. § 1367 because all of Plaintiffs' state-law claims are derived from a common nucleus of operative facts and are of the kind Plaintiffs would ordinarily expect to try in one judicial proceeding.

37.    This Court has personal jurisdiction over Defendants pursuant to 18 U.S.C. § 1965 and 12 U.S.C. § 1975.

38.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because Wells Fargo maintains its principal places of business in California.    Moreover, Defendants are considered to reside in this District because their contacts with it are sufficient to subject them to personal jurisdiction herein.    Furthermore, the acts giving rise to Plaintiffs' claims occurred, among other places, in this District.    At oral argument before the Judicial Panel on Multidistrict Litigation, "Wells Fargo represented that the primary witnesses would be found in the Central District of California."    *In re Wells Fargo Auto Ins. Marketing & Sales Practices Litig.*, MDL No. 2797, Dkt. No. 90 at 2 (J.P.M.L. Oct. 5, 2017).

## IV.    <u>INTRA-DISTRICT ASSIGNMENT</u>

39.    This action is properly assigned to the Santa Ana Division of this District pursuant to the Central District Local Rules because a substantial portion of the events or omissions giving rise to Plaintiffs' claims arise in the counties served by the Santa Ana Division of this Court.    Several named Plaintiffs and proposed Class Representatives, as well as thousands of Class members, obtained automobile loans, had CPI force-placed on their loans, and suffered injuries as a result of Defendants' CPI scheme in the counties

9

served by this Division.   Moreover, Defendants conduct substantial business in the counties served by this Division.   Finally, the Judicial Panel on Multidistrict Litigation centralized this litigation as MDL No. 2797 before the Honorable Andrew J. Guilford, presiding in the Santa Ana Division of this District.

## V.    FACTS COMMON TO ALL COUNTS

### A.    Collateral Protection Insurance and Force-Placed Insurance

40.    Vehicles in the United States are typically covered by one of the following three categories of insurance:  liability insurance, collision insurance, and comprehensive insurance.

41.    Liability insurance provides coverage when the insured is the at-fault driver in an incident that causes property damage or injury to a person.  Consumers are required by laws in most states to maintain liability insurance.  Collision insurance covers the vehicle when it is in a collision with another driver or stationary object.  Comprehensive coverage handles all other kinds of non-collision damages, such as flooding, fires, and natural disasters, among other things.

42.    The auto insurance policies at issue in this case are commonly referred to as CPI.  Unlike auto insurance policies commonly taken out by vehicle owners, which not only cover the insured vehicle, but also liability for collisions with other vehicles, property loss, and bodily injury, CPI only covers the cost of damage to the insured vehicle.  Although vehicle owners are not required to maintain collision or comprehensive coverage by law, according to a 2013 Insurance Information Institute report, 78% of insured drivers purchase comprehensive coverage and 73% purchase collision coverage, in addition to the mandatory liability insurance.[6]

---

[6] William Hoffman, Forced Protection: How Will the Industry Respond to Wells Fargo's Insurance Scandal, Auto Finance News (October 5, 2017), available at https://www.autofinancenews.net/forced-protection-how-will-the-industry-respond-to-wells-fargos-insurance-scandal/.

75925478.7

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

43.    When vehicle owners take out loans to purchase their vehicles, their lender may obligate them to carry insurance.[7]  If borrowers do not obtain insurance to protect the loan collateral, namely their vehicles, their lender may purchase it for them. ████████████ ███████████████████████████████████████████████████████ ████████████[8]

44.    As described in detail throughout this Complaint, Wells Fargo purchased CPI from National General and its predecessors, force-placed CPI on its auto loan borrowers' accounts, and tacked on CPI charges for premium, interest, and unearned commissions to the borrowers' principal, thus raising the borrowers' monthly payments.  The unearned commissions were paid by the CPI Vendor as kickbacks to one of Wells Fargo's affiliates for the force-placement of CPI.  These kickbacks ensured that the CPI charges to Wells Fargo's borrowers were more expensive than the premiums for coverage borrowers obtained on their own. ██████████████████████ ████████████████████████████████████████████████████████████ ███ ████ ████████ ███ ███ ██████ █████████ ██████[9]  These unearned commissions generated undisclosed charges even when CPI was properly placed on borrowers' accounts.  Even after Wells Fargo stopped receiving commissions in 2013, it continued to assess CPI charges on borrowers' accounts in excess of the cost of CPI or other auto insurance products.

45.    In this regard, the CPI market created by the partnership between Wells Fargo, National General, and their predecessors was "rigged" against the borrower because it pushed up costs for consumers, rather than down.[10]  Instead of competing in the

---

[7] Wells Fargo, Car Loan FAQ's, available at https://www.wellsfargo.com/help/faqs/auto-loans/.

[8] WFCPI_00035207 at 214; WFCPI_00050483 at 484.

[9] WFCPI_00030113

[10] Kristin Broughton, Do problems with lender-placed auto insurance go beyond Wells? American Banker (August 8, 2017, 5:31 p.m. EST), available at https://www.americanbanker.com/news/do-problems-with-lender-placed-auto-insurance-go-beyond-wells.

75925478.7

open insurance marketplace, the CPI Vendor offered compensation and other considerations to Wells Fargo, which Wells Fargo accepted, for its CPI business. The compensation and considerations—in other words, kickbacks—were paid for by the CPI Vendor through unreasonable expenses included in the CPI premium charged to Wells Fargo, which were then passed-on to the unsuspecting borrowers. These expenses included not only the unearned commissions but also the cost of tracking services for Wells Fargo's indirect auto loan portfolio, which were passed-on at a disproportionate rate only to those borrowers who paid charges for force-placed CPI. ██████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████ ██████[11]

46.    The CPI market was characterized by "reverse competition" in that borrowers who were forced to pay CPI charges lacked the ability to exert market power over prices. Wells Fargo's auto loan borrowers were vulnerable to excessive CPI charges, because they did not request CPI but were forced to pay for it at a cost far greater than an independent auto insurance policy. In fact, for hundreds of thousands of borrowers, they had no choice but to pay the CPI charges that were crammed onto their accounts, despite the fact that they had their own independent auto insurance. Again, in the words of Wells Fargo's consultant Oliver Wymanm, ████████████████████

██████████████████████████████████████████████████████

██████████████████[12]

47.    After Defendants force-placed a CPI policy on a Wells Fargo borrower, Wells Fargo assessed a full year's worth of CPI charges against the borrower's account, and then charged interest each month on the CPI before applying payments to the

---

[11] WFCPI_00017004 at 009; WFCPI_00040990 at 992.

[12] WFCPI_00030113.

principal loan balance. This ensured that Wells Fargo's CPI charges got paid first, and any deficiency resulted in the borrower falling short on the underlying loan.[13]

48.    The core decisions concerning the force-placed CPI scheme were made by Defendants in their California offices and headquarters. These decisions implemented a nationwide practice of force-placing Defendants' unnecessary CPI on Wells Fargo's automobile loan customers and assessing improperly inflated premiums against their accounts in exchange for lucrative kickbacks from the CPI Vendors.

49.    Defendants are no strangers to force-placed insurance abuse in the more traditional home mortgage CPI market. For example, in May 2013, Wells Fargo Bank N.A., QBE Specialty Insurance Co., and a class of Florida homeowners reached a settlement which required Wells Fargo to pay up to $19.25 million to Florida homeowners. The suit charged Wells Fargo, among others, with deriving improper financial benefits from force-placed insurance.[14]    Additionally, in 2014, while Wells Fargo's automobile CPI scheme was in full-swing, a Florida federal judge approved a $281 million settlement reached by Wells Fargo and Assurant Inc. in a suit over their force-placed homeowners insurance practices.[15]    The suit, which involved about 1.3 million class members, alleged Wells Fargo allowed Assurant to automatically issue force-placed insurance on mortgage loans if a borrower's *voluntary* insurance lapsed. After collecting high premiums on the new coverage, Wells Fargo passed the payments along to Assurant, who would later funnel a portion of the premiums back to Wells Fargo as "commissions."

---

[13] *See* Understanding Your Auto Loan, *supra* at note 2.

[14] LendersRisk.com, Regulatory Landscape for 2016: Lender-Placed Insurance and What You Need to Know, February 8, 2016, available at *http://lendersrisk.com/index.php/regulatory-landscape-for-2016-lender-placed-insurance-and-what-you-need-to-know/*.

[15] Kelly Knaub, Law360, Wells Fargo's Contested $281M Force-Placed Deal Approved, October 30, 2014, available at https://www.law360.com/articles/591839/wells-fargo-s-contested-281m-force-placed-deal-approved.

75925478.7

50.     Finally, in 2015, Wells Fargo and Assurant settled a putative class action in Illinois federal court in which they were accused of conspiring to inflate the cost of force-placed hazard insurance in order to provide kickbacks to Wells Fargo.[16]

**B.     Defendants Unlawfully Force-Place CPI on Millions of Borrowers' Automobile Loan Accounts for More Than 14 Years**

51.     Wells Fargo's CPI Program existed from 2002 to 2016.  During that time period, Wells Fargo and its predecessors forced-placed CPI on millions of auto loan borrowers, even when borrowers maintained sufficient insurance to protect Wells Fargo's collateral. ███████████████████████████████ ███████ ███████ ██████ ███ ██████████ ████████ ████████ ██████████ ███████████████████████████████████ The Wells Fargo companies involved in the CPI Program were WFS, Wachovia, WestFin, and WFDS.  The National General companies involved in the CPI Program were Newport, Meritplan, Balboa, QBEF, and NGIC.

**1.     The CPI Vendor Provided ███████████████ ████████ for the CPI Program**

███ ███████████████████████████████████████ ██████████████████████████████████.[17]  Like Wells Fargo, WFS was engaged in the business of extending credit and financing for automobile buyers and lessors.[18] █████████████████████████████ ████████ .[19]

---

[16] Dani Kass, Law360, <u>Wells Fargo, Assurant Settle Force-Placed Insurance Suit</u>, May 11, 2015, available at https://www.law360.com/articles/654372/wells-fargo-assurant-settle-force-placed-insurance-suit.

[17] WFCPI_00015256 at 296.

[18] *Id.*

[19] WFCPI_00015256 at 296-322.

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

1

2

3

4 [20]

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23 [21]

24

25

---

26 [20] *Id.*

27 [21] Rule 30(b)(6) Deposition of Wells Fargo & Co. and Wells Fargo Bank, N.A. By and Through its Designee James William McLawhorn ("McLawhorn Dep.") at 213:9-11.

28

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

1

2

3

4

5

6 .

7

8

     **2.**    **The CPI Vendor Paid an Undisclosed Kickback in the Form of an Unearned Commission to Wells Fargo's Subsidiary**

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

---

[22] WFCPI_00002776 at 778.

[23] WFCPI_00003667 at 372-97.

▇▇ ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇ ▇▇▇▇▇.[24]

60.    Insurance companies commonly pay commissions to their licensed agents, even those affiliated with commercial lenders, to compensate those agents for *actual* services performed.  Agency services that are compensable by commissions include promoting and selling the insurance product, collecting insurance premiums from customers, and forwarding those premiums to insurers.  In contrast, the payment of commissions to a bank-affiliated insurance agent that fails to perform these services should internally raise red flags of improper, and even unlawful business practices.  These commissions are in essence an undisclosed and unearned kickback.

▇▇ ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ ▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇ ▇ ▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇.[26]

▇▇ ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇[27]

---

[24] McLawhorn Dep. at 35:16-25.

[25] McLawhorn Dep. at 272:13-273:2.

[26] McLawhorn Dep. at 35:7-15, 271:10-20, 273:3-5, 273:19-22, 274:3-14.

[27] McLawhorn Dep. at 273:25-274:2, 274:18-275:12.

75925478.7

The traditional role of an insurance agent is to assist the policyholder in determining her insurance needs, shopping the market for the insurance product that meets the policyholder's needs, and seeking the most competitive price for the product. ██████████████████████████████. In reality, and unbeknownst to customers, Wells Fargo's internal documents reveal that ████████████████████████████████████████████████████ ██████████████████████████[28]

64.    As a subsidiary of Wells Fargo, ██████████ commissions were booked as revenue to the bank.

65.    The CPI Vendor's payment of commissions to ██████ was not justified by any service provided by ██████ or any other legitimate business reason. Instead, these unearned commissions, which generated undisclosed charges, were a kickback to WFS and its successors (through and including Wells Fargo) for force-placing CPI on the accounts of unsuspecting borrowers.

### 3.    Defendants Operated the CPI Program as a Single, Continuous Enterprise Since Inception

66.    Wells Fargo, National General, and their predecessors operated the CPI Program as a single, continuous enterprise from its inception in March 2002 until its termination in September 2016. Defendants were systematically linked through continually coordinated activities to operate the CPI Program.

67.    Throughout the duration of the CPI Program, Defendants employed the use of U.S. wire facilities by electronically exchanging information and money with each other about the CPI Program and individual borrower's accounts on a daily basis. These

---

[28] WFPI_00017004 at 016 (emphasis added).

75925478.7

1   electronic  exchanges  included ███████████████████████████

2   ████████████████████████████████████████████████████████

3   ████████████████████████████████████████████████████████

4   ████████████████████████████████████████████████████████

5   █████████████████████████  ██████████████████████████████

6   ████████████████████████████████████████████████████████

7   ████████████

8     ████  ████████████████████████████████████████████████

9   ████████████████████████████████████████████████████████

10  ████████████████████████████████████████████████████████

11  ████████████████████████████████████████████████████████

12  ████████████████████████████████████████████████████████

13  ████████████████████████████████████████████████████████

14  ████████████████████████████████████████████████████████

15  ████████████████████████████████████████████████████████

16  ████████████████████████████████████████████████████████

17  ████████████████████████████████████████████████████████

18  ████████████████████████████  ████████████████████████████

19  ████████████████████████████████████████████████████████

20  ████████████████████████████████████████████████████████

21  ████████████████████████████████████████████████████████

22  ███████████████████████████████████████[30]

23    ████  ████████████████████████████████████████████████

24  ████████████████████████████████████████████████████████

25  _____

26  [29] WFCPI_00046240 at p.2.

27  [30] McLawhorn Dep. at 119:4-124:2; Defendants Wells Fargo & Company and Wells Fargo Bank, N.A.'s Initial Disclosures; National General Defendants' Initial Disclosures.

28

75925478.7

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

1

2

3

4

5

6

7

8

9

10

11

12 <sup>31</sup>

13

14

15

16

17

18

19

20

21 <sup>32</sup>

22

23

24

25  <sup>31</sup> McLawhorn Dep. at 124:3-125:15; NatGen00292685; WFCPI_00004484-522; WFCPI_00004272-

26  306; WFCPI_00008247-279.

27  <sup>32</sup> McLawhorn Dep. at 124:3-125:15; Defendants Wells Fargo & Company and Wells Fargo Bank,

N.A.'s Initial Disclosures; National General Defendants' Initial Disclosures.

28

75925478.7

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

██████████████████████████ ██████████████████████████████████████████

██████████████████████████████████████████████████████████████████████████

████████████        Although the names of the specific Wells Fargo and National General entities changed, their roles and responsibilities did not.

72.    ████████████████████████████████████████████████████████████

██████████████████████████ ██████ █████████████████████████████████████████████

██████████████████████████████████████████████ █████████ ██████████

████████████████████████████████████████████████████████████████████

████████████

████    WFS changed its name to Wachovia effective March 1, 2007.    ████████

████████████████████████████████████████████████████████████ ████

██████████████████████████████████████████████████████████████████████

████████.[36]

74.    Wachovia changed its name to Wells Fargo Dealer Service, Inc. ("WFDS") effective March 20, 2010.  WFDS was a wholly-owned subsidiary of Wells Fargo Bank, N.A. ████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████

████████████████.[37]

75.    Effective July 1, 2011, Wells Fargo Dealer Services, Inc. dissolved its separate corporate status, merged into Wells Fargo Bank, N.A., and was renamed Wells

---

[33] McLawhorn Dep. at 18:19-29:1.

[34] WFCPI_00015256 at 296-322.

[35] WFCPI_00003667 at 372-97.

[36] WFCPI_00015256 at 284.

[37] WFCPI_0015256 at 281.

75925478.7

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

Fargo Dealer Services. ███████████████████████████████████

████████████████████████████. [38]

76.    ████████ ██████ █ █████ ████ ████ █████ ████ ██ █████,
████████████████████████████████████████████████ ████████
█████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████
████████████████████ █ █████████████████████████████████
█████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████
████████████████████████████████████ [40]

77.    Effective on or about July 15, 2015, National General acquired the assets and liabilities of QBE, and succeeded to QBEF's roles and responsibilities ████████████
█████ ████████████████████████████████████████████████████
████████████████████████ ████████████████████████████████
████████████████████████ ████████████████████████████████
█████████████████████████████████████████████████████████
██████████████████████████████████ [41]

78.    Wells Fargo terminated the CPI Program effective September 30, 2016. [42]

**4.    The CPI Program Was Lucrative for Defendants**

79.    Between 2005 and 2016, Defendants force-placed more than ███████████ CPI certificates on Wells Fargo's auto loan borrowers. [43]

---

[38] WFCPI_0015256 at 279.

[39] WFCPI_00003367 at 369.

[40] WFCPI_00008981 at 982.

[41] WFCPI_00052015 at 016.

[42] WFCPI_00051954.

75925478.7

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

80.     Between 2005 and 2016, the CPI Program generated ██████████ in net written premiums for National General and its predecessors.[44]

81.     Between October 2005 and 2017, the CPI Program generated more than ███ ████ in commissions and more than ██████████ in interest on force-placed CPI premiums for Wells Fargo.[45]   On information and belief, Wells Fargo generated tens of millions of dollars in late fees, NSF fees, repossession fees, reinstatement fees, and other charges in connection with the CPI Program.

82.     Even in the waning months of the CPI Program, Wells Fargo acknowledged that there had been ████████████████████████████████████ ██████[46]

83.     ████████████████████████████████████ ████████████████████████████████████ ██████████████████ ██ ████████████████████████████████ ████████████████████████████████████ ████████████████████████████████████ ████████████████████████████████████ ████████████████████████████████████ ████████████████████████[47]

---

[43] National General Defendants' Response to Plaintiffs' Second Set of Interrogatories to All Defendants, Response to Interrogatory Nos. 6(a), dated June 15, 2018.

[44] National General Defendants' Response to Plaintiffs' Second Set of Interrogatories to All Defendants, Response to Interrogatory Nos. 6(c), dated June 15, 2018.

[45] Defendants' Supplemental Responses and Objections to Plaintiffs' Interrogatories – Set Two, Supplemental Responses to Interrogatory No. 6(e) and 6(f), dated July 13, 2018.

[46] WFCPI_00055693 at 697.

[47] WFCPI_00003367 at 389-97.

75925478.7

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

85. ████████████████████████████████████████████████████
████████████████████████████ ██ ████████████████████████████
████████████████████████████████████████████████████████████
████████████████████ ████████████████████████████████████████
██████████████████████

86.    That ████████ stopped accepting commissions in ████████████ further demonstrates that the commissions it had accepted were in fact kickbacks. Had ████ been providing essential and valuable services to the CPI Vendor, ████████ could not (and would not) have continued to perform those services without compensation.

87. ████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
██████████[49]

88. ████████████████████████████████████████████████████
██ ████████████████████ ██████████ ██████████████████████████
████████████████████████████████████████████████████[51]

89. ████████████████████████████████████████████████████
████████████████████████████ ██████████████████████████████
██████████████████████████████████████████ ████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████[52]

---

[48] WFCPI_00003367 at 368.

[49] McLawhorn Dep. at 216:12-19.

[50] WFCPI_00015256 at 265.

[51] McLawhorn Dep. at 216:19-217:25.

[52] WFCPI_00047065 at 067; *see also* McLawhorn Dep. at 222:7-22.

75925478.7

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

1    90. █████████████████████████████████████████████
2    ███████████████████████████████████████████████████
3    ███████████████████████████████████████████████████
4    ████████████████████████[53]

5    91. █████████████████████████████████████████████
6    ███████████████████████████████ ███████████████████
7    ███████████████████████████████████████████████████
8    ███████████████████ ██████ █████████████████████████
9    ███████████████████████████████████████████████████
10   █████████

11   92.    Although Wells Fargo terminated the CPI Program in September 2016,
12   ███████████████████████████████████████████████████
13   ███████████████████████████████████████████████████
14   ███████████████████████████████████████████████████
15   ██████ █████[55]

16   93. █████████████████████████████████████████████
17   ███████████████████████████████████████████████████
18   ████████ ██████████████████████████████████████████
19   ███████████████████████████████████████████████████
20   ███████████████████████████████████████████████████
21   ███████████████████████████████████████████████████
22   █████████████████████

_____

[53] WFCPI_00017004 at 010 (emphasis added).

[54] WFCPI_00045980 at p. 2.

[55] NatGen00237999.

75925478.7

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

**5.    Charges to Wells Fargo's Auto Loan Borrowers Were Not Insurance Premiums**

94.    Charges for CPI that Wells Fargo assessed to borrowers were not insurance premiums and were not subject to state insurance rate regulation.  Instead, CPI was a commercial insurance policy purchased by Wells Fargo from the CPI Vendor.  ███████ ████████████████████████████████ ███████████████████████████████████ ████████████████████████████████

95.    Wells Fargo then assessed charges to borrowers for CPI.  As explained in an internal Wells Fargo presentation, █████████████████████████████████ █████████████████████████████████████████████████████ ████████████████[57]  Although Wells Fargo purchased CPI in 12-month terms, it assessed a full-year of premiums on borrowers' accounts over a 9-month period.

96.    Wells Fargo structured customers' loan payments to maximize the interest customers paid on CPI over the life of their automobile loan.  Wells Fargo describes the order in which it applies payments as follows:

Loan interest - the daily amount due on your loan;

Collateral Protection Insurance (CPI) Interest - the amount of interest on your insurance premium (**if applicable**);

Principal - the principal payment amount due on your loan;

CPI principal - the principal payment on your insurance premium (**if applicable**)

Payment variance - any amount remaining due from previous payments;

CPI variance - any amount remaining due from previous insurance premium payments (**if applicable**); and

---

[56] McLawhorn Dep. at 146:3-6.

[57] WFCPI_00002776 at 780.

Other charges - fees such as nonsufficient funds.[58]

97.    Wells Fargo's deliberate decision to structure payments in this order had the predictable effect of increasing the overall interest customers paid to Wells Fargo on their loans, because less of their payment went to the actual outstanding loan principal each month.    This increased the likelihood of underpayments, late payments, fees for insufficient funds, and ultimately repossessions.

98.    The payment structure was lucrative for Wells Fargo,



99.

[58] *See* <u>Understanding Your Auto Loan</u>, *supra* at note 2 (emphasis added).

[59]

[60] NatGen00033469 at 472 (emphasis in original).

27

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

1 ██████████████████████████████████████████████████████

2 ████████ ███████████████████████████████████████████

3 ██████████████████████████████████████████████████████

4 ██████████████████████████████████████████████████████

5 ████████████████████████████████████[62]

100.   Neither the CPI policy nor state insurance laws required Wells Fargo to assess premium and interest charges to borrowers.  In fact, lenders generally pay for CPI through a "blanket policy" covering the collateral for an entire class of loans without assessing charges for the premium on borrowers, ██████████████████████

██████████████████████████████████████████████████████

████████████████████.[63]

101.   Wells Fargo's baseline practice of conditioning auto loans on borrowers paying Wells Fargo for CPI was not a customary industry banking practice—even when isolated from the bank's deceptive billing procedures and duplicative CPI placements.

███████████████████████████ █████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████[65]

---

[61] WFCPI_00029418 at 421.

[62] WFCPI_00052720 at 721.

[63]   WFCPI_00015256  at  314-15;  McLawhorn  at  242:6-10 ████ ████████████████ ███████ ██ ██
██████████████████████████ ██ ███ ████████ ██
█████████████████████

[64] WFCPI_00035207 at 214.

[65] WFCPI_00050483 at 484.

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

102. ███████████████████ ████████████████

████████████ ██ ██████████████████████ Instead, Wells Fargo kept the CPI Program in place to obtain lucrative kickbacks in the form of unearned commissions and other compensation, inflated interest charges, and other fees and charges for late payments, insufficient funds, and the like, all of which went straight to the bottom line as essentially pure profit.

### 6. Wells Fargo and Its CPI Vendor Unlawfully Force-Placed CPI

#### a. Wells Fargo Obtained Borrowers' Insurance Information from the Automobile Dealer at the Time of Sale

103. Throughout the duration of the CPI Program, consumers who purchased or leased automobiles through a dealer either had financing approved directly from a lender in advance of the transaction or worked with the dealer to obtain financing indirectly from a lender, such as Wells Fargo. In the latter case, the financing contract was a standard form agreement, called a Retail Installment Sale Contract ("RISC"). The financial obligations under the RISC were later assigned to the lender.

104. The RISC was an integrated agreement that typically contained the following language: "This contract contains the entire agreement between you and us relating to this contract. Any change to the contract must be in writing and both you and we must sign it. No oral changes are binding."[67]

105. The RISC required the borrower to maintain physical damage insurance on the vehicle to protect the collateral. A standard disclosure in a RISC was as follows:

> **Insurance you must have on the vehicle.**
> You agree to have physical damage insurance covering loss of or damage to the vehicle for the term of this contract. The insurance must cover our interest in the vehicle. If you do not have this insurance, we may, if we choose, buy physical damage

---

[66] McLawhorn Dep. at 169:21-23.

[67] WFCPI_00000045.

insurance. If we decide to buy physical damage insurance, we may either buy insurance that covers your interest and our interest in the vehicle, or buy insurance that covers only our interest. If we buy either type of insurance, we will tell you which type and the charge you must pay. The charge will be the premium for the insurance and a finance charge equal to the Annual Percentage Rate shown on the front of this contract or, at our option, the highest rate the law permits. If the vehicle is lost or damaged, you agree that we may use any insurance settlement to reduce what you owe or repair the vehicle.[68]

106. ███████████████████████████ ████ ████ ████ ████ █
████████████████████████████████████████████████
████████████████████████████████████ █ ████████████
██████████████████████████████████████████████████ █
███████████████████████████████████[71]

107. █████████████████████████████████████████████
██████████████████████████████████████████████████

███████[72] The dealer typically photocopied the borrower's proof of insurance[73] and filled out a standard form document called, an "Agreement to Furnish Insurance (To Be Used with Security Agreement on Sale of Vehicle)," which identified the borrower's insurance carrier, the carrier's address and/or phone number, and policy number.[74] In the Agreement to Furnish Insurance, the dealer also identified Wells Fargo (or its

---

[68] WFCPI_00000045 at 046.

[69] McLawhorn Dep. at 41:2-10.

[70] McLawhorn Dep. at 41:15-18, 44:7-15.

[71] McLawhorn Dep. at 41:3-43:3.

[72] McLawhorn Dep. at 50:2-11.

[73] *E.g.*, WFCPI_00000045 at 057.

[74] *E.g.*, WFCPI_00000045 at 053.

75925478.7

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

predecessor) as the "Loss Payee," *i.e.*, the entity to which the claim from any loss should be paid.[75]

108. ███████████ ████████████████ ██████ █ █████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████ █ ███████████████████████████████

███████████████████████[77]

**b.    Defendants Disregarded Borrowers' Proof of Insurance**

109. ███████████████████████████████████████████

██████████████ ████████████████████████████████

██████████████ █ ████████████████████████████████

████████████████████████████████████████████████

██████████████████████████.[78]

110. ████████████████████████████████████████████

████████████████████████████.[79]    Nonetheless, Defendants deliberately disregarded the available information about a borrower's auto insurance—including the borrower's proof of insurance or Agreement to Furnish Insurance provided by the borrower with the origination of the loan—in favor of force-placing CPI.

111. ████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████ ██████████████████████

████████████████████████████████████████████████

_____

[75] *Id.*

[76] McLawhorn Dep. at 54:14-55:25.

[77] McLawhorn Dep. at 56:1-57:17.

[78] McLawhorn Dep. at 66:24-67:20.

[79] McLawhorn Dep. at 68:6-17.

75925478.7

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

1  ████████████████████████████████████████████████████

2  ████████████████████████████████████████████████████

3  ██████.[80]

4  112.  ████  ██  ███  ████████  ████  ███  ████  █████████████

5  ██████████████████████████████████████████████████

6  ████████████████████████████████████  █  ██████████████

7  ████████████████████████████████████████████████████

8  ████████████████████████████████████████████████████

9  ████████.[83]

### c. Defendants Sent False and Misleading "Insurance Request" Letters to Borrowers

113.  Per the agreed-upon policies, practices, and procedures of Wells Fargo and its CPI Vendor, the CPI Vendor sent via U.S. mail a first letter entitled "Insurance Request" to any "eligible" borrower ███████████████████████████████ ████████████████████████████████████████████████████ █████████████████  █  ███████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ █████████████████████

114.  ████████████████████████████████████████████████ ████████████████  █  ███████████████████████

---

[80] McLawhorn Dep. at 68:18-73:1.

[81] McLawhorn Dep. at 79:1-7.

[82] McLawhorn Dep. 79:1-4.

[83] McLawhorn Dep.79:8-80:1.

[84] WFCPI_00045980 at p.6.

[85] *See*, *e.g.*, NatGen00576109.

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

1 ███████████████████████████████████████████████████

2 ████████████████ █████████████████████████████████████

3 ████████████████████████

4     115. ██████ ████████████████████ ██████ ████ ████ ████ ██

5 ███████████████████████████████ █ ██████████████████████

6 ████████████ ██ █████████████████████████████████████████

7 ████████████████████████████████████████████████████,[89]

8 leaving the borrower to believe that he or she was receiving correspondence from Wells

9 Fargo. ██████████████████████████████████████████████

10 ███████████████████████████████████████████████████

11 ████████████████████████████████████████████████[90]

12     116. █████████████████████████████████████████

13 ███████████████████████████████████████████████████

14 ██████[91]

15     117. █████████████████████████████████████████

16 ███████████████████████████████████████████████████

17 ███████████████████████████████████████████████████

18 ████████████████████████████ █████████████████████████

19 ████████

---

[86] McLawhorn Dep. at 76:12-24.

[87] McLawhorn Dep. at 75:19-22, 76:12-20; *see also*, *e.g.*, NatGen00576109.

[88] McLawhorn Dep. at 76:25-77:4.

[89] *See*, *e.g.*, NatGen00576109; *see also* McLawhorn Dep. at 80:18-20.

[90] McLawhorn Dep. at 82:6-11.

[91] McLawhorn Dep. at 79:16-22.

75925478.7

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

[Redacted].[92]

118.    The Insurance Request falsely stated, "Please be advised that we have not received insurance information for your financed vehicle."[93]   Of course, that statement contained a false or misleading representation of material fact, as Wells Fargo had received proof of the borrower's insurance from the dealer at the time of the purchase transaction. [Redacted]

119.    The Insurance Request further falsely stated, "If we do not receive evidence of adequate insurance with an effective date on or before [Redacted] [Redacted], we may buy insurance to protect our interest in your vehicle."[94]   This statement was false or misleading as Wells Fargo knew at the time that it did not need to purchase insurance to protect its interest in the borrower's vehicle.   The Insurance Request also identified the cost of the annual insurance premium and provided the approximate amount by which the borrower's monthly payment would increase.[95]

120.    Letters issued before February 2013 also falsely stated that "the insurance agency, which is an affiliate of Wells Fargo Dealer Services [or its predecessors], will earn a commission if this insurance is purchased."[96]   This statement contained a false or

---

[92] McLawhorn Dep. at 78:4-11.

[93] NatGen00576109.

[94] *Id.*

[95] *Id.*

[96] *See, e.g., id.*

34

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

misleading representation of material fact.  At no point during the CPI Program was the commission "earned" by Wells Fargo's insurance agent affiliate, ███████  As described above, WestFin did nothing to earn the commission it received.  ███████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████  The commission that Wells Fargo's affiliate received was an unlawful kickback for the placement of CPI on borrowers' accounts.

121.  ██ ██ ███ ████ ████ ██ ███ ██ ██ ███ █
████████████████████ ██████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████[97]  But nothing within the RISC permitted Wells Fargo to charge borrowers for administrative fees to run the CPI Program, and Wells Fargo concealed from borrowers that they were being charged for these administrative fees.  None of the communications Wells Fargo sent to consumers disclosed such charges.

122.  Many letters issued between October 2005 and February 2013 also stated that the commission was "15% of the premium."[98]  That statement contained a false or misleading representation of material fact.  ████████████████████

████████████████████████████████████████████████████

---

[97] WFPI_00017004 at 016 (emphasis added).

[98] *See, e.g.*, NatGen00576109.

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

████████████████████████████████████████████████████

████████████████████████

123.    The Insurance Request included specified means by which the borrower could provide information in response to the letter.  The borrower's options included an "Insurance Service Center" post office box, toll-free telephone number, fax number, and the website www.ihaveinsurance.com.[99] ████████████████████████████████

████████████████████████████████████████[100] As a result, a borrower who engaged with any of these points of contact would have reasonably believed that he or she was communicating directly with Wells Fargo. ████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████[101]

124.    ████████████████████████████████████████████

████████████████████████[102]

### d.    Wells Fargo Had No Practice of Monitoring the CPI Vendor's Telephone Calls to Borrowers

125.    Per the agreed-upon policies, practices, and procedures of Wells Fargo and its CPI Vendor, the CPI Vendor used the facilities of the U.S. wires by placing outbound telephone calls to the borrower, the borrower's insurance agent (if known), or the borrower's insurance company (if known), ████████████████████

████████████████████████████████████████████████████

████████████████████[103]

---

[99] *See id.*

[100] *See id.*

[101] NatGen00563655 at p.5.

[102] McLawhorn Dep. at 81:16-82:5.

[103] McLawhorn Dep. at 85:25-86:19; WFCPI_00045980 at p.6.

75925478.7

126. ██████████████████████████████ ████████████████
████████████████ ████████████████████████████████████
██████████████ [104]

127. ████████████████████████████████████
██████████████████████████████ ██████████████
████████████████████████████████████████████
██████████████████████████████ ██████████████
████████████████████████████████████████████
██████████████████████ .[105]

128. ████████████████████████████████████
████████████████████████████████████████████
████████████████████ [106]

**e.** **Defendants Sent False and Misleading "Coverage Issued" Letters to Borrowers**

129. Per the agreed-upon policies, practices, and procedures of Wells Fargo and its CPI Vendor, the CPI Vendor sent via U.S. mail a second letter entitled "Coverage Issued" to the borrower ██████████████████████
████████████████████████████████████████████
██████████████████ [107]

130. Like the Insurance Request, the Coverage Issued Letter was a standardized form letter sent to borrowers ██████████████████████████
██████ █ ████████████████████████████████████

---

[104] McLawhorn Dep. at 91:2-16.

[105] McLawhorn Dep. at 86:20-89:11.

[106] Rule 30(b)(6) Deposition of Mark Turner dated Aug. 16, 2018 ("Turner Dep.") at 62:15-63:13.

[107] McLawhorn Dep. at 89:18-90:1; WFCPI_00045980 at p.6.

[108] *See, e.g.,* NatGen00576035.

37

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

1    ████████████████████████████████████████ ██ ██████████████

2    ████████████████████████████████████████████

3    131.    ████████████████████████████ ████ ████████████████

4    ███████████████████████████ ██ ██████████████████████████

5    ████████████████████████████████████████████████████

6    ██████████████████████████████████ [111]

7    leaving the borrower to believe that he or she was receiving correspondence from Wells

8    Fargo.

9        132.    The Coverage Issued Letter falsely stated, "Our records indicate an absence

10   of required insurance coverage since ████████████████████████████

11   ██████" This statement contained a false or misleading representation of material fact.

12   In fact, Wells Fargo had received proof of the borrower's insurance from the dealer at the

13   time of the purchase transaction. ████████████████████████████

14   ██████████████████████████████

15       133.    The Coverage Issued Letter further falsely stated, "Since we have not

16   received proof of the required coverage, we have exercised our contractual right to

17   purchase insurance coverage at your expense to protect our interest in your financed

18   vehicle."[112]    This statement was likewise false or misleading as Wells Fargo knew it did

19   not need to purchaser insurance coverage to protect its interest in the vehicle.

20       134.    The Coverage Issued Letter falsely represented that Defendants were

21   exercising their "contractual right to purchase coverage" at the borrower's expense.

22   Nothing in the RISC disclosed to borrowers that Defendants would charge borrowers for a

23   commission, the cost of administering the CPI Program, or the cost to pay for Tracking

24   ─────────────────
25   [109] McLawhorn Dep. at 90:14-18.

26   [110] McLawhorn Dep. at 90:19-20; *see also, e.g.,* NatGen00576035.

27   [111] *See, e.g.,* NatGen00576035.

28   [112] *Id.*

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

Services for Wells Fargo's indirect auto loan portfolio. Also, nothing in the RISC disclosed to borrowers that Defendants would force place a CPI policy without verifying that the borrower failed to maintain adequate collateral insurance.

135. The Coverage Issued Letter also identified the cost of the annual insurance premium, finance charge, and the amount by which the borrower's monthly payment would increase.[113] ██████████████████████████████████████████ ████████████████████[114]

136. The Coverage Issued Letter was also false or misleading as it omitted to disclose the material fact that the identified premium included an unearned commission paid to ████████ for CPI issued ████████████████████████████████[115] As Wells Fargo's Rule 30(b)(6) witness explained:

██   ████████████████████████████████████████████
     ████████████████████████

██   ██████████

██   ████████████████████████████████████████████
     ████████████████████████████████████████████
     ████████████████████████████████████████████
     ████████████████████████████

██   ████████████████████████████████████████████
     ████████████████████████████[116]

137. Throughout the duration of the CPI Program, the Coverage Issued Letter was also false or misleading as it indicated that CPI was forced-placed effective ████████████ ██████████████████████████████████████████████████████████████████

---

[113] *See id.*

[114] WFCPI_00015256 at 300; McLawhorn Dep. at 280:17-22.

[115] McLawhorn Dep at 93:3-9.

[116] McLawhorn Dep. at 96:1-9.

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

138.  This was not the only way in which Defendants employed the CPI Program to minimize the likelihood of paying claims.  As explained above, Wells Fargo admitted that Defendants force-placed duplicative and unnecessary CPI on the accounts of hundreds of thousands of borrowers who already had adequate auto insurance of their own.

.[119]  Moreover, borrowers who maintained private insuarnce coverage were less likely to place a claim through CPI in the first place, because their first recourse generally was to place a claim with their own auto insurance company.

139.

.[120]  This practice minimized the risk to Wells Fargo, enabling the bank to

---

[117] *E.g.,* NatGen00576111; McLawhorn Dep. at 97:18-98:3.

[118] McLawhorn Dep. at 98:10-18.

[119] McLawhorn Dep. at 99:8-100:10.

[120] McLawhorn Dep. at 228:17-229:10.

75925478.7

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

pass costs for CPI to the borrower who had never received disclosures that they would be so charged.

### 7. Wells Fargo Sent ███████ Deceptive Account Statements to Borrowers

███    ████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████. [121]

141.    However, Wells Fargo concealed CPI charges—for premium, interest, and commissions—on borrowers' billing statements at all times between inception of the CPI Program in March 2002 and September 2016, less than one month before Wells Fargo terminated the CPI Program. ████████████████████████████████████

███████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

█████████ ████████████████████████████

████████████████████████████████████

█████████ █████████████████████████████

████████████████████████████████████

██████████████████████████████

████████ ██████████████████████████████

██████████████

████████████████████████████████████████

████████████████████ [122]

---

142. ████████████████████████████, ████ ████████████████
████████████████████████████████████████

████  ████████████████████████ ████████████████
       ███████████

████  ████

              ███  ███  ███

████  ████████████████████████

████  ████████████

                    ███  ███  ███

████  ████████████████████████████
       ███████████████████████████

████  ████████████████████████████
       ████████████████████████████
       █████████████████

              ███  ███  ███

████  ████████████████████████████
       ███████████████

████  █████████████████████████

              ███  ███  ███

████  ████████████████████████████
       ████████████████████████████
       ██████████████████

████  ████████████████████████████
       ████████████.[123]

─────────────────────
[123] McLawhorn Dep. at 135:25-143:23.

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

143.   Wells Fargo's deceptive billing practices harmed borrowers including Plaintiffs and Class members.   Wells Fargo's failure to disclose on customer billing statements the addition of charges for CPI premiums and interest increased the likelihood that borrowers would suffer adverse consequences such as underpayments, late payments, fees for insufficient funds, and repossessions.   Wells Fargo's deliberate decision to omit CPI charges on customer billing statements decreased the likelihood that borrowers would call to complain or notice that their payments were deficient.   Defendants' actions also caused significant damage to the credit reports of thousands of auto loan borrowers.

144.   For borrowers who did discover increased charges due to CPI, working with Defendants to remove the CPI was typically futile.   Many borrowers who sent proof of their independent insurance policies to Defendants had no success in getting the unnecessary force-placed CPI removed.   In other cases, the CPI charges would stop for a month or two and then inexplicably be reinstated with no explanation or notice. Defendants generally refused to fix the problem, or even grant leniency to borrowers whose vehicles were wrongfully repossessed.

## 8.   Wells Fargo Identified Other Features of the CPI Program That Harmed Borrowers

145.   By 2016, Wells Fargo finally admitted that other aspects of the CPI Program, which had been in place throughout the duration of the CPI Program, caused great harm to its own customers.

146.   Defendants recognized two types of CPI cancellations:   "flat cancels" and "partial cancels."   Flat cancellations referred to a borrower's submitting to Defendants proof of adequate auto insurance covering the entire time for which they had force-placed CPI.   Borrowers who flat cancelled CPI were supposed to receive full refunds of all charges for CPI premiums and interest they paid.   Partial cancellations referred to a borrower's submitting to Defendants proof of adequate auto insurance covering a portion, but not all, of the time for which they had force-placed CPI.   Borrowers who partially

cancelled CPI would not receive refunds of charges for CPI premiums and interest they paid for the period when Defendants concluded they needed CPI.

147. Defendants knew that most force-placed CPI certificates were either fully or partially cancelled. ████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████ The high cancellation rates were also apparent within Wells Fargo's own system of record because it processed refunds when force-placed CPI certificates were cancelled and reported those cancellations back to the CPI Vendor.

148. On average over the period 2005 to 2016, nearly ████████████ of force-placed CPI certificates were flat or partially cancelled.[124] ███████████████████████████

████████████████████████████████████████████████████████████████████████

███████████████████████████.[125]

149. But cancellation did not end the harm to borrowers. ███████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

██████████████████████████████████    █████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████    ██████████████████████████████████████

████████████████████████████████████████  ██████████████████████████████

[124] National General Defendants' Response to Plaintiffs' Second Set of Interrogatories to All Defendants, Response to Interrogatory Nos. 6(g) and 6(h), dated June 15, 2018.

[125] NatGen00201645 at 646.

[126] WFCPI_00050483 at 484.

[127] McLawhorn Dep. at 166:23-167:2.

75925478.7

1

2

3

[129]

4

5

6

7

8

9

10

[130]   This problem of falsely-placed duplicative and unnecessary CPI has turned out to affect hundreds of thousands of Wells Fargo's auto loan borrowers.

151.

12

13

14

15

16

17

18

19

[133]

20

21

22

---

[128] WFCPI_00048472-474.

[129] McLawhorn Dep. at 193:21-25.

[130] WFCPI_00050483 at 484.

[131] WFCPI_00019260 at 261.

[132] McLawhorn Dep. at 176:12-17.

[133] McLawhorn Dep. at 176:18-177:17.

75925478.7



[135]

### 9.    Defendants Knowingly Ignored and Failed to Track Consumer Complaints About CPI

153.    Defendants deliberately ignored and failed to track consumer complaints despite having force-placed CPI on hundreds of thousands of borrowers and having known that most of CPI certificates were flat or partially cancelled.



154.

[137]

155.

[138]

---

[134] WFCPI_00019260 at 262.

[135] McLawhorn Dep. at 189:21-190:5.

[136] Videotaped Deposition of Rule 30(b)(6) Witness Kimberly A. Dee dated July 18, 2018 ("Dee Dep.") at 18:2-24.

[137] *Id.*

[138] Dee Dep. at 27:15-20, 28:5-22.

1   ██████  ████████████████████████████████████████████████████

2   ████████████████████████████████████████████████████████████████

3   ████████████████████████████████████████████████████████████████

4   ███████████ [139]

5   157. ████████████████████████████████████████████████

6   █████████████████████████ ██ ████████████████████████████████████

7   ████████████████████████████████████████████████████████████████

8   ██████████████████████.[141]

9   158. ████████████████████████████████████████████████

10  ███████████████████████████████████████████ ██ ██████████████████

11  █████████████████████████████████████

12  ███████████████████████████████████████████████

13  ███████████████████████████████████████████████

14  ███████████████ ██ ██████████████████████████████

15  ████████████████████████████████ ██ ████████████

16  ████████████████████████████████████████████████

17  ██████████████████████████████████████[143]

18  159. ████████████████████████████████████████████████

19  ████████████████████████████████████████████████████████████████

20  ████████████████████████████████████████████████████████████████

21  █████████████████████████████ ██ ███████████████████████████████he

[139] Dee Dep. at 32:13-22.

[140] Dee Dep. at 35:18-23.

[141] Dee Dep. at 40:4-41:1.

[142] NatGen00370224 at 227.

[143] NatGen00295965 at p. 28.

[144] NatGen00295965 at p. 30.

75925478.7

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

1 ███████████████████████████████████████████████████████

2 ███████████████████████████████████████ █ ████████████

3 ████████████████████.[146]

4 ████ ████████████████████████████████████████████████

5 ██████ ████ ██████ ██████ ███ ███ ██ ███████ ██ ████ ██████ ████

6 ███████████████████████ ████████████████████████████████

7 ██████████████████████████████████████████████████████████

8 ████████ ████████████████████████████████████████████████

9 ██████████████████████████████████████████████████████████

10 ████████████████████████████████████████ █ ██████████

11 ██████████████████████████████████████████████████████████

12 ██████████████████████████████████████████████████████████

13 ████████████████████████████.

161. Thus, Defendants' policy and practice for the vast majority of the CPI Program was to ignore customer complaints ██████████████████████████ so they never had to address them. In this way, Defendants could perpetuate the force-placed CPI scheme to their own financial benefit at their customers' expense.

**C.    Wells Fargo's Management, Risk Officers, and Board of Directors Knew That the CPI Program Harmed Its Customers**

162. ████████████████████████████████████████████

███████████████████████████████████████████████████████████

██ █ █████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

---

[145] NatGen00295965 at p. 29.

[146] NatGen00255795 at p. 31.

[147] NatGen00255795 at p. 31.

[148] WFCPI_00017004.

75925478.7

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

1 ██████████████████████████████████████████████████

2 ██████████████████████████████████████████████████

3 ██████████████████████████████████████████████████

4 ███████████████████████████████

5     163. ████████████████████████ ██████ ████████

6 ██████████████████████████████████████████████████

7 ██████████████████████████████████████████████████

8 ██████████████████████████████████████████████████

9 ██████████████████████████████████████████████████

10 █████████████████████████████████████ ████████████

11 ██████████████████████████████████████████████████

12 ██████████████████████████████████████████████████

13 ████████████████████████████████████[150]

14     164. Following a deluge of customer complaints about the deceptive CPI

15 Program, Wells Fargo scrambled to address the issue. ████████████████

16 ██████████████████████████████████████████████████

17 ██████████████████████████████████████████████████

18 ██████████████████████████████████████████████████

19 ████████ █ ██████████████████

20

21 • ██████████████████████████████████

22 ██████████████████████████████████

23 ████████████████

24

25 _____

26 [149] *Id.*

27 [150] WFCPI_00045980 at p.2.

28 [151] WFCPI_00062871 at 872.

75925478.7

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

1    •    ████████████████████████████████████████

2    ████████████████████████████████████████

3    ██████████████████████████████████

4    •    ████████████████████████████████████████
         ███████████████████████████[152]██████

5

6    165.    ██ ████ ███ ███ ███ ████ ████ ███ ████

7    ██████████████████████████████████████████

8    ███████████████████████[153]

9    166.    Defendants discontinued their unusual practice of force-placing CPI on Wells

10   Fargo's auto loan borrowers' accounts effective September 30, 2016.    ████████████

11   ██████████████████████████████████████████

12   ███████████.[154]

13   167.    ████████████████████████████████████

14   ██████████████████████████████████████████

15   ██████████████████████████████████████████

16   ███████████████████████████████████ ██  ██

17   ██████████████████████████████████████████

18   ███.[156]

19   168.    ████████████████████████████████████

20   ██████████████████████████████████████████

21   ██████████████████████████████████████████

22   ████ ██ ████████████████████████████████████

23

24   [152] *Id.*

25   [153] WFCPI_00035207 at 208.

26   [154] WFCPI_00062871 at 872.

27   [155] *Id.*

28   [156] Turner Dep. at 97:15-20.

     [157] WFCPI_00062871 at 872.

75925478.7

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

1

2

3 .[158]

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

---

[158] Turner Dep. at 38:10-40:8.

75925478.7

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

■ ████████████████████████████████
  ███████████

● ██████████████████████████████████
  ██████████████████████████████████
  ██████████████████████████████████
  ██████████[159]

170.   Nonetheless, Wells Fargo refused to publicly acknowledge the CPI scheme until information about it was leaked to the press.

**D.   The *New York Times* Exposes Defendants' Force-Placed CPI Scheme**

171.   Defendants' fraudulent CPI scheme finally came to light on July 27, 2017, when *The New York Times* ran an investigative report on the scandal.[160]  The *Times* report, was based on a copy of the internal report commissioned by and prepared for Wells Fargo by consulting firm Oliver Wyman that detailed the scheme (the "Oliver Wyman Report").

172.   The Oliver Wyman Report was commissioned in 2016 and completed in February 2017—five months before it was leaked to the press.  The Oliver Wyman Report investigated Defendants' CPI practices, but only between January 2012 and July 2016.  It found that Defendants charged roughly 800,000 consumers for CPI they did not need, with an estimated 274,000 becoming delinquent on their account.  Approximately 25,000 vehicles were wrongfully repossessed as a result of Defendants' CPI practices.  The report estimated Wells Fargo owed $73 million to its customers.[161]

---

[159] WFCPI_00062871 at 873.

[160] Gretchen Morgenson, The New York Times, Wells Fargo Forced Unwanted Auto Insurance on Borrowers, July 27, 2017, available at https://www.nytimes.com/2017/07/27/business/wells-fargo-unwanted-auto-insurance.html.

[161] *Id.* ███████████████████████████████████████████████████████ *See* WFCPI_00030101 at 103.

75925478.7

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

173. But, the scheme began well before 2012, and Wells Fargo's borrowers sustained financial damages far beyond the costs of the insurance.[162]  The harm also included repossession costs, late fees, charges for insufficient funds, time spent dealing with overdrafts, unfair charges, bank account deficiencies, attempts to reverse the Defendants' wrongful charges, and damage to consumers' credit reports.

174. In a press release posted to its Dealer Services website on the same day the *Times* story first ran, Wells Fargo announced a purported "remediation" program:  "In total, approximately $64 million of cash remediation will be sent to customers in the coming months, along with $16 million of account adjustments, for a total of approximately $80 million in remediation."[163]

175. The core decisions concerning the nationwide remediation program were made by Wells Fargo from it California offices and headquarters.

176. But, Wells Fargo's "remediation" program is not what it purports to be. Wells Fargo has not offered consumers remediation of the financial harm they suffered. Rather, Wells Fargo has informed borrowers that if they submit proof of insurance, they "may be eligible for a refund."  Wells Fargo offers no "remediation" for its scheme to apply unnecessary, unauthorized and inflated CPI premiums, and Wells Fargo's remediation program offers no relief for ███████████████████████ ████████████████.[164]

---

[162] The *New York Times* reported that the scheme began as early as 2006.  *Id.*  But, after a subsequent *Times* article questioned the time period of Wells Fargo's study, Wells Fargo subsequently admitted that the CPI scheme began as early as 2005.  *See* Wells Fargo, SEC and Other Regulatory Filings, Q3 2017 Form 10-Q, at p.3, November 3, 2017, available at https://www08.wellsfargomedia.com/assets/pdf/about/investor-relations/sec-filings/2017/third-quarter-10q.pdf.  As detailed herein, the scheme began in March 2002.

[163] *See* Wells Fargo Announces Plan to Remediate Customers for Auto Insurance Coverage, *supra* at n.1.

[164] WFCPI_00030101 at 113; Turner Dep. at 107:6-9, 108:10-13 ("Q. And 2 A says customers that paid higher premiums for CPI due to commissions charged.  Do you see that?  A. Yes. … Q. And it was a business decision of the bank's not to include that category in the remediation plan; right?  A. The – yes.").

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

177.  ██████████████████████████  ████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████[165]

178.  Wells Fargo's announced "remediation" program drew criticism from federal regulators.  On October 20, 2017, *The New York Times* ran a follow-up article after having reviewed a preliminary report on the CPI scandal prepared by the Office of the Comptroller of the Currency ("OCC").  The report stated that Wells Fargo had most likely underestimated how much it would cost to reimburse harmed customers.[166]  The OCC found that Wells Fargo's claimed $80 million fund to compensate consumers was not enough money to properly reimburse consumers, nor did the money sufficiently cover all of the consumers impacted.  The OCC also found that Wells Fargo used "an overly complicated reimbursement methodology, which lacked clear support for addressing all the customer costs incurred," according to the report.

179.  As noted by the *Times*, "[t]he report paints a damning picture of a bank that didn't monitor its contractors, that lacked the impetus to correct problems once they were uncovered and that proved unresponsive to complaints from its customers."[167]

180.  Whereas Wells Fargo initially claimed that Defendants' force-placed CPI practices affected only 570,000 borrowers between January 2012 and 2016 and would require $80 million in remediation, Wells Fargo's 2017 3rd Quarter Form 10-Q, filed on November 3, 2017, paints a different picture.  Wells Fargo then admitted that "[t]he time period in which customers may be eligible to claim or otherwise receive remediation

---

[165] WFCPI_00060786.

[166] Gretchen Morgenson, The New York Times, <u>Regulator Blasts Wells Fargo for Deceptive Auto Insurance Program</u>, October 20, 2017, available at https://www.nytimes.com/2017/10/20/business/wells-fargo-auto-insurance-comptroller.html.

[167] *See id.*

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

compensation for certain CPI placements has now been extended back to October 15, 2005."[168]    And, whereas Wells Fargo originally pledged $80 million to remediate Defendants' fraudulent practices, Wells Fargo increased its estimate to approximately $130 million.[169]  Again, this proposed remediation is insufficient.

181.   Soon after the *Times* reported on the OCC's report, Senator Sherrod Brown, a member of the Senate Banking Committee, bluntly noted during a Congressional hearing on Wells Fargo's various scandals:   "The company pure and simple lied to this committee—and lied to the public."[170]  Senator Brown was referring to the fact that Wells Fargo said it first became aware of the CPI debacle a year earlier, in July 2016.  Yet, former Wells Fargo CEO John Stumpf did not disclose the CPI scheme to Congress during a hearing in September 2016 concerning millions of fake bank accounts that Wells Fargo created.  And of course, Wells Fargo failed to acknowledge that ███████████ ██████████████████████████████████████████████████████.

182.   In written questions following the 2016 fake account hearings, the Senate Banking Committee specifically asked Wells Fargo executives if they were "confident that this type of fraudulent activity does not exist" elsewhere in the bank. Lawmakers also asked whether Wells Fargo "discovered other types of misconduct."   Wells Fargo responded in November 2016, saying:  "We believe that the activity at issue here was limited to certain" employees working in the company's community banking division. Wells Fargo did not mention the auto insurance scandal, which was rooted in its auto dealer services department.[171]

---

[168] Q3 2017 Form 10-Q, *supra* at n.161, at p. 5.

[169] *Id.*

[170] Matt Egan, CNN, <u>Wells Fargo accused of lying to Congress about auto insurance scandal</u>, October 3, 2017, available at http://money.cnn.com/2017/10/03/investing/wells-fargo-lie-congress-hearing-auto-insurance/index.html.

[171] *Id.*

183.    Recently, the Honorable John Tigar, United States District Judge for the Northern District of California, rejected similar claims of lack of corporate knowledge or involvement in the "fake accounts" scandal also plaguing Wells Fargo.  "Just as it is implausible that the director defendants were unaware of the account-creation scheme given the extent of the alleged fraud and the number of red flags," Judge Tigar wrote, "it is implausible that Wells Fargo's senior management, involved in the day-to-day operations of the bank and with greater access to the underlying cross-sell metrics and employee whistle-blower complaints than independent board members, was unaware of the alleged fraud."[172]

184.    In a now-familiar theme, Wells Fargo's 2017 3rd quarter 10-Q filing notes that "a former team member has alleged retaliation for raising concerns regarding automobile lending practices."[173]

185.    Federal regulators finally recognized that Wells Fargo's explanations and excuses had been insufficient.  In a pair of Consent Orders announced on April 20, 2018, the Consumer Financial Protection Bureau and the OCC found that Wells Fargo's CPI practices violated multiple federal statutes and warranted some of the largest fines in recent memory.  Wells Fargo agreed to pay $1 billion to federal regulators in part to settle claims it improperly charged auto loan customers for duplicative, unnecessary, and overpriced CPI.[174]

---

[172] Gretchen Morgenson, The New York Times, Bringing Accountability to the Wells Fargo Boardroom, November 3, 2017, available at https://www.nytimes.com/2017/11/03/business/wells-fargo-board.html; *see also In re Wells Fargo & Company Shareholder Derivative Litig.* 282 F. Supp. 3d 1074, 1099–1100 (N.D. Cal. Oct. 4, 2017).

[173] *See* Wells Fargo Q3 2017 Form 10-Q, *supra* at n. 161.

[174] *See In the Matter of Wells Fargo Bank*, No. 2018-BCFP-0001 (April 20, 2018), *available at* https://files.consumerfinance.gov/f/documents/cfpb_wells-fargo-bankna_consent-order_2018-04.pdf; *In the Matter of Wells Fargo Bank, N.A.*, No. AAEC-2018-16, (April 20, 2018), *available at* https://www.occ.gov/static/enforcementactions/ea2018-026.pdf.

75925478.7

186.   All of this paints a picture of a company—Wells Fargo—driven entirely by profit and its willing co-conspirator—National General—who together rigged an already abusive insurance practice for their own ill-gotten gain.

## VI.    PLAINTIFFS' EXPERIENCES

### Plaintiff Angelina Camacho

187.   On January 25, 2014, Plaintiff Angelina Camacho purchased a used 2011 Mazda CX-9 from Maxon Mazda in Union, New Jersey.

188.   To finance her purchase, Ms. Camacho signed a form RISC that required her to make fixed monthly payments of $595.00.   The RISC also included a standard provision that required her to maintain physical damage insurance protecting the seller's collateral in the vehicle.  If Ms. Camacho failed to maintain physical-damage insurance, the RISC gave the seller the option of purchasing insurance for itself and charging Ms. Camacho for the premiums.

189.   Wells Fargo's documents reflect that the dealerships verified that Ms. Camacho, and other Plaintiffs, had the required insurance before turning the vehicle over to her.  Ms. Camacho provided the dealership with a copy of her insurance card, which included her policy number and the contact information for her insurance agent.

190.   On or around January 9, 2015, Wells Fargo added a $1,282.00 CPI charge to Mr. Camacho's outstanding balance.  About a year later, on February 1, 2016, Wells Fargo added another CPI charge to Ms. Camacho's account—this time in the amount of $1,037.00.  Wells Fargo added these CPI charges even though Ms. Camacho had provided evidence of the required insurance when she purchased her vehicle, and even though Ms. Camacho continued to maintain the required insurance.

191.   According to Ms. Camacho's billing statements, the balance for her loan increased by nearly $1,000 for the period ending January 22, 2015, despite the fact that she had made her regular monthly payment.  The January bill separately calls out Ms. Camacho's monthly payment and even a $10 late charge that Wells Fargo charged her

since the last statement, but nowhere does Wells Fargo disclose that it added a CPI charge to Ms. Camacho's loan.

192. Ms. Camacho did not learn that Wells Fargo had charged her for CPI coverage until after vehicle was repossessed late in the evening on August 29, 2016.

193. When Ms. Camacho finally learned about the CPI charges from Wells Fargo's representative, she was promptly able to provide the representative with her policy number and Wells Fargo was able to verify through her insurance company that Ms. Camacho did indeed maintain the required insurance. Ms. Camacho's vehicle was then returned to her and Wells Fargo cancelled her CPI coverage. However, Ms. Camacho continues to be harmed from the erroneous CPI charges, since her Wells Fargo loan payments continue to be marked as late.

194. Defendants' policies, practices, and procedures were to make other false and misleading statements to Plaintiffs, including Ms. Camacho, by inflating the outstanding balance on Plaintiffs' loans in billing statements and mailing letters to Plaintiffs 42 and 77 days after loan origination that falsely stated that Wells Fargo lacked evidence of Plaintiffs' insurance and was exercising its contractual right to add CPI fees in good faith, when in fact Defendants had Plaintiffs' insurance information.

195. Plaintiff Camacho reviewed documents that were made available to her in connection with her auto loan. Had the CPI scheme been disclosed, Plaintiff Camacho would have seen and been aware of it and would not have would not have obtained an auto loan from Wells Fargo, would not have paid the CPI charges, and/or would have disputed the CPI charges and demanded full compensation.

### Plaintiff Odis Cole

196. On January 17, 2015, Plaintiff Odis Cole purchased a used 2011 Cadillac DTS from Driven Auto Sales in Burbank, Illinois.

197. To finance his purchase, Mr. Cole signed a form RISC that required him to make fixed monthly payments of $330.37. The RISC also included a standard provision that required him to maintain physical-damage insurance protecting the seller's collateral

58

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

in the vehicle.  If Mr. Cole failed to maintain physical-damage insurance, the RISC gave the seller the option of purchasing insurance for itself and charging Mr. Cole for the premiums.

198.    Wells Fargo's documents reflect that the dealerships verified that Mr. Cole, and other Plaintiffs, had the required insurance before turning the vehicle over.  In this regard, Mr. Cole further provided the dealership with a signed "Agreement to Provide Physical Damage Insurance," which reiterated his obligation to maintain the required insurance.

199.   On or around November 10, 2015, Wells Fargo added a $1,116 CPI charge to Mr. Cole's outstanding loan balance. Wells Fargo did so even though Mr. Cole had provided evidence of the required insurance when he purchased his vehicle, and it did so even though Mr. Cole continued to maintain the required insurance.

200.   On or around November 23, 2015, Wells Fargo partially refunded Mr. Cole in the amount of $842 for the CPI charge erroneously placed on his account. On or around July 6, 2016, Wells Fargo added a second $1,082 CPI charge to Mr. Cole's outstanding loan balance.

201.    After Mr. Cole asked his insurer to provide Wells Fargo with another copy of his insurance, Wells Fargo partially refunded Mr. Cole $569 for the CPI charge erroneously placed on his account on or around September 19, 2016.  Wells Fargo did not fully refund Mr. Cole for the CPI charges he had already paid.

202.    Defendants' policies, practices, and procedures were to make other false and misleading statements to Plaintiffs, including Mr. Cole, by inflating the outstanding balance on Plaintiffs' loans in billing statements and mailing letters to Plaintiffs 42 and 77 days after loan origination that falsely stated that Wells Fargo lacked evidence of Plaintiffs' insurance and was exercising its contractual right to add CPI fees in good faith, when in fact Defendants had Plaintiffs' insurance information.

203.    Plaintiff Cole reviewed documents that were made available to him in connection with his auto loan.  Had the CPI scheme been disclosed, Plaintiff Cole would

have seen and been aware of it and would not have would not have obtained an auto loan from Wells Fargo, would not have paid the CPI charges, and/or would have disputed the CPI charges and demanded full compensation.

### **Plaintiff Nyle Davis**

204.   On September 18, 2014, Plaintiff Nyle Davis purchased a used 2013 Dodge Grand Caravan from Griffith Motor Company in Neosho, Missouri.

205.   To finance his purchase, Mr. Davis signed a form RISC that required him to make fixed monthly payments of $369.44.  The RISC also included a standard provision that required him to maintain physical damage insurance protecting the seller's collateral in the vehicle.  If Mr. Davis failed to maintain physical-damage insurance, the RISC gave the seller the option of purchasing insurance for itself and charging Mr. Davis for the premiums.

206.   Wells Fargo's documents reflect that the dealerships verified that Mr. Davis, and other Plaintiffs, had the required insurance before turning the vehicle over. In this regard, Mr. Davis provided Griffith Motor Company with proof of his insurance through Progressive.

207.   On or around February 27, 2015, Wells Fargo added a $988.00 CPI charge to Mr. Davis' outstanding loan balance. Wells Fargo did so even though Mr. Davis had provided evidence of the required insurance when he purchased his vehicle, and it did so even though Mr. Davis continued to maintain the required insurance. Wells Fargo also added a CPI charge of $933.00 on April 12, 2016 and a charge of $208.99 on October 21, 2016—even though Mr. Davis had the required insurance during those periods.

208.   On or around April 21, 2015, Mr. Davis noticed that the amount owing on his loan was higher than it should have been.  In fact, the principal Mr. Davis owed was less than what appeared in the balance Wells Fargo reported to him.

209.   In late 2016, Mr. Davis' vehicle was repossessed.  The repossession company told Mr. Davis that he was purportedly late on his Wells Fargo auto loan payments, and

75925478.7

the bank had ordered repossession of his vehicle.  Mr. Davis ultimately had to pay $1,200 to recover his vehicle from the repossession company.

210.    Defendants' policies, practices, and procedures were to make other false and misleading statements to Plaintiffs, including Mr. Davis, by inflating the outstanding balance on Plaintiffs' loans in billing statements and mailing letters to Plaintiffs 42 and 77 days after loan origination that falsely stated that Wells Fargo lacked evidence of Plaintiffs' insurance and was exercising its contractual right to add CPI fees in good faith, when in fact Defendants had Plaintiffs' insurance information.

211.    Plaintiff Davis reviewed documents that were made available to him in connection with his auto loan.  Had the CPI scheme been disclosed, Plaintiff Davis would have seen and been aware of it and would not have would not have obtained an auto loan from Wells Fargo, would not have paid the CPI charges, and/or would have disputed the CPI charges and demanded full compensation.

### Plaintiff Duane Fosdick

212.    On June 28, 2014, Plaintiff Duane Fosdick purchased a used 2008 BMW 3-Series vehicle from Courtesy Motors Auto Center in Chico, California.

213.    To finance his purchase, Mr. Fosdick signed a form RISC that required him to make fixed monthly payments of $359.74.   The RISC also included a standard provision that required him to maintain physical damage insurance protecting the seller's collateral in the vehicle.  If Mr. Fosdick failed to maintain the required insurance, the RISC gave the seller the option of purchasing insurance for itself and charging Mr. Fosdick for the premiums.

214.    Wells Fargo's documents reflect that the dealerships verified that Mr. Fosdick, and other Plaintiffs, had the required insurance before turning the vehicle over. In this regard, Mr. Fosdick provided the dealership with proof of insurance, as well as a signed "Agreement to Furnish Insurance Policy" that listed the name of Mr. Fosdick's insurance company (National General, as it turned out), his insurance agent, policy number, and his insurance agent's address.

75925478.7

215.   The tellers at the Wells Fargo branch where he tendered his monthly payment did not inform him that, on or about October 7, 2014, Wells Fargo added a $1,423.00 CPI charge to his account and his monthly payments had therefore increased.  As a result, Wells Fargo began charging Mr. Fosdick late fees—which were also added to his outstanding balance—and reporting to credit bureaus that Mr. Fosdick had past-due loan payments.

216.   Even after Mr. Fosdick proved to Wells Fargo that he was wrongly charged for CPI coverage, Wells Fargo added another CPI charge to Mr. Fosdick's loan balance on October 7, 2015—this time in the amount of $1,393.00.  Once again, Wells Fargo did so even though Mr. Fosdick had provided evidence of the required insurance (both when he purchased his vehicle, and again when he called to complain about the first wrongly-placed CPI policy), and it did so even though Mr. Fosdick continued to maintain the required insurance.

217.   On August 15, 2016, Wells Fargo mailed Mr. Fosdick a letter advising him that they had cancelled the CPI coverage previously purchased for his vehicle and would be removing the CPI charges previously added to his loan balance.  Wells Fargo did not remove the late charges incurred as a result of the CPI charges or correct the adverse credit reports that resulted from the CPI charges.

218.   Defendants' policies, practices, and procedures were to make other false and misleading statements to Plaintiffs, including Mr. Fosdick, by inflating the outstanding balance on Plaintiffs' loans in billing statements and mailing letters to Plaintiffs 42 and 77 days after loan origination that falsely stated that Wells Fargo lacked evidence of Plaintiffs' insurance and was exercising its contractual right to add CPI fees in good faith, when in fact Defendants had Plaintiffs' insurance information.

219.   10.   Plaintiff Fosdick reviewed documents that were made available to him in connection with his auto loan.  Had the CPI scheme been disclosed, Plaintiff Fosdick would have seen and been aware of it and would not have would not have obtained an

auto loan from Wells Fargo, would not have paid the CPI charges, and/or would have disputed the CPI charges and demanded full compensation.

### Plaintiff Regina Gonzalez

220.   On March 22, 2014, Plaintiff Regina Gonzalez purchased a used Chevrolet HHR station wagon from Inver Grove Ford Lincoln in Inver Grove Heights, Minnesota.

221.   To finance her purchase, Ms. Gonzalez signed a form RISC that required her to make monthly payments of $284.21 for 72 months.  The RISC also included a standard provision that required her to maintain physical-damage insurance protecting the seller's collateral in the vehicle.  If Ms. Gonzalez failed to maintain the required insurance, the RISC gave the seller the option of purchasing insurance for itself and charging her for the premiums.

222.   Wells Fargo's documents reflect that the dealerships verified that Ms. Gonzalez, and other Plaintiffs, had the required insurance before turning the vehicle over. In this regard, while at the dealership, Ms. Gonzalez provided the dealership with a copy of her insurance card.  Ms. Gonzalez provided the dealership with a signed "Agreement to Provide Insurance," which reiterated her obligation to maintain the required insurance, and listed the name of her insurance company, her policy number, and her insurance agent's name and telephone number.

223.   On or around March 10, 2015, Wells Fargo added a $1,343 CPI charge to Ms. Gonzalez's outstanding loan balance.  Wells Fargo did so even though Ms. Gonzalez had provided evidence of the required insurance when she purchased her vehicle, and it did so even though Ms. Gonzalez continued to maintain the required insurance.

224.   In a letter sent by U.S. Mail dated February 26, 2015, Wells Fargo informed Ms. Gonzalez that CPI had been placed on her account for the period between November 29, 2014 and November 29, 2015 but stated that it had cancelled this force-placed CPI for the period from February 19, 2015 to November 29, 2015 because of "duplicate coverage."  The letter erroneously maintained that Ms. Gonzalez had not provided proof of insurance for the time period of November 29, 2014 to February 29, 2015 but implicitly

63

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

acknowledged that she had provided proof of insurance for the remaining time period.  On or around March 11, 2015, Wells Fargo partially refunded Ms. Gonzalez in the amount of $1,041 for the CPI charge erroneously placed on her account.

225.   On or around June 1, 2015, Wells Fargo added a second $1,303 CPI charge to Ms. Gonzalez's outstanding loan balance.  Wells Fargo did so even though Ms. Gonzalez had provided evidence of the required insurance when she purchased her vehicle and continued to maintain the required insurance—and despite the fact that Wells Fargo had acknowledged in its February 26, 2015 letter that CPI was "duplicate coverage" because she already maintained the required insurance.

226.   Ms. Gonzalez generally made loan payments by deposit at a Wells Fargo drive-through or with a teller inside her local Wells Fargo branch.  She knew the amount of her regular monthly loan payments and did not notice that Wells Fargo had unilaterally and unlawfully increased her outstanding loan balance.

227.   In or around August 2015, Ms. Gonzalez received a billing statement by U.S. Mail and discovered that the amount owing on her loan was higher than it should have been.   In fact, the principal Ms. Gonzalez owed was less than what appeared in her balance.  Unbeknownst to Ms. Gonzalez, Wells Fargo had been applying portions of her monthly payment toward the CPI charge and interest on that CPI charge—rather than toward the principal amount owing on Ms. Gonzalez's loan.

228.   Ms. Gonzalez informed Wells Fargo representatives over the phone that she already had insurance, but Wells Fargo continued to charge her for insurance.  Beginning in or around December 2015, she received letters from Wells Fargo by U.S. Mail stating that she had failed to make full monthly payments of $485.62 (reflecting both her agreed upon monthly loan payment of $284.21 as well as the unlawful CPI charges) and that her vehicle would be repossessed if she did not pay a purportedly past due amount.  On or around February 16, 2016, Wells Fargo repossessed Ms. Gonzalez's vehicle.

229.   Defendants' policies, practices, and procedures were to make other false and misleading statements to Plaintiffs, including Ms. Gonzalez, by inflating the outstanding

75925478.7

balance on Plaintiffs' loans in billing statements and mailing letters to Plaintiffs 42 and 77 days after loan origination that falsely stated that Wells Fargo lacked evidence of Plaintiffs' insurance and was exercising its contractual right to add CPI fees in good faith, when in fact Defendants had Plaintiffs' insurance information.

230.   Plaintiff Gonzalez reviewed documents that were made available to her in connection with her auto loan.  Had the CPI scheme been disclosed, Plaintiff Gonzalez would have seen and been aware of it and would not have would not have obtained an auto loan from Wells Fargo, would not have paid the CPI charges, and/or would have disputed the CPI charges and demanded full compensation.

### Plaintiff Brandon Haag

231.   On November 14, 2013, Plaintiff Brandon Haag purchased a used 2008 BMW 5 Series from Dahl Automotive La Crosse in La Crosse, Wisconsin.

232.   To finance his purchase, Mr. Haag signed a form RISC that required him to make fixed monthly payments of $484.50. The RISC also included a provision that required him to maintain physical-damage insurance protecting the seller's collateral in the vehicle.  If Mr. Haag failed to maintain physical-damage insurance, the RISC gave the seller the option of purchasing insurance for itself and charging Mr. Haag for the premiums.

233.   Wells Fargo's documents reflect that the dealerships verified that Mr. Haag, and other Plaintiffs, had the required insurance before turning the vehicle over. In this regard, while at the dealership, Mr. Haag signed an "Agreement to Provide Insurance," which reiterated his obligation to maintain the required insurance, and listed the name of his insurance company (Geico), his policy number, the effective date of the policy, and comprehensive and collision deductibles under the policy.

234.   On or around October 9, 2014, Wells Fargo added a $1,423.00 CPI charge to Mr. Haag's outstanding loan balance.  Wells Fargo did so even though Mr. Haag had provided evidence of the required insurance when he purchased his vehicle, and it did so even though Mr. Haag continued to maintain the required insurance.

65

235.   Wells Fargo continued to charge Mr. Haag for the CPI policy and deducted sums from his monthly loan payment to pay for the CPI premium.  As a result of such deductions, Mr. Haag was erroneously deemed to be delinquent under his loan agreement and was charged late fees.

236.   Defendants' policies, practices, and procedures were to make other false and misleading statements to Plaintiffs, including Mr. Haag, by inflating the outstanding balance on Plaintiffs' loans in billing statements and mailing letters to Plaintiffs 42 and 77 days after loan origination that falsely stated that Wells Fargo lacked evidence of Plaintiffs' insurance and was exercising its contractual right to add CPI fees in good faith, when in fact Defendants had Plaintiffs' insurance information.

237.   Plaintiff Haag reviewed documents that were made available to him in connection with his auto loan.  Had the CPI scheme been disclosed, Plaintiff Haag would have seen and been aware of it and would not have would not have obtained an auto loan from Wells Fargo, would not have paid the CPI charges, and/or would have disputed the CPI charges and demanded full compensation.

**Plaintiff Paul Hancock**

238.   On February 8, 2016, Plaintiff Paul Hancock purchased a used 2006 Chrysler PT Cruiser from Hubler Ford Center in Shelbyville, Indiana

239.   To finance his purchase, Mr. Hancock signed a form RISC that required him to make fixed monthly payments of $119.67.  The RISC also included a provision that required him to maintain physical-damage insurance protecting the seller's collateral in the vehicle.  If Mr. Hancock failed to maintain physical-damage insurance, the RISC gave the seller the option of purchasing insurance for itself and charging Mr. Hancock for the premiums.

240.   Wells Fargo's documents reflect that the dealerships verified that Mr. Hancock, and other Plaintiffs, had the required insurance before turning the vehicle over.  In this regard, Mr. Hancock provided the dealership with a signed "Agreement to Provide

75925478.7

Insurance," which reiterated his obligation to maintain the required insurance, and listed his policy number and his insurance agent's address and telephone number.

241.  On or around May 18, 2016, Wells Fargo added a $598.00 CPI charge to Mr. Hancock's outstanding loan balance.  Wells Fargo did so even though Mr. Hancock had provided evidence of the required insurance when he purchased his vehicle, and it did so even though Mr. Hancock continued to maintain the required insurance.

242.  Wells Fargo increased the amount owing on Mr. Hancock's loan without explanation beginning in May 2016.  On or around May 20, 2016, Wells Fargo sent Mr. Hancock a bill by U.S. mail with a current payment due of $180.69.  The statement increased his monthly payment due from $119.67 without no stated reason.  The bill also reflects a total loan balance of $5,222—an unexplained increase from the $4,903 due on his loan as of February 18, 2016.

243.  Only beginning on or around September 2016 did Wells Fargo disclose the CPI charges that had been imposed on Mr. Hancock, sending him statements that included itemized entries for CPI and CPI interest.  A Wells Fargo bill dated September 19, 2016 and sent by U.S. mail reflects that Mr. Hancock paid $75.63 towards CPI and $1.38 towards CPI interest in an earlier payment made on September 13, 2016.

244.  Wells Fargo mailed Mr. Hancock letters on November 30, 2016 and December 2, 2016 notifying him that it was discontinuing its force placed CPI program.  But Wells Fargo still billed Mr. Hancock for CPI and CPI interest in a mailed statement dated January 20, 2017.  Furthermore, Wells Fargo did not refund Mr. Hancock for the CPI charges he had already paid.

245.  Defendants' policies, practices, and procedures were to make other false and misleading statements to Plaintiffs, including Mr. Hancock, by inflating the outstanding balance on Plaintiffs' loans in billing statements and mailing letters to Plaintiffs 42 and 77 days after loan origination that falsely stated that Wells Fargo lacked evidence of Plaintiffs' insurance and was exercising its contractual right to add CPI fees in good faith, when in fact Defendants had Plaintiffs' insurance information.

246.    Plaintiff Hancock reviewed documents that were made available to him in connection with his auto loan.  Had the CPI scheme been disclosed, Plaintiff Hancock would have seen and been aware of it and would not have would not have obtained an auto loan from Wells Fargo, would not have paid the CPI charges, and/or would have disputed the CPI charges and demanded full compensation.

## **Plaintiff Dustin Havard**

247.    On April 3, 2012, Plaintiff Dustin Havard purchased a used Ford F150 truck from Watson Quality Ford in Jackson, Mississippi.

248.    To finance his purchase, Mr. Havard signed a form RISC that required him to make fixed monthly payments of $396.52.  The RISC also included a standard provision that required him to maintain physical damage insurance protecting the seller's collateral in the vehicle.  If Mr. Havard failed to maintain physical damage insurance, the RISC gave the seller the option of purchasing insurance for itself and charging Mr. Havard for the premiums.

249.    Wells Fargo's documents reflect that the dealerships verified that Mr. Havard, and other Plaintiffs, had the required insurance before turning the vehicle over. HavardIn this regard, Mr. Havard provided the dealership with a signed "Agreement to Furnish Insurance Policy," which reiterated his obligation to maintain the required insurance, and listed the name of his insurance company, his insurance agent's name and phone number, and the expiration date of his current policy.

250.    On or around July 12, 2012, Wells Fargo added a $1,200.00 CPI charge to Mr. Havard's outstanding loan balance.  It added another CPI charge, this time for $975.00, on September 16, 2014, and a third CPI charge for $954.00 on January 13, 2016.

251.    Shortly after the first CPI charge was added to Mr. Havard's account, he was online checking his account and noticed that his outstanding balance had increased.  This was because Wells Fargo was unlawfully charging him for CPI coverage.

252.    Mr. Havard repeatedly provided Wells Fargo with evidence that he maintained the required insurance, yet Wells Fargo continued to place CPI charges on Mr.

68

Havard's accounts and apply his monthly loan payments toward the CPI charges and interest on those charges.   As a result, Mr. Havard was charged late fees, deemed to be delinquent under his loan agreement, and his vehicle was wrongly repossessed and held for two weeks.

253.   Defendants' policies, practices, and procedures were to make other false and misleading statements to Plaintiffs, including Mr. Havard, by inflating the outstanding balance on Plaintiffs' loans in billing statements and mailing letters to Plaintiffs 42 and 77 days after loan origination that falsely stated that Wells Fargo lacked evidence of Plaintiffs' insurance and was exercising its contractual right to add CPI fees in good faith, when in fact Defendants had Plaintiffs' insurance information.

254.   Plaintiff Havard reviewed documents that were made available to him in connection with his auto loan.  Had the CPI scheme been disclosed, Plaintiff Havard would have seen and been aware of it and would not have would not have obtained an auto loan from Wells Fargo, would not have paid the CPI charges, and/or would have disputed the CPI charges and demanded full compensation.

### Plaintiff Brian Miller

255.   On October 31, 2014, Plaintiff Brian Miller purchased a used 2005 Chevrolet Avalanche from Desoto Auto Sales in Olive Branch, Mississippi.

256.   To finance his purchase, Mr. Miller signed a form RISC that required him to make fixed monthly payments of $367.11.  The RISC also included a standard provision that required him to maintain physical damage insurance protecting the seller's collateral in the vehicle.  If Mr. Miller failed to maintain the required insurance, the RISC gave the seller the option of purchasing insurance for itself and charging Mr. Miller for the premiums.

257.   Wells Fargo's documents reflect that the dealerships verified that Mr. Miller, and other Plaintiffs, had the required insurance before turning the vehicle over. In this regard, the dealership reviewed and kept a copy of Mr. Miller's insurance card, which included the name of his insurance company, his policy number, his insurance agent, and

69

contact information for both the insurance company and agent. Both the dealership and Mr. Miller also signed an "Agreement to Provide Insurance," which confirmed Mr. Miller had "arranged for the required insurance through the insurance company shown" and stated that Wells Fargo "reserve[d] the right to contact your agent and verify the insurance information provided." The insurance information was not filled in on the form because the dealership instead took a copy of Mr. Miller's insurance card.

258.   On or around December 22, 2015, Wells Fargo added a $862.00 CPI charge to the amount owed under Mr. Miller's RISC. Wells Fargo did so even though Mr. Miller had provided evidence of the required insurance when he purchased his vehicle, and it did so even though Mr. Miller continued to maintain the required insurance.

259.   Mr. Miller had set up an automatic bill pay so his fixed monthly payment would be deducted from his Wells Fargo bank account each month. Once Wells Fargo added a $862.00 CPI charge to his outstanding balance, it began applying a portion of his monthly payments toward the CPI charge and interest on the CPI charge. As a result, under Wells Fargo's false internal accounting, Mr. Miller's monthly payments were insufficient, and Wells Fargo began charging him late fees—which were also added to the outstanding balance on Mr. Miller's loan—and reporting negative information to the credit bureaus.

260.   Mr. Miller did not learn that Wells Fargo had force-placed CPI on his account, imposed late charges, or reported delinquencies to credit bureaus until on or about July 29, 2016. While trying to buy his wife a car, he discovered that his credit score had dropped and was told the reason was six late payments reported by Wells Fargo.

261.   Mr. Miller again provided his insurance information to Wells Fargo (which remained unchanged from the information Wells Fargo already had). About a week later, Wells Fargo removed the CPI coverage from Mr. Miller's account. Wells Fargo has not, however, refunded the late charges incurred as a result of its unlawful CPI charges or corrected the negative credit information it provided to the credit bureaus.

75925478.7

262.    Defendants' policies, practices, and procedures were to make other false and misleading statements to Plaintiffs, including Mr. Miller, by inflating the outstanding balance on Plaintiffs' loans in billing statements and mailing letters to Plaintiffs 42 and 77 days after loan origination that falsely stated that Wells Fargo lacked evidence of Plaintiffs' insurance and was exercising its contractual right to add CPI fees in good faith, when in fact Defendants had Plaintiffs' insurance information.

263.    Plaintiff Miller reviewed documents that were made available to him in connection with his auto loan.  Had the CPI scheme been disclosed, Plaintiff Miller would have seen and been aware of it and would not have would not have obtained an auto loan from Wells Fargo, would not have paid the CPI charges, and/or would have disputed the CPI charges and demanded full compensation.

### Plaintiff Analisa Moskus

264.    On May 31, 2008, Plaintiff Analisa Moskus purchased a used 2007 Toyota 4Runner from Hawthorne Motors in Lawndale, California.

265.    To finance her purchase, Ms. Moskus signed a form RISC that required her to make fixed monthly payments of $327.32.    The RISC also included a standard provision that required her to maintain physical damage insurance protecting the seller's collateral in the vehicle.  If Ms. Moskus failed to maintain physical damage insurance, the RISC gave the seller the option of purchasing insurance for itself and charging Ms. Moskus for the premiums.

266.    Wells Fargo's documents reflect that the dealerships verified that Ms. Moskus, and other Plaintiffs, had the required insurance before turning the vehicle over. In this regard, Ms. Moskus provided the dealership with a signed "Agreement to Furnish Insurance Policy," which reiterated her obligation to maintain the required insurance, and listed the name of her insurance company, her policy number, and her insurance agent's phone number.

75925478.7

267. Ms. Moskus provided Defendants with evidence that she already had insurance through AAA on multiple occasions. But on January 23, 2013, Wells Fargo nonetheless billed Ms. Moskus for CPI, adding $798.00 to her outstanding loan balance.

268. Wells Fargo continued to charge Ms. Moskus for CPI, even after she called to complain, and wrongfully applied portions of Ms. Moskus's monthly loan payment toward the CPI charge and interest on that charge. As a result, Ms. Moskus was erroneously deemed to be delinquent under her loan agreement and Wells Fargo reported that delinquency to credit agencies.

269. Defendants' policies, practices, and procedures were to make other false and misleading statements to Plaintiffs, including Ms. Moskus, by inflating the outstanding balance on Plaintiffs' loans in billing statements and mailing letters to Plaintiffs 42 and 77 days after loan origination that falsely stated that Wells Fargo lacked evidence of Plaintiffs' insurance and was exercising its contractual right to add CPI fees in good faith, when in fact Defendants had Plaintiffs' insurance information.

270. Plaintiff Moskus reviewed documents that were made available to her in connection with her auto loan. Had the CPI scheme been disclosed, Plaintiff Moskus would have seen and been aware of it and would not have would not have obtained an auto loan from Wells Fargo, would not have paid the CPI charges, and/or would have disputed the CPI charges and demanded full compensation.

### Plaintiff Keith Preston

271. On September 30, 2007, Plaintiff Keith Preston purchased a new 2008 Mazda3 from Great Valley Chrysler Jeep in Sacramento, California.

272. To finance his purchase, Mr. Preston signed a form RISC that required him to make fixed monthly payments of $364.10. The RISC also included a standard provision that required him to maintain physical damage insurance protecting the seller's collateral in the vehicle. If Mr. Preston failed to maintain physical damage insurance, the RISC gave the seller the option of purchasing insurance for itself and charging Mr. Preston for the premiums.

75925478.7

273. Wells Fargo's documents reflect that the dealerships verified that Mr. Preston, and other Plaintiffs, had the required insurance before turning the vehicle over. In this regard, Mr. Preston purchased insurance at the dealership from an insurance agent referred by the dealership, and the dealership received copies of the insurance paperwork. Mr. Preston also signed an "Agreement to Furnish Insurance Policy," which listed the name of Mr. Preston's insurance company, his policy number, his insurance agent, and the agent's address and phone number.

274. On or about May 1, 2008, Wachovia added a $1,583.00 CPI charge to the amount owed on Mr. Preston's loan. Wachovia did so even though Mr. Preston had provided evidence of the required insurance when he purchased his vehicle, and it did so even though Mr. Preston continued to maintain the required insurance.

275. Two weeks after Wachovia added the CPI charge, it cancelled the CPI policy it had added to Mr. Preston's account. It reduced—but did not eliminate—the CPI charge that had been added to Mr. Preston's account. The amount remaining on the account was $398.00.

276. The unlawful CPI charge that Wachovia added to Mr. Preston's account resulted in a higher monthly payment, which Mr. Preston struggled to meet. The CPI charge caused or contributed to late charges incurred by Mr. Preston, as well as to a monthly fee that Wachovia charged Mr. Preston for paying his bill by phone. Because of the CPI charge, the monthly payment Wachovia insisted that Mr. Preston pay varied from month to month, and Mr. Preston needed to call the bank to be sure he was paying the correct amount.

277. Defendants' policies, practices, and procedures were to make other false and misleading statements to Plaintiffs, including Mr. Preston, by inflating the outstanding balance on Plaintiffs' loans in billing statements and mailing letters to Plaintiffs 42 and 77 days after loan origination that falsely stated that Wells Fargo lacked evidence of Plaintiffs' insurance and was exercising its contractual right to add CPI fees in good faith, when in fact Defendants had Plaintiffs' insurance information.

75925478.7

278.   Plaintiff Preston reviewed documents that were made available to him in connection with his auto loan.   Had the CPI scheme been disclosed, Plaintiff Preston would have seen and been aware of it and would not have would not have obtained an auto loan from Wells Fargo, would not have paid the CPI charges, and/or would have disputed the CPI charges and demanded full compensation.

### Plaintiff Victoria Reimche

279.   On December 27, 2010, Plaintiff Victoria Reimche purchased a used 2008 Saturn VUE from Go Buick GMC Park Meadows in Lone Tree, Colorado.

280.   To finance her purchase, Ms. Reimche signed a form RISC that required her to make fixed monthly payments of $352.84.   The RISC also included a standard provision that required her to maintain physical damage insurance protecting the seller's collateral in the vehicle.   If Ms. Reimche failed to maintain physical damage insurance, the RISC gave the seller the option of purchasing insurance for itself and charging Ms. Reimche for the premiums.

281.   Wells Fargo's documents reflect that the dealerships verified that Ms. Reimche, and other Plaintiffs, had the required insurance before turning the vehicle over to her.   Ms. Reimche provided the dealership with a signed "Confirmation of Accidental Physical Damage Insurance," which reiterated her obligation to maintain the required insurance.

282.   On or around April 6, 2011, Wells Fargo added a $1,036.00 CPI charge to Ms. Reimche's outstanding loan balance.   Wells Fargo did so even though Ms. Reimche had provided evidence of the required insurance when she purchased her vehicle, and it did so even though Ms. Reimche continued to maintain the required insurance.

283.   On or around June 21, 2011, Wells Fargo partially refunded Ms. Reimche in the amount of $ 551.00 for the CPI charge erroneously placed on her account.

284.   On or around May 22, 2012, Wells Fargo added a second $977.00 CPI charge to Ms. Reimche's outstanding loan balance.   Wells Fargo did so even though Ms. Reimche had continued to maintain the required insurance.

285.    On or around May 23, 2012, Wells Fargo partially refunded Ms. Reimche in the amount of $761.00 for the second CPI charge erroneously placed on her account.

286.    Ms. Reimche paid her loan with Wells Fargo in full on or around August 25, 2015.  Because of the wrongfully charged CPI policies placed on her loan, Ms. Reimche's final billing statement was false and paid Wells Fargo more than it was owed.

287.    Defendants' policies, practices, and procedures were to make other false and misleading statements to Plaintiffs, including Ms. Reimche by inflating the outstanding balance on Plaintiffs' loans in billing statements and mailing letters to Plaintiffs 42 and 77 days after loan origination that falsely stated that Wells Fargo lacked evidence of Plaintiffs' insurance and was exercising its contractual right to add CPI fees in good faith, when in fact Defendants had Plaintiffs' insurance information.

288.    Plaintiff Reimche reviewed documents that were made available to her in connection with her auto loan.  Had the CPI scheme been disclosed, Plaintiff Reimche would have seen and been aware of it and would not have would not have obtained an auto loan from Wells Fargo, would not have paid the CPI charges, and/or would have disputed the CPI charges and demanded full compensation.

## Plaintiff Dennis Small

289.    On September 29, 2014, Plaintiff Dennis Small purchased a used 2012 Ford F350 truck from AutoNation Ford Memphis in Memphis, Tennessee.

290.    To finance his purchase, Mr. Small signed a form RISC that required him to make fixed monthly payments of $674.24.  The RISC also included a standard provision that required him to maintain physical-damage insurance protecting the seller's collateral in the vehicle.  If Mr. Small failed to maintain physical damage insurance, the RISC gave the seller the option of purchasing insurance for itself and charging Mr. Small for the premiums.

291.    Wells Fargo's documents reflect that the dealerships verified that Mr. Small, and other Plaintiffs, had the required insurance before turning the vehicle over. In this regard, while at the dealership, Mr. Small added the vehicle to his existing comprehensive

75

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

insurance policy, printed out confirmation that he maintained the required coverage, and provided that evidence of insurance to the dealership.  Mr. Small provided the dealership with a signed "Agreement to Provide Insurance," which reiterated his obligation to maintain the required insurance, and listed the name of his insurance company, his policy number, and his insurance company's address and telephone number.

292.   On or around March 22, 2016, Wells Fargo added a $1,282.00 CPI charge to Mr. Small's outstanding loan balance.  Wells Fargo did so even though Mr. Small had provided evidence of the required insurance when he purchased his vehicle, and it did so even though Mr. Small continued to maintain the required insurance.

293.   Mr. Small had set up auto-pay with Wells Fargo, so that his loan payments would be transferred from his debit account automatically each month, and at first, because the monthly payments were in the same amount, he did not notice that Wells Fargo had unilaterally and unlawfully increased his outstanding loan balance.

294.   In or around October 2016, however, Mr. Small was online checking his balances when he noticed that the amount owing on his loan was higher than it should have been.  In fact, the principal Mr. Small owed was less than what appeared in his balance. Unbeknownst to Mr. Small, Wells Fargo had been applying portions of his monthly payment toward the CPI charge and interest on that CPI charge—rather than toward the principal amount owing on Mr. Small's loan.

295.   Defendants' policies, practices, and procedures were to make other false and misleading statements to Plaintiffs, including Mr. Small, by inflating the outstanding balance on Plaintiffs' loans in billing statements and mailing letters to Plaintiffs 42 and 77 days after loan origination that falsely stated that Wells Fargo lacked evidence of Plaintiffs' insurance and was exercising its contractual right to add CPI fees in good faith, when in fact Defendants had Plaintiffs' insurance information.

296.   Plaintiff Small reviewed documents that were made available to him in connection with his auto loan.  Had the CPI scheme been disclosed, Plaintiff Small would have seen and been aware of it and would not have would not have obtained an auto loan

76

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

from Wells Fargo, would not have paid the CPI charges, and/or would have disputed the CPI charges and demanded full compensation.

### Plaintiff Bryan Tidwell

297.   On March 9, 2016, Plaintiff Bryan Tidwell purchased a used 2012 Subaru Outback from Fremont Motor Cody Inc. in Cody, Wyoming.

298.   To finance his purchase, Mr. Tidwell signed a form RISC that required him to make fixed monthly payments of $189.96.  The RISC also included a provision that required him to maintain physical-damage insurance protecting the seller's collateral in the vehicle.  If Mr. Tidwell failed to maintain physical-damage insurance, the RISC gave the seller the option of purchasing insurance for itself and charging Mr. Tidwell for the premiums.

299.   Wells Fargo's documents reflect that the dealerships verified that Mr. Tidwell and other Plaintiffs, had the required insurance before turning the vehicle over to him.  Mr. Tidwell provided evidence of that insurance while he was at the dealership.  Mr. Tidwell also provided the dealership with a signed "Agreement to Provide Insurance," which reiterated his obligation to maintain the required insurance, and listed the name of his insurance company (Progressive), as well as Progressive's address and telephone number.

300.   On or around June 17, 2016, Wells Fargo added a $1,398.00 CPI charge to Mr. Tidwell's outstanding loan balance.  Wells Fargo did so even though Mr. Tidwell had provided evidence of the required insurance when he purchased his vehicle, and it did so even though Mr. Tidwell continued to maintain the required insurance.

301.   Mr. Tidwell had set up monthly automatic payments for his loan.  When Wells Fargo added CPI, it cancelled his auto payment, causing Mr. Tidwell to incur a late fee.

302.   Defendants' policies, practices, and procedures were to make other false and misleading statements to Plaintiffs, including Mr. Tidwell, by inflating the outstanding balance on Plaintiffs' loans in billing statements and mailing letters to Plaintiffs 42 and 77

77

days after loan origination that falsely stated that Wells Fargo lacked evidence of Plaintiffs' insurance and was exercising its contractual right to add CPI fees in good faith, when in fact Defendants had Plaintiffs' insurance information.

303.  Plaintiff Tidwell reviewed documents that were made available to her in connection with her auto loan.  Had the CPI scheme been disclosed, Plaintiff Tidwell would have seen and been aware of it and would not have would not have obtained an auto loan from Wells Fargo, would not have paid the CPI charges, and/or would have disputed the CPI charges and demanded full compensation.

## VII.    STATUTE OF LIMITATIONS

### A.    Discovery Rule

304.  The discovery rule tolls any statutes of limitation otherwise-applicable to any claims asserted herein.

305.  Plaintiffs and Class members did not discover, and could not have discovered through the exercise of reasonable diligence, that Defendants conspired to force-place unnecessary CPI on hundreds of thousands of borrowers and refuse to honor proof of insurance, when provided.

306.  Defendants' CPI scheme was elaborate and well-concealed.  Despite having received proof of insurance at loan origination, Defendants falsely represented that they had never received such information.  Moreover, Wells Fargo chose not to disclose CPI charges, including premium, interest and unearned commissions, in its regular billing statements to consumers at any point between inception of the CPI Program in 2002 and just before termination in September 2016.[175]

307.  ████████████████████████
████████████████████████████████
████████████████████████████████
████████████████████████████████

---

[175] WFCPI_00062871 at 873.

75925478.7

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

1 ████████████████████████████████████████████████████████

2 ████████████████████████████████ [176]

3    308.   It was not until Wells Fargo commissioned a report on Defendants'

4 conduct—which was leaked to *The New York Times*—that Plaintiffs and Class members

5 discovered the fraud.  Plaintiffs and Class members had no realistic ability to discover the

6 true nature of Defendants' CPI practices until July 27, 2017 at the earliest.

7 **B.    Fraudulent Concealment**

8    309.   Defendants' affirmative and active concealment of their conduct also tolls

9 any otherwise-applicable statute of limitations to any claims asserted herein.

10    310.   Under the fraudulent concealment doctrine, the causes of action alleged

11 herein did or will only accrue upon discovery of the true nature of the charges assessed

12 against borrowers' accounts, as a result of Defendants' concealment of the material facts.

13    311.   Plaintiffs and members of the Class, as defined below, were kept ignorant by

14 Defendants of critical information required for the prosecution of their claims, without

15 any fault or lack of diligence on their part.  Plaintiffs and members of the Class did not

16 discover, and could not have discovered through the exercise of reasonable diligence, the

17 true nature of the Defendants' force-placed CPI scheme, including the kickbacks to Wells

18 Fargo from the CPI Vendor, until the publication of *The New York Times* article on July

19 27, 2017 at the earliest. █████████████████████████████████████████

20 ████████████████████████████████████████████████████████

21 ████████████████████████████████████.

22    312.   Defendants are under a continuous duty to disclose, to Plaintiffs and Class

23 members, the true character, quality and nature of the charges they assess on borrowers'

24 accounts.  Defendants actively and affirmatively concealed the true character, quality, and

25 nature of their assessment of force-placed charges for CPI polices on borrowers' accounts.

26

27 [176] WFCPI_00048650; *see also* WFCPI_00006404.

28

79

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

Defendants' concealment includes their false and misleading statement and omissions of material fact in their Insurance Request letters, Coverage Issued letters, billing statements, customer service telephone calls, and elsewhere.  Plaintiffs and members of the Class reasonably relied on Defendants' affirmative and active concealment.

## VIII.   CLASS ACTION ALLEGATIONS

### A.    Class Definitions

313.    Plaintiffs bring this action on behalf of themselves and a Nationwide Class and State Classes (collectively, the "Class"), defined as:

**Nationwide Class:**

All residents of the United States of America who obtained an auto loan through Wells Fargo Bank, N.A., or its predecessors, subsidiaries or divisions, and who were assessed charges for CPI and/or related fees on or after March 1, 2002.

**California State Class:**

All residents of the State of California who obtained an auto loan through Wells Fargo Bank, N.A., or its predecessors, subsidiaries or divisions, and who were assessed charges for CPI and/or related fees on or after March 1, 2002.

**Colorado State Class:**

All residents of the State of Colorado who obtained an auto loan through Wells Fargo Bank, N.A., or its predecessors, subsidiaries or divisions, and who were assessed charges for CPI and/or related fees on or after March 1, 2002.

**Indiana State Class:**

All residents of the State of Indiana who obtained an auto loan through Wells Fargo Bank, N.A., or its predecessors, subsidiaries or divisions, and who were assessed charges for CPI and/or related fees on or after March 1, 2002.

**Minnesota State Class:**

All residents of the State of Minnesota who obtained an auto loan through Wells Fargo Bank, N.A., or its predecessors, subsidiaries or divisions, and who were assessed charges for CPI and/or related fees on or after March 1, 2002.

**Mississippi State Class:**

All residents of the State of Mississippi who obtained an auto loan through Wells Fargo Bank, N.A., or its predecessors, subsidiaries or divisions, and who were assessed charges for CPI and/or related fees on or after March 1, 2002.

**Missouri State Class:**

All residents of the State of Missouri who obtained an auto loan through Wells Fargo Bank, N.A., or its predecessors, subsidiaries or divisions, and who were assessed charges for CPI and/or related fees on or after March 1, 2002.

**Wisconsin State Class:**

All residents of the State of West Virginia who obtained an auto loan through Wells Fargo Bank, N.A., or its predecessors, subsidiaries or divisions, and who were assessed charges for CPI and/or related fees on or after March 1, 2002.

**Wyoming State Class:**

All residents of the State of Wyoming who obtained an auto loan through Wells Fargo Bank, N.A., or its predecessors, subsidiaries or divisions, and who were assessed charges for CPI and/or related fees on or after March 1, 2002.

314. Certification of Plaintiffs' claims for classwide treatment is appropriate because Plaintiffs can prove the elements of their claims regarding liability and entitlement to damages on a classwide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claim.

315. Plaintiffs reserve the right to amend the Class Definition if discovery and further investigation reveal that the Class should be expanded or otherwise modified.

**B.    Class Certification Requirements: Federal Rule of Civil Procedure 23**

316. This action is brought and properly may be maintained as a class action on behalf of the Nationwide Class and/or State Classes proposed herein under the provisions of Federal Rules of Civil Procedure 23(a)(1)-(4) and 23(b)(3), and satisfies the requirements thereof.

75925478.7

317.    Numerosity:  While the exact number of members of the Class is unknown to Plaintiffs at this time, and can only be determined by appropriate discovery, membership in the Class is ascertainable based upon the records maintained by Defendants. At this time, Plaintiffs are informed and believe that the Class includes at least 2 million members.  Therefore, the Class is sufficiently numerous that joinder of all members of the Class in a single action is impracticable under Federal Rule of Civil Procedure Rule 23(a)(1), and the resolution of their claims through a class action will be of benefit to the parties and the Court.

318.    Ascertainability:  Names and addresses of members of the Class are available from Defendants' records.  Notice can be provided to the members of the Class through direct mailing, publication, or otherwise using techniques and a form of notice similar to those customarily used in consumer class actions arising under California state law and federal law.

319.    Typicality:  Plaintiffs' claims are typical of the claims of the other members of the Class which they seek to represent under Federal Rule of Civil Procedure 23(a)(3) because Plaintiffs and each member of the Class have been subjected to the same unlawful, deceptive, and improper practices and has been damaged in the same manner thereby.

320.    Adequacy:  Plaintiffs will fairly and adequately represent and protect the interests of the Class as required by Federal Rule of Civil Procedure Rule 23(a)(4). Plaintiffs are adequate representatives of the Class, because they have no interests which are adverse to the interests of the members of the Class.  Plaintiffs are committed to the vigorous prosecution of this action and, to that end, Plaintiffs have retained counsel who are competent and experienced in handling class action litigation on behalf of consumers.

321.    Superiority:  A class action is superior to all other available methods of the fair and efficient adjudication of the claims asserted in this action under Federal Rule of Civil Procedure 23(b)(3) because:

75925478.7

a. The expense and burden of individual litigation make it economically unfeasible for members of the Class to seek to redress their claims other than through the procedure of a class action;

b. If separate actions were brought by individual members of the Class, the resulting duplicity of lawsuits would cause members to seek to redress their claims other than through the procedure of a class action; and

c. Absent a class action, Defendants likely would retain the benefits of their wrongdoing, and there would be a failure of justice.

322. Common questions of law and fact exist as to the members of the Class, as required by Federal Rule of Civil Procedure 23(a)(2), and predominate over any questions which affect individual members of the Class within the meaning of Federal Rule of Civil Procedure 23(b)(3). The common questions of fact include, but are not limited to, the following:

a. Whether Defendants engaged in the unlawful conduct alleged herein:

b. Whether Defendants force-placed CPI on Wells Fargo auto loan customers who maintained independent automobile insurance;

c. Whether Defendants assessed CPI charges to Plaintiffs and other Class members including charges for premiums, interest, unearned commissions, and other fees as a result of their force-placement of CPI;

d. Whether Defendants wrongfully threatened collections, repossessed vehicles, and made adverse notations on credit reports of Plaintiffs and other Class members as a result of their force-placement of CPI;

e. Whether Defendants made misrepresentations and omissions of material fact regarding their loans and their procedures for force-placing CPI;

f. Whether Wells Fargo received kickback payments in the form of unearned commissions from the CPI Vendor for force-placing CPI and, as a result, whether Plaintiffs and Class members were charged unlawfully inflated CPI premiums;

83

g. Whether Defendants knew or should have known that they failed to properly confirm whether borrowers had independent automobile insurance;

h. Whether Defendants' conduct violates RICO, the Bank Holding Company Act, consumer protection statutes, and other causes of action herein;

i. Whether Plaintiffs and other Class members are entitled to equitable relief, including but not limited to, restitution or injunctive relief;

j. Whether such equitable relief includes Defendants' remediation of Plaintiffs' and Class members' credit reports;

k. Whether Plaintiffs and the other Class members are entitled to damages, including treble damages, punitive damages, exemplary damages and statutory damages (where allowed by state law) and other monetary relief and, if so, in what amount; and

l. Whether Plaintiffs and members of the Class are entitled to an award of reasonable attorneys' fees, pre-judgment interest, and costs of this suit.

323. Plaintiffs are not aware of any difficulty which will be encountered in the management of this litigation which should preclude its maintenance as a class action.

## IX.    **RICO ALLEGATIONS**

324. The following allegations pertain to Plaintiffs' claim for relief under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1962(c) and 1964, against all Defendants.

325. Plaintiffs and the members of the Class are each "persons" as that term is defined in 18 U.S.C. § 1961(3) who were injured in their business or property as a result of Defendants' wrongful conduct.

326. Defendants are, and at all relevant times were, "persons" within the meaning of 18 U.S.C. § 1961(3) because they are entities capable of holding legal or beneficial interest in property.

327. Section 1964(c) provides that "[a]ny person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefore . . . and

84

shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee." 18 U.S.C. § 1964(c).

328.  Section 1962(c) makes it unlawful "for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." 18 U.S.C. §1962(c).

329.  RICO defines an enterprise as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity."  18 U.S.C. § 1961(4).  An association-in-fact enterprise generally has three structural features, including:  (1) a purpose; (2) relationships among those associated with the enterprise; and (3) longevity sufficient to permit those associates to pursue the enterprise's purpose.  *See Boyle v. United States*, 556 U.S. 938, 946 (2009).

330.  As alleged below and throughout this Complaint, the Wells Fargo and National General companies orchestrated a scheme to extract millions of dollars from Plaintiffs and members of the Class by force-placing inflated, unlawful, unnecessary and undisclosed CPI in connection with automobile loans issued and held by Wells Fargo. Wells Fargo, National General, and their predecessors conducted their business through an association-in-fact enterprise in violation of section 1962(c) by a pattern of racketeering activity, including mail and wire fraud, for the purpose of improperly profiting from unlawfully force-placed CPI.  The CPI scheme enabled Wells Fargo to enjoy kickbacks in the form of unearned commissions and other compensation for force-placing CPI.  The CPI scheme also afforded National General a captive audience of millions of accounts on which it could force-place CPI, earning hundreds of millions of dollars in net written premium at a low risk of payout on insurance claims.

331.  Defendants' endeavor had the desired effect.  Defendants secured unlawful profits during the pendency of the enterprises.  And, as collateral damage, unsuspecting borrowers were charged millions of dollars in excessive premiums, interest, overdraft

85

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

fees, late fees, and experienced negative credit occurrences and repossession as a result of Defendants' conduct.

## X.    CAUSES OF ACTION

### FIRST CLAIM FOR RELIEF

**Violations of the Racketeer Influenced and Corrupt Organizations Act**

**18 U.S.C. § 1962(c)**

**(Against All Defendants)**

332.   Plaintiffs incorporate by reference, in this claim for relief, each and every allegation of the preceding paragraphs, with the same force and effect as though fully set forth herein.

333.   Plaintiffs bring this claim for relief on behalf of themselves and the members of the Nationwide Class pursuant to 18 U.S.C. §§ 1962(c) and 1964 of RICO against Wells Fargo and National General (for purposes of this cause of action, "Defendants").

**A.    The CPI Enterprise**

334.   Defendants Wells Fargo, National General, and their predecessors as detailed throughout this Complaint, formed an association-in-fact enterprise, referred to as the "CPI Enterprise."   The CPI Enterprise included: (a) Wells Fargo, its predecessors, subsidiaries, employees, and agents including WFS, Wachovia, WestFin, and WFDS; and (b) National General, its predecessors, subsidiaries, employees, and agents including Newport, Meritplan, Balboa, and QBEF.  The CPI Enterprise was formed for the purpose of unlawfully extracting significant revenue and profits from Plaintiffs and the Class by force-placing CPI on their automobile loans, and sharing kickbacks in the form of unearned commissions and other payments between the members of the enterprise.

335.   At all relevant times, each member of the CPI Enterprise was aware of the enterprise's purpose and conduct, and was a knowing, willing, and active participant in that conduct.  Each member of the enterprise reaped substantial profits from the conduct of the enterprise.

75925478.7

336.    Each member of the CPI Enterprise acquired, maintained control of, was associated with, and conducted or participated in the conduct of the enterprise's affairs. But, at all relevant times, the enterprise, and each member thereof: (a) had an existence separate and distinct from each of its members; (b) was separate and distinct from the pattern of racketeering in which the Defendants engaged; and (c) was an ongoing and continuing organization consisting of legal entities, including the Defendants, along with other individuals and entities, including unknown third parties.

337.    The members of the CPI Enterprise are systematically linked through continually coordinated activities ███████████████████████████████████████ ██████████████████████████████████████████, financial ties ████████████████ ████████████████, and contractual business arrangements ██████████████ ██████. The CPI Enterprise was an ongoing and continuous enterprise from March 2002 to September 2016.

338.    Defendants could not have accomplished the purpose of the CPI Enterprise without the assistance of each other, and all Defendants profited financially from the scheme.

339.    The CPI Enterprise described above involved regular communications between Wells Fargo and National General in which insurance and customer information, and payments were exchanged to facilitate the goals of the enterprise.  As described below, such communications occurred through the mail and wire facilities of the United States.

340.    The members of the CPI Enterprise functioned as a continuing unit for the purposes of implementing the scheme.  All members agreed to take actions to hide the existence of the scheme and the CPI Enterprise from others including Wells Fargo's auto loan borrowers.

341.    The CPI Enterprise engaged in and affected interstate commerce because, *inter alia*, it affected the price and terms of auto loans and/or CPI that was force-placed on

87

millions of Class members throughout the United States. The CPI Enterprise further required that Class members make payments for CPI premiums, interest, and unearned commissions in interstate commerce to Wells Fargo.

342. The effects of the CPI Enterprise are still felt today, as many Wells Fargo auto loan customers continue to be damaged by CPI-related negative reports to credit reporting agencies.

## B.    Conduct of the CPI Enterprise

343. During the Class Period, Wells Fargo, National General, and their predecessors identified in this Complaint exerted control over the CPI Enterprise and participated in the operation and management of its affairs, directly and indirectly.

344. Wells Fargo and its predecessors participated in the operation and management of the enterprise as described throughout this Complaint, including but not limited to the following ways:

   a.  Misrepresenting to customers, and failing to adhere to, the terms of its auto loans at loan origination;

   b.  Transmitting borrower information to the CPI Vendor ███████████ █████████████ ;

   c.  Disregarding the borrowers' proof of insurance provided at the time of loan origination;

   d.  Misrepresenting the circumstances under which it would force-place CPI on borrowers' accounts;

   e.  Authorizing the issuance of false and misleading Insurance Request Letters and Coverage Issued Letters to borrowers;

   f.  Force-placing unnecessary and undisclosed CPI on borrowers' accounts;

   g.  Concealing CPI charges on borrowers' billing statements, ███████████ █████████████ ;

   h.  Receiving concealed kickbacks in the form of unearned commissions and other compensation from the CPI Vendor for force-placing CPI;

88

i. ████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
█████████████████████████;

j. Paying CPI premiums to the CPI Vendor;

k. Assessing CPI charges and collecting monthly payments from Class members, including premium charges and interest, which falsely represented that those charges were due and owed;

l. Misrepresenting to credit agencies and to Class members that there were delinquencies when CPI premiums and insurance were not paid; and

m. Misrepresenting to credit agencies, Class members, and the Courts that repossession of Class members' vehicles was authorized because Class members were delinquent on their loan accounts.

345. Far from being a mere outside service provider, National General and its predecessors also were knowing, willing, and active participants in the CPI Enterprise. National General and its predecessors participated in and conducted the affairs of the CPI Enterprise as described throughout this Complaint, including but not limited to the following ways:

a. Underwriting CPI that Wells Fargo force-placed, with the knowledge and intent that it be used in the CPI Enterprise's fraudulent scheme;

b. Misrepresenting that it did or would search hard copy and electronic data to determine whether borrowers maintained adequate insurance on their vehicles;

c. Issuing CPI certificates for loans it knew or should have known were secured by sufficient automobile insurance;

d. Ignoring and/or disregarding proof of insurance submitted by borrowers after they learned about force-placed CPI;

e. Accepting payments from Wells Fargo for premiums due on CPI;

89

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

f.  Paying kickbacks in the form of unearned commissions and other compensation to Wells Fargo for the force-placement of CPI;

g.  ███████████████████████████████████████████████████; 

h.  ███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
████████████████████████████; and

i.  Transmitting to Wells Fargo lists accounts on which CPI was force-placed or removed.

## C.  Pattern of Racketeering Activity

346.  Defendants carried out their force-placed CPI scheme through a pattern of racketeering activity that employed the use of United States mail and wire facilities. Defendants accomplished this scheme by committing, conspiring to commit, and/or aiding-and-abetting the commission of at least two predicate acts of racketeering activity (i.e. violations of 18 U.S.C. §§ 1341 and 1343) within the past ten years.

347.  Defendants' predicate acts of racketeering activity (18 U.S.C. § 1961(1)(B)) including, but are not limited to:

• Mail Fraud:  Defendants violated 18 U.S.C. § 1341 by sending and/or receiving, or causing to be sent and/or received, materials via U.S. mail or commercial interstate carriers, for the purpose of executing the unlawful and fraudulent scheme to profit from force-placed CPI.

• Wire Fraud:  Defendants violated 18 U.S.C. §1343 by transmitting and/or receiving, or by causing to be transmitted and/or received, materials by wire for the purpose of executing the unlawful and fraudulent scheme to profit from force-placed CPI.

348.  The CPI Enterprise's pattern of racketeering involved thousands of separate instances wherein the U.S. Mail or interstate wire facilities were knowingly and

90

intentionally used to further the enterprise's pattern of racketeering activity, including mail and wire fraud.  These instances included but were not limited to the following:

a. 

b.

c.

d.

e.

f.

g.    Wells Fargo's use of the U.S. mail and wire facilities to send billing statements with charges for CPI premium, interest, and unearned commissions

91

h. ████████████████████████████████████

i. ████████████████████████████████████

349. The CPI Enterprise also communicated by U.S. Mail, interstate facsimile, and by interstate electronic mail with various other affiliates, regional offices, divisions, and other third-party entities in furtherance of the CPI Enterprise's mail and wire fraud.

350. Defendants knew, and intended that, Plaintiffs and the members of the Class would be induced by their fraudulent scheme to pay for unnecessary and unlawful CPI charges. Defendants further knew, and intended that, Plaintiffs and members of the Class would rely on their false and misleading representations and omissions of material fact and would incur increased costs as a result. Indeed, if Plaintiffs and the Class did not pay for unnecessary and unlawful CPI, the CPI Enterprise could not succeed.

351. Each of these mailings and interstate wire transmissions constitutes "racketeering activity" within the meaning of 18 U.S.C. § 1961(1)(B). Collectively, these violations constitute a "pattern of racketeering activity," within the meaning of 18 U.S.C. § 1961(5), through which Defendants intended to and did defraud Plaintiffs, and members of the Class.

352. Each instance of racketeering activity alleged herein was related, had similar purposes, involved the same or similar participants and methods of commission, and had similar results affecting similar victims, including Plaintiffs and the Class.

353. The pattern of racketeering activity alleged herein and the CPI Enterprise are separate and distinct from each other. Likewise, Wells Fargo, National General, and their

92

predecessors, subsidiaries, and affiliates identified in this Complaint are distinct from the CPI Enterprise. They each have separate existences from the CPI Enterprise, including distinct legal statuses, different offices and roles, bank accounts, officers, directors, employees, individual personhood, reporting requirements, and financial statements.

354. Defendants' final racketeering activity occurred within five years of the commission of a prior incident of racketeering.

**D.    Damages**

355. Defendants' pattern of racketeering activity, directly and proximately caused Plaintiffs and members of the Nationwide Class, injury in their business and property because Plaintiffs paid charges for CPI—including premiums, interest, and unearned commissions—that were inflated, unlawful, unnecessary and undisclosed, as well as increased interest on their automobile loans, diminished credit scores and the costs of repossession.

356. Plaintiffs are the most directly harmed individuals and entities and there are no other Plaintiffs better suited to seek a remedy from Defendants for the economic harms at issue here.

357. Any remediation program that Wells Fargo may implement will not provide complete legal relief to all Plaintiffs and Class Members. Such remediation is unlikely to compensate Plaintiffs and Class Members for their payment of kickbacks through unearned commissions and other forms of compensation. 

[178] Similarly, such remediation, even if it were to compensate Plaintiffs

---

[177] WFCPI_00030101 at 113.

[178] Turner Dep. at 107:6-9, 108:10-13.

75925478.7

and Class Members for single damages, would not satisfy their claims for treble damages under RICO. Damages must be trebled under RICO first, before remediation payments, if any, could be an offset.

358. Plaintiffs also seek all legal relief as allowed by law, including *inter alia*, actual damages and treble damages. Plaintiffs seek equitable relief, including but not limited to the elimination of adverse notations on their credit reports and remediating reduced credit scores, as deemed proper by the Court. Plaintiffs also seek attorneys' fees, all costs and expenses of suit, and pre- and post-judgment interest pursuant to 18 U.S.C. § 1964(c).

<u>**SECOND CLAIM FOR RELIEF**</u>

**Violation of the Bank Holding Company Act**

**12 U.S.C. § 1972**

**(Against Wells Fargo)**

359. Plaintiffs incorporate by reference each and every allegation of the preceding paragraphs, with the same force and effect as though fully set forth herein.

360. Wells Fargo & Company and Wells Fargo Bank, N.A. are a "bank holding companies" and "banks" within the meaning of 12 U.S.C. § 1971 and 12 U.S.C. § 1841(a) and (c).

361. Wells Fargo Bank, N.A. is a "subsidiary" of Wells Fargo & Company, as defined in 12 U.S.C. § 1971 and 12 U.S.C. § 1841(d).

362. Wells Fargo Dealers Services is a "subsidiary" of Wells Fargo Bank, N.A. and Wells Fargo & Company as defined in 12 U.S.C. § 1971 and 12 U.S.C. § 1841(d).

363. WestFin Insurance Agency, Inc. is a "subsidiary" of Wells Fargo Bank, N.A. and Wells Fargo & Company as defined in 12 U.S.C. § 1971 and 12 U.S.C. § 1841(d).

364. The Bank Holding Company Act ("BHCA") 12 U.S.C. § 1972 prohibits a bank extending credit from requiring the borrower to obtain or provide some additional property or service from the bank, the holding company of the bank, or a subsidiary of the holding company of a bank.

365.   Specifically, the BHCA states that "a bank shall not in any manner extend credit, lease, or sell property of any kind, or furnish any service, or fix or vary the consideration for any of the foregoing, on the condition or requirement . . . *that the customer shall obtain some additional credit, property, or service* from [such bank or] a bank holding company of such bank, or from any other subsidiary of such bank holding company . . . [or] *that the customer provide some additional credit, property, or service* to [such bank] or a bank holding company of such bank, or to any other subsidiary of such bank holding company."  [Emphasis added.]

366.   A claim under the BHCA requires (1) the banking practice to be unusual in the banking industry, (2) the existence of an anti-competitive tying arrangement, and (3) the practice to benefit the bank.

367.   Unlike under general antitrust statutes, however, a violation of the BHCA does not require one to establish the anti-competitive effects of the tie-in, the bank's market share, or any showing of coercion by the bank.  This is because Congress perceived conditional transactions involving credit as inherently anti-competitive and intended to regulate banks' credit-related transactions more stringently than the Supreme Court does under other antitrust laws.  Accordingly, the "anti-competitive" modifier in the above test either drops out or is presumed to exist.[179]

368.   Here, Wells Fargo violated the BHCA because it "extended credit" and "furnished a service" to Plaintiffs—auto loans—on the condition that Plaintiffs "provide additional property" to Wells Fargo related to CPI and "obtain additional" "services" and "credit" from Wells Fargo related to CPI.

369.   Wells Fargo required Plaintiffs to "provide additional property" to Wells Fargo by requiring Plaintiffs to make additional monetary payments to Wells Fargo for CPI charges.  Wells Fargo required Plaintiffs to "obtain additional services" from Wells Fargo's by requiring Plaintiffs to obtain Wells' Fargo's CPI-placement services.  Wells

---

[179] *S & N Equip. Co. v. Casa Grande Cotton Fin. Co.*, 97 F.3d 337, 346 (9th Cir. 1996).

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

Fargo required Plaintiffs to "obtain additional credit" from Wells Fargo by billing Plaintiffs for CPI charges that Wells Fargo made to CPI Vendors and passed-on to Plaintiffs.

370.   These required additional payments, services, and credits related to CPI were both *de facto* conditions of Wells Fargo's initial extension of credit to Plaintiffs, as well as explicit conditions of Wells Fargo's ongoing extension of credit to Plaintiffs (*i.e.* requirements for Plaintiffs to avoid foreclosure and/or additional fees).

371.   These additional requirements were *de facto* conditions of Wells Fargo's initial extension of credit because each Plaintiff and Nationwide Class member who obtained an auto loan from Wells Fargo was charged for CPI, regardless of whether they maintained independent automobile insurance coverage.   In other words, despite purporting to allow Plaintiffs and members of the Nationwide Class to maintain their own auto insurance in lieu of purchasing CPI, Wells Fargo in practice required all Plaintiffs and members of the Nationwide Class to accept and pay for its CPI-related services as a basic condition of their auto loan.

372.   These additional CPI-related payments, services, and credits were also explicit conditions of Wells Fargo's ongoing extension of credit to Plaintiffs because Wells Fargo conditioned its forbearance from foreclosing on existing loans on Plaintiffs' payment of CPI charges to Wells Fargo.   When Plaintiffs did not make such CPI payments, Wells Fargo threatened to—and often did—cease extending credit, repossess vehicles, and assess other additional charges on Plaintiffs.   These threats and actions to foreclose on or alter the conditions of Plaintiffs' existing auto loans constitutes unlawful conduct under the BHCA.[180]

373.   Wells Fargo's initial and ongoing extension of credit to Plaintiffs in the form of auto loans constitutes the "tying" product.   Wells Fargo's CPI-related services, credit, and associated demand for payment from Plaintiffs constitute "tied" products.

---

[180] *Akiki v. Bank of Am., N.A.*, 632 Fed. Appx. 965, 969 (11th Cir. 2015).

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

374.   Wells Fargo's provision of auto loans and Wells Fargo' CPI-related services are separate products that engender separate consumer demand.

375.   Wells Fargo's practice of conditioning its auto financing on customers obtaining and paying for additional CPI services was unusual and not traditional in the banking industry in several respects.

376.   Auto lenders typically do not require borrowers to purchase CPI, even when borrowers lack independent auto insurance.   Wells Fargo's internal documents acknowledge that █████████████████████████████████████████ ██████████████████████████████████████████████████ ██████████████     ████████████████████████████████ ████████[182]

377.   Also unusual and not traditional in the banking industry was Wells Fargo's practice of profiting from its CPI program through the generation of kickbacks from CPI Vendors, which inflated the true cost of CPI to borrowers.

378.   It is similarly unusual and not traditional in the banking industry for auto lenders to require borrowers to pay for duplicative and unnecessary CPI, even when they maintain independent auto insurance coverage.   Wells Fargo's related practice of repeatedly re-assessing duplicative charges, threatening collections, and repossessing vehicles despite customers' objections was similarly unusual and not traditional in the banking industry.

379.   As set forth above, Wells Fargo's extension of credit under these conditions—including its forbearance from collecting on existing loan—constituted an anticompetitive tying arrangement in violation of 12 U.S.C. § 1972(1).

---

[181] WFCPI_00035207 at 214.

[182] WFCPI_00050483 at 484.

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

380.  Wells Fargo's extension of credit on these terms benefited Wells Fargo because the force-placed CPI generated revenue for Wells Fargo as kickbacks in the form of unearned commissions and other compensation from the CPI Vendor, increased interest payments, and fees, among other methods.

381.  Wells Fargo's provision of CPI to Plaintiffs and members of the National Class constituted both a "service" and "credit" under 12 U.S.C. § 1972(A) and (B).

382.  Plaintiffs' and National Class Members' payments to Wells Fargo for CPI charges and related fees constituted "property" under 12 U.S.C. § 1972(C) and (D).

383.  As a direct and proximate result of Wells Fargo's violation of 12 U.S.C. § 1972(1), Plaintiffs have suffered damage and are entitled to treble damages pursuant to 12. U.S.C. § 1975.

384.  Any remediation program that Wells Fargo may implement will not provide complete legal relief to all Plaintiffs and Class Members.  Such remediation is unlikely to compensate Plaintiffs and Class Members for their payment of kickbacks through unearned commissions and other forms of compensation. ██████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████       ████████████████████████████

████████████████████████████████████████████████████████

████████████████████   [184]  Similarly, such remediation, even if it were to compensate Plaintiffs and Class Members for single damages, would not satisfy their claims for treble damages under the BHCA.  Damages must be trebled under BHCA first, before remediation payments, if any, could be an offset.

---

[183] WFCPI_00030101 at 113.

[184] Turner Dep. at 107:6-9, 108:10-13.

75925478.7

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

# THIRD CLAIM FOR RELIEF

## Violation of the California Unfair Competition Law

## Cal. Bus. & Prof. Code § 17200 *et seq.*

## (Against All Defendants)

385.   Plaintiffs incorporate by reference each and every allegation of the preceding paragraphs with the same force and effect as though fully set forth herein.

386.   Plaintiffs bring this claim for relief on behalf of themselves, the Nationwide Class, and, in the alternative, on behalf the California State Class (for purposes of this claim, the "Class").

387.   California's Unfair Competition Law ("UCL"), Business and Professions Code § 17200 *et seq.*, prohibits any "unlawful, unfair, or fraudulent business act or practices."  Defendants have engaged in unlawful, fraudulent, and unfair business acts and practices in violation of the UCL.

388.   Defendants' practice of force-placing CPI and charging customers for inflated premiums due to kickbacks in the form of unearned commissions and other compensation, and interest on those policies, as alleged herein, constitutes unfair business acts or practices because Defendants' conduct was injurious to consumers, offended public policy, and was unethical and scrupulous.  Defendants' unfair business acts and practices caused harm to consumers in California and nationwide.  The gravity of the harm suffered by hundreds of thousands of consumers greatly outweighs the utility of force-placing unnecessary CPI.

389.   Defendants' practice of force-placing CPI and charging customers for inflated premiums due to kickbacks in the form of unearned commissions and other compensation, and interest on those policies, as alleged herein, constitute unlawful business acts or practices because they violate multiple state, federal and common laws, including, but not limited to:  18 U.S.C. §§ 1341, 1341; 18 U.S.C. § 1962; 12 U.S.C. § 1972, *et seq.*; Cal Civ. Code §§ 1572, 1573; Tenn. Code § 56-49-113, *et seq.*; Wash.

75925478.7

RCW 448.22.115, *et seq.*; Miss. Code § 83-54-25, *et seq.*; Mich. Comp. Laws § 500.1625, *et seq.*; AR Code § 23-101-113, *et seq.*; and the common law.

390.    Defendants' practice of force-placing CPI and charging customers for inflated premiums due to kickbacks in the form of unearned commissions and other compensation, and interest on those policies, as alleged herein, also constitutes a fraudulent business act or practice.  Defendants' representations regarding CPI, including the statements regarding charges, and omissions of material fact regarding its pattern and practice of force-placing unnecessary CPI were false, misleading, and likely to deceive the public, including Plaintiffs and members of the Class.

391.    Plaintiffs and the other Class members relied on the reasonable expectation that Defendants comply with the law.  Plaintiffs and the Class also relied on Defendants' representations that the force-placed CPI charges were lawful, not inflated, and necessary and required to maintain their loans in good standing, and to avoid repossession.

392.    Accordingly, Plaintiffs and the other Class members have suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' misrepresentations and their concealment of and failure to disclose material information.

393.    Plaintiffs requests that this Court enter such orders or judgments as may be necessary to enjoin Defendants from continuing its unfair, unlawful, and/or deceptive practices and to restore to Plaintiffs and members of the Class any money it acquired by unfair competition, including restitution and/or restitutionary disgorgement, as provided in Cal. Bus. & Prof. Code § 17203 and Cal. Bus. & Prof. Code § 3345; and for such other relief set forth below.

## FOURTH CLAIM FOR RELIEF

### Fraud by Concealment

### (Against All Defendants)

394.    Plaintiffs incorporate by reference each and every allegation of the preceding paragraphs with the same force and effect as though fully set forth herein.

395.  Plaintiffs bring this claim for relief on behalf of themselves and the Nationwide Class, and, in the alternative, on behalf of the California State Class (for purposes of this claim, the "Class").

396.  Each Defendant committed fraud through their scheme to force-placing unlawful, unnecessary and undisclosed CPI on the automobile loans of the Plaintiffs and Class members.  Defendants concealed from Plaintiffs and the Class members that they engaged in a pattern of practice of force-placing CPI on borrowers' automobile loans and sharing in kickbacks in the form of unearned commissions and other compensation for the force-placed CPI, without regard for the insurance policies already maintained by Plaintiffs and the Class members.

397.  Wells Fargo began requiring insurance on automobile loans as early as March 2002.  In conjunction with the insurance requirement, Wells Fargo represented to Plaintiffs and Class members that they needed to maintain active comprehensive and collision insurance naming Wells Fargo as a loss payee, and that proof of insurance was required.

398.  Force-placed CPI was not applicable unless the Plaintiffs or Class members did not maintain insurance on their vehicles.   But, when Wells Fargo made these representations, it intentionally concealed, suppressed, omitted and failed to disclose the material facts that Wells Fargo, National General, and their predecessors force-placed CPI polices without regard for the insurance Plaintiffs or Class members maintained on their vehicle.  Wells Fargo intentionally concealed, suppressed, omitted and failed to disclose the material fact that it received kickbacks in the form of unearned commissions and other compensation from the CPI Vendor for force-placing CPI, all of which resulted in excessive charges or premiums, all of which resulted in excessive charges or premiums.

399.  National General and its predecessors represented to Plaintiffs and Class members that premiums for the force-placed CPI were necessary and proper because they were required by Wells Fargo.  National General and its predecessors also represented that they would not force-place CPI if the Plaintiffs and Class members maintained

75925478.7

insurance on their vehicles. But National General and its predecessors intentionally concealed, suppressed, omitted, and failed to disclose the material facts that they, in conjunction Wells Fargo, force-placed CPI without regard for the insurance Plaintiffs or Class members maintained on their vehicle. National General and its predecessors intentionally concealed, suppressed, omitted, and failed to disclose the material fact they paid kickbacks in the form of unearned commissions and other compensation to Wells Fargo for force-placing CPI.

400. A reasonable consumer who maintained the insurance coverage required by Defendants would not have expected to be charged premiums or interest for force-placed CPI, or to contribute to the kickbacks between Wells Fargo and its CPI Vendor. Plaintiffs and the members of the Class did not know of the facts which were concealed from them by Defendants. Moreover, as consumers, Plaintiffs and the members of the Class did not, and could not, unravel the deception on their own.

401. Defendants had a duty to disclose that they had a pattern and practice of force-placing CPI without regard for the insurance policies maintained by Plaintiffs or the Class members, and sharing kickbacks in the form of unearned commissions and other compensation for force-placing CPI. Defendants had such a duty because they had superior knowledge. The true facts were known only to them and they knew that these facts were not known to or reasonably discoverable by Plaintiffs or members of the Class. Defendants also had a duty to disclose the true nature of their CPI scheme because they actively concealed the truth from Plaintiffs and the members of the Class.

402. Finally, Defendants had a duty to disclose the true nature of their fraudulent CPI scandal in light of their statements and partial representations about the circumstances under which they would force-place CPI, the validity of their CPI practices, and the charges for CPI premiums, interest, and unearned commissions, as alleged herein. Having volunteered to provide information to Plaintiffs and the Class members, Defendants had the duty to disclose the whole truth.

75925478.7

403.  Plaintiffs and the Class members reviewed documents that were made available to them in connection with their auto loans.  Wells Fargo also intentionally concealed CPI charges on borrowers' billing statements, ██████████ ████████████████████[185]  Had the truth concerning the CPI scheme been disclosed, Plaintiffs and the Class members would have seen and been aware of it, and would not have obtained an auto loan from Wells Fargo, would not have paid the CPI charges, and/or would have disputed the CPI charges and demanded full compensation. Defendants should have disclosed this material information in the RISC, Insurance Request Letters, telephone calls with borrowers, Coverage Issued Letters, and billing statements.

404.  Plaintiffs and members of the Class sustained damages because they were forced to pay inflated premiums and insurance for unlawful, unnecessary and undisclosed CPI.  Plaintiffs and members of the Class also sustained damages when the incurred late fees, insufficient funds fees, damage to their credit scores, and repossession of their vehicles.  Accordingly, Defendants are liable to Plaintiffs and the members of the Class for damages in an amount to be proven at trial.

405.  Defendants' acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud; in reckless disregard of the rights of Plaintiffs; and to enrich themselves.  Defendants' misconduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount shall be determined according to proof at trial.

---

[185] WFCPI_00048650; WFCPI_00006404; McLawhorn Dep. at 135:25-143:23.

75925478.7

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

# **FIFTH CLAIM FOR RELIEF**

## **Unjust Enrichment**

### **(Against All Defendants)**

406.   Plaintiffs incorporate by reference, in this cause of action, each and every allegation of the preceding paragraphs with the same force and effect as though fully set forth herein.

407.   Plaintiffs bring this Claim for Relief on behalf of themselves and the Class (for purposes of this Claim identified herein) as follows:

    a.    Plaintiffs Duane Fosdick, Analisa Moskus, and Keith Preston bring this Claim for Relief on behalf of themselves and on behalf of the Nationwide Class, or in the alternative, the California State Class under California law;

    b.    Plaintiff Nyle Davis brings this Claim for Relief on behalf of himself and on behalf of the Missouri State Class under Missouri law;

    c.    Plaintiff Regina Gonzales brings this Claim for Relief on behalf of herself and on behalf of the Minnesota State Class under Minnesota law;

    d.    Plaintiff Brandon Haag brings this Claim for Relief on behalf of himself and on behalf of the Wisconsin State Class under Wisconsin law;

    e.    Plaintiff Paul Hancock brings this Claim for Relief on behalf of himself and on behalf of the Indiana State Class under Indiana law;

    f.    Plaintiffs Dustin Havard and Brian Miller bring this Claim for Relief on behalf of themselves and on behalf of the Mississippi State Class under Mississippi law;

    g.    Plaintiff Victoria Reimche brings this Claim for Relief on behalf of herself and on behalf of the Colorado State Class under Colorado law; and

    h.    Plaintiff Bryan Tidwell brings this Claim for Relief on behalf of himself and on behalf of the Wyoming State Class under Wyoming law.

75925478.7

408.   Defendants force-placed unnecessary and undisclosed CPI on Plaintiffs and the Class members' automobile loan accounts, resulting in the payment of CPI premium, interest, late fees, and other charges to Defendants.

409.   Defendants were unjustly enriched at the expense of Plaintiffs and the Class members.  Money and property belonging to the Plaintiffs and members of the Class were unjustly taken by Defendants.

410.   It would be inequitable and unconscionable for Defendants to retain the profit, benefit and other compensation they obtained from the conduct alleged herein.

411.   Plaintiffs and Class members seek restitution from Defendants, and an order disgorging all profits, benefits, and other compensation obtained by Defendants from their unlawful practice of force-placing unlawful, unnecessary and undisclosed CPI.

412.   In the alternative, Plaintiffs and Class members seek an order establishing a constructive trust over all money or property wrongfully obtained by the Defendants' conduct alleged herein.

## XI.    <u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiffs, individually and on behalf of members of the Nationwide Class and State Classes, respectfully request that the Court grant certification of the proposed Nationwide Class and State Classes, including the designation of Plaintiffs as the named representatives of the Nationwide Class and respective State Classes, the appointment of the undersigned as Class Counsel, and the designation of any appropriate issue classes and/or subclasses, under the applicable provisions of Fed. R. Civ. P. 23, and that the Court enter judgment in their favor and against Defendants, as follows:

A.    A declaration that any applicable statute of limitations are tolled under the discovery rule or due to the fraudulent concealment alleged in this Complaint, and that Defendants are estopped from relying on any statutes of limitation as a defense;

B.    An order enjoining, temporarily and permanently, from continuing the unlawful, deceptive, fraudulent and unfair business practices alleged in this Complaint;

105

C.      Injunctive and equitable relief in the form of a comprehensive program to fully reimburse and make whole all Class members for all costs and economic losses, including credit repair and the costs of vehicle repossession;

D.      Costs, restitution, compensatory damages for economic loss and out-of-pocket costs, treble damages under RICO and the BHCA, multiple damages under applicable states' laws, punitive and exemplary damages under applicable law;

E.      Rescission of all force-placed CPI, including reimbursement of and/or compensation for the full cost of CPI, including any interest, taxes, license and other fees;

F.      A determination that Defendants are financially responsible for all Class notice and administration of Class relief;

G.      Any and all applicable statutory and civil penalties;

H.      An order requiring Defendants to pay both pre- and post-judgment interest on any amounts awarded;

I.      An award of attorneys' fees and costs, including expert costs;

J.      Leave to amend this Complaint to conform to the evidence produced in discovery and at trial; and

K.      Such other or further relief as the Court may deem appropriate, just and equitable.

## XII.   **DEMAND FOR JURY TRIAL**

Plaintiffs demand a trial by jury of any and all issues in this action so triable by right, pursuant to Federal Rule of Civil Procedure 38(b).

Dated:  August 17, 2018                Respectfully submitted,

By:     */s/ Roland Tellis*
_____
Roland Tellis

BARON & BUDD, P.C.
15910 Ventura Boulevard, Suite 1600
Encino, California  91436
Telephone:  (818) 839-2333

75925478.7

Facsimile:   (818) 986-9698

By:   */s/ Aaron M. Sheanin*
      Aaron M. Sheanin

Roman M. Silberfeld (SBN 62783)
rsilberfeld@robinskaplan.com
ROBINS KAPLAN LLP
2049 Century Park East, Suite 3400
Los Angeles, California  90067
Telephone: (310) 552-0130
Facsimile: (310) 229-5580

Aaron M. Sheanin (SBN 214472)
asheanin@robinskaplan.com
ROBINS KAPLAN LLP
2440 W. El Camino Real, Suite 100
Mountain View, California  94040
Telephone:  (650) 784-4040
Facsimile:  (650) 784-4041

*Plaintiffs' Co-Lead Counsel*

GIBBS LAW GROUP LLP
Eric H. Gibbs (SBN 178658)
Michael L. Schrag (SBN 185832)
505 14th Street, Suite 1110
Oakland, California 94612
Telephone:   (510)-350-9700
Facsimile:    (510 350-9701

Levin Sedran & Berman
Charles E. Schaffer (*Pro Hac Vice*)
510 Walnut Street, Suite 500
Philadelphia, Pennsylvania 19106
Telephone:   (215) 592 1500
Facsimile:    (215) 592-4663

WEITZ & LUXENBERG, P.C.
Paul F. Novak (*Pro Hac Vice*)
Chrysler House

107

719 Griswold, Suite 620
Detroit, Michigan 48226
Telephone:  (313) 800-4170
Facsimile:  (646) 293-7992

*Plaintiffs' Steering Committee*

CASEY GERRY SCHENK
FRANCAVILLA BLATT & PENFIELD, LLP
David S. Casey, Jr. (SBN 060768)
Gayle M. Blatt (SBN 122048)
110 Laurel Street
San Diego, California
Telephone:  (619) 238-1811
Facsimile:  (619) 544-9232

*Plaintiffs' Liaison Counsel*

108

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT