Roland Tellis (SBN 186269)
rtellis@baronbudd.com
David B. Fernandes, Jr. (SBN 280944)
dfernandes@baronbudd.com
BARON & BUDD, P.C.
15910 Ventura Boulevard, Suite 1600
Encino, California  91436
Telephone:   (818) 839-2333
Facsimile:    (818) 986-9698

Roman M. Silberfeld (SBN 62783)
rsilberfeld@robinskaplan.com
David Martinez (SBN 193183)
dmartinez@robinskaplan.com
Robins Kaplan LLP
2049 Century Park East, Suite 3400
Los Angeles, California  90067
Telephone: (310) 552-0130
Facsimile: (310) 229-5580

Aaron M. Sheanin (SBN 214472)
asheanin@robinskaplan.com
Robins Kaplan LLP
2440 W. El Camino Real, Suite 100
Mountain View, California  94040
Telephone:  (650) 784-4040
Facsimile:  (650) 784-4041

*Plaintiffs' Co-Lead Counsel*
*\* Additional counsel listed on signature page*

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**SOUTHERN DIVISION**

| | |
|---|---|
| IN RE WELLS FARGO COLLATERAL PROTECTION INSURANCE LITIGATION | Case Number:  8:17-ML-2797-AG-KES<br><br>**PLAINTIFFS' MOTION FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT AND APPROVAL OF CLASS NOTICE**<br><br>Date:           July 8, 2019<br>Time:           10:00 am<br>Courtroom:   10D<br><br>Hon. Andrew J. Guilford |

**TO THE COURT, ALL PARTIES, AND THEIR ATTORNEYS OF RECORD**:

**PLEASE TAKE NOTICE** that on July 8, 2019, at 10:00 am, in Courtroom 10D of the above-captioned Court, located at 411 West Fourth Street, Santa Ana, California 92701, the Honorable Andrew J. Guilford presiding, Plaintiffs Angelina Camacho, Odis Cole, Nyle Davis, Duane Fosdick, Regina-Gonzalez Phillips, Brandon Haag, Paul Hancock, Dustin Havard, Brian Miller, Analisa Moskus, Keith Preston, Victoria Reimche, Dennis Small, and Bryan Tidwell ("Plaintiffs"), on behalf of themselves and all others similarly situated, will, and hereby do, move this Court to:

1.     Preliminarily approve the settlement described in the Settlement Agreement, attached as Exhibit 1 to the Joint Declaration of Plaintiffs' Co-Lead Counsel Roland Tellis and Roman M. Silberfeld;

2.     Conditionally certify the Settlement Class;

3.     Appoint the named Plaintiffs as Settlement Class Representatives;

4.     Appoint the undersigned counsel as Settlement Class Counsel;

5.     Approve distribution of the proposed Notice of Class Action Settlement to the Settlement Class;

6.     Appoint Epiq Systems as the Settlement Administrator; and

7.     Set a hearing date and briefing schedule for Final Settlement Approval and Plaintiffs' fee and expense application.

This Motion is based upon: (1) this Notice of Motion and Motion for Preliminary Approval of Class Action Settlement and Class Notice; (2) the Memorandum of Points and Authorities in Support of Motion for Preliminary Approval of Class Action Settlement and Class Notice; (3) the Joint Declaration of Roland Tellis and Roman M. Silberfeld; (4) the Declaration of Professor Eric D. Green; (5) the Declaration of Cameron R. Azari, Esq.; (6) the Settlement Agreement and attached exhibits thereto; (7) the records, pleadings, and papers filed in this action; and (8) such other documentary and oral evidence or argument as may be presented to the Court at or prior to the hearing of

this Motion.

Dated:  June 6, 2019                          Respectfully submitted,

                                   By:  /s/ Roland Tellis
                                        Roland Tellis

                                        Roland Tellis (SBN 186269)
                                        David B. Fernandes, Jr. (SBN 280944)
                                        BARON & BUDD, P.C.
                                        15910 Ventura Boulevard, Suite 1600
                                        Encino, California  91436
                                        Telephone:  (818) 839-2333
                                        Facsimile:   (818) 986-9698


                                   By:  /s/ Roman M. Silberfeld
                                        Roman M. Silberfeld

                                        Roman M. Silberfeld (SBN 62783)
                                        rsilberfeld@robinskaplan.com
                                        David Martinez (SBN 193183)
                                        dmartinez@robinskaplan.com
                                        ROBINS KAPLAN LLP
                                        2049 Century Park East, Suite 3400
                                        Los Angeles, California  90067
                                        Telephone: (310) 552-0130
                                        Facsimile: (310) 229-5580

                                        Aaron M. Sheanin (SBN 214472)
                                        asheanin@robinskaplan.com
                                        ROBINS KAPLAN LLP
                                        2440 W. El Camino Real, Suite 100
                                        Mountain View, California  94040
                                        Telephone:  (650) 784-4040
                                        Facsimile:  (650) 784-4041

Kellie Lerner (*pro hac vice*)
klerner@robinskaplan.com
Benjamin D. Steinberg
bsteinberg@robinskaplan.com
ROBINS KAPLAN LLP
399 Park Avenue, Suite 3600
New York, New York  10022
Telephone:  (212) 980-7400
Facsimile:  (212) 980-7499

*Plaintiffs' Co-Lead Counsel*

Eric H. Gibbs (SBN 178658)
Michael L. Schrag (SBN 185832)
GIBBS LAW GROUP LLP
505 14th Street, Suite 1110
Oakland, California 94612
Telephone: (510)-350-9700
Facsimile: (510 350-9701

Charles E. Schaffer (*Pro Hac Vice*)
LEVIN SEDRAN & BERMAN
510 Walnut Street, Suite 500
Philadelphia, Pennsylvania 19106
Telephone: (215) 592 1500
Facsimile: (215) 592-4663

Paul F. Novak (*Pro Hac Vice*)
WEITZ & LUXENBERG, P.C.
Chrysler House
719 Griswold, Suite 620
Detroit, Michigan 48226
Telephone: (313) 800-4170
Facsimile: (646) 293-7992

*Plaintiffs' Steering Committee*

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

David S. Casey, Jr. (SBN 060768)
Gayle M. Blatt (SBN 122048)
CASEY GERRY SCHENK
FRANCAVILLA BLATT & PENFIELD, LLP
110 Laurel Street
San Diego, California
Telephone: (619) 238-1811
Facsimile: (619) 544-9232

*Plaintiffs' Liaison Counsel*

MOTION FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT AND CLASS NOTICE

# <u>TABLE OF CONTENTS</u>

**PAGE**

I.     INTRODUCTION ..................................................................................... 1

II.    BACKGROUND ..................................................................................... 2

    A.     Factual Background.................................................................... 2

    B.     History of this Litigation ........................................................... 3

        i.      Commencement of this Action and Motion Practice........................... 3

        ii.     Investigation and Discovery ................................................ 4

        iii.    Settlement Negotiations ...................................................... 6

III.   TERMS OF THE SETTLEMENT ........................................................ 6

    A.     The Settlement Class Definition ............................................... 6

    B.     The Settlement Terms ................................................................ 6

IV.    THE COURT SHOULD PRELIMINARILY APPROVE THE
       SETTLEMENT.................................................................................. 10

    A.     The Class Action Settlement Process...................................... 10

    B.     The Standard for Preliminary Approval................................... 11

V.     THIS SETTLEMENT MERITS PRELIMINARY APPROVAL .......... 12

    A.     The Settlement Is Substantively Fair because it Provides Significant
        Benefits in Exchange for the Compromise of Strong Claims...................... 13

    B.     The Settlement Is the Product of Good Faith, Informed, and Arm's-
        Length Negotiations, and it Is Fair................................................. 14

VI.    CERTIFICATION IS APPROPRIATE FOR SETTLEMENT PURPOSES
       BECAUSE THE SETTLEMENT CLASS MEETS THE REQUIREMENTS
       OF RULE 23.................................................................................... 16

    A.     The Settlement Class Meets the Requirements of Rule 23(a) ..................... 16

MOTION FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT AND CLASS NOTICE

|   |   |      | i.   | The Settlement Class is Sufficiently Numerous ................................ 16 |
|   |   |      | ii.  | There are Common Questions of Law and Fact ................................ 16 |
|   |   |      | iii. | Plaintiffs' Claims Are Typical of the Settlement Class Members' Claims ................................................................ 17 |
|   |   |      | iv.  | Plaintiffs and Class Counsel Have Protected, and Will Continue to Protect, the Interests of the Settlement Class ................................ 18 |
|   |   | B.   |      | The Settlement Class Meets the Requirements of Rule 23(b)(3) ................ 19 |
|   |   |      | i.   | Common Issues of Law and Fact Predominate ................................ 19 |
|   |   |      | ii.  | Class Treatment Is Superior to Other Available Methods for the Resolution of This Case. ................................................ 21 |

VII. THE PROPOSED NOTICE PROGRAM IS ADEQUATE AND SHOULD BE APPROVED ........................................................................ 22

VIII. THE COURT SHOULD SET A FINAL APPROVAL HEARING SCHEDULE ............................................................................ 24

IX. CONCLUSION ................................................................................ 25

MOTION FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT AND CLASS NOTICE

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Barbosa v. Cargill Meat Solutions Corp.*,
   297 F.R.D. 431 (E.D. Cal. 2013) .................................................................... 13

*Byrne v. Santa Barbara Hospitality Services, Inc.*,
   2017 WL 5035366 (C.D. Cal. 2017) ............................................................... 14

*Churchill Vill., L.L.C., v. GE*,
   361 F.3d 566 (9th Cir. 2004) ........................................................................... 22

*Class Plaintiffs v. City of Seattle*,
   955 F.2d 1268 (9th Cir. 1992) ......................................................................... 10

*Cohen v. Trump*,
   303 F.R.D. 376 (S.D. Cal. 2014) ..................................................................... 16

*Evon v. Law Offices of Sidney Mickell*,
   688 F.3d 1015 (9th Cir. 2012) .................................................................... 17, 18

*In re First Alliance Mortg. Co.*,
   471 F.3d 977 (9th Cir. 2006) ........................................................................... 20

*Friedman v. 24 Hour Fitness USA, Inc.*,
   No. CV 06-6282 AHM, 2009 WL 2711956 (C.D. Cal. Aug. 25, 2009) ....................... 20

*Hanlon v. Chrysler Corp.*,
   150 F.3d 1011 (9th Cir. 1998) ............................................................ 11, 14, 20, 21

*Jimenez v. Allstate Ins. Co.*,
   765 F.3d 1161 (9th Cir. 2014) ......................................................................... 16

*Kenneth Glover, et al. v. City of Laguna Beach, et al.*,
   2018 WL 6131601 (C.D. Cal. 2018) (Guilford, J.) ........................................ 12

*Kim v. Space Pencil, Inc.*,
   2012 WL 5948951 (N.D. Cal. Nov. 28, 2012) ............................................. 14

*Klay v. Humana, Inc.*,
   382 F.3d 1241 (11th Cir. 2004) ....................................................................... 20

*Lane v. Facebook, Inc.*,
   696 F.3d 811 (9th Cir. 2012), *cert. denied,* 134 S.Ct. 8 (2013) ................................... 11

*Loritz v. Exide Technologies*,
   No. 2:13–CV–02607–SVW–E, 2015 WL 6790247 (C.D. Cal. Apr. 21,
   2016) ......................................................................................................................... 18

*In re Mego Fin. Corp. Sec. Litig.*,
   213 F.3d 454 (9th Cir. 2000) ..................................................................................... 15

*Mullane v. Central Hanover Bank & Trust Co.*,
   339 U.S. 306 (1950)..................................................................................................... 22

*Nat'l Rural Telecommunications Coop. v. DIRECTV, Inc.*,
   221 F.R.D. 523 (C.D. Cal. 2004)................................................................... 11, 14, 15

*Negrete v. Allianz Life Ins. Co. of N. Am.*,
   238 F.R.D. 482 (C.D. Cal. 2006)................................................................................ 16

*In re Netflix Privacy Litig.*,
   2013 WL 1120801 (N.D. Cal. Mar. 18, 2013) ......................................................... 12

*Nobles v. MBNA Corp.*,
   2009 WL 1854965 (N.D. Cal. June 29, 2009)............................................................ 14

*Officers for Justice v. Civil Service Comm'n*,
   688 F.2d 615 (9th Cir. 1982) ..................................................................................... 11

*In re Omnivision Technologies, Inc.*,
   559 F. Supp. 2d 1036 (N.D. Cal. 2008)...................................................................... 14

*Parsons v. Ryan*,
   754 F.3d 657 (9th Cir. 2014) ..................................................................................... 17

*Radcliffe v. Experian Info. Sols., Inc.*,
   715 F.3d 1157 (9th Cir. 2013) ................................................................................... 18

*Rodriguez v. Hayes*,
   591 F.3d 1105 (9th Cir. 2010) ................................................................................... 17

*Rosales v. El Rancho Farms*,
   2015 WL 4460918 (E.D. Cal. July 21, 2015)......................................................13, 15

*Stockwell v. City & Cty. of San Francisco*,
   749 F.3d 1107 (9th Cir. 2014) ................................................................................... 16

*In re Syncor ERISA Litig.*,
　516 F.3d 1095 (9th Cir. 2008) .................................................................. 10

*Tyson Foods, Inc. v. Bouaphakeo*,
　136 S. Ct. 1036 (2016) .......................................................................... 20

*Wal-Mart Stores, Inc. v. Dukes*,
　564 U.S. 338 (2011) ......................................................................... 16, 17

*Waldrup v. Countrywide Financial Corporation*,
　2018 WL 799156 (C.D. Ca. Feb. 6, 2018) ................................................ 20

**Other Authorities**

Federal Rule of Civil Procedure ...................................................... *passim*

Herbert B. Newberg & Alba Conte, *Newberg on Class Actions* §13:1 (5th
　ed.)................................................................................................ 10, 11

MOTION FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT AND CLASS NOTICE

# I. INTRODUCTION

After almost two years of hard fought litigation, Plaintiffs and Defendants Wells Fargo & Company and Wells Fargo Bank, N.A. ("Wells Fargo") and National General Holdings Corp. and National General Insurance Company ("National General"[1]) (collectively, "Defendants") have reached a proposed class action settlement (the "Settlement") to resolve claims that Defendants engaged in an unlawful scheme to force millions of Wells Fargo auto loan customers to pay for unnecessary and unwanted Collateral Protection Insurance ("CPI") from October 15, 2005 and through September 30, 2016.

As a result of this litigation, Defendants have agreed to pay at least ***$393.5 million*** to Plaintiffs and the Settlement Class ***without*** the need for claim forms or documentary "proof," ***plus*** attorneys' fees and costs. This Settlement is the result of contentious, prolonged, arm's length negotiations between the parties who participated in five in-person mediation sessions between May 2018 and March 2019, as well as numerous telephone sessions, with the Court-appointed mediator, Professor Eric D. Green. The Settlement not only confers substantial relief, but it far exceeds the original $64 million remediation plan Wells Fargo proposed prior to the commencement of this litigation and it guarantees that there is one, Court-monitored fund that compensates the Settlement Class while at the same time satisfying Wells Fargo's regulatory obligations.

A qualified settlement administrator, Epiq Systems, is proposed to administer the Settlement and a direct mail and publication notice program. Additionally, the settlement administrator will maintain a website to provide information concerning the Settlement and the rights of the Settlement Class. The proposed notice program far exceeds all applicable requirements of law, including Rule 23 and Constitutional Due Process, to apprise Settlement Class members of the pendency of this action, the terms of the Settlement, and their rights to opt out of, or object to, the Settlement.

---

[1] "National General" also includes National General Lender Services, Inc., QBE First Insurance Agency, Inc., Newport Management Corporation, Meritplan Insurance Company, and Balboa Insurance Company and the predecessors, successors, and/or affiliates of either.

As described in detail below, the Settlement provides direct and significant benefits to the Settlement Class, while avoiding the risks and delay associated with further litigation. Accordingly, Plaintiffs request that the Court grant this motion for preliminary approval, approve the form and manner of notice to the Settlement Class, and set the Final Approval Hearing.

## II.  BACKGROUND

### A.  Factual Background

Wells Fargo and its predecessors, together with auto insurance underwriter National General and its predecessors, engaged in a more than decade-long scheme that forced millions of Wells Fargo customers to pay for CPI they did not need or want, bilking tens of millions of dollars from them in the process.  Defendants' unlawful scheme was devious and disguised. Wells Fargo would purchase CPI from National General (or its predecessors) and then force-place the CPI on its auto loan borrowers' accounts. Wells Fargo assessed a full year worth of CPI charges against the borrower's account, and then charged interest each month on that CPI premium before applying payments to a customer's principal loan balance. This ensured that Wells Fargo's CPI charges were paid first, and any deficiency resulted in the borrower falling behind on payments, suffering related harm, and defaulting on the underlying loan.

On top of the CPI premium and interest, Wells Fargo also tacked on an unearned commission. The unearned commissions were paid by National General and its predecessors as kickbacks to one of Wells Fargo's affiliates for the force-placement of the CPI. These kickbacks ensured that the CPI charges to Wells Fargo's borrowers were more expensive than the premiums for coverage borrowers could have and often did obtain on their own. Even after Wells Fargo stopped receiving commissions in 2013, it continued to assess CPI charges on borrowers' accounts in excess of the cost of CPI or other auto insurance products.

On July 27, 2017, Defendants' fraudulent CPI scheme was disclosed in an investigative report published by *The New York Times*. The *Times* report was based on a

copy of an internal report commissioned by and prepared for Wells Fargo by consulting firm Oliver Wyman that detailed the scheme. On that same day, Wells Fargo announced that it was going to compensate auto loan customers who were financially harmed by its CPI scheme. However, Wells Fargo only agreed to review CPI policies placed on customer accounts beginning in 2012 and identified only approximately 570,000 impacted customers. Wells Fargo announced that approximately $64 million of cash remediation would be sent to customers. This litigation followed.

As this litigation has shown, Wells Fargo's 2017 remediation plan was woefully inadequate and ultimately represented only a fraction of the benefit the Settlement confers on consumers.  Indeed, in addition to recovering almost five times as much in compensation, Class Counsel's vigorous litigation also expanded the class period by seven years.

### B.    History of this Litigation

#### i.    Commencement of this Action and Motion Practice

On July 30, 2017, Plaintiff Paul Hancock, filed a putative class action complaint against Defendants in the Central District of California (Case No. 8:17-cv-01814-AG-KES). On August 15, 2017, Plaintiff Hancock filed an Amended Complaint adding Plaintiffs Analisa Moskus, Brandon Haag, Adriana Avila, and Nyle Davis.

Following the filing of the *Hancock* action, more than a dozen related actions were filed in California and New York. On October 18, 2017, the United States Judicial Panel on Multidistrict Litigation centralized this litigation in the Central District of California. On December 11, 2017, this Court appointed Baron & Budd, P.C. and Robins Kaplan, LLC as Co-Lead Counsel, Gerry, Schenk, Francavilla, Blatt & Penfield, LLP as Liaison Counsel, and Weitz & Luxenberg PC, the Gibbs Law Group, and Levin Sedran & Berman to the Plaintiffs' Steering Committee.

On January 26, 2018, Plaintiffs' filed their Original Complaint in this MDL.  On March 9, 2018, Defendants filed Rule 12(b)(6) motions to dismiss Plaintiffs' Original Complaint. (Dkts. 68-69.) Plaintiffs filed an omnibus opposition to Defendants' motions

on April 20, 2018, and Defendants filed replies on May 11, 2018. (Dkts. 80, 92-93.) On June 18, 2018, the Court granted in part Wells Fargo's and National General's motion to dismiss with leave to amend as to all claims except Plaintiffs' Consumer Legal Remedies Act claim. (*Id.*)

On August 17, 2018, Plaintiffs filed their First Amended Complaint, adding additional factual allegations to support their claims. (Dkt. 130.) Defendants again filed motions to dismiss under Rule 12(b)(6). (Dkts. 142, 146-1.) Plaintiffs filed an omnibus opposition to Defendants' motions on November 2, 2018, and Defendants' filed replies on November 19, 2018. (Dkts. 179, 187-88.) This Court denied Defendants' motions on December 14, 2018, with the exception that Plaintiffs' Bank Holding Claim Act against Wells Fargo, which the Court dismissed with leave to amend. (Dkt. 203 at 15, 23.)

### ii.    Investigation and Discovery

Prior to reaching the Settlement, Plaintiffs conducted a comprehensive factual investigation into their allegations. At the outset of the case and in connection with an early Court-ordered mediation, Plaintiffs promptly conducted full-day interviews of Wells Fargo personnel in Charlotte, North Carolina and obtained data and business information on certain CPI related topics. (Joint Declaration of Roland Tellis and Roman M. Silberfeld ("Tellis-Silberfeld Decl.") at ¶ 3.) The mediation was unsuccessful and Plaintiffs launched into full discovery. Plaintiffs served Wells Fargo with six sets of document requests and three sets of interrogatories. (*Id.* ¶ 4.) Plaintiffs also served National General with four sets of document requests and two sets of interrogatories. (*Id.*) In response to Plaintiffs' document requests, Defendants produced 663,880 documents totaling about 4,472,564 pages. (*Id.*) These documents relate to Defendants' internal and external communications, policies and procedures, loan practices, disclosures to Class Members, CPI policies, and loan records. (*Id.*) Plaintiffs were also served with written discovery. In response to the document requests, Plaintiffs produced over 1,800 pages of documents. (*Id.* ¶ 5.) Each Plaintiff also responded to interrogatories. (*Id.*)

Plaintiffs also obtained documents from a third-party consulting firm, Oliver Wyman, which was retained to analyze Wells Fargo's CPI program and devise its 2017 remediation program. Oliver Wyman produced 8,910 documents, which totaled approximately 40,685 pages. (*Id.* ¶ 6.) Plaintiffs were forced to engage in motion practice, including numerous hearings before the Honorable Karen E. Scott to gain access to the Oliver Wyman documents, ultimately leading to orders compelling the production of documents and awarding discovery sanctions. (*Id.*)

Aside from the written discovery, Plaintiffs also deposed a number of Defendants' corporate representatives and employees on topics relevant to their claims. Plaintiffs deposed seven witnesses from Wells Fargo and three witnesses from National General. (*Id.* ¶ 7.)

Plaintiffs' counsel also spent considerable time evaluating Wells Fargo's original remediation plan and noting substantial deficiencies in its breadth and scope. (*Id.* ¶ 8.) Plaintiffs' counsel worked with Wells Fargo's counsel to substantially enhance the breadth and scope of the compensation to the Settlement Class and ultimately achieved a unitary Court-monitored settlement program that compensates the Settlement Class while at the same time satisfying Wells Fargo's regulatory obligations. (*Id.*)

Finally, Plaintiffs conditioned the settlement Memorandum of Understanding on confirmatory discovery, which took place in the months following its execution. (*Id.* ¶ 9.) Plaintiffs examined Wells Fargo personnel on the assumptions underlying various categories of compensation to be paid to certain class members, the contours of the mediation program that will be offered to certain class members and the loan data utilized by Wells Fargo to ensure that class members can be identified and compensated properly. (*Id.*) In addition to the examination, Plaintiffs obtained a copy of the massive loan database utilized by Wells Fargo to identify class members and compute their compensation. (*Id.*)

Given the discovery completed to date, there can be no real dispute that the parties have more than sufficient information to make an informed decision regarding settlement of this action.

### iii.    Settlement Negotiations

The Settlement was the culmination of protracted discussions between the parties. The parties held in-person mediation sessions in May 2018, September 2018, December 2018, January 2019, and March 2019 before their court-appointed mediator, Professor Eric D. Green. (*Id.* ¶ 2.) On April 5, 2019, the Parties reached agreement on material terms for a settlement. (Dkt. 233.) Subsequently, the parties spent two months finalizing the settlement agreement and related exhibits, including the class notice. (*Id.*)

## III.    TERMS OF THE SETTLEMENT

### A.    The Settlement Class Definition

The Settlement Class includes all Wells Fargo Dealer Services ("WFDS") Customers who had a CPI Policy placed on their Account(s) that became effective at any time between October 15, 2005 and September 30, 2016 and Wells Fargo Auto Finance ("WFAF") Customers who had a CPI Policy placed on their Account(s) that became effective at any time between February 2, 2006 and September 1, 2011. The "Settlement Class" excludes Non-Compensable Flat Cancels.

### B.    The Settlement Terms

As a result of this litigation, Defendants have agreed to pay ***at least*** $393.5 million to the Settlement Class. The CPI charges at issue are identifiable from Defendants' records. Using those records, and with the assistance of an expert, Defendants will compensate all Settlement Class members who were affected by the CPI charges assessed against their automobile loan accounts.

The Settlement terms are as follows:

a.    Settlement Class members will receive direct notice of the Settlement using Wells Fargo's last known contact and verified by the settlement administrator;

b.    Settlement Class members will receive cash and/or non-cash

compensation according to the circumstances of each of their CPI accounts;

c.    Wells Fargo shall distribute *at least* $385 million to the Settlement Class in cash compensation;

d.    Pursuant to the Settlement Allocation Plan attached to the Settlement Agreement as Exhibit B, Class Members will receive cash and non-cash compensation, as follows:

1.    Settlement Class members who had forced-placed CPI policies cancelled in part or in full because they had their own insurance for a portion or the full term of the CPI policy will receive:

    i.    A refund of the fees assessed to their account during the time period when CPI impacted their account;

    ii.    A refund of the insurance premiums they were assessed for duplicative CPI;

    iii.    A refund of the interest charges they were assessed for duplicative CPI;

    iv.    A payment for the additional interest that accrued on their loan due to the duplicative CPI premiums and interest;

    v.    A payment to compensate for their inability to use the above funds elsewhere; and

    vi.    Adjustments to adverse credit reporting due to CPI.

2.    Settlement Class members who had a CPI Policy placed on their Account(s) in (1) Arkansas (between July 30, 2012 and September 30, 2016); (2) Michigan (between July 30, 2011 and September 30, 2016); (3) Mississippi (between July 30, 2014 and September 30, 2016); (4) Tennessee (between July 30, 2011 and September 30, 2016); or (5) Washington (between July 30, 2011 and September 30, 2016) during the period indicated will

receive:

    i.  A refund of the fees assessed to their account during the time period when CPI impacted their account;

    ii.  A refund of the insurance premiums they were assessed for CPI;

    iii.  A refund of the interest charges they were assessed for CPI;

    iv.  A payment for the additional interest that accrued on their loan due to the duplicative CPI premiums and interest;

    v.  A payment to compensate for their inability to use the above funds elsewhere; and

    vi.  Adjustments to adverse credit reporting due to CPI.

3.  All Settlement Class members who fall into categories d.1 and d.2 above **and** who had their vehicle repossessed during the time period when CPI impacted their account shall also be entitled to:

    i.  $4,000 as an estimate for the out-of-pocket transportation and non-transportation expenses they incurred due to the loss of their vehicle;

    ii.  A refund of the repossession costs they paid to Wells Fargo;

    iii.  A refund of the payments they made on their remaining auto loan balance after the proceeds from their vehicle's sale were applied to their loan (if applicable);

    iv.  The difference in price between what their vehicle sold for at auction and their vehicle's Kelley Blue Book Lender Value at the time of repossession, to the extent that value is greater than their outstanding loan balance (if applicable);

          v.   A payment to provide a tax benefit if they previously had a deficiency balance waived and a 1099-C tax document was filed;

          vi.   A payment to compensate for their inability to use the above funds elsewhere;

          vii.   The option to participate in Wells Fargo's no-cost telephonic mediation program if they are not satisfied with their compensation under the Settlement.

   e.   Pursuant to the Settlement Distribution Plan attached to the Settlement Agreement as Exhibit C, National General shall pay $7.5 million and Wells Fargo shall pay an additional $1 million to compensate Settlement Class members who are otherwise not receiving any payment under the Settlement Allocation Plan, as follows:

       1.   $6,375,000 million distributed pro rata to Settlement Class members who do not receive payments under the Settlement Allocation Plan **and** who paid for a CPI Policy placed on their auto loan account which remained in effect, without reversal, for at least 120 days after the CPI Policy Billing Date; and

       2.   $2,125,000 million distributed pro rata to all other Settlement Class members who would not otherwise receive payment under the Settlement Allocation Plan and who paid for a CPI Policy placed on their auto loan account which remained in effect, without reversal, for less than 120 days after the CPI Policy Billing Date.

   f.   Settlement checks will be automatically mailed to each Settlement Class member without the need to submit a claim form;

   g.   The settlement administrator will engage in outreach to contact Settlement Class members and remind them to cash their checks;

h.      In addition to the amounts paid to the Settlement Class, Wells Fargo shall pay all costs of providing notice to the Settlement Class and administration of the settlement;

i.      Each Class Representative will receive service award payments in a sum not to exceed $7,500; and

j.      Defendants will pay Class Counsel for attorneys' fees in an amount, consistent with Ninth Circuit precedent, not to exceed $36 million and for reimbursement of litigation expenses not to exceed $500,000.

(Tellis-Silberfeld Decl., Ex. 1.)

In exchange for these significant benefits, Settlement Class members agree to release their claims against Defendants which arise out of the CPI policies placed on WFDS accounts between October 15, 2005 and September 30, 2016 as well as CPI policies placed on WFAF accounts between February 2, 2006 and September 1, 2011. (*Id.*)

## IV.    THE COURT SHOULD PRELIMINARILY APPROVE THE SETTLEMENT

### A.    The Class Action Settlement Process

Under Rule 23(e) of the Federal Rules of Civil Procedure, class actions "may be settled, voluntarily dismissed, or compromised only with the court's approval." As a matter of "express public policy," federal courts favor and encourage settlements, particularly in class actions, where the costs, delays, and risks of continued litigation might otherwise overwhelm any potential benefit the class could hope to obtain. *See Class Plaintiffs v. City of Seattle*, 955 F.2d 1268, 1276 (9th Cir. 1992) (noting the "strong judicial policy that favors settlements, particularly where complex class action litigation is concerned"); *In re Syncor ERISA Litig.*, 516 F.3d 1095, 1101 (9th Cir. 2008) (same); *see also* Herbert B. Newberg & Alba Conte, *Newberg on Class Actions* ("*Newberg*") §13:1 (5th ed.) (noting that there is a "strong judicial policy in favor of class action settlement").

The *Manual for Complex Litigation (Fourth)* (2004) (the "*Manual*") describes a three-step procedure for approval of class action settlements: (1) preliminary approval of

the proposed settlement; (2) dissemination of the notice of the settlement to class members, providing for, among other things, a period for potential objectors and dissenters to raise challenges to the settlement's reasonableness; and (3) a formal fairness and final settlement approval hearing. *Id.* at §21.63. The *Manual* characterizes the preliminary approval stage as an "initial evaluation" of the fairness of the proposed settlement made by the court on the basis of written submissions and informal presentations from the settlement parties. *Id*. at § 21.632.

Here, Plaintiffs request the Court grant preliminary approval of the Settlement and authorize the dissemination of notice of the Settlement to the Settlement Class.

## B.    The Standard for Preliminary Approval

As the Ninth Circuit has explained, the "settlement or fairness hearing is not to be turned into a trial or rehearsal for trial on the merits." *Officers for Justice v. Civil Service Comm'n,* 688 F.2d 615, 625 (9th Cir. 1982). Moreover, a district court should not "reach any ultimate conclusions on the contested issues of fact and law which underlie the merits of the dispute, for it is the very uncertainty of outcome in litigation and avoidance of wasteful and expensive litigation that induce consensual settlements." *Id.* Rather, "a district court's only role in reviewing the substance of [a] settlement is to ensure that it is 'fair, adequate, and free from collusion.'" *Lane v. Facebook, Inc.,* 696 F.3d 811, 819 (9th Cir. 2012), *cert. denied,* 134 S.Ct. 8 (2013) (quoting *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1027 (9th Cir. 1998)).

The Ninth Circuit has identified the following factors to be used in determining whether a settlement is fair, reasonable, and adequate to all concerned:

> the strength of the plaintiffs' case; the risk, expense, complexity, and likely duration of further litigation; the risk of maintaining class action status throughout the trial; the amount offered in settlement; the extent of discovery completed and the stage of the proceedings; the experience and views of counsel; the presence of a governmental participant; and the reaction of the class members to the proposed settlement.

*Hanlon*, 150 F.3d at 1026. "The relative degree of importance to be attached to any

particular factor will depend upon and be dictated by the nature of the claim(s) advanced, the type(s) of relief sought, and the unique facts and circumstances presented by each individual case." *Officers for Justice*, 688 F.2d at 625; see also *Nat'l Rural Telecommunications Coop. v. DIRECTV, Inc.*, 221 F.R.D. 523, 525 (C.D. Cal. 2004) ("Under certain circumstances, one factor alone may prove determinative in finding sufficient grounds for court approval.").

"If the proposed settlement 'appears to be the product of serious, informed, non-collusive negotiations, has no obvious deficiencies, does not improperly grant preferential treatment to class representatives or segments of the class, and falls within the range of possible approval,' the court should grant preliminary approval of the class and direct notice of the proposed settlement to the class." *Kenneth Glover, et al. v. City of Laguna Beach, et al.*, 2018 WL 6131601, at *2 (C.D. Cal. 2018) (Guilford, J.) (quoting *In re Tableware Antitrust Litig.*, 484 F. Supp. 2d 1078, 1079-80 (N.D. Cal. 2007) (citation omitted); *see also In re Netflix Privacy Litig.*, 2013 WL 1120801, at *4 (N.D. Cal. Mar. 18, 2013) (applying at preliminary approval a "presumption" of fairness to settlement that was "the product of non-collusive, arms' length negotiations conducted by capable and experienced counsel").

## V.   THIS SETTLEMENT MERITS PRELIMINARY APPROVAL

As discussed above, the Settlement was the culmination of extensive discussions between the Parties, voluminous discovery, and thorough analysis of the pertinent facts and law. The Parties participated in a total of five in-person mediations, the last mediation being held in Los Angeles in March 2019. (Tellis-Silberfeld Decl. at ¶ 2.) On April 5, 2019, the Parties reached agreement on material terms for a settlement. (Dkt. 233.) Subsequently, the parties spent weeks finalizing the settlement agreement and related exhibits, including the notice to the class. (*Id.*)

The relevant factors set forth by the Ninth Circuit for evaluating the fairness of a settlement weigh in favor of preliminary approval, and there can be no doubt that the Settlement was accomplished in a procedurally fair manner. For these reasons, the

Settlement merits an initial presumption of fairness, and preliminary approval should thus be granted.

### A. The Settlement Is Substantively Fair because it Provides Significant Benefits in Exchange for the Compromise of Strong Claims

The Settlement compensates Settlement Class members who had CPI policies force-placed on their auto loan accounts from October 15, 2005 through September 30, 2016. The significant benefits of the settlement are based on the Parties' recognition of the strong merits of Plaintiffs' case compared to Defendants' affirmative defenses, the risks and uncertainty associated with continued litigation, and the possibility that Defendants might successfully compel arbitration of claims brought by class members whose financing agreements included arbitration clauses.

Class Counsel, all experienced class action litigators, support the Settlement, and it is highly uncertain whether the Settlement Class would be able to obtain a better outcome through continued litigation and a trial. Given Class Counsel's "experience and familiarity with the facts, their recommendation that the settlement be approved is entitled to significant weight." *Rosales v. El Rancho Farms*, 2015 WL 4460918, at *15 (E.D. Cal. July 21, 2015) (citing *Nat'l Rural Telecommunications Coop.*, 221 F.R.D. at 528 ("'Great weight' is accorded to the recommendation of counsel, who are most closely acquainted with the facts of the underlying litigation. This is because '[p]arties represented by competent counsel are better positioned than the courts to produce a settlement that fairly reflects each party's expected outcome in the litigation.'") (internal references omitted); *see also Barbosa v. Cargill Meat Solutions Corp.*, 297 F.R.D. 431, 447 (E.D. Cal. 2013) ("In considering the adequacy of the terms of the settlement, the trial court is entitled to, and should, rely upon the judgment of experienced counsel for the parties.").

Similarly, there can be little doubt that resolving the Settlement Class members' claims through a single class action is superior to a multitudinous series of individual lawsuits. "From either a judicial or litigant viewpoint, there is no advantage in individual members controlling the prosecution of separate actions. There would be less litigation or

1 settlement leverage, significantly reduced resources and no greater prospect for recovery."

2 *Hanlon*, 150 F.3d at 1023. Indeed, the terms of the Settlement demonstrate the advantages

3 of a collective bargaining and resolution process.

4    Moreover, while Class Counsel believes in the strength of this case, they recognize

5 that there are uncertainties in litigation, making compromise of claims in exchange for

6 certain and timely provision to the Settlement Class of the significant benefits described

7 herein an unquestionably reasonable outcome. *See Nat'l Rural Telecommunications*

8 *Coop.*, 221 F.R.D. at 526 ("'In most situations, unless the settlement is clearly inadequate,

9 its acceptance and approval are preferable to lengthy and expensive litigation with

10 uncertain results.'") (citation omitted); *Kim v. Space Pencil, Inc.*, 2012 WL 5948951, at

11 *5 (N.D. Cal. Nov. 28, 2012) ("The substantial and immediate relief provided to the Class

12 under the Settlement weighs heavily in favor of its approval compared to the inherent risk

13 of continued litigation, trial, and appeal, as well as the financial wherewithal of the

14 defendant."); *Nobles v. MBNA Corp.*, 2009 WL 1854965, at *2 (N.D. Cal. June 29, 2009)

15 (citing *In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 458 (9th Cir. 2000)) ("The risks

16 and certainty of recovery in continued litigation are factors for the Court to balance in

17 determining whether the Settlement is fair."). Indeed, should Class Counsel prosecute

18 these claims against Defendants to conclusion, any potential recovery could come years in

19 the future and at far greater expense. That "risk of continued litigation balanced against

20 the certainty and immediacy of recovery from the Settlement" strongly favors preliminary

21 approval. *In re Omnivision Technologies, Inc.*, 559 F. Supp. 2d 1036, 1041 (N.D. Cal.

22 2008) (citing *In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d at 458).

23    **B.    The Settlement Is the Product of Good Faith, Informed, and Arm's-Length Negotiations, and it Is Fair**

24 

25    For a court to approve a proposed settlement, "[t]he parties must ... have engaged in

26 sufficient investigation of the facts to enable the court to intelligently make an appraisal of

27 the settlement." *Byrne v. Santa Barbara Hospitality Services, Inc.*, 2017 WL 5035366, at

28 *8 (C.D. Cal. 2017) (citation omitted). Here, Class Counsel deposed seven witnesses from

Wells Fargo and three witnesses from National General. (Tellis-Silberfeld Decl. at ¶ 7.) Class Counsel also propounded numerous document requests and interrogatories and engaged in substantive review of almost 4.5 million pages of documents produced by Defendants, and more than 40,000 pages of documents produced by third-party Oliver Wyman. (*Id.* ¶¶ 4, 6.) Class Counsel's analysis of the vast volume of discovery material indisputably provided them sufficient information to enter into a reasoned and well-informed settlement. *See, e.g.*, *In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d at 459 (holding "significant investigation, discovery and research" supported "district court's conclusion that the Plaintiffs had sufficient information to make an informed decision about the Settlement"). Accordingly, because the "settlement follow[s] sufficient discovery and genuine arms-length negotiation," it should be "presumed fair." *Nat'l Rural Telecommunications Coop.*, 221 F.R.D. at 527.

This presumption of fairness is bolstered by the fact that Class Counsel negotiated at arms-length. Class Counsel vigorously prosecuted this action for nearly two years before reaching the Settlement. Negotiations were difficult, protracted, and often spirited. The parties' negotiations were aided by Professor Eric Green, an unbiased, experienced mediator who played a crucial role in supervising the negotiations and helping the parties bridge their differences and evaluate the strengths and weaknesses of their respective positions. (*See* Declaration of Professor Eric Green.) The adversarial nature of the litigation and settlement discussions weigh in favor of preliminary approval. *See Rosales*, 2015 WL 4460918, at *16 (quoting *In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 946 (9th Cir. 2011) ("Notably, the Ninth Circuit has determined the 'presence of a neutral mediator [is] a factor weighing in favor of a finding of non-collusiveness.'")).

Taken together, the Settlement's substantial and extensive benefits and the procedurally fair manner in which it was reached strongly support preliminary approval.

# VI.   CERTIFICATION IS APPROPRIATE FOR SETTLEMENT PURPOSES BECAUSE THE SETTLEMENT CLASS MEETS THE REQUIREMENTS OF RULE 23

Here, an analysis of the requirements of Fed. R. Civ. P. 23 show that certification of the non-disputed Settlement Class is appropriate.[2]

## A.   The Settlement Class Meets the Requirements of Rule 23(a)

### i.   The Settlement Class is Sufficiently Numerous

Rule 23(a)(1) requires the class to be so large that joinder of all members is impracticable. Here, there are hundreds of thousands of Settlement Class members who had CPI force-placed onto their Wells Fargo automobile loan accounts. As noted in II.A. *supra*, Wells Fargo identified 570,000 affected Settlement Class members going back only to 2012 whereas the Settlement Class starts on October 15, 2005.

### ii.   There are Common Questions of Law and Fact

"Federal Rule of Civil Procedure 23(a)(2) conditions class certification on demonstrating that members of the proposed class share common 'questions of law or fact.'" *Stockwell v. City & Cty. of San Francisco*, 749 F.3d 1107, 1111 (9th Cir. 2014). Commonality "does not turn on the number of common questions, but on their relevance to the factual and legal issues at the core of the purported class' claims." *Jimenez v. Allstate Ins. Co.*, 765 F.3d 1161, 1165 (9th Cir. 2014). Indeed, "'[e]ven a single question of law or fact common to the members of the class will satisfy the commonality requirement." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 369 (2011).

Courts routinely find commonality where, as here, the class claims arise from the defendant's uniform course of conduct. *See, e.g.*, *Cohen v. Trump*, 303 F.R.D. 376, 382 (S.D. Cal. 2014) ("Here, Plaintiff argues his RICO claim raises common questions as to '[Defendant's] scheme and common course of conduct, which ensnared Plaintiff[] and the other Class Members alike.' The Court agrees."); *Negrete v. Allianz Life Ins. Co. of N.*

---

[2] When "[c]onfronted with a request for settlement only class certification, a district court need not inquire whether the case, if tried, would present intractable management problems … for the proposal is that there will be no trial." *Amchem Prods.*, 521 U.S. at 620.

*Am.*, 238 F.R.D. 482, 488 (C.D. Cal. 2006) (finding common core of factual and legal issues in "the questions of whether Allianz entered into the alleged conspiracy and whether its actions violated the RICO statute.").

Here, the Settlement Class claims are rooted in commons questions of fact as to Defendants' fraudulent scheme to profit from force-placed CPI by inducing Plaintiffs and the Settlement Class to pay for unnecessary and unlawful CPI charges. Answering these questions will, in turn, generate common answers "apt to drive the resolution of the litigation" for the Settlement Class as a whole. *See Dukes*, 564 U.S. at 350. Thus, commonality is satisfied.

### iii.    Plaintiffs' Claims Are Typical of the Settlement Class Members' Claims

Rule 23(a)(3)'s typicality requirement counsels that "'the claims or defenses of the representative parties are typical of the claims or defenses of the class.'" *Parsons v. Ryan*, 754 F.3d 657, 685 (9th Cir. 2014) (quoting Fed. R. Civ. P. 23(a)(3)). "Like the commonality requirement, the typicality requirement is 'permissive' and requires only that the representative's claims are 'reasonably co-extensive with those of absent class members; they need not be substantially identical.'" *Rodriguez v. Hayes*, 591 F.3d 1105, 1124 (9th Cir. 2010) (quoting *Hanlon*, 150 F.3d at 1020). Typicality "assure[s] that the interest of the named representative aligns with the interests of the class." *Wolin*, 617 F.3d at 1175 (quoting *Hanlon*, 976 F.2d at 508). Thus, where a plaintiff suffered a similar injury and other class members were injured by the same course of conduct, typicality is satisfied. *See Parsons*, 754 F.3d at 685; *see also Evon v. Law Offices of Sidney Mickell*, 688 F.3d 1015, 1030 (9th Cir. 2012) ("The test of typicality is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct.").

Here, the same conduct that injured Plaintiffs injured the Settlement Class members because they were all financially harmed by Defendants force-placement of CPI on their

Wells Fargo auto loan accounts. Similarly, Plaintiffs' interest in obtaining a fair, reasonable, and adequate settlement of the claims asserted are identical to the interests of the Settlement Class members. Under the Settlement Allocation Plan, there is no difference in how Plaintiffs and Settlement Class members will be compensated. Instead, compensation amounts are based exclusively on the circumstances of each Settlement Class members' account. Accordingly, Plaintiffs have established the typicality element.

### iv. Plaintiffs and Class Counsel Have Protected, and Will Continue to Protect, the Interests of the Settlement Class

Rule 23(a)(4)'s adequacy requirement is met where, as here, "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). "This requirement is rooted in due-process concerns—'absent class members must be afforded adequate representation before entry of a judgment which binds them.'" *Radcliffe v. Experian Info. Sols., Inc.*, 715 F.3d 1157, 1165 (9th Cir. 2013) (quoting *Hanlon*, 150 F.3d at 1020). Adequacy entails a two-prong inquiry: "'(1) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?'" *Evon*, 688 F.3d at 1031 (quoting *Hanlon*, 150 F.3d at 1020). Both prongs are satisfied here.

Plaintiffs, who all seek to be Class Representatives, have no interests that in conflict with the Settlement Class members and will continue to vigorously protect class interests, as they have throughout this litigation. Plaintiffs understand their duties as class representatives, have agreed to consider the interests of absent Settlement Class members, and have actively participate in this litigation and will continue to do so. (Tellis-Silberfeld Decl. at ¶ 10); *See, e.g.*, *Loritz v. Exide Technologies*, No. 2:13–CV–02607–SVW–E, 2015 WL 6790247, at *6 (C.D. Cal. Apr. 21, 2016) ("All that is necessary is a 'rudimentary understanding of the present action and … a demonstrated willingness to assist counsel in the prosecution of the litigation.'"). Plaintiffs are more than adequate Class Representatives.

At the start of this MDL, this Court appointed Baron & Budd, P.C. and Robins Kaplan, LLC as Co-Lead Counsel, Gerry, Schenk, Francavilla, Blatt & Penfield, LLP as Liaison Counsel, and Weitz & Luxenberg PC, the Gibbs Law Group, and Levin Sedran & Berman to the Plaintiffs' Steering Committee (collectively, "Class Counsel"). In making its selection, this Court noted that, "[b]efore making these appointments, the Court must consider (1) the work counsel has done in identifying or investigating potential claims in the action, (2) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action, (3) counsel's knowledge of applicable law, and (4) the resources that counsel will commit to representing the class." *See* Dkt. 35 at 1 (citing Fed. R. Civ. P. 23(g)).

As this Court has already found, Class Counsel are experienced class action attorneys who specialize in complex litigation. Since their appointment, Class Counsel have devoted thousands of hours and substantial financial resources to identify, investigate, and successfully litigate the claims of Plaintiffs and the Settlement Class. These efforts led to a settlement that will provide significant financial benefits to the Settlement Class—***at least*** $393.5 million in class benefits. Class Counsel have vigorously prosecuted this action and will continue to do so through final approval. As such, the Court should appoint Class Counsel under Rule 23(g) for purposes of settlement.

**B.      The Settlement Class Meets the Requirements of Rule 23(b)(3)**

Under Rule 23(b)(3), a class may be certified if a court finds that, "the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."

**i.      Common Issues of Law and Fact Predominate**

"The predominance inquiry 'asks whether the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues.'" *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1045 (2016) (citation omitted)). "When 'one or more of the central issues in the action are

common to the class and can be said to predominate, the action may be considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately, such as damages or some affirmative defenses peculiar to some individual class members.'" *Id.* (citation omitted). "[W]hen common questions present a significant aspect of the case and they can be resolved for all members of the class in a single adjudication, there is clear justification for handling the dispute on a representative rather than on an individual basis." *Hanlon*, 150 F.3d at 1022.

The Ninth Circuit favors class treatment of fraud claims stemming from a "common course of conduct," like the scheme alleged here. *See, e.g., In re First Alliance Mortg. Co.*, 471 F.3d 977, 990 (9th Cir. 2006); *Hanlon*, 150 F.3d at 1022-23. Even outside of the settlement context, courts in the Ninth Circuit and elsewhere regularly certify RICO based class claims.-*See Friedman v. 24 Hour Fitness USA, Inc.*, No. CV 06-6282 AHM (CTx), 2009 WL 2711956, at *8 (C.D. Cal. Aug. 25, 2009) ("Common issues frequently predominate in RICO actions that allege injury as a result of a single fraudulent scheme."); *Waldrup v. Countrywide Financial Corporation*, 2018 WL 799156, at *15 (C.D. Ca. Feb. 6, 2018) (certifying RICO claim); *see also Klay v. Humana, Inc.*, 382 F.3d 1241, 1256-57 (11th Cir. 2004) (affirming certification of RICO claim where "all of the defendants operate nationwide and allegedly conspired to underpay doctors across the nation, so the numerous factual issues relating to the conspiracy are common to all plaintiffs [and the] corporate policies constitute[d] . . . the very heart of the plaintiffs' RICO claims").

Here, questions of law or fact common to Settlement Class members predominate over any questions affecting only individual members. These important common questions include, but are not limited to: whether Defendants engaged in a uniform scheme to profit from force-placed CPI; whether Defendants made misrepresentations and omissions regarding their loans and their procedures for force-placing CPI; whether such misrepresentations and omissions were material; whether Wells Fargo received kickback payments in the form of unearned commissions from National General and its

predecessors for force-placing CPI, resulting in unlawfully inflated CPI premiums; whether Defendants knew or should have known that they failed to properly confirm whether Settlement Class members had independent automobile insurance; whether Settlement Class members suffered damages and the measure of such damages; and whether equitable relief is warranted. Should this case have required a trial, these common questions could have been resolved in a single adjudication and justify handling this dispute on a class, rather than an individual, basis.

ii.     **Class Treatment Is Superior to Other Available Methods for the Resolution of This Case.**

"The superiority inquiry under Rule 23(b)(3) requires determination of whether the objectives of the particular class action procedure will be achieved in the particular case." *Hanlon*, 150 F.3d at 1023. As *Hanlon* noted, "[f]rom either a judicial or litigant viewpoint, there is no advantage in individual members controlling the prosecution of separate actions. There would be less litigation or settlement leverage, significantly reduced resources and no greater prospect for recovery." 150 F.3d at 1023. Indeed, the terms of the Settlement demonstrate the advantages of a collective bargaining and resolution process.

Additionally, although the benefits of the Settlement are significant, the amount in controversy for an individual case is likely insufficient to incentivize individual class members to bring individual actions. *See Wolin*, 617 F.3d at 1175 ("Where recovery on an individual basis would be dwarfed by the cost of litigating on an individual basis, this [superiority] factor weighs in favor of class certification."); *Amchem*, 521 U.S. at 617 ("The policy at the very core of the class action mechanism is to overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights. A class action solves this problem by aggregating the relatively paltry potential recoveries into something worth someone's (usually an attorney's) labor.").

1    Here, the efforts and funds required to marshal the type of evidence to establish
2  liability against corporate defendants such as Wells Fargo and National General would
3  discourage Settlement Class members from pursuing individual litigation. The superiority
4  of proceeding through the class action mechanism is demonstrated by the results of the
5  Settlement, which, if approved, will provide the Settlement Class with significant cash
6  and non-cash consideration.

7    As the class action device provides the superior means to effectively and efficiently
8  resolve this controversy, and as the other requirements of Rule 23 are satisfied,
9  certification of the non-disputed Settlement Class proposed is appropriate.

10  **VII.   THE PROPOSED NOTICE PROGRAM IS ADEQUATE AND SHOULD BE**
11  **APPROVED**

12    Plaintiffs propose using Epiq Class Action & Claims Solutions, Inc. ("Epiq") as the
13  Settlement Administrator. Epiq is uniquely knowledgeable about the class and its
14  membership and makeup because Wells Fargo employed it to communicate with
15  Settlement Class members about Wells Fargo's CPI Remediation plan. This will result in
16  efficiencies to ensure the Settlement Class members receive the maximum benefit from
17  the Settlement with as minimal administrative costs as possible.

18    Under Rule 23(e)(1), before a proposed settlement may be approved, the Court
19  "must direct notice in a reasonable manner to all class members who would be bound by
20  the proposal." The notice must be "reasonably calculated, under all the circumstances, to
21  apprise interested parties of the pendency of the action and afford them an opportunity to
22  object." *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950).
23  "Notice is satisfactory if it 'generally describes the terms of the settlement in sufficient detail
24  to alert those with adverse viewpoints to investigate and come forward and be heard.'"
25  *Churchill Vill., L.L.C., v. GE*, 361 F.3d 566, 575 (9th Cir. 2004) (quoting *Mendoza v. Tucson*
26  *Sch. Dist. No. 1*, 623 F.3d 1338, 1352 (9th Cir. 1980)). Here, the proposed notice program,
27  which consists of, among other things, a dedicated website, a robust Long Form Notice, and
28  a Summary Notice, exceeds these standards.

As part of the proposed notice program, Epiq will establish and maintain a settlement website (www.WellsFargoCPISettlement.com) to provide Settlement Class members with detailed information about the case and access to key documents, including Settlement notices, the Settlement Agreement, the Complaint, and the Preliminary Approval Order, as well as answers to frequently asked questions. (Declaration of Cameron Azari on Settlement Notice Plan ("Azari Decl.") at ¶29.) This website address will be prominently displayed on all notice documents.

Epiq will also disseminate a Long Form and Summary Notice to all Settlement Class members. The Long Form Notice includes a thorough series of questions and answers designed to explain the Settlement in clear terms and in a well-organized and reader-friendly format. Among other things, it includes an overview of the litigation, an explanation of the benefits available under the Settlement, and detailed instructions on how to comment on, participate in, or opt out of, the settlement. (Tellis-Silberfeld Decl., Ex. D to the Settlement Agreement.) The Summary Notice, though less comprehensive, also conveys the basic structure of the Settlement and is designed to capture Settlement Class members' attention with clear, concise, plain language. (*Id.*, Ex. E to the Settlement Agreement.) The Summary Notice includes the address for the Settlement Website (where the Long Form Notice is available) and it provides Settlement Class members with an overview of the litigation. (*Id.*) Together, these notices cover all of the elements outlined in Rule 23(c)(2)(B).

Since Wells Fargo has data on virtually all Settlement Class members, Plaintiffs propose that Epiq send Long Form Notice directly to Settlement Class members via United States Postal Service ("USPS") first class mail using Wells Fargo's data. (Azari Decl. ¶¶ 12, 14.) Prior to mailing the notices, Epiq will check the addresses of all Settlement Class members against the USPS National Change of Address ("NCOA") database. (*Id.* ¶14.) Any addresses not confirmed by the NCOA database will be updated (pre-mailing) through a third-party address search service. (*Id.*) In addition, the addresses will be certified via the Coding Accuracy Support System ("CASS") to ensure the quality

of the zip code, and verified through Delivery Point Validation ("DPV") to confirm their accuracy. (*Id.*)

Epiq will also process all returned and undeliverable mail. Mailings returned as undeliverable will be promptly re-mailed to any new address available through postal service information, for example, to the address provided by the postal service on returned pieces for which the automatic forwarding order has expired, or to better addresses that may be found using a third-party lookup service such as AllFind Address Locator, which is maintained by LexisNexis. (*Id.* ¶ 15.)

Epiq also will establish and maintain a toll-free telephone number and a post office box. Settlement Class members can call the toll-free telephone number, which will be prominently displayed on notice documents, to obtain additional information about the Settlement, listen to answers to FAQs and/or request Long Form and/or Summary Notices, or Class Members may also speak to a live operators during normal business hours. (*Id.* ¶ 30.) Epiq's post office box will also allow Settlement Class members to contact Epiq by mail if they so choose. (*Id.* ¶ 31.)

Finally, because internet advertising has become a standard component in legal notice programs, Epiq will also run a comprehensive Banner Notice campaign on select websites that Settlement Class members may visit regularly, allowing users to identify themselves as potential Settlement Class members and directly link them to the Settlement website for more information. (*Id.* ¶¶ 16-24.)

Because the proposed method of disseminating class notice is the best practicable method under the circumstances Plaintiffs respectfully request the Court approve the proposed class notice program.

## VIII.  THE COURT SHOULD SET A FINAL APPROVAL HEARING SCHEDULE

The last step in the settlement approval process is the Final Approval Hearing, at which the Court may hear any evidence and argument necessary to evaluate the Settlement.

The parties propose the following schedule for Final Approval of the Settlement and implementation of the Settlement Program:

| Date | Event |
|------|-------|
| Monday, July 8, 2019 | Preliminary Approval Hearing |
| Monday, July 15, 2019 | Defendants provide notice of the Settlement to the appropriate federal and state officials, as required by the Class Action Fairness Act (CAFA) |
| Monday, July 15, 2019 | Class Notice Disseminated |
| Monday, August 19, 2019 | Motions for Final Approval and Attorneys' Fees and Expenses filed |
| Monday, September 30, 2019 | Objection and Opt-Out Deadline |
| Monday, October 21, 2019 | Reply Memoranda in Support of Final Approval & Fee and Expense Application filed |
| Monday, October 28, 2019 at 10:00 a.m. | Settlement Fairness Hearing |

## IX.   CONCLUSION

For the reasons discussed herein, Plaintiffs respectfully request that the Court: (1) preliminarily approve the Settlement; (2) conditionally certify the Settlement Class; (3) Appoint the named Plaintiffs as Settlement Class Representatives; (4) appoint Baron & Budd, P.C., Robins Kaplan, LLC, Gerry, Schenk, Francavilla, Blatt & Penfield, LLP, Weitz & Luxenberg PC, the Gibbs Law Group, and Levin Sedran & Berman as Class Counsel under Rule 23(g) for purposes of settlement; (5) approve distribution of the proposed Notice of Class Action Settlement to the Settlement Class; (6) appoint EPIQ Systems as the Settlement Administrator; and (7) Set a hearing date and briefing schedule for Final Settlement Approval and Plaintiffs' fee and expense application.

Dated:  June 6, 2019                              Respectfully submitted,

                                          By:   */s/ Roland Tellis*
                                                Roland Tellis

                                                Roland Tellis (SBN 186269)
                                                David B. Fernandes, Jr. (SBN 280944)
                                                BARON & BUDD, P.C.
                                                15910 Ventura Boulevard, Suite 1600
                                                Encino, California  91436
                                                Telephone:  (818) 839-2333
                                                Facsimile:   (818) 986-9698


                                          By:   */s/ Roman M. Silberfeld*
                                                Roman M. Silberfeld

                                                Roman M. Silberfeld (SBN 62783)
                                                rsilberfeld@robinskaplan.com
                                                David Martinez (SBN 193183)
                                                dmartinez@robinskaplan.com
                                                ROBINS KAPLAN LLP
                                                2049 Century Park East, Suite 3400
                                                Los Angeles, California  90067
                                                Telephone: (310) 552-0130
                                                Facsimile: (310) 229-5580

                                                Aaron M. Sheanin (SBN 214472)
                                                asheanin@robinskaplan.com
                                                ROBINS KAPLAN LLP
                                                2440 W. El Camino Real, Suite 100
                                                Mountain View, California  94040
                                                Telephone:  (650) 784-4040
                                                Facsimile:  (650) 784-4041

Kellie Lerner (*pro hac vice*)
klerner@robinskaplan.com
Benjamin D. Steinberg
bsteinberg@robinskaplan.com
ROBINS KAPLAN LLP
399 Park Avenue, Suite 3600
New York, New York  10022
Telephone:  (212) 980-7400
Facsimile:  (212) 980-7499

*Plaintiffs' Co-Lead Counsel*

Eric H. Gibbs (SBN 178658)
Michael L. Schrag (SBN 185832)
GIBBS LAW GROUP LLP
505 14th Street, Suite 1110
Oakland, California 94612
Telephone: (510)-350-9700
Facsimile: (510 350-9701

Charles E. Schaffer (*Pro Hac Vice*)
LEVIN SEDRAN & BERMAN
510 Walnut Street, Suite 500
Philadelphia, Pennsylvania 19106
Telephone: (215) 592 1500
Facsimile: (215) 592-4663

Paul F. Novak (*Pro Hac Vice*)
WEITZ & LUXENBERG, P.C.
Chrysler House
719 Griswold, Suite 620
Detroit, Michigan 48226
Telephone: (313) 800-4170
Facsimile: (646) 293-7992

*Plaintiffs' Steering Committee*

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

David S. Casey, Jr. (SBN 060768)
Gayle M. Blatt (SBN 122048)
CASEY GERRY SCHENK
FRANCAVILLA BLATT & PENFIELD, LLP
110 Laurel Street
San Diego, California
Telephone: (619) 238-1811
Facsimile: (619) 544-9232

*Plaintiffs' Liaison Counsel*