**MARK BRNOVICH**
**ATTORNEY GENERAL**
  Drew C. Ensign (CA Bar No. 243956)
    Deputy Solicitor General
2005 N. Central Avenue
Phoenix, AZ 85004
Telephone: (602) 542-5025
Drew.Ensign@azag.gov

Attorney for the State of Arizona and Mark
Brnovich, Arizona Attorney General

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| **IN RE WELLS FARGO COLLATERAL PROTECTION INSURANCE LITIGATION** | **CASE NO. 8:17-ML-2797-AG-KES** |
| | **PROPOSED AMICUS CURIAE BRIEF OF STATE OF ARIZONA** |
| | Hearing Date: July 29, 2019 |
| | Time: 10:00 a.m. |
| | Courtroom: 10D |
| | Hon. Andrew J. Guilford |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................ ii

ARGUMENT ................................................................................................... 1

CONCLUSION ................................................................................................ 6

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

PAGE(S)

**CASES**

*In re Bluetooth Headset Prod. Liab. Litig.*
  654 F.3d 935, 942 (9th Cir. 2011) ............................................................... 1, 5

*In re Cendant Corp. Sec. Litig.*
  404 F.3d 173, 191 (3d Cir. 2005) ...................................................................... 4

*In re Easysaver Rewards Litig.*
  906 F.3d 747 (9th Cir. 2018) ............................................................................. 1

*In re Ins. Brokerage Antitrust Litig.*
  579 F.3d 241 (3d Cir. 2009) .............................................................................. 2

*In re Online DVD-Rental Antitrust Litig.*
  779 F.3d 934 (9th Cir. 2015) ............................................................................. 1

*In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*
  148 F.3d 283 (3d Cir. 1998) .......................................................................... 2, 5

*Johnston v. Comerica Mortg. Corp.*
  83 F.3d 241 (8th Cir. 1996) ............................................................................... 6

*Redman v. RadioShack Corp.*
  768 F.3d 622 (7th Cir. 2014) ............................................................................. 5

*Reynolds v. Beneficial Nat'l Bank*
  288 F.3d 277 (7th Cir. 2002) ............................................................................. 5

*Staton v. Boeing Co.*
  327 F.3d 938 (9th Cir. 2003) ............................................................................. 5

**ARGUMENT**

The State of Arizona and Mark Brnovich, Arizona Attorney General (collectively, the "State") respectfully submit this amicus brief to inform this Court of its concerns regarding the Proposed Settlement, and to urge the Court to set forth the governing requirements that the parties would need to satisfy in order to obtain final approval for the Proposed Settlement.

When considered purely on its own, the Proposed Settlement appears to be substantially unbalanced against class members:  It contemplates that more than $45 million would potentially change hands:  (1) $8.5 million in additional restitution for consumers/class members, (2) up to $36 million in attorneys' fees, (3) up to $500,000 in legal expenses, and (4) $7,500 incentive payments to each class representative.  *See*, *e.g.*, Doc. 262 at 9-10.

The full fee award to Class Counsel would constitute over 80% of the marginal dollars created by the settlement (roughly $36.5 million out of a $45 million settlement), which would greatly exceed "the 25% benchmark typically used" in the Ninth Circuit.  *In re Easysaver Rewards Litig.*, 906 F.3d 747, 754 (9th Cir. 2018), *cert. denied* 2019 WL 689413 (U.S. June 24, 2019).[1]  Viewed in isolation, the Proposed Settlement plainly would violate Rule 23.

Justifying a large fee award based upon the $385+ million in restitution ordered by the Consumer Financial Protection Board ("CFPB") and Office of Currency Comptroller ("OCC") could potentially be permissible.  But such an approach would be subject to rigorous requirements, which the Court should make clear to the parties if the Court does grant preliminary approval.  As the Third Circuit has explained, when looking at relief flowing from government action alongside private litigation, "The crux of th[e] inquiry is distinguishing *those benefits created by class counsel* from the benefits created under the [restitution

---

[1]  *Accord In re Bluetooth Headset Prod. Liab. Litig.*, 654 F.3d 935, 942 (9th Cir. 2011); *In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 934, 949 (9th Cir. 2015)

secured by governmental agencies]." *In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*, 148 F.3d 283, 338 (3d Cir. 1998) (emphasis added) (cited favorably by *Bluetooth* 654 F.3d at 943). "This determination is especially crucial in consumer class actions where federal or state agencies, including attorneys general, have conducted their own investigations of wrongdoing." *Prudential*, 148 F.3d at 338. It accordingly was error for the district court to "credit[] class counsel with creating the entire value of the settlement," or to fail "to distinguish between those benefits created by the [governmental agencies] and those created by class counsel." *Id.*; *accord In re Ins. Brokerage Antitrust Litig.*, 579 F.3d 241, 282 (3d Cir. 2009) (noting "'the Third Circuit's prohibition of collecting fees based on the work of governmental agencies'" (citation and alteration omitted)).

Based on the filings to date, it appears likely that the parties will suggest using the entire CFPB-ordered restitution as a common fund for purposes of valuing an award of attorneys' fees. *See* Doc. 262 at 1, 6, 19. Given the above-cited authorities, it would be prudent for this Court to ask the parties to establish what portion (if any) of the $385+ million in CFPB/OCC-ordered restitution was "created by class counsel," rather than the government. *Prudential*, 148 F.3d at 338. Permitting Class Counsel to take credit for the entire fund would be clear error under *Prudential*.

The State recognizes that, depending on the evidence that the parties submit in support of final approval, there may be a substantial range of valuations for Class Counsel's contributions based on this Court determining what credit belongs to CFPB and OCC (and the 50 states). But attributing the entire $393.5 million to Class Counsel and nothing to CFPB's and OCC's efforts is legally and logically untenable. The CFPB and OCC should be given substantial credit for their own consent decrees that ultimately mandated the restitution at issue here. That is particularly true as CFPB and OCC extracted a $1 billion fine from Wells Fargo,

demonstrating the agencies' ample leverage over the bank.[2]  And there may be some difficult questions in ascertaining causation, so a lodestar cross-check could help give the Court guidance with the final determination.  Such a cross-check would help to ensure that Class Counsel is neither over- or under-compensated for their contributions.

The State does not discount the possibility that the parties' submissions in support of final approval could meet the stringent obligations that apply here.  But the submissions to date have not done so.[3]  In particular, the motion for preliminary approval appears to conflate chronology with causation.  For example, Class Counsel argues that the $393.5 million in total restitution (*i.e.*, $385 million ordered by the CFPB/OCC and $8.5 million additional in the Proposed Settlement) "far exceeds the original $64 million remediation plan Wells Fargo proposed prior to the commencement of this litigation."  Doc. 262 at 1:10-19.  That may be an accurate chronology, but it is not proof that Class Counsel created that additional value.  And the limited evidence that Plaintiffs have submitted to date is quite conclusory on this dispositive issue.  *See id.* at 5:12-17, Doc. 262-1 ¶ 8 (stating that "Plaintiffs' counsel worked with Wells Fargo's counsel to substantially enhance the breadth and scope of the compensation to the Settlement Class and ultimately achieved a unitary Court-monitored settlement program that compensates the Settlement Class while at the same time satisfying Wells Fargo's regulatory obligations.").

The State also notes that the chronology is in tension with attributing a large portion of the $393.5 million to Class Counsel's efforts.  The CFPB and OCC

---

[2]  *See* https://www.consumerfinance.gov/about-us/newsroom/bureau-consumer-financial-protection-announces-settlement-wells-fargo-auto-loan-administration-and-mortgage-practices/.

[3]  Notably, Plaintiffs' motion for preliminary approval does not mention the CFPB, OCC, or either of the April 20, 2018 Consent Orders, *see* Doc. 262, although they are mentioned in exhibits, *see*, *e.g.*, Doc. 262-1 Ex. 1 at 13.

announced their Consent Orders on April 20, 2018, which required Wells Fargo to submit "a comprehensive written plan to develop and implement a program for remediation," specified requirements for such a program, and demanded that once any remediation program was approved, Wells Fargo "must implement and adhere to the definitions, steps, recommendations, deadlines, and timeframes outlined in the Remediation Program."[4]  It is those consent orders that create the framework under which $385 million of the $393.5 million in restitution at issue —i.e., more than 95%—will be paid.  On that same date, Class Counsel were in still early stages of this litigation, having just filed an opposition to a motion to dismiss.  *See* Doc. 80.  Moreover, the first negotiation session between Class Counsel and Defendants did not occur until May 8, 2018, and did not reach a final settlement until March 2019.  Doc. 262 at 1; Doc. 262-8 ¶6.  In addition, the State notes that this class action also overlapped chronologically with a 50-state investigation of Wells Fargo, which culminated in a $575 million settlement resolving the CPI insurance at issue here and other legal violations.[5]

*          *          *

The State recognizes that Class Counsel appear to have performed substantial work on this case.  But "[t]he cases are unanimous that simply *doing* work on behalf of the class does not create a right to compensation; the focus is on whether that work provided a benefit to the class."  *In re Cendant Corp. Sec. Litig.*, 404 F.3d 173, 191 (3d Cir. 2005).  This Court should accordingly insist that Class Counsel demonstrate that the work performed actually *created* additional value to the class—not merely that Class Counsel were doing similar litigation work that resulted in $8.5 million in independent value for the class at the same time that

---

[4]  Consent Order, *In re Wells Fargo Bank*, No. 2018-BCFP-0001 (Apr. 20, 2018) *available at* https://files.consumerfinance.gov/f/documents/cfpb_wells-fargo-bank-na_consent-order_2018-04.pdf.

[5]  *See* https://www.azag.gov/press-release/ag-brnovich-and-other-state-attorneys-general-reach-575-million-settlement-wells.

1  government enforcers were generating hundreds of millions of dollars in consumer

2  restitution as part of separate efforts.

3      This Court's announcement and application of the proper legal standard is

4  particularly important in this context.  Consumers are virtually powerless to

5  monitor a class action settlement negotiation and effect meaningful change on their

6  own, as each person on an individual basis has "such a small stake in the outcome

7  of the class action that they have no incentive to monitor the settlement

8  negotiations or challenge the terms agreed upon by class counsel and the

9  defendant." *Redman v. RadioShack Corp.*, 768 F.3d 622, 629 (7th Cir. 2014).

10     In light of these disadvantages, courts serve the interests of consumer class

11 members in the class action settlement process.  *See Staton v. Boeing Co.*, 327 F.3d

12 938, 972 n.22 (9th Cir. 2003) (it is the district court's duty to police "the inherent

13 tensions among class representation, defendant's interests in minimizing the cost of

14 the total settlement package, and class counsel's interest in fees.").  This entails

15 fulfilling a fiduciary-like duty.  *See, e.g. Reynolds v. Beneficial Nat'l Bank*, 288

16 F.3d 277, 280 (7th Cir. 2002) (holding that, at the settlement phase, the district

17 judge is "a fiduciary of the class," subject "to the high duty of care that the law

18 requires of fiduciaries").  And by insisting on the proper legal standard, as set forth

19 above, this Court can align the incentives of Class Counsel and class members—

20 *i.e.*, ensure that Class Counsel will seek to increase the actual value of relief to

21 class members, rather than simply claiming credit for work performed by

22 governmental actors.

23     The fiduciary duty of federal courts is critical in large cash fund cases,

24 because the real value provided by class counsel can fall far short of the customary

25 fee percentage:  "[I]n many instances the increase [in recovery] is merely a factor

26 of the size of the class and has no direct relationship to the efforts of counsel."

27 *Prudential*, 148 F.3d at 339 (citation omitted); *see also Bluetooth*, 654 F.3d at 942

28 ("[W]here awarding 25% of a 'megafund' would yield windfall profits for class

counsel in light of the hours spent on the case, courts should adjust the benchmark percentage or employ the lodestar method instead.").  And by enforcing these precedents, this Court can ensure that any settlement is properly balanced so that the bulk of the benefits actually conferred by a proposed settlement goes to class members, rather than to Class Counsel.  *See also Johnston v. Comerica Mortg. Corp.*, 83 F.3d 241, 246 (8th Cir. 1996) ("Although under the terms of each settlement agreement, attorney fees technically derive from the defendant rather than out of the class' recovery, in essence the entire settlement amount comes from the same source.").

## CONCLUSION

The State asks that this Court, in the event preliminary approval is granted, to clarify the applicable law and demand that any final approval papers seeking to rely on the $385 million in CFPB/OCC-ordered restitution include materials specifically demonstrating the actual value within that fund that was created by Class Counsel.  The State also requests that this Court conduct a cross-check using lodestar valuation to ensure the ultimate fairness of any fee award.


Dated:  July 22, 2019                     MARK BRNOVICH


                                          By: s/ Drew C. Ensign

                                          Drew C. Ensign (CA Bar No. 243956)
                                            Deputy Solicitor General
                                          2005 N. Central Avenue
                                          Phoenix, AZ 85004
                                          Telephone:  (602) 542-5025
                                          Facsimile:  (602) 542-4377
                                          drew.ensign@azag.gov

                                          *Attorney for the State of Arizona and Mark Brnovich, Arizona Attorney General*