UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | SAML 17-02797 AG (KESx) | Date | November 4, 2019 |
|---|---|---|---|
| Title | IN RE WELLS FARGO COLLATERAL PROTECTION INSURANCE LITIGATION | | |

| Present: The Honorable | ANDREW J. GUILFORD | |
|---|---|---|
| Melissa Kunig | Not Present | |
| Deputy Clerk | Court Reporter / Recorder | Tape No. |
| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: | |

**[IN CHAMBERS] ORDER GRANTING FINAL SETTLEMENT APPROVAL AND FEES, COSTS, AND OTHER AWARDS**

This case concerns allegations that Wells Fargo Bank, N.A., together with National General Insurance Company and other related entities, unlawfully participated in a scheme to force millions of Wells Fargo auto-loan customers to pay for Collateral Protection Insurance ("CPI") they didn't need, want, or (in some cases) know about. (*See generally* Second Amended Consolidated Class Action Complaint ("SAC"), Dkt. No. 239-1.) The parties have reached a settlement, and Plaintiffs now move for final settlement approval and for fees, costs, and other funds. (Mot. for Settlement Approval, Dkt. No. 294; Mot. for Fees, Dkt. No. 295.) Defendants don't oppose Plaintiffs' motions. But the States of Arizona, Arkansas, Idaho, Indiana, Louisiana, Nebraska, and Oklahoma ("Amici") have filed an amicus brief opposing Plaintiffs' fee motion and requesting that a special master be appointed to assess fees. (Amicus Br., Dkt. No. 309-1.) An extensive hearing was held on Plaintiffs' motions and numerous issues were discussed by the parties and the Amici.

The Court GRANTS Plaintiffs' motion for final settlement approval. The Court GRANTS IN PART Plaintiffs' motion for fees. The Court will separately sign and enter Plaintiffs' proposed judgment dismissing this case. (*See* Proposed J., Dkt. No. 294-6.)

**1.     BRIEF BACKGROUND**

Few facts have changed since the Court preliminarily approved the parties' settlement. (*See* Order Granting Preliminary Approval, Dkt. No. 280.) Epiq Class Action & Claims Solutions, Inc. ("Epiq"), the parties' settlement administrator, was able to deliver the court-approved notice materials to all class members, including 2,254,411 notice packets and 1,019,408 summary notices. (Suppl. Joint Decl., Dkt. No. 318-1 at ¶¶ 2-4.) Epiq only received 78

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | SAML 17-02797 AG (KESx) | Date | November 4, 2019 |
|---|---|---|---|
| Title | IN RE WELLS FARGO COLLATERAL PROTECTION INSURANCE LITIGATION | | |

requests for exclusion and 6 objections in response. (*Id.* at ¶¶ 8-16; Pls.' Suppl. Reply, Dkt. No. 323 at 1.) Epiq also sent notice to "approximately 5,000 general media (print and broadcast) outlets across the United States," "4,500 online databases and websites," and to "112 officials, including the Attorneys General of each of the 50 states, the District of Columbia and the United States Territories," as well as "the Attorney General of the United States, the Office of the Comptroller of the Currency ('OCC'), and the Consumer Financial Protection Bureau ('CFPB')." (Reply, Dkt. No. 294 at 7-8 (citing Suppl. Joint Decl. at ¶¶ 17, 26 and Decl. of Cameron R. Azari ("Azari Decl."), Dkt. No. 294-4 at ¶ 8).)

Meanwhile, the total settlement fund ended up being substantially greater than initially expected, increasing from $393.5 million to $432.4 million. (Joint Decl., Dkt. No. 293-3 at ¶ 59.) At the same time, litigation costs are slightly less than the $500,000 originally projected, totaling approximately $483,000. (*Id.* at ¶¶ 102, 104.) The resulting distribution of funds under the settlement agreement is shown in the following table.

| | Amount | Payee |
|---|---|---|
| Class Settlement | $432.4 million | Class Members |
| Attorney Fees | $36 million | Class Counsel |
| Litigation Costs | $483,489.04 | Class Counsel |
| Class Representative Awards | $105,000 | Class Representatives ($7,500 Per Representative) |

Importantly, none of these payments are being paid from the $432.4 million owed to class members, and no amount of the $432.4 million reverts back to Defendants. (Settlement Agreement, Dkt. No. 262-1 at 19.) The $432.4 million also fails to account for non-cash compensation eligible class members will receive in addition to their allocated share of cash compensation, which includes credit report adjustments. (Joint Decl. at ¶ 61.) As for cash compensation, each class member will be paid according to the parties' settlement allocation plan, which accounts for varying consequences among class members caused by force-placed CPI. (*Id.* at ¶¶ 64-65.) There's also a "catch-all" category to ensure payment for class members who are not otherwise receiving payment under the terms of the settlement allocation plan. (*Id.* at ¶ 65.)

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | SAML 17-02797 AG (KESx) | Date | November 4, 2019 |
|---|---|---|---|
| Title | IN RE WELLS FARGO COLLATERAL PROTECTION INSURANCE LITIGATION | | |

Further, the settlement agreement provides that this Court's award of attorney fees has no bearing on the terms of the settlement agreement or the parties' obligations under that agreement. (Settlement Agreement at 21.) The settlement also states that this Court reserves "continuing and existing jurisdiction" over all "proceedings concerning the administration, consummation, and enforcement of [the Settlement] Agreement." (*Id.* at 7.)

**2.     FINAL APPROVAL OF CLASS ACTION SETTLEMENT**

The Court first considers Plaintiffs' motion for final approval, finding that final settlement approval is warranted here.

   **2.1     Legal Standard**

A court can approve a class action settlement that binds class members "only after a hearing and on finding that it is fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2). The Ninth Circuit Court of Appeals has listed several factors that courts must balance to decide whether to approve a class action settlement. *See Churchill Vill., L.L.C. v. Gen. Elec.*, 361 F.3d 566 (9th Cir. 2004). These factors include (1) the strength of the plaintiff's case; (2) the risk, expense, complexity, and likely duration of further litigation; (3) the risk of maintaining class action status throughout the trial; (4) the amount offered in settlement; (5) the extent of discovery completed and the stage of the proceedings; (6) the experience and views of counsel; (7) the presence of a government participant; (8) the reaction of the class members to the proposed settlement; (9) whether the settlement was the product of collusion among the negotiating parties; and (10) notice to the class. *See id.* at 575–76. "The relative degree of importance to be attached to any particular factor will depend upon and be dictated by the nature of the claim(s) advanced, the type(s) of relief sought, and the unique facts and circumstances presented by each individual case." *Officers for Justice v. Civil Serv. Comm'n of City & Cty. of San Francisco*, 688 F.2d 615, 625 (9th Cir. 1982).

The Court is not required to rely on every factor in every case. Under some circumstances, the presence of a single factor may provide sufficient grounds for court approval. *See, e.g., Torrisi v. Tucson Elec. Power Co.*, 8 F.3d 1370, 1376 (9th Cir. 1993). "It is the settlement taken as a whole, rather than the individual component parts, that must be examined for overall fairness, and the settlement must stand or fall in its entirety." *Staton v. Boeing Co.*, 327 F.3d 938, 960 (9th Cir.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | SAML 17-02797 AG (KESx) | Date | November 4, 2019 |
|---|---|---|---|
| Title | IN RE WELLS FARGO COLLATERAL PROTECTION INSURANCE LITIGATION | | |

2003) (quoting *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1026 (9th Cir. 1998)). This suggests the wisdom of a holistic analysis. And "the decision to approve or reject a settlement is committed to the sound discretion of the trial judge." *Hanlon*, 150 F.3d at 1026. And ultimately, "[s]trong judicial policy favors settlements." *Churchill Vill., LLC v. Seattle*, 361 F.3d 566, 576 (9th Cir. 2004) (omission and quotation marks omitted) (quoting *Churchill Vill., L.L.C.*, 361 F.3d at 576).

    **2.2**    **Analysis**

Here, the relevant *Churchill* factors weigh in favor of finally approving the settlement. To begin, the Court is satisfied that the settlement is based on a sufficient understanding of what's at stake in this case, especially given Plaintiffs' extensive investigation and discovery of the facts underlying their claims. Plaintiffs reviewed almost 4.5 million pages of documents produced by Defendants, conducted one full-day interview of a key Wells Fargo operation manager in Charlotte, North Carolina, and deposed eight other Wells Fargo and National General corporate designees. (Joint Decl. at ¶¶ 18-20, 33-34.) Plaintiffs also noticed and prepared for the deposition of an additional 15 defense witnesses, including Wells Fargo's former CEO Tim Sloan. (*Id.* at ¶ 34.) Further, in part because Plaintiffs defended against two rounds of dismissal motions by Defendants, Plaintiffs were aware of the legal weaknesses in each of their claims.

It's also apparent that the risk, expense, complexity, and likely duration of continued litigation were substantial here. Absent settlement, Plaintiffs faced a tough class certification battle. (Mot. for Settlement Approval at 11.) Plaintiffs also faced a potentially meritorious motion to compel arbitration since "as many as half the Settlement Class members were parties to retail installment sales contracts that included arbitration provisions with class action waivers." (*Id.* at 10.) Summary judgment posed further threats to Plaintiffs' claims, especially given Defendants repeated assertion of various defenses. (*Id.* at 10-11.) And of course, even if Plaintiffs' claims survived these hurdles, Plaintiffs still had to prove their case at trial and, if they won at trial, likely defend a verdict in their favor on appeal. For all these same reasons, continued litigation would be protracted and costly—a reality made worse by the complex nature of this broad, multidistrict class action. Given all this, it makes sense that Plaintiffs' counsel, as experienced litigators, concluded that the benefits of settlement outweigh the risks of continued litigation.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | SAML 17-02797 AG (KESx) | Date | November 4, 2019 |
|---|---|---|---|
| Title | IN RE WELLS FARGO COLLATERAL PROTECTION INSURANCE LITIGATION | | |

The Court is also satisfied that this settlement wasn't the product of collusion among the negotiating parties. Notably, this settlement was reached after significant arms-length negotiations with a third-party mediator. (Joint Decl. at ¶ 48.) *See In re Capital Holdings Corp. Financial Prods.*, No. MDL 901, 1992 WL 226321, at *2 (C.D. Cal. June 10, 1992) ("[T]here is typically an initial presumption of fairness where the settlement was negotiated at arm's length."); *see also Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 965 (9th Cir. 2009) (explaining that courts in the Ninth Circuit "put a good deal of stock in the product of an arms-length, non-collusive, negotiated resolution"). Indeed, the mediator held five separate in-person mediation sessions with the parties, as well as numerous telephone conferences, all spanning a 17-month period. (Joint Decl. at ¶¶ 47, 48.) And before these negotiations even began, the parties had already actively and aggressively litigated this case for nearly two years. The Court thus finds no signs of collusion.

Further, this settlement provides a great result for class members. Under the settlement agreement, Defendants agreed to pay a minimum of $393.5 million to class members. But based on a continued analysis of claims since the settlement agreement was reached, the parties now anticipate that Defendants will pay a combined total of $432.4 million. (Joint Decl. at ¶ 59.) No portion of this amount will be used to pay attorney fees, litigation costs, settlement administration costs, or other expenses. (*Id.*) And no portion of this amount will revert to Defendants. Besides the $432.4 million in cash compensation, class members will also receive adjustments to adverse credit reporting due to CPI, among other forms of non-cash relief. (*See id.* at ¶ 64.)

Perhaps the only *Churchill* factor weighing against approving the settlement here is the presence of government participants. Recognizing this, the Court's preliminary approval order instructed Plaintiff's counsel to "thoroughly brief" whether they can "appropriately take credit for the entire settlement amount." (Prelim. Approval Order, Dkt. No. 280 at 7.) The Court is satisfied that this instruction has been heeded, and that final settlement approval is warranted here despite the presence of government actors in this case. Before this action was filed, the OCC and CFPB began investigating Wells Fargo's CPI practices. (Mot. for Settlement Approval at 17.) Then, about six months after this multidistrict litigation was created, the OCC and CFPB issued consent orders that ordered Wells Fargo to submit a "comprehensive written plan to develop and implement" a remediation program, among other things. (Joint Decl. at ¶ 88.) But Plaintiffs insist that these consent orders were incomplete and ineffective until this settlement was reached. Specifically, Plaintiffs say the consent orders didn't require

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | SAML 17-02797 AG (KESx) | Date | November 4, 2019 |
|---|---|---|---|
| Title | IN RE WELLS FARGO COLLATERAL PROTECTION INSURANCE LITIGATION | | |

Wells Fargo to pay consumers any specific dollar amount, nor did the consent orders "identify the individuals for whom remediation would be available," "the methodology for determining who would qualify for remediation," "the total dollar amount of the remediation," "the amounts available per person," "the process and procedures for providing redress to consumers," or the "mechanism by which consumers could enforce their rights to redress." (Mot. for Settlement Approval at 16 (citing Joint Decl. at ¶¶ 16, 89).) And because the parties' settlement does all those things and does them well, Plaintiffs claim the consent orders don't detract from the fairness, reasonableness, or adequacy of the settlement terms. The Court agrees and finds that, here, the presence of government actors doesn't prevent final settlement approval.

Finally, the Court considers the class members' reaction to the settlement. Again, since notice was sent, Epiq has received 78 class requests for exclusion and 6 objections. (Suppl. Joint Decl. at ¶¶ 2-4; Pls.' Suppl. Reply at 1.) One other objector appeared at the final settlement hearing, bringing the total number of objections to 7. Together, the requests for exclusion and objections represents slightly more than 0.0037% of the total class. (Reply. at 4.) This small percentage shows a positive class reaction to the settlement agreement and further supports a finding that the settlement is fair, reasonable, and adequate. *See Churchill Vill.*, 361 F.3d 566, 577 (9th Cir. 2004) (affirming final approval where "only 45" of the approximately 90,000 notified class members objected and 500 opted out). As for the 7 objectors, their objections either mistakenly interpret the settlement terms, seek relief for harm that falls outside the scope of this litigation, are untimely, or assert arguments that the objector has no standing to assert. (*See* Reply at 5-9.) The Court thus overrules these objections.

At bottom, the settlement is overall fair, reasonable, and appropriate. The Court GRANTS final approval of the class settlement.

3.     **ATTORNEY FEES**

    3.1     **Legal Standard**

"In a certified class action, the court may award reasonable attorney[] fees and nontaxable costs that are authorized by law or by the parties' agreement." Fed. R. Civ. P. 23(h). "Where a settlement produces a common fund for the benefit of the entire class, courts have discretion to employ either the lodestar method or the percentage-of-recovery method." *In re Bluetooth*

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | SAML 17-02797 AG (KESx) | Date | November 4, 2019 |
|---|---|---|---|
| Title | IN RE WELLS FARGO COLLATERAL PROTECTION INSURANCE LITIGATION | | |

*Headset Prod. Liab. Litig.*, 654 F.3d 935, 942 (9th Cir. 2011). But this "discretion must be exercised so as to achieve a reasonable result." *Id.* Courts generally first calculate a fee award using the percentage method, and then use the lodestar method as a "check" on that amount. *See, e.g., Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1050 (9th Cir. 2002). Courts can, "[a]s a final check on the reasonableness of the requested fees, . . . compare the fee counsel seeks as a percentage with what their hourly bills would amount to under the lodestar analysis." *In re Omnivision Techs.*, 559 F. Supp. 2d 1036, 1048 (N.D. Cal. 2007).

In assessing a request for attorney fees, courts consider several factors. These factors include: (1) the results achieved; (2) the risk of litigation; (3) the skill required and the quality of work; (4) the contingent nature of the fee and the financial burden carried by the plaintiffs; (5) awards made in similar cases; and (6) a comparison of the percentage and lodestar methods. *See Vizcaino*, 290 F.3d at 1048–50; *see also In re Omnivision Techs., Inc.*, 559 F. Supp. 2d at 1046.

### 3.2 Analysis

Plaintiffs seek an award of $36 million in attorney fees. As the following discussion shows, the Court finds a reduced fee award of $34 million appropriate.

The Court begins by considering the results achieved by the settlement, since "the most critical factor" in assessing a request for fees "is the degree of success obtained." *Hensley v. Eckerhart*, 461 U.S. 424, 436 (1983). Here, the total settlement fund is significant and provides meaningful relief to class members that's narrowly tailored to address their varying harms. To reach this settlement, class counsel had to engage in substantial premediation investigation and discovery, defend against various dismissal motions, present the merits of their claims at mediation, and negotiate the exact terms of the settlement agreement. Further, and as already described in Section 2, the settlement eliminates the risks of continued litigation. Had the parties not settled, Plaintiffs would've faced a contested class certification motion, Defendants planned on moving to compel arbitration, and Defendants likely also planned on moving for summary judgment.

This level of success reflects in part the skill and experience of class counsel, who have worked for many years litigating complex class actions like this one. Class counsel's rates were capped by court order, ranging from $300 to $800. (Joint. Decl. at ¶ 105.) And class counsel

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | SAML 17-02797 AG (KESx) | Date | November 4, 2019 |
|---|---|---|---|
| Title | IN RE WELLS FARGO COLLATERAL PROTECTION INSURANCE LITIGATION | | |

worked a total of 31,660.65 hours in the years spent litigating this case, on a contingency basis. (*Id.* at ¶¶ 103, 106; Second Suppl. Decl., Dkt. No. 331, at ¶ 5.) The Court finds these rates and hours to be reasonable.

Calculating fees as a percentage of the total settlement amount supports awarding class counsel their requested fees. The fee award sought here represents only 8% of the expected settlement payment to class members, which is well below percentages awarded in other megafund cases like this one. *See, e.g., In re Anthem, Inc. Data Breach Litigation*, No. 15-MD-02617-LHK, 2018 WL 3960068, at *5 (N.D. Cal. Aug. 17, 2018) (awarding 27% fee based on $115 million settlement fund). But a lodestar cross-check suggests class counsel's requested fees are too high. The lodestar amount here is only $14,943,203.25. (Joint Decl. at ¶ 103; Second Suppl. Decl. at ¶ 5.) Thus, to award class counsel their requested fees, the Court would need to apply a 2.41 multiplier to the lodestar amount. (*Id.*) While this multiplier is within the range of multipliers frequently awarded in common fund cases, the Court finds that, here, a multiplier of around 2.3 is more appropriate. *See Vizcaino*, 290 F.3d at 1051 (finding that multipliers ranging from 1.0 to 4.0 are frequently awarded in common fund cases, with slightly over half the surveyed cases awarding positive multipliers in the 1.5 to 3.0 range).

The Court's conclusion is principally driven by the OCC's and CFPB's investigations and consent orders, which no doubt helped bring about this settlement agreement. True, the consent orders were issued *after* this litigation began. (Joint Decl. at ¶ 88.) But the underlying investigations that led to those orders started long before this lawsuit was filed. (Mot. for Fees at 11.) Further, given the ongoing regulatory investigations into Wells Fargo's CPI practices, the Court gives less credit to class counsel for taking this case on a contingency basis. Surely, the presence of several simultaneous government investigations made the likelihood of recovery more certain than in the typical contingency fee case. The Court also finds it significant that this case never proceeded past the pleading stage. Perhaps this can be attributed, at least in part, to the OCC's and CFPB's consent orders. But in any case, the relatively early stage of this litigation has some bearing on the multiplier that should be applied to class counsel's lodestar amount. And finally, although the parties' settlement agreement fills crucial gaps left by the consent orders, the consent orders did mandate that Wells Fargo submit a "comprehensive written" remediation plan. (Joint Decl. at ¶ 85.) So even absent the settlement, Wells Fargo would have still been obligated to redress consumer harms caused by

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | SAML 17-02797 AG (KESx) | Date | November 4, 2019 |
|---|---|---|---|
| Title | IN RE WELLS FARGO COLLATERAL PROTECTION INSURANCE LITIGATION | | |

its CPI practices. Thus, the Court finds a reduced fee award of $34 million appropriate under the circumstances of this case.

In awarding this amount, the Court rejects the Amici's arguments, except to the extent those arguments generally advocate for a reduced fee award. First, Amici argue that the Court should appoint a special master to assess class counsel's fees. (Amicus Br. at 2.) But the Court isn't convinced a special master is necessary to determine what fees are reasonable here, particularly given the Court's familiarity with this case, as well as the added time and expense a special master imposes. *See In re Enron Corp. Sec., Deriv. & ERISA Litig.*, 586 F. Supp. 2d 732, 811 (S.D. Tex. 2008) (The "appointment of a guardian . . . or special master [is not] necessary here, since the Court's personal oversight of all aspects of this case provides a strong basis for evaluating counsel's fee request."). The Court also has concerns that the appointment of a single special master diminishes the benefits of adversaries competing in the pursuit of truth.

Next, around the time of the hearing, Amici cited a new case, *In re Wells Fargo & Co. Shareholder Derivative Litigation*, No. 16-CV-05541-JST, 2019 WL 5458022 (N.D. Cal. Oct. 24, 2019), which involved use of a special master. The Court has reviewed that case and finds it does not alter this Court's conclusions.

Next, Amici argue that the Court should only award class counsel $2.1 million in fees. (Amicus Br. at 2.) This amount, according to Amici, avoids improperly crediting class counsel with settlement value wholly generated by the OCC and CFPB consent orders. (*Id.*) Not so. As described in Section 2, the OCC and CFPB consent orders left many necessary details undetermined. (*See* Joint Decl. at ¶¶ 88-89.) The settlement, which class counsel fought hard for, comprehensively fills in those details while also locking in a $432.4 million payment for class members. This added settlement value is substantial and class counsel can appropriately take credit for a large part of it. Further, class counsel has worked diligently assisting class members through the settlement implementation process in the weeks since the preliminary settlement approval was granted. (*See* Second Suppl. Decl. at 3.) Class counsel have exchanged over 2,000 emails and engaged in over 2,500 telephone calls with class members, at time handling more than 200 calls per day." (*Id.*) This more recent work, which is no doubt crucial to the successful resolution of class members' claims, adds to the distinct settlement value class counsel has contributed to this case.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | SAML 17-02797 AG (KESx) | Date | November 4, 2019 |
|---|---|---|---|
| Title | IN RE WELLS FARGO COLLATERAL PROTECTION INSURANCE LITIGATION | | |

Finally, Amici fault class counsel for failing to "pars[e] in detail their contribution [to the settlement] as compared to the value generated by the federal regulators[.]" (Amicus Br. at 3.) In support, Amici rely on a Third Circuit case, *In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*, 148 F.3d 283 (3d. Cir. 1998). *Prudential* holds that, to take credit for relief obtained by class settlement, class counsel must be a "material factor in bringing about" that relief. *Prudential*, 148 F.3d at 337-38. Putting aside whether the rule in *Prudential* should govern in the Ninth Circuit, the Court finds that, for the reasons already mentioned, class counsel was indeed a material factor in bringing about the parties' settlement. This is true regardless of whether class counsel parses out the precise contours of their contributions in their papers, as Amici urge them to do here. The other authority Amici relies on mostly consists of cases concerning causation generally. (*See* Amicus Br. at 4-5 (citing cases).) But because none of those cases speak directly to attorney fees, the Court finds them unpersuasive.

This Court's conclusion is consistent with a holistic approach to fees, and an understanding of what "rough justice" requires in this case. *See Fox v. Vice*, 563 U.S. 826, 838 (2011). In *Fox*, Justice Elena Kagan wrote, "[T]rial courts need not, and indeed should not, become green-eyeshade accountants. The essential goal . . . is to do rough justice, not to achieve auditing perfection." *Id.* (quoting *Hensley*, 461 U.S. at 437). Former Supreme Court Justice Sandra Day O'Connor, sitting by designation, echoed this view stating that "[t]he net result of fee-setting jurisprudence . . . is that the district courts must engage in an equitable inquiry of varying methodology while making a pretense of mathematical precision." *Arbor Hill Concerned Citizens Neighborhood Ass'n v. Cty. of Albany*, 522 F.3d 182, 189 (2d Cir. 2007) (O'Connor, J., sitting by designation, joining in the opinion) (citation omitted). This perhaps reflects the "growing trend that District Court judges should award fees based on an overall global understanding and review of a case, rather than on a tedious review of voluminous time entries and hourly rates." *Universal Elecs., Inc. v. Universal Remote Control, Inc.*, 130 F. Supp. 3d 1331, 1335 (C.D. Cal. 2015), *appeal dismissed* (Feb. 18, 2016).

In reaching its conclusions, the Court was assisted by perceptive comments made by Professor Brian T. Fitzpatrick in a filing by Plaintiffs. (*See generally* Decl. of Prof. Brian T. Fitzpatrick, Dkt. No. 294-3.)

In sum, the Court finds that class counsel is entitled to a reasonable attorney fee award of $34 million for their substantial work on this case and for the exceptional settlement ultimately reached. The Court thus GRANTS IN PART Plaintiffs' motion for attorney fees.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES – GENERAL

| Case No. | SAML 17-02797 AG (KESx) | Date | November 4, 2019 |
|---|---|---|---|
| Title | IN RE WELLS FARGO COLLATERAL PROTECTION INSURANCE LITIGATION | | |

4. **OTHER FUNDS**

Plaintiffs also seek $483,489.04 in litigation costs and $105,000 in class representative awards ($7,500 per class representative). The Court previously approved these amounts (including a higher amount for the litigation costs) at the preliminary approval stage. The Court affirms that conclusion here. The requested costs are fair and reasonable considering the nature and complexity of this case, as well as the expenses incurred prosecuting and settling this matter.

As for the class representative incentive award, it's a "fairly typical" feature of class action cases. *See Rodriguez*, 563 F.3d at 958. Such awards are discretionary and are "intended to compensate class representatives for work done on behalf of the class, to make up for financial or reputational risk undertaken in bringing the action." *Id.* at 958-59. Class counsel describes the class representatives here as participating actively and effectively, often investigating matters themselves, reviewing documents, and maintaining communication with counsel. (*See* Mot. for Fees at 25.) Further, as class counsel correctly points out, the class representatives "lent their names to the case[ ] so that they could help the millions of people who, like them, were adversely affected by Defendants' CPI program." (*Id.*) Thus, the requested $7,500 per class representative is appropriate here.

The Court APPROVES the requested costs and awards.

5. **DISPOSITION**

The Court GRANTS Plaintiffs' motion for final settlement approval. The Court GRANTS IN PART Plaintiffs' motion for fees. The Court will separately sign and enter Plaintiffs' proposed judgment dismissing this case. (*See* Proposed J., Dkt. No. 294-6.)

| | : | 0 |
|---|---|---|
| Initials of Preparer | mku | |